## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS
## AT KANSAS CITY, KANSAS

| | | |
|---|---|---|
| MAELLA BLALOCK, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 21-cv-2552-DDC-GEB |
| | ) | |
| vs. | ) | **ORAL HEARING REQUESTED** |
| | ) | |
| SRKBS HOTEL, LLC, NINAD SHARMA, | ) | |
| PARESH BHAKTA, SURENDRAKUMAR | ) | |
| BHAKTA, GEETA V. REDDY, RSD, LLC, | ) | |
| AND SEVJAYMAN, LLC. | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT SRKBS HOTEL, LLC, NINAD SHARMA, PARESH BHAKTA, SURENDRAKUMAR BHAKTA, GEETA V. REDDY, RSD, LLC, AND SEVJAYMAN, LLC'S MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1 of this Court, Defendant SRKBS Hotel, LLC, and Defendants Ninad Sharm, Paresh Bhakta, Surendrakumar Bhakta, Geeta V. Reddy, RSD, LLC, and Sevjayman, LLC hereby move this Honorable Court for Summary Judgment on all of Plaintiff's claims or, alternatively, for Partial Summary Judgment on certain parts of Plaintiff's claims herein. Defendants, together, provide this Brief in support of their Joint Motion for Summary Judgment.

## NATURE OF THE MATTER BEFORE THE COURT

The above-captioned matter is an action for personal injury filed by Maella Blalock (hereinafter referred to as "Plaintiff" and/or "Plaintiff Blalock") as the result of personal injury she sustained while staying as a guest at the Super 8 Motel in Wichita, Kansas. Plaintiff brings her negligence claim in Count I of her Amended Complaint, against Defendant SRKBS Hotel, LLC (hereinafter referred to as "Defendant SRKBS"), predicated upon a theory of premise liability. In Count II of her Amended Complaint, Plaintiff further alleges that the actions of Defendant SRKBS

were so wanton as to warrant the imposition of punitive damages. Alleging that Defendant SRKBS has the inability to pay an award of punitive damages rendered against it, Plaintiff seeks to pierce the corporate veil, allowing for a personal judgment to be rendered against the members of SRKBS Hotel, LLC: Ninad Sharm, Paresh Bhakta, Surendrakumar Bhakta, Geeta V. Reddy, RSD, LLC, and Sevjayman, LLC (hereinafter collectively referred to as "Individual Defendants.").

Before this Honorable Court is Defendants' Joint Motion for Summary Judgment, or, in the alternative, Defendants' Joint Motion for Partial Summary Judgment.

## NATURE OF RELIEF SOUGHT

Defendant SRKBS and the Individual Defendants bring before this Honorable Court their Motion for Summary Judgment, seeking relief from the Court on each of the Counts set forth in Plaintiff's Amended Complaint. Defendants respectfully request that this Court *grant* their Motion for Summary Judgment as it pertains to Counts I, II, and III of Plaintiff's Amended Complaint.

## DEFENDANT'S STATEMENT OF UNCONTROVERTED MATERIAL FACTS

1. SRKBS Hotel, LLC is a limited liability company, founded on October 4, 2016, organized under the laws of the State of Kansas, that is active and in good standing in the State of Kansas. Ex. 2, Shura Aff. ¶ 2-3.

2. SRKBS Hotel, LLC consists of the following Members: Ninad Sharma, Paresh Bhakta, Surendrakumar Bhakta, Geeta V. Reddy, RSD, LLC and Sevjayman, LLC. Ex. 2, Shura Aff. ¶ 5.

3. Sevjayman, LLC is a limited liability company organized under the laws of the State of Texas. Ex. 2, Shura Aff. ¶ 6.

4. The members of Sevjayman, LLC are AB Family Ltd. Partnership, Arti Patel, and Manubhai Bhakta. Ex. 2, Shura Aff. ¶ 7.

5. RSD, LLC is a limited liability company organized under the laws of the State of Kansas. Ex. 2, Shura Aff. ¶ 8.

6. The Members of RSD, LLC are Daksha Shura, Dhava Patel, Rahul Dhing, and Samir Shura. Ex. 2, Shura Aff. ¶ 9.

7. On June 20, 2020, a Super 8 Motel existed at 3741 N. Rock Road in Wichita, Kansas. Ex. 2, Shura Aff. ¶ 13.

8. The Super 8 Motel located at 3741 N. Rock Road in Wichita, Kansas was owned and operated by SRKBS Hotel, LLC since its purchase in January of 2017. Ex. 2, Shura Aff. ¶ 12, 21.

9. As of June 20, 2020, SRKBS Hotel, LLC was insured via a policy of insurance through Berkshire Hathaway GUARD Insurance Company, policy number SRBP193928, with a limit of liability of One Million Dollars and 0/100 ($1,000,000.00). Ex. 2, Shura Aff. ¶ 34.

10. As of June 20, 2020, SRKBS Hotel, LLC was insured via an umbrella policy of insurance in addition to and as excess to the primary coverage of the GUARD policy through Great American Alliance Insurance Company, policy number UM2664580, with a limit of liability of Ten Million Dollars and 0/100 ($10,000,000.00). Ex. 2, Shura Aff. ¶ 35.

11. During the ownership of the hotel by SRKBS Hotel, LLC, Mark Stark was the general manager. Ex. 2, Shura Aff. ¶ 14.

12. The day-to-day operation of the hotel was entrusted to Mark Stark in his role as general manager. Ex. 2, Shura Aff. ¶ 14.

13. The Super 8 Motel was classified as an economy hotel. Ex. 11, Mark Stark Dep. 18: 9-10, May 19, 2021.

14. Economy hotels can be described as value driven, with lower rates than other hotel classes. Ex. 11, Stark Dep. 18: 14-17.

15. On June 19, 2020, Maella Blalock was a guest of the Super 8 Motel. Ex. 3, Maella Blalock Dep. 30: 5-9, 17-18, May 4, 2021.

16. On June 19, 2020, Gregg Townsend was working as night auditor at the Super 8 Motel. Ex. 4, Gregg Townsend Dep. 8: 2-13, May 19, 2021.

17. At approximately midnight on June 19, 2020, Mr. Townsend rented a suite at the Motel to two females. Ex. 4, Townsend Dep. 12: 10-19, 13: 1-7.

18. Prior to renting the room, the individuals asked to see a floor plan of the room, which Mr. Townsend did not provide. Ex. 4, Townsend Dep. 12: 21-15, 19: 1-4.

19. The room rented to the two females was secured with a credit card. Ex. 4, Townsend Dep. 13: 1-7.

20. Mr. Townsend received a noise complaint from a motel guest, complaining of "noise and people trampling around in the halls." Ex. 4, Townsend Dep. 13: 8-15.

21. The Motel policy for the handling of noise complaints was as follows: (1) first, attempt to call the room; (2) second, go directly to the room; and (3) if that didn't work, call the police. Ex. 4, Townsend Dep. 39: 7-13.

22. Mr. Townsend knocked on the door of the suite and observed approximately thirty people in the room. Ex. 4, Townsend Dep. 14: 1-7.

23. Mr. Townsend informed the guests that they could not have a party at the Motel. Ex. 4, Townsend Dep. 14: 12-13.

24. The contact between Mr. Townsend and hotel guests was made at roughly 2:26 a.m. Ex. 5, Glenn Whisby Dep. 21: 9-17, August 15, 2023.

25. Following the warning of Mr. Townsend, the guests left the interior of the Motel, taking either the stairs or the elevator. Ex. 4, Townsend Dep. 14: 19-20.

26. Mr. Townsend took the elevator from the third floor to the second floor, to make sure no one was congregating on the second floor. Ex. 4, Townsend Dep. 15: 1-6.

27. Mr. Townsend took the elevator from the second floor to the first floor, to make sure that no one was congregating on the first floor. Ex. 4, Townsend Dep. 15: 1-6.

28. Mr. Townsend observed "a few" of the guests in the parking lot, and exited the building to tell them to leave. Ex. 4, Townsend Dep. 15: 3-6.

29. As Mr. Townsend walked to tell the individuals to leave the Motel parking lot, gunshots started. Ex. 4, Townsend Dep. 15: 7-13.

30. The gunfire in the parking lot started at roughly 2:33 a.m. Ex. 5, Whisby Dep. 21: 18-22.

31. No gunfire occurred inside the Super 8 Motel. Ex. 6, Steven Abasolo Dep. 45: 19-25, August 14, 2023.

32. Surveillance footage from the Motel shows an individual in a red shirt firing a firearm. Ex. 6, Abasolo Dep. 33: 16-23, 35:14-19, 36:13-20.

33. The identity of the individual in the red shirt is unknown. Ex. 6, Abasolo Dep. 41: 10-16.

34. The individual in the red shirt pointed his gun at Jaylen Thomas and Marion Norwood. Ex. 7, Paul Kimble Dep. 30: 3-11, Aug. 14, 2023.

35. At the time the gun was pointed at them, Jaylen Thomas and Marion Norwood were running towards the Comfort Inn parking lot. Ex. 7, Kimble Dep. 30: 3-11.

36. As the shooting was occurring, Jaylen and Marion were running. Ex. 7, Kimble Dep. 32: 13-17.

37. Wichita Police Sergeant Paul Kimble responded to the shooting incident at the Super 8 Motel. Ex. 7, Kimble Dep. 8: 11-24.

38. Wichita Police Officer Steven Abasolo responded to the shooting incident at the Super 8 Motel. Ex. 6, Abasolo Dep. 21: 25, 22: 1-2.

39. Wichita Police Officer Glen Whisby responded to the shooting incident at the Super 8 Motel. Ex. 5, Whisby Dep. 10: 22-25, 11: 1-3.

40. Wichita Police Officer Brendon Penner responded to the shooting incident at the Super 8 Motel. Ex. 8, Brendon Penner Dep. 7: 13-21, Aug. 15, 2023.

41. Wichita Police Officer Brian Malcolm responded to the shooting incident at the Super 8 Motel. Ex. 9, Brian Malcolm Dep. 16: 9-11, Aug. 14, 2023.

42. Wichita Police Officer Ryan Masethin responded to the shooting incident at the Super 8 Motel. Ex. 10, Ryan Masethin Dep. 9: 23-25, 10: 1-3, Aug. 15, 2023.

43. Bullet casings were found in the parking lot of the Super 8 Motel to the south of the building. Ex. 7, Kimble Dep. 14: 12-19.

44. The Super 8 Motel and the Comfort Inn and Suites have adjacent parking lots. Ex. 7, Kimble Dep. 14:20-22.

45. Bullet casings in the parking lot of the Super 8 Motel were found in the area closest to where the parking lot of the Super 8 Motel and the Comfort Inn and Suites intersect. Ex. 7, Kimble Dep. 14: 23-25, 15: 1-5.

46. Bullet casings can travel several feet to the left or the right of the location of where the gun is fired. Ex. 7, Kimble Dep. 33: 14-25, 34: 1-6.

47. The parking lot of the Super 8 Motel is adjacent to the parking lot of the Comfort Inn and Suites. Ex. 7, Kimble Dep. 37: 16-25, 38: 1-6.

48. Sergeant Kimble of the Wichita Police Department testified that it was possible that shots were fired from the parking lot of the Comfort Inn and Suites. Ex. 7, Kimble Dep. 36: 22-25, 37:1-15.

49. The police investigation revealed that the shots were fired following a verbal altercation between the unknown individual and Marion Norwood and Jaylen Thomas. Ex. 6, Abasolo Dep. 37: 11-16.

50. The unknown individual, Marion Norwood, and Jaylen Thomas were each present at the party at the Super 8 Motel. Ex. 6, Abasolo Dep. 55:7-13. Ex. 7, Kimble Dep. 43:1-4.

51. The police investigation revealed that the shooting event appeared to be the result of an argument between the unknown individual, Marion Norwood and Jaylen Thomas. Ex. 6, Abasolo Dep. 42: 19-24, 43: 6-12. Ex. 7, Kimble Dep. 43: 5-15.

52. The police investigation revealed that the gunfire exchanged with intended for the individuals involved in the altercation. Ex. 6, Abasolo Dep. 44:11-16. Ex. 7, Kimble Dep. 46:2-4.

53. The police investigation revealed that the incident at the Super 8 Motel was not a random shooting. Ex. 6, Abasolo Dep. 33: 11-24.

54. The police investigation revealed that the incident at the Super 8 Motel was a targeted event. Ex. 7, Kimble Dep. 50: 8-20.

55. There has been no conclusion drawn by the Wichita Police Department as to what gun was used to shoot Maella Blalock. Ex. 7, Kimble Dep. 24: 22-25, 35: 1-15.

56. The identity of the individual who shot Maella Blalock is unknown. Ex. 7, Kimble Dep. 25: 21-23.

57. The exact location of the individual who shot Maella Blalock at the time the gun was fired is unknown. Ex. 7, Kimble Dep. 35: 16-25, 36: 1.

58. Staff at the Super 8 Motel utilized a do-not-rent list for individuals to whom they would not rent rooms. Ex. 11, Stark Dep. 22: 19-23.

59. Prior to June 2020, night auditor Gregg Townsend was unaware of any violence on the property, including assaults or individuals being "beat up or hurt." Ex. 4, Townsend Dep. 23: 7-10.

60. Prior to June 20, 2020, housekeeping staff made no reports of finding firearms on the property. Ex. 13, Erika Luna Dep. 13: 3-4, May 19, 2021. Ex. 12, Teresa Malone Dep. 25: 15-25, May 19, 2021.

61. Prior to June 20, 2020, housekeeping staff made no reports of suspicion of gang activity on the property. Ex. 13, Luna Dep. 14: 21-24.

62. Prior to June 20, 2020, housekeeping staff made no reports of guests wearing red hats or red bandanas. Ex. 13, Luna Dep. 16: 5-12.

63. Prior to June 20, 2020, housekeeping staff made no reports of drug activity on the property, with the exception of "occasionally" finding supposed drug paraphernalia. Luna Dep. 16: 15-20. Ex. 13, Luna Dep. 21: 14-20.

64. Prior to June 20, 2020, housekeeping staff made no reports of prostitution on the property. Ex. 13, Luna Dep. 16: 21-24.

65. Teresa Malone, employee of SRKBS Hotel, LLC stated that she had no proof of prostitution on the property. Ex. 12, T. Malone Dep. 19: 12-14, 22: 11-19.

66. James Wissinger, employee of SRKBS Hotel, LLC stated that any indication that there was prostitution on the property was a suspicion, and that he could not say for sure. Ex. 16, James Wissinger Dep. 16: 6-10, July, 16, 2022.

67. Teresa Malone, employee of SRKBS Hotel, LLC testified that her only concern with the property involved domestic violence incidents at the Motel. Ex. 12, T. Malone Dep. 25: 9-14.

68. Prior to the incident in question, and during the ownership of the Super 8 Motel by SRKBS Hotel, LLC, there were no shootings on the property. Ex. 14, Ryan Snyder Dep. 30: 4-11, May 26, 2023. Ex. 18, Letter from Wichita Police Department, June 1, 2021.

69. In 2019, there were twenty-three police reports generated in connection with the subject property. Ex. 32, Report of Timothy Zehring, pg. 70.

70. In 2020, there were twelve police reports generated in connection with the subject property prior to June 20. Ex. 32, Report of Timothy Zehring, pg. 71.

71. Between June 2018 and June 2020, the Wichita Police Department made eleven (11) reports of battery at 3741 N. Rock Road, i.e. the Super 8 Motel. Ex. 18, Wichita Police Letter.

72. Domestic violence is an offense described as an argument, physical or verbal, between two intimate partners including husband and wife, dating relationship, or roommates. Ex. 8, Penner Dep. 12: 22-25.

73. Kansas Standard Offense Report 18C047107 has a description of "simple battery." Ex. 19.

74. The narrative portion contained in Report 18C047107 describes a physical altercation in the lobby of the Super 8 Motel. Ex. 19.

75. Kansas Standard Offense Report 19C053858 has a description of "aggravated battery/DV." Ex. 20.

76. The narrative portion contained in Report 19C053858 describes an argument between a boyfriend and girlfriend wherein the girlfriend cut her boyfriend with a knife. Ex. 20.

77. Kansas Standard Offense Report 18C062612 has a description of "simple battery." Ex. 21.

78. The narrative portion contained in Report 18C062612 describes an altercation in the parking lot of the Super 8 amongst individuals who knew one another, in the midst of a custody drop-off. Ex. 21.

79. Kansas Standard Offense Report 18C063284 has a description of "simple battery/DV". Ex. 22.

80. Kansas Standard Offense Report 19C005518 has a description of "aggravated battery/DV." Ex. 22.

81. The narrative portion contained in Report 19C005518 describes a "disturbance" between a woman and her boyfriend. Ex. 23

82. Kansas Standard Offense Report 19C040349 has a description of "simple battery/DV." Ex. 24.

83. The narrative portion contained in Report 19C040349 describes an argument between a girlfriend and boyfriend that resulted in the girlfriend punching and slapping her boyfriend. Ex. 24.

84. Kansas Standard Offense Report 19C043297 has a description of "simple battery/DV." Ex. 25.

85. The narrative portion contained in Report 19C043297 describes an incident wherein a woman at the hotel was "beat up" by her boyfriend. Ex. 25.

86. Kansas Standard Offense Report 19C047611 has a description of "simple battery/DV." Ex. 26.

87. The narrative portion contained in Report 19C047611 describes an incident wherein a wife struck her husband multiple times in the head with her phone because he went to a music festival. Ex. 26.

88. Kansas Standard Offense Report 19C047770 has a description of "simple battery." Ex. 27.

89. The narrative portion contained in Report 19C047770 describes a physical altercation between a mother and her minor son. Ex. 27.

90. Kansas Standard Offense Report 20C016209 has a description of "simple battery/DV." Ex. 28.

91. The narrative portion contained in Report 20C016209 describes an argument wherein a wife was hit in the face by a door during an argument with her husband. Ex. 28.

92. Kansas Standard Offense Report 20C025932 has a description of "simple battery/DV." Ex. 29.

93. The narrative portion contained in Report 20C025932 describes an incident wherein a hotel guest pushed an employee of the Motel, after being told that he could not use the window of his Motel room as a door. Ex. 29.

94. Between June 2018 and June 2020, the Wichita Police Department made one (1) report of simple assault at 3741 N. Rock Road, i.e. the Super 8 Motel. Ex. 18, Wichita Police Letter.

95. Kansas Standard Offense Report 19C010527 has a description of "assault/DV." Ex. 8, Penner Dep. 20: 11-15. Ex. 30.

96. The narrative portion contained in Report 19C010527 describes a disturbance between an intoxicated woman and her boyfriend, wherein she claims he "swung" at her. Ex. 8, Penner Dep. 21: 5-25, 22: 1-6. Ex. 30.

97. Between June 2018 and June 2020, the Wichita Police Department made one (1) report of fighting/DV at 3741 N. Rock Road, i.e. the Super 8 Motel. Ex. 18, Wichita Police Letter.

98. Kansas Standard Offense Report 20C021639 has a description of "fighting/DV." Ex. 8, Penner Dep. 30: 3-7. Ex. 31.

99. The narrative portion contained in Report 20C021639 describes a fight in the lobby of the Super 8 Motel between a girlfriend and a boyfriend. Ex. 8, Penner Dep. 30: 16-20. Ex. 31.

100. Police officers use a number of factors in determining if someone is a member of a gang, including tattoos, the flashing of gang signs, and association with other gang members. Ex. 7, Kimble Dep. 26: 2-14.

101. It is not easily discernible for a member of the general public to determine if an individual is associated with a gang. Ex. 6, Abasolo Dep. 14: 9-20.

102. The Wichita Police Department does not issue lists of known gang members to business owners or the general public. Ex. 7, Kimble Dep. 28: 15-19.

103. At the time of its inception, the Members of SRKBS Hotel, LLC executed the Limited Liability Company Operating Agreement for SRKBS Hotel, LLC. Ex. 2, Shura Aff. ¶ 10. Ex. 38, Operating Agreement.

104. At that time, the Members of SRKBS Hotel, LLC voted on the election of Managers, pursuant to the terms of the Operating Agreement. The Members' votes were recorded and, together with a list of the Managers elected, attached to the Operating Agreement. Ex. 2, Shura Aff. ¶ 10. Ex. 38, Operating Agreement, p. 7.

105. At the time of SRKBS Hotel, LLC's inception, the Members made initial capital contributions totaling Seven Hundred Two Thousand Dollars and 0/100 ($702,000.00). Ex. 2, Shura Aff. ¶ 11. Ex. 38, Operating Agreement, p. 9.

106. On November 23, 2021, a Purchase and Sale Agreement was entered into by SRKBS Hotel, LLC and Five Star Hotels, LLC. A First Amendment to the Purchase and Sale Agreement was signed on January 12, 2022. Ex. 2, Shura Aff. ¶ 20.

107. After deducting the costs of sale, real estate tax payments, and loan payoff, SRKBS Hotel, LLC received a total of One Million One Hundred Forty One Thousand Four Hundred and Twenty Six Dollars and 44/100 ($1,141,426.44) from the sale of the Motel. Ex. 2, Shura Aff. ¶ 23.

108. A portion of the proceeds of the sale was distributed among the Members of SRKBS Hotel, LLC, in accordance with the terms of SRKBS Hotel, LLC's Operating Agreement. Ex. 2, Shura Aff. ¶ 24.

109. A portion of the proceeds of the sale was held back to satisfy obligations or expenses of SRKBS Hotel, LLC. Ex. 34, Surendrakumar Bhakta Dep. 46: 22-24, Vol. II, June 12, 2023. Ex.

35, Akash Bhakta Dep. 29: 19-25, 30: 1-2, June 26, 2023. Ex. 37, Geeta V. Reddy Dep. 9: 22-25, 10: 1-14, June 12, 2023.

110. As of the date of this filing, SRKBS Hotel, LLC has cash assets in the amount of Two Hundred Four Thousand Nine Hundred and Eighteen Dollars and 87/100 ($204,918.87) in its corporate checking account at Legacy Bank. Ex. 2, Shura Aff. ¶ 36.

111. The sale of the Motel was made in the regular course and scope of business, as the intention of SRKBS Hotel, LLC's Members was *always,* from the date of inception, to use the Super 8 Motel as a part of an investment portfolio; not as a long-term business venture. Ex. 2, Shura Aff. ¶ 25. Ex. 33, Surendrakumar Bhakta Vol. I Dep. 19: 8-11, May 12, 2023. Ex. 36, Ninad Sharma Dep. 13: 19-25, 14: 1, May 15, 2023.

112. The sale of the Motel was in no way made to intentionally avoid liability in this lawsuit, or to deny Plaintiff a remedy at law. Ex. 2, Shura Aff. ¶ 26.

113. Prior to June 20, 2020, the Members had already decided to sell the Motel. Ex. 35, A. Bhakta Dep. 12: 9-23. Ex. 37, Reddy Dep. 8: 21-23.

114. The Motel was placed on the market for sale in 2019, and was not able to be sold due to the impact of COVID-19 on the hotel industry. Ex. 35, A. Bhakta Dep. 12: 9-23.

115. At all times since SRKBS Hotel, LLC's inception, bank and checking accounts belonging to SRKBS Hotel LLC were kept separate from bank and checking accounts belonging to the Members or any other business. Ex. 2, Shura Aff. ¶ 27. Ex. 36, Sharma Dep. 26: 1-3. Ex. 34, S. Bhakta Vol. II Dep. 48: 12-13.

116. At all times since SRKBS Hotel, LLC's inception, the Managers of SRKBS Hotel, LLC have maintained all company records that are required to be kept under SRKBS Hotel, LLC's Operating Agreement. Ex. 2, Shura Aff. ¶ 28.

117. At all times since SRKBS Hotel, LLC's inception, financial statements for SRKBS Hotel, LLC have been prepared and maintained as required by SRKBS Hotel, LLC's Operating Agreement. Ex. 2, Shura Aff. ¶ 29.

118. At all times since SRKBS Hotel, LLC's inception, federal and Kansas income tax returns have been prepared and filed on behalf of SRKBS Hotel, LLC each year. Copies of such tax returns have been maintained as required by SRKBS Hotel, LLC's Operating Agreement. Ex. 2, Shura Aff. ¶ 30.

119. At all times since SRKBS Hotel, LLC's inception, corporate funds belonging to SRKBS Hotel, LLC have been used solely for SRKBS Hotel, LLC's business operations and expenses. Corporate funds were never taken or used by the Members for personal or any other use. Ex. 2, Shura Aff. ¶ 31.

120. During the operation of the Super 8 Motel, SRKBS Hotel, LLC's Members received payments from SRKBS Hotel, LLC's profits, in accordance with the terms of SRKBS Hotel, LLC's Operating Agreement. Ex. 2, Shura Aff. ¶ 32.

121. At all times since SRKBS Hotel, LLC's inception, the books and records of SRKBS Hotel, LLC were prepared and maintained by a Certified Public Accountant on behalf of SRKBS Hotel, LLC. Ex. 36, Sharma Dep. 7: 2-6, 13: 1-3.

122. At all times since SRKBS Hotel, LLC's inception, the books, records, and corporate funds and expenses of SRKBS Hotel, LLC were kept separate from the books, records, funds and expenses of any of the Members or any other business. Ex. 36, Sharma Dep. 24: 24-25, 25: 1-11. Ex. 34, S. Bhakta Vol. II Dep. 48: 7-11.

123. At all times since SRKBS Hotel, LLC's inception, SRKBS Hotel, LLC was not used as a façade for operation of any other business purposes, but rather as a functioning business operation for purposes of investment. Ex. 2, Shura Aff. ¶ 33.

124. During the operation of the Super 8 Motel, SRKBS Hotel, LLC's Managing Members all met via telephone calls approximately two (2) to three (3) times per month. Ex. 34, S. Bhakta Vol. II Dep. 45: 17-24. Ex. 37, Reddy Dep. 17: 3-13.

125. During the operation of the Super 8 Motel, SRKBS Hotel, LLC's Managing Members all met in person at least annually. Ex. 34, S. Bhakta Vol. II Dep. 45: 25, 46: 1-2. Ex. 37, Reddy Dep. 17: 23-25, 18: 1.

126. Prior to the formation of SRKBS Hotel, LLC, each of the individual Members, as well as Samir Shura, registered agent, were connected with one another by familial connections and/or friendship. Ex. 36, Sharma Dep. 13: 4-13. Ex. 33, S. Bhakta Vol. I Dep. 19: 1-4. Ex. 37, Reddy Dep. 17: 14-17. Ex. 35, A. Bhakta Dep. 7: 13-16.

## SUMMATION OF FACTS

The Super 8 Motel located at 3741 N. Rock Road in Wichita, Kansas was owned, at all relevant times hereto, by SRKBS Hotel, LLC. Facts ¶ 8. The limited liability company was formed in 2016, just prior to purchase of the land located on N. Rock Road, and the accompanying hotel. Facts¶ 1, 8. The Members of SRKBS Hotel, LLC are Ninad Sharma, Surendrakumar Bhakta, Paresh Bhakta, Geeta V. Reddy, RSD, LLC and Sevjayman, LLC. Facts¶ 2. Prior to the formation of the LLC, each of the individual Members, as well as Samir Shura, registered agent, were connected with one another, both by familial connections and/or friendship. Facts¶ 126. The Motel, at the time of purchase, was acquired as an investment property for the Members. Facts¶ 111.

On June 19, 2020, Plaintiff was a guest at the Super 8 Motel. Facts¶ 15. That evening, Gregg Townsend was working as the night auditor at the Motel. Facts¶ 16. Between 11:30 p.m. and 12:00 p.m., Mr. Townsend was approached in the lobby of the Motel by two females, who inquired about renting a room at the Motel. Facts¶ 17. After asking to see a floor plan of the room, which Mr. Townsend did not provide, the room was secured with a credit card, and rented. Facts¶

18, 19. In the early morning hours of June 20, 2020, Mr. Townsend received a telephone call from another guest of the motel, who complained of "noise and people trampling around in the halls." Facts¶ 20. He testified that the Motel's policy for handling noise complaints included attempting to call the room first. Facts¶ 21. If that did not work, the employee was directed to go to the room to speak with the occupants. Facts¶ 21. If the occupants would not answer the door or otherwise cooperate, the police should be called. Facts¶ 21. Mr. Townsend went to the girls' room at approximately 2:26 a.m. Facts¶ 22, 24. Upon arrival, he observed roughly thirty (30) individuals in the room. Facts¶ 23. In speaking to the female guests who had rented the room, he explained that they could not have a party of the Motel, and instructed everyone other than the registered guests to leave. Facts¶ 23. Following this exchange, Mr. Townsend noted that the guests left the interior of the Motel by either the stairs or the elevator. Facts¶ 25. In order to verify that the guests had left, Mr. Townsend then took the elevator from the third floor of the hotel to the second floor of the hotel, and from the second floor of the hotel to the first floor of the hotel. Facts¶ 26, 27. Upon arriving on the first floor, he noted that partygoers were still congregating on the exterior of the hotel, in the parking lot. Facts ¶ 28. He exited the building to tell the individuals to leave the property, but as he approached, gun shots rang out. Facts ¶ 28, 29.

The gunfire described by Mr. Townsend started at approximately 2:33 a.m., roughly seven (7) minutes after he asked the partygoers to vacate the property. Facts ¶ 30. The individuals involved in the altercation were congregated at the south side of the Motel 8. Surveillance footage from the property shows an unknown individual (hereinafter referred to as "shooter") in a red long-sleeve shirt engaging in a verbal altercation with two other individuals. Facts ¶ 49, 51. The shooter then can be shown directing a firearm at those individuals, who were later identified as Jaylen Thomas and Marion Norwood. Facts ¶ 34. While being shot at, and returning fire, Mr. Thomas

and Mr. Norwood were towards the Comfort Inn and Suites parking lot, which is adjacent to the designated parking for the Super 8 Motel. Facts ¶ 35, 36, 44.

Wichita Police Department Officers Steven Abasolo, Glen Whisby, Brendon Penner, Brian Malcolm, Ryan Masethin, along with Sergeant Paul Kimble, reported to the scene of the incident in the early morning hours of June 20, 2020. Facts ¶ 37-42. Upon arrival, it was determined that Maella Blalock was struck, while sleeping, by a bullet that had permeated her Motel wall. Plaintiff suffered gunshot wounds to the feet, which were treated non-surgically. During the course of the investigation, it was determined that shots were fired following a verbal altercation between the individuals outlined above, each of whom were present at the party inside the Motel. Facts ¶ 49-51. Police confirmed that this was a targeted event, with the gunfire exchanged being *intended for* the ultimate recipients. Facts ¶ 52-54. Bullet casings from the incident were located in the southern portion of the Super 8 parking lot. Facts ¶ 43. Testimony rendered by the officers involved revealed that bullet casings can travel several feet to the left or the right of the location where a gun is fired. Facts ¶ 46. Because the parking lot of the Super 8 is adjacent to the parking lot of the Comfort Inn, Sergeant Kimble testified that it *was* possible that at the time the shots were fired, the shooter was not on property owned by the Super 8. Facts ¶ 45, 47-48. As of the date of the officers' depositions, which took place August 14-15, 2023, the identity of the shooter who injured Maella Blalock remains unknown. Facts ¶ 56. Likewise, there has been no conclusion drawn as to what gun was used to shoot Maella Blalock. Facts ¶ 55. No arrests have been made, and no convictions have been secured. Notably, as part of this lawsuit, there has been no effort on part of the Plaintiff to depose either Jalen Thomas or Marion Norwood, nor are they parties to the suit.

In the two years preceding the shooting at the Super 8 Motel, there were no other shooting events at the property. Facts ¶ 68. During that same time period, and in regard to crimes against persons, Wichita Police reported to the property for calls related to "battery" on eleven (11)

occasions. Facts ¶ 71. In response to those calls, the following police reports were generated: 18C047107, 19C053858, 18C062612, 18C063284, 19C005518, 19C040349, 19C043297, 19C047611, 19C047770, 20C016209, and 20C025932. Facts ¶ 72-93. Of those, eight of the reports included an additional description of domestic violence, which can be described as an argument, physical or verbal, between two intimate partners including spouses, roommates, or any two individuals engaged in a dating relationship. Facts ¶ 72-93. The three remaining reports included an incident between a mother and son, an altercation in the parking lot over a custody exchange, and an incident between two guests in the lobby of the hotel. Facts ¶ 72-93. Wichita Police reported to the property during that same period on one occasion for "fighting", generating police report 20C021639. Facts ¶ 97-99. That call also had a designation of domestic violence. Facts ¶ 98. Likewise, Wichita Police responded to a singular call for "assault" during that time period, again for domestic violence, generating police report 19C010527. Facts ¶ 94-96. Of the reports described herein, there were *no crimes* committed against *individual persons* by *individuals unknown to them* that resulted in bodily injury. Facts ¶ 71-99. In total, in the years 2019 and 2020, the Wichita Police made a total of thirty-five (35) reports in connection with the Super 8 Motel, which, notably, operated on a 24-hour basis. Facts ¶ 69-70.

Throughout the course of the litigation, several employees of Defendant SRKBS were deposed. Mark Stark testified that employees utilized a "do-not-rent" list for unwelcome guests, or those guests suspected of criminal activity. Facts ¶ 58. Gregg Townsend, night auditor, could not recall any instances of violence on the property, including but not limited to any instances wherein an individual was "beat up or hurt." Facts ¶ 59. Erika Luna, housekeeper, testified that she was unaware of any reports by her staff of prostitution on the property, firearms in guests' rooms, or suspicions of gang activity. Facts ¶ 60-23, 64. Though Ms. Luna conceded that housekeeping staff would "occasionally" find drug paraphernalia, she also testified that she was

not aware of any "drug activity," at the Motel itself. Facts ¶ 63. Teresa Malone, who worked at the front desk of the Motel, stated that she had suspicions of prostitution by certain guests, but qualified that statement as an opinion, not fact. Facts ¶ 65. James Wissinger, a maintenance employee on the property, also testified as to his suspicions regarding prostitution, but noted that with regard to that statement, he "could not say for sure."   Facts ¶ 66.

The claim at issue in this suit was originally filed in Kansas State Court in September of 2020. The matter was subsequently dismissed and thereafter was refiled in this Honorable Court on November 24, 2021 on the basis of diversity jurisdiction. Prior to the refiling of the suit in Federal Court, the members of SRKBS Hotel, LLC determined that it was in their best interest to sell the business. Facts ¶ 106. This decision was based upon the fact that the property and motel had always been viewed by the members as an investment property. Facts ¶ 111. As a result, the sale of the property and accompanying motel was agreed to by all members, and the contract of sale was executed by registered agent Samir Shura on November 23, 2021. Facts ¶ 106.

## ARGUMENT

### A. <u>Standard of Review</u>

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *See* Fed.R.Civ.P. 56(a); *accord Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Vitkus v. Beatrice Co.,* 11 F.3d 1535, 1538–39 (10th Cir.1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. A "genuine" factual dispute requires more than a mere scintilla of evidence. *Id.* at 252, 106 S.Ct. 2505.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hicks v. City of Watonga,* 942 F.2d 737, 743 (10th Cir.1991). Once the moving party meets its burden, the burden shifts to the nonmoving parties to demonstrate that genuine issues remain for trial as to those dispositive matters for which they carry the burden of proof. *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.,* 912 F.2d 1238, 1241 (10th Cir.1990); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir.1991). The nonmoving parties may not rest on their pleadings but must set forth specific facts. *Applied Genetics,* 912 F.2d at 1241.

Summary judgment may be granted if the nonmoving parties' evidence is merely colorable or is not significantly probative. *Anderson,* 477 U.S. at 250–51, 106 S.Ct. 2505. "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir.1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S. Ct. 2505.

**B.  <u>Plaintiff Does Not Have a Submissible Case of Negligence Against Defendant SRKBS Hotel, LLC.</u>**

> 1. **Plaintiff Has Not Established that the Shooting Incident of June 20, 2020 was Foreseeable.**

To establish a prima facie case of negligence under Kansas law, Plaintiff must establish (1) the existence of a legal duty owed by the defendant to the plaintiff, (2) a breach of that legal duty,

(3) that the breach of that legal duty was the proximate cause of the plaintiff's injury, and (4) that the plaintiff sustained damages. *Jewett v. Miller,* 46 Kan. App. 2d 346, 350 (2011). Generally speaking, under Kansas law, a person has *no duty* to control the conduct of a third person. *D.W. Richard and Carol Bliss,* 279 Kan. 726, 732 (2005). However, a duty may be created wherein a special relationship exists, like that between an innkeeper and its guests. Restatement (Second) of Torts §314A(2)(1964). In regard to criminal acts on the property, Kansas Courts have stated that this protection applies within the State in those situations wherein the innkeeper "has reason to anticipate such an assault and fails to exercise reasonable care to forestall or prevent the same." *Gould v. Taco Bell,* 239 Kan. 564, 567 (1986). Thus, the issue before this Court on the Motion for Summary Judgment is whether the incident of June 20, 2020 was so foreseeable as to create a *duty* on behalf of the hotel. If, and only if, that duty exists, can the Plaintiff survive a Motion for Summary Judgment.

In Kansas, the test for the foreseeability of criminal acts of third parties is based upon a inquiry as to the totality of circumstances. *Betsy Seibert v. Vic Regnier Builders, Inc.*, 253 Kan. 540, 549 (1993). While this test allows for a broader analysis than looking *only at prior similar incidents,* in adopting the same, the Supreme Court cautioned that the circumstances considered *must have* a "direct relationship to the harm incurred in regard to foreseeability." *Id.* That is, there must be some connection between the circumstances considered and the actual event itself. In explaining the application of the rule, the Court in *Seibert* pointed to the analysis contained in the case captioned *Isaacs v. Huntington Memorial Hospital,* 38 Cal. 3d 112, 211 Cal. Rptr. 356, 695 P.2d 653 (1985). There, the scene of the crime was a physicians' parking lot at a major hospital in a high crime area. *Siebert*, 253 Kan. at 549 (citing *Isaacs*, 38 Cal. 3d at 130-131). Numerous crimes had occurred at the nearby emergency room parking area where security guards were employed. *Id*. Like most hospitals, the emergency department was open 24-hours a day, and served

individuals from all walks of life. *Id*. In *Isaac,* the plaintiff, a physician, was shot by an assailant near his car in the physicians' lot. *Id*. Despite the fact that there had been no prior incidents in this particular lot, the California Supreme Court rejected the prior similar incidents rule and embraced the totality of the circumstances test for foreseeability. *Id.* In essence, the California court held that because the lot was in a high crime area and directly adjacent to the emergency room parking lot where violent behavior was known to be a common occurrence requiring security, the fact that no prior incidents had occurred in the physicians' lot could not be the only factor considered. *Id.* From there, and via *Seibert*, the "totality of the circumstances" test was adopted in Kansas.

The fact pattern in *Seibert* is instructive. There, plaintiff was a passenger in an automobile owned by her friend, who was driving Ms. Seibert to the Ranch Mart Shopping Center. *Seibert*, 253 Kan. at 541. Once the women arrived at the subterranean parking garage, they were robbed by two assailants. *Id*. During the struggle, Ms. Seibert screamed and dropped or threw a can of soda at one of the robbers, who in turn, shot her in the head. *Id*. at 542. Thereafter, suit was brought against the owner of the shopping center, based upon the proposition that the crime was foreseeable. *Id*. Plaintiff based her claim against the shopping center owner on the fact that the defendant owed a duty to provide security in the garage, which contained no warning signs, video surveillance, or security guards. *Id*. Plaintiff further argued that the garage had inadequate lighting given its design as an underground structure. *Id*. The district court granted summary judgment in favor of the defendant owner. *Id*. Though the Court in Seibert *remanded the case*, it did so only so as to direct the district court to base its analysis on the totality of the circumstances, noting that factors to be considered should be adequate lighting and whether the garage was in a high crime area, in addition to, prior incidents on the property. *Id.*at 550. Taking direction from the Court in *Siebert*, then, Defendants respectfully argue that this Court must take into consideration *only* those

factors that have a direct relationship to the harm incurred by the Plaintiff – namely, prior violent incidents on the property and/or gang activity on the property.

Following the *Seibert* ruling, the Kansas Supreme Court in *Gragg v. Wichita State Univ.,* 261 Kan. 1037, 934 P.2d 121 (1997), explained the definition of foreseeability. In doing so, the court defined the concept as follows:

> Foreseeability, for the purpose of proving negligence, is defined as a common-sense perception of the risks involved in certain situations and includes whatever is likely enough to happen that a reasonably prudent person would take it into account. An injury is foreseeable so as to give rise to a duty of care where a defendant knows or reasonably should know that an action or failure to act will result in harm.

*Id. at* 1056.

In this case, an analysis as to the totality of the circumstances undoubtedly begins with the previously-used test of prior similar incidents. To that end, Plaintiff cannot establish that prior criminal incidents on the property gave notice to the Motel owners of the potential for an altercation in the parking lot. Regrettably, "it is sad commentary on our times that there is probably no shopping center parking lot that is likely to be crime free." *Seibert,* 253 Kan. 540, 549. Likewise, "thefts of vehicles and from vehicles do occur, as well as purse snatches, etc. It is only where the frequency and severity of criminal conduct substantially exceed the norm, that liability should be imposed." *Id.* To date, there has been *no evidence* set forth in the case to show that any of the crimes on the property were committed by the same persons, or against the same individuals. Instead, like in *Seibert,* the prior criminal acts at the Super 8 occurred against different persons by presumably different attackers at different times and in different areas of the Motel. *See generally,* Facts ¶ 68-99. Plaintiff's expert Timothy Zehring neatly identified the crimes that occurred on the property in 2019 and 2020, including in that analysis the time parameters for each crime. Facts ¶ 69-70. As noted more fully above, in 2020, there were a total of twenty-three (23) reports generated – including both crimes against persons, crimes against property, and victimless crimes. Facts ¶

69. Of those, only six reports involved the crime of "battery." Facts ¶ 71-93. Of those six reports, five were further classified as "domestic violence." Facts ¶ 71-93. In the singular report without the DV notation, the narrative section explains that the altercation involved a mother and her fourteen-year-old son. Facts ¶ 88-89. In 2020, there were twelve (12) reports generated. Facts ¶ 70. Of those, only two involved the crime of battery, with one report containing a classification of "domestic violence." Facts ¶ 71-93. With regard to the report that did not have a DV notation, the narrative portion states that a hotel guest pushed employee Jordan Malone after he was told by Teresa Malone to stop passing suitcases through the window. Facts ¶ 92-93. Mr. Malone suffered no injuries. Notably, in each of the eight reports of "battery" on the property in 2019 and 2020, none of the reports reference use of a firearm. Facts ¶ 71-93. Only one of the eight reports involve individuals unknown to one another. Facts ¶ 71-93. In essence, any crimes against persons occurring on the property in 2019 and 2020 were *interpersonal crimes* between persons who knew one another. Notably, Defendants direct the Court to the expert report of ***Plaintiff's own*** expert witness. Therein, Mr. Zehring states as follows:

> Reports of child abuse and domestic violence are generally not considered to be a foreseeability factor regarding the risk of crimes at a hotel property. An exception would be drug users and abusers that reasonably known to be under the influence of drugs or alcohol, making them predictably unstable and a high-risk.

See Ex. 32, Report of Timothy Zehring, pg. 71. To date, no evidence has been elicited by the Plaintiff to suggest that any of the individuals identified in the seven reports referenced above were drug users or abusers reasonably known to be under the influence of drugs or alcohol, and therefore, by the account of Plaintiff's *own endorsed expert*, those police reports do not factor into a foreseeability analysis. For that reason, reference to prior incidents on the property must fail by virtue of Plaintiff's own case-in-chief.

Likewise, Plaintiff cannot show that the Defendants had notice of gang activity on the property. Testimony elicited from responding officers suggested that two of the individuals

involved in the shooting – namely, Jaylen Thomas and Marion Thomas, were gang-affiliated. Thus, the question becomes whether the owners knew or could have known that gang activity occurred on the property. The answer to that question, in short, is that they could not. At this juncture, it is worth noting that the only testimony in the case regarding gang activity comes from James Wissinger, maintenance personnel, who, parenthetically, has no qualifications necessary to render an opinion in the realm of law enforcement. To that end, Mr. Wissinger testified as follows, when asked if any hotel guests were "gangbangers,":

> Q:    Did you ever see anybody on the property that looked like gangbangers?
> A:    Yeah, of course I did. You know, there was some – some shady-looking people coming through there every now and then.
> Q:    Tell me what you mean by that.
> A:    just looked strung out, tattooed all over, you know, and dirty and – you know, just – I don't know. Tattoos all over their faces and gang signs and – you know.

Dep. of James Wissinger, Pg. 24: 8-20. Despite this testimony from Mr. Wissinger, which is based solely on speculation based on appearance, officers from the Wichita Police Department testified that identifying a gang member is not, in fact, easy. Facts ¶ 100-102. Instead, Officer Abasolo, who has specialized training in gang activity, testified that it is not easily discernible for a member of the general public to determine if an individual is associated with a gang. Facts ¶ 101. Officer Abasolo testified as follows:

> Q:    So if you are a member of the general public that has no training in gangs, would it be easily discernable to determine if someone is a member of either the Crips or the Bloods?
> A:    No.
> Q:    Would you expect that a lay person would be able to identify a member of either the Crips or the Bloods just by eyesight?
> A:    No.

Ex. 6, Abasolo Dep., Pg.: 14: 9-20. Sergeant Kimble echoed those sentiments, stating that he could not tell, from a photograph alone, if an individual was a member of a gang. Stating that "a lot of things go into determining if someone is in a gang", Officer Kimble testified that some factors to consider include tattoos, the flashing of gang signs, and association with other gang members.

Facts ¶ 100. The Wichita Police Department does not issue lists of known gang members to business owners or the general public, making it difficult for business owners to make such a determination without passing judgment on appearance. Facts ¶ 102. Officer Whisby testified on that subject. Specifically, in regard to the topic of identifying gang members, Officer Whisby testified as follows:

> Q:    Mr. Wilson asked you some questions about whether people wearing a certain color could be an indicator of gang affiliation, correct?
> A:    Correct.
> Q:    And you answered that it could be; right?
> A:    Yes, it could be.
> Q:    As a police officer is that something that you are trained to look for?
> A:    Yes, and other signs?
> Q:    And I guess my question is, do you agree with me that as a general proposition, we do not want businesses looking at any individual in a certain color and assuming they are a member of a gang?
> A:    Correct, yes.

Ex. 5, Whisby Dep. 41: 11-25, 42: 1. Defendants note that as a general principal, assumptions regarding gang affiliation based on items of clothing or appearance alone are neither sound public policy, or enough to overcome the burden of proof in a Motion for Summary Judgment. As such, any reference to prior gang activity on the property should be disregarded.

With regard to gang activity and targeted crimes, the recent case of *Estate of Bell by and Through Bell v. 617 West LLC,* No. 124,418, 2022 WL 17881331 (Kan. Ct. App. Dec. 23, 2022) is squarely on point. In *Bell,* summary judgment was granted to an apartment complex following the death of an eighteen-year-old gang member by rival gang members in the complex's parking lot. *Id*. at *1. On the night in question, the deceased, Debrylan Bell, who was linked to the Folk Gangster Disciples, was involved in an altercation with the Piru Bloods, another known gang in the area. *Id*. Later that same evening, members of the rival gang drove around Wichita seemingly looking for Bell. *Id*. He was eventually located at the parking complex, where he was summarily ambushed, shot, and killed. *Id*. at *2. The trial court's entry of summary was two-fold, based (1)

first, on the fact that Bell was parked in a fire lane of the parking lot and was therefore a 'trespasser'; and (2) second, on the fact that even if he was not a trespasser, his killing was not reasonably foreseeable, and therefore no duty existed. *Id*. at *3. In ruling that the finding regarding foreseeability was sound, the Court of Appeals noted that neither the victim nor his killers lived at the complex, and there had been no other issues at the complex involving them. *Id*. at *4-5. The Court noted that while there was a long list of incidents reported to police from the complex in the year before Bell's death, which increased *after* Defendant's purchased the property and included violent gun crimes and rape, those reports did not demonstrate that the *particular* crime was foreseeable. *Id*. at *5. Specifically, the Court noted that, "these previous incidents had 'no direct relationship to the harm incurred,' – that is, to Bell's targeted killing." *Id*. The application of the analysis in *Bell* to the facts of this matter easily flows. Like in *Bell,* the police incident reports generated prior to June 2020 do not reference gang activity on the property, nor do they involve Marion Norwood or Jaylen Thomas. *See* Facts ¶ 68-99. Unlike in *Bell*, the reports in the instant matter are also devoid of any reference to gun violence or the use of firearms. *Id*. Moreover, the shooting event of June 20, 2020, much like the murder of Debrylan Bell was a *targeted event,* resulting from an altercation between individuals who were known to one another. Facts ¶ 52-54. Just as was the case in *Bell,* the events in the instant matter were wholly unforeseeable.

Of those factors that *should not be considered* by this Court are any facts that do not bear a direct relationship to the harm incurred. To that end, and throughout the course of this litigation, counsel for the Plaintiff has attempted to establish the existence of prostitution on the property, the use of drugs on the property, and the fact that the hotel accepted cash deposits on rooms. Alas, because none of those factors bear on the facts of the shooting event of June 20, 2020, Defendant respectfully argues that the same should not factor into the analysis of this Court. Simply put – there has been no testimony that the party at the Super 8 Motel on June 20, 2020 involved

prostitution or drugs, and the evidence *does* establish that a cash payment *was not used*. Facts ¶ 19. Nevertheless, throughout the course of this litigation, Plaintiff has attempted to bolster her case by eliciting testimony riddled with generalizations and assumptions. To that end, Plaintiff's claim is largely based on speculation made by employees of the hotel, based on the physical appearance of guests or the economic status of those individuals staying in the hotel. With regard to prostitution on the property, a sampling of the deposition testimony rendered in this regard is instructive in understanding the fallacy of Plaintiff's argument. Former employee Jordan Malone, who was terminated after it was suspected that he was stealing sundry items from the hotel, was asked to opine as to whether female guests were engaged in prostitution, regardless of the fact that those accusations were not accompanied by police calls for service, police reports, or police investigation. To that end, when asked to expand upon his answer regarding suspicions of prostitution, Mr. Malone testified as follows:

> A:    … -- the apparel of what you're wearing is, you know, on a certain occasion – you know what I mean, only – you see what I'm saying. You would wear that to not go out into public, per se.
> Q:    Um-hum.
> A:    you would not wear this appear to go in public.

Ex. 15, Jordan Malone Dep. 60: 13-23, June 24, 2021. Likewise, Plaintiff has repeatedly cited to the fact that the hotel utilized cash payments. Again, however, no evidence was presented as to the *true effect* of offering this option to patrons. Instead, testimony like that given by Gregg Townsend, wherein he states that "if you didn't have a credit card you maybe were kind of undesirable," added to the attempt to confuse the policy of an economy hotel with the creation of crime. Defendants note that being poor is not a crime in the State of Kansas, and allowing those with lower economic means to find refuge at a motel is neither negligent or wanton. Parenthetically, on June 20, 2020, the host of the 'party' at the Super 8 Motel secured the room with a credit card deposit. Facts ¶ 19.

For the reasons stated more fully herein, Plaintiff cannot meet her burden as it pertains to demonstrating, with any level of particularity, that the shooting of June 20, 2020 was a foreseeable event. Defendant therefore respectfully requests that this Honorable Court grant its Motion for Summary Judgment as it relates to Count I of Plaintiff's Amended Complaint.

**C.  Plaintiff Does Not Have a Submissible Case for Punitive Damages.**

    1.  **Plaintiffs are Required to Establish a Claim of Punitive Damages by Clear and Convincing Evidence.**

K.S.A. 60-3701(c) provides that in order to establish a claim for punitive damages, plaintiffs must prove by **clear and convincing evidence** "that the defendant acted toward the plaintiff with willful conduct, wanton conduct, fraud, or malice." "Clear and convincing evidence is evidence which shows that the truth of the facts asserted is highly probable**."** *In re B.D.-Y,* 286 Kan. 686, Syl. ¶ 3, 187 P.3d 594 (2008) (emphasis added).

"In Kansas, punitive damages are awarded to punish the wrongdoer for malicious, vindictive, or willful and wanton invasion of another's rights, with the ultimate purpose being to restrain and deter others from the commission of similar wrongs." *Cerretti v. Flint Hills Rural Electric Co-op. Ass'n*, 251 Kan. 347, 366, 837 P.2d 330 (1992)(emphasis added); *see also Brand*, 978 F. Supp. at 1393. "Punitive damages are awarded on the theory that the defendant deserves punishment for his or her wrongful acts." *Adamson*, 295 Kan. at 888.

    2.  **Plaintiffs Have Not Produced Sufficient Evidence to Establish a Claim of Punitive Damages Under Kansas Law.**

A claim for punitive damages is not a "cause of action" triable to a jury; rather, it is an award given *incident to* and *dependent upon* the recovery of actual damages. *Smith v. Printup*, 254 Kan. 315, 322, 866 P.2d 985, (1993). In determining whether there is a probability that the Plaintiff will prevail on a claim for punitive damages, the court should consider that the standard of proof on the issue is, "clear and convincing." *Moore v. Associated Material and Supply Co. Inc.,* 263

Kan. 226, 948 P.2d 652 (1997). With regard to determining if the Plaintiff will *probably prevail*, the standard for that determination is whether, by clear and convincing evidence, "it is more likely than not that the plaintiff will prevail" at the trial level. *Fusaro v. First Family Mtg. Corp.,* 257 Kan. 794, 801 (1995). Because Plaintiff cannot demonstrate to this Court evidence that she will prevail on her claim of punitive damages, summary judgment should be entered in favor of Defendants.

The case of *Rios v. Bigler*, 847 F. Supp. 1538 (D. Kan. 1994) is instructive. In that case, Judge Lungstrum granted defendants' summary judgment on plaintiff's punitive damages claim, which was based on alleged wanton conduct. First, the Court stated, "Plaintiff's claim for punitive damages survives a motion for summary judgment if a reasonable juror could find from the evidence that the defendants acted in a wanton manner by clear and convincing evidence." 847 F. Supp, at 1548. Then the Court summarized its holding:

> The Court finds plaintiff has not met her burden to show that Dr. Bigler and Dr. Welch failed to take corrective action, but rather has only shown that they took certain actions that may or may not have been negligent. Nor has plaintiff shown that the doctors were aware that the failure to take actions that they did not take posed a serious threat to the health of plaintiff. Plaintiff has not met her burden to show that either doctor had knowledge of the imminence of danger caused by the actions they were taking or that, despite knowledge of the severity of plaintiff's condition, they recklessly failed to act or were indifferent.

The court continued and noted that wantonness "refers to a mental attitude" and not "a practical act of negligence." *Id.* While Plaintiff testified she believed her complaints were trivialized and ignored by the doctors, this evidence was not sufficient. *Id.* at 1549. "There is no evidence that either doctor knew that they were unable to diagnose plaintiff's condition or that she was presenting with symptoms absolutely indicative of RSD and that these doctors refrained from acting in any event." *Id.* In addition, the evidence demonstrated the doctors "were treating the plaintiff and actively attempting to diagnose her condition." *Id.* "Plaintiff's assertion that her pain was not recognized, standing alone, is simply insufficient to overcome the clear

evidence that she was continuously cared for by these doctors and to establish that the 'mental attitude' of either Dr. Bigler or Dr. Welch approached wantonness." *Id.* "Punitive damages may not be assessed against 'one who acts under innocent mistake in engaging in conduct that nevertheless constitutes a tort.'" *Id.* (quoting *Iola State Bank v. Bolan*, 235 Kan. 175, 192, 679 P.2d 720 (1984)). *See also Moore v. Associated Material and Supply Co.*, 263 Kan. 226, 948 P.2d 652 (1997)(upholding the trial court's refusal to allow a punitive damages amendment where defendant built a levy that caused flooding onto Plaintiff's property because the evidence relied upon by the Plaintiffs regarding the defendant's "knowledge of the potential danger to [the Plaintiffs'] properties is subject to conflicting interpretations, such that it would not be likely to clearly and convincingly prove [the defendant] acted willfully or wantonly"); *Fusaro v. First Family Mortg. Corp., Inc.*, 257 Kan. 794, 801, 897 P.2d 123 (1995) (upholding the trial court's refusal to allow a punitive damages amendment based on conclusory allegations without actual evidence to support a claim that the defendants acted with a "designed purpose," "reckless disregard," or an "intent to do a harmful act."); *Lindsey v. Miami County Nat. Bank*, 267 Kan. 685, 984 P.2d 719 (1999)(upholding the trial court's refusal to allow a punitive damages claims where the bank's employee negligently repossessed the wrong vehicle without checking the VIN or year of the vehicle because there was no evidence of malicious intent or wanton conduct); *Estate of McCaffree v. Via Christi Regional Medical Center, Inc.*, No. 88,209 2003 WL 22990125 (Kan. App. Dec. 19, 2003) (denying a claim to amend for punitive damages in a medical negligence case); *Lanning v. Anderson*, 22 Kan. App. 2d 474, 482, 921 P.2d 813 (1996) ("There is no evidence of [defendants'] disregard of a known or obvious risk that was so great as to make it highly probably that harm could follow. The facts do not support a conclusion that practice was held in disregard of a high and excessive degree of danger known or apparent to a reasonable person").

Wantonness involves *known indifference* to *known circumstances. Elliott v. Peters,* 163 Kan. 631, 634 (1947). The Supreme Court has stated that, "there is substantial difference when wantonness is asserted between what a man actually knows and what he should have known. There is a potent element of consciousness of danger in wantonness." *Id.* As outlined more fully above, there were no shooting events prior to June 20, 2020 that would have alerted Defendants to the fact that an event of that magnitude could take place at the Motel. Facts ¶ 68.

For the reasons stated more fully herein, Plaintiff cannot meet the *extremely* high burden of demonstrating, via clear and convincing evidence, that Defendants acted with a wanton mental state. Defendant therefore respectfully requests that this Honorable Court grant its Motion for Summary Judgment as it relates to Count II of Plaintiff's Amended Complaint.

**D.  Plaintiff cannot meet her burden of proof to pierce the corporate veil.**

Defendants note that Count III of Plaintiff's Amended Complaint is premised on Plaintiff's success on Counts I and II. More specifically, in light of the fact that SRKBS Hotel, LLC has insurance coverage sufficient to satisfy a judgment on Count I, Count III logically flows from Count II. That is, only if Count II of Plaintiff's Amended Complaint survives the Motion for Summary Judgment in front of this Court, does an analysis regarding piercing of the corporate veil logically flow. Alas, assuming arguendo that Plaintiff survives summary judgment on Counts I and II, Defendants address Count III as outlined below.

Whether to pierce the corporate veil is a question of fact, to be determined on the particular facts presented in each case. *Emprise Bank v. Rumisek*, 42 Kan. App. 2d 498, 520, 215 P.3d 621 (2009) (citing *Sampson v. Hunt*, 233 Kan. 572, 579, 665 P.2d 743 (1983)). The burden of proof is on the party seeking to have the corporate entity disregarded. *Louisburg Bldg. & Dev. Co. v. Albright*, 45 Kan. App. 2d 618, 631, 252 P.3d 597 (2011)

The Kansas Supreme Court starts the analysis of whether to pierce a corporate veil "with the basic premise that a corporation and its [owners] are presumed separate and distinct." *Amoco Chems. Corp. v. Bach*, 222 Kan. 589, 593, 567 P.2d 1337 (1977). The Court also warns that the "power to pierce the corporate veil is to be exercised reluctantly and cautiously." *Id*. This warning that the power must be "exercised reluctantly and cautiously" applies to all theories that may be applied. *Louisburg Bldg*, 45 Kan. App. 2d at 634 (citing *Amoco Chems. Corp. v. Bach*, 222 Kan. 589, Syl. ¶ 3).

The typical situation for piercing a corporate veil is "where a corporation's owner is found to be the alter ego of the corporation – the individual uses the corporation merely as an instrumentality to conduct his or her own personal business." *Louisburg Bldg.*, 45 Kan. App. 2d at 632 (citation and internal quotation marks omitted). Kansas courts have also recognized a "second, less-developed theory" for piercing the corporate veil where "the interests of justice require it." *Id*. at 634. Under either theory, the uncontroverted material facts show that Plaintiff cannot meet her burden of proof.

## 1. The evidence does not support piercing the corporate veil under the alter-ego theory.

The "ultimate standard for piercing the corporate veil in Kansas is whether disregarding the corporate entity is necessary to achieve equity on the grounds that the corporation was used as a cover for fraud or illegality, or to work an injustice." *Schutte v. Petter Const. Co.*, No. 99,870, 2009 WL 1911693, at * 6 (Kan. Ct. App. July 2, 2009) (citing *Amoco Chems.*, 222 Kan. at 593). The Kansas Supreme Court instructs that the following factors should be considered in applying the alter-ego theory:

> (1) Undercapitalization of a one-man corporation, (2) failure to observe corporate formalities, (3) nonpayment of dividends, (4) siphoning of corporate funds by the dominant stockholder, (5) nonfunctioning of other officers or directors, (6) absence of corporate records, (7) the use of the corporation as a facade for operations of the

dominant stockholder or stockholders, and (8) the use of the corporate entity in promoting injustice or fraud."

*Louisburg Bldg.*, 45 Kan. App. 2d at 632 (citing *State ex rel. Graeber v. Marion County Landfill, Inc.*, 276 Kan. 328, 355, 76 P.3d 1000 (2003)).

In *Louisburg Bldg.*, the Court considered evidence that the corporation had a little over three hundred thousand dollars ($300,000) in assets during the relevant time period, filed annual federal and state tax returns, filed required reports with the Secretary of State, and distributed payments to its members from the corporate profits, "as is customary for limited-liability companies." *Id*. The Court also considered that there was no evidence to show that the owner was siphoning corporate funds for his personal use and testimony that typical formalities of a limited-liability company were maintained. *Id*. at 633. Based on this, the trial court found that the plaintiffs failed to meet their burden under the alter-ego theory because the evidence did not support any of the factors. *Id*. The Court upheld the trial court's finding, noting that it was supported by "substantial evidence." *Id*. at 636.

In *Schutte*, the Court analyzed the evidence as it related to each factor to affirm the trial court's finding that the corporation was not an alter ego. 2009 WL 1911693, at * 6. As to the first factor, undercapitalization, the Court noted that the relevant inquiry involves comparing the corporate assets "with the business to be done and the risk of loss." *Id*. at *2 (citing *Service Iron Foundry, Inc. v. M.S. Bell Co.*, 2 Kan. App. 2d 662, 667, 588 P.2d 463 (1978)). The Court specifically considered that the company maintained insurance coverage to cover its risk of loss in assessing this factor. *Id*. As to corporate formalities, the Court found that some were observed, such as holding meetings, maintaining separate accounting and accounts, registering the company with the Secretary of State, filing corporate tax returns, and treating the company as a separate entity, but not all formalities set forth in the bylaws were observed. *Id*. at *3. As to payment of dividends, the court noted that it would not be customary for this type of corporation to do so. *Id*.

As to siphoning of corporate funds, the Court described conflicting evidence related to the issue, and followed the trial court's finding of fact that the evidence did not support this factor. *Id*. at *3-5. The Court stated that the factor related to nonfunctioning of other officers or directors was not applicable as there were no other officers or directors of the company. *Id*. at *5. As to absence of corporate records, the Court noted that the company maintained some corporate records, including tax records, annual reports, bank records, credit card statements, and minutes of meetings, but there were no records of transactions between the company and the owners, corporate resolutions, promissory notes, written authorizations or corporate minutes. *Id*. The Court followed the trial court's finding of fact that this factor was not supported. *Id*. As to use of the company as a façade, the Court rejected the plaintiff's bare argument that the company was an "empty shell" and said that the fact that the company had lost its corporate charter and reinstated it only after the lawsuit was filed does not show that this factor was met. *Id*. at *6.

As to the final factor, the plaintiffs argued "the company was used to promote injustice because there were insufficient funds … to satisfy the [plaintiffs'] judgment" in the underlying lawsuit. *Id*. The Court held that "the mere inability to collect a judgment is not enough to show fraud or injustice resulting from the use of the corporate entity." *Schutte v. Petter Const. Co.*, No. 99,870, 2009 WL 1911693, at * 6 (Kan. Ct. App. July 2, 2009) (citing *Luckett v. Bethlehem Steel Corp.*, 618 F.2d 1373, 1379 (10th Cir. 1980) (finding possible difficulty in enforcing judgment against corporation not type of injustice that warranted piercing corporate veil)); *see also N.L.R.B. v. Greater Kansas City Roofing*, 2 F.3d 1047, 1053 (10th Cir. 1993) ("In most cases the mere fact that a corporation is incapable of paying all its debts is insufficient for a finding of injustice. That condition will exist in virtually all cases in which there is an attempt to pierce the corporate veil.") (citations omitted). In light of its analysis of all of the factors, the Court held that the evidence was insufficient to pierce the corporate veil. *Id*.

As in *Louisburg Bldg.* and *Schutte*, the uncontroverted material facts show that Plaintiff cannot meet her burden of proof as to the alter-ego factors. First, Defendant SRKBS has over Two Hundred Thousand Dollars and 0/100 ($200,000.00) in liquid assets, and its risks of loss are covered by Eleven Million Dollars and 0/100 ($11,000,000.00) of liability insurance coverage. Facts ¶ 9-10, 110. Compared with the fact that Defendant SRKBS is no longer operating a hotel or other business since its sale of the Super 8 Motel, these assets and insurance coverage establish that Defendant SRKBS is not undercapitalized. Facts ¶ 106. Additionally, the Individual Defendants made initial capital contributions in excess of Seven Hundred Thousand Dollars and 0/100 ($700,000.00) when Defendant SRKBS was formed, which was sufficient capital for Defendant SRKBS to purchase, renovate, and operate the hotel. Facts ¶ 105. The evidence shows that this factor cannot support piercing the corporate veil.

Second, Defendant SRKBS and the Individual Defendants observed numerous corporate formalities. The books and records of Defendant SRKBS were kept separate from any Individual Defendant's or any other company's records, as were its bank accounts, corporate funds, and expenses. Facts ¶ 115, 121-122. Defendant SRKBS is organized and in good standing with the Secretary of State, and an Operating Agreement was executed upon its inception. Facts ¶ 1, 103. The Members complied with the Operating Agreement's requirements by voting to elect Managers, maintaining a record of that vote, list of Members, and list of Managers, filing and maintaining tax records on behalf of Defendant SRKBS each year, and preparing and maintaining financial statements. Facts ¶ 104, 116-118. The Managers also met by phone multiple times a month and had an annual in person meeting. Facts ¶ 124-125. Though they did not keep formal minutes or voting records, all decisions were discussed during these regular meetings and any actions taken were with unanimous consent. Further, the Managing Members were all familiar with each other through familial connections or friendship prior to formation of SRKBS Hotel,

LLC. Facts ¶ 126. The evidence shows that Defendant SRKBS observed many corporate formalities and that this factor cannot support piercing the corporate veil. The same evidence is also applicable to the sixth factor, as the corporate formalities include maintenance of appropriate corporate records. As such, the sixth factor also cannot support piercing the corporate veil.

Third, distributions from Defendant SRKBS's profits to its Members is customary as a limited liability company, and such distributions are analogous to dividends for purposes of the third factor. *See Louisburg Bldg.*, 45 Kan. App. 2d at 632. Defendant SRKBS made these distribution payments to its Members as allowed by the Operating Agreement and in consideration of its profits. Facts ¶ 120. As such, the facts show that this factor does not support piercing the corporate veil.

Fourth, all of the evidence shows that Defendant SRKBS's corporate funds were always maintained entirely separate from the funds of any Individual Defendant or any other business. Facts ¶ 115, 119, 122-123. From the date of its inception, all of Defendant SRKBS's corporate funds have been used solely for its business operations and expenses. Facts ¶ 119. Defendant SRKBS's corporate funds have never been used for any personal expenses or the expenses of any other business. Facts ¶ 119. There is absolutely no evidence to the contrary. This factor does not support piercing the corporate veil.

Fifth, all of the Individual Defendants are Managing Members of Defendant SRKBS, and there are no other officers or directors to make this factor applicable in this circumstance. As to the seventh factor, Defendant SRKBS was never used as a façade or for any other business purposes. Facts ¶ 123. It was solely used as a functioning business operating a hotel for investment purposes. Facts ¶ 123. Again, there is no evidence to the contrary. This factor cannot support piercing the corporate veil.

Finally, the evidence shows that Defendant SRKBS was not used in promoting injustice or fraud. The evidence shows that the sale of the hotel was not done with any intent to avoid liability for Plaintiff's claims. Facts ¶ 112. Rather, the uncontroverted facts are that Defendant SRKBS has maintained liability insurance that covers Plaintiff's claims and has kept over Two Hundred Thousand Dollars and 0/100 ($200,000.00) of corporate funds in the bank that would be available to satisfy a potential judgment that is not covered by its insurance. Facts ¶ 9-10, 110. Further, the Individual Defendants always intended for the hotel to be an investment that would be sold for a profit, and the decision to sell was made before the incident in June 2020. Facts ¶ 111, 113. In fact, the hotel had been actively marketed for sale in 2019, it just hadn't sold before the COVID-19 pandemic began affecting the hotel industry. Facts ¶ 114. Clearly, this shows that the intention was entirely unrelated to Plaintiff's claims, as the decision to sell and placing the hotel on the market both occurred before Plaintiff's claims arose. It is not enough that a judgment in this case may potentially exceed the Eleven Million Two Hundred Dollars and 0/100 ($11,200,000.00) in insurance coverage and assets available to Defendant SRKBS. An inability to collect a judgment does not show fraud or injustice resulting from use of the corporate entity to justify piercing the corporate veil. *See Schutte*, 2009 WL 1911693, at *6.

Based on the foregoing uncontroverted facts and analysis of the alter-ego factors, Individual Defendants are entitled to summary judgment on this issue because Plaintiff cannot meet her burden of proof.

**2. To the extent that it is a valid theory under which the corporate veil may be pierced, the evidence does not support piercing the corporate veil under the interests-of-justice theory.**

As an initial matter, while Kansas courts have *recognized* the interests-of-justice theory, there is little guidance for application of the theory because those cases still applied the alter-ego

theory. *Hill v. Kansas Dep't of Lab., Div. of Workers Comp.*, 42 Kan. App. 2d 215, 235-7, 210 P.3d 647, 661-2 (Kan. Ct. App. 2009), *aff'd in part and rev'd in part on other grounds*, 292 Kan. 17, 248 P.3d 1287 (2011) (collecting cases where the court recognized both theories but applied the alter-ego theory).

In *Hill*, the trial court relied on a prior opinion of the Court of Appeals of Kansas, *Kvassay v. Murray*, 15 Kan. App. 2d 426, 808 P.2d 896 (Kan. Ct. App. 1991), to apply this theory to pierce the corporate veil. *Hill*, 42 Kan App. 2d at 235. In reversing the trial court's finding, the Court of Appeals discussed *Kvassay* at length. Specifically, the trial court relied on *Kvassay*'s holding that "injustice alone will support a disregard of the corporate entity," to apply this theory. *Id*. at 237. However, the Court of Appeals held this was erroneous, as *Kvassay* was not decided solely on injustice. *Id*. Rather, the *Kvassay* court applied the alter-ego factors, finding numerous of those factors in support of its decision, and was referring to the eighth factor when it made this statement. *Id*. Notably, this quotation comes from a section labeled "8. Use of corporate entity in promoting injustice or fraud," and was made in response to the defendant's argument that there must be proof of fraud or wrongdoing to pierce the corporate veil. *Kvassay*, 15 Kan. App. 2d at 439.

Even under the interests-of-justice theory, "[a] mere showing that some kind of injustice occurred is not sufficient to disregard the corporate entity." *Kinder v. QI Enterprises, L.L.C.*, No. 111,537, 2015 WL 1124603, at*4 (Kan. Ct. App. Mar. 6, 2015). Piercing the corporate veil "must be 'necessary to achieve equity.'" *Id*. (quoting *Service Iron Foundry, Inc. v. M.A. Bell Co., 2* Kan. App. 2d 662, 673, 588 P.2d 463 (Kan. Ct. App. 1978)). "Without a showing that disregarding the corporate entity is the ***only*** way to achieve equity in this case, Kinder has failed to meet her burden of proof." *Id*. (emphasis added); *see also Louisburg Bldg.*, 45 Kan. App. 2d at 635 (citing *Naples v. Keystone Bldg. and Dev. Corp.*, 295 Conn. 214, 237, 990 A.2d 326 (2010) (refusing to disregard

the corporate entity because the plaintiffs failed "to point to evidence that declining to pierce the corporate veil would defeat justice by leaving them without compensation" for their claim)).

For the same reasons discussed as to the injustice factor of the alter-ego theory, the facts do not show a sufficient reason to support piercing the corporate veil under this theory. Plaintiff cannot show that piercing the corporate veil is necessary to achieve justice. Individual Defendants are entitled to summary judgment on Count III because Plaintiff cannot meet her burden of proof for piercing the corporate veil under either theory recognized under Kansas law.

For the reasons stated more fully herein, Plaintiff cannot meet her burden of proof to overcome the presumption of separate and distinct entities or to pierce the corporate veil. Individual Defendants therefore respectfully request that this Honorable Court grant their Motion for Summary Judgment as it relates to Count III of Plaintiff's Amended Complaint.

## CONCLUSION

The void in Plaintiff's evidence prevents Plaintiff from presenting to this Honorable Court a coherent, submissible case demonstrating that Defendants were negligent and caused the injuries of Maella Blalock. The deposition testimony rendered, affidavits produced, and discovery exchanged in this case demonstrate that there is no genuine issue as to any material fact: Maella Blalock was shot by an unknown individual *in the vicinity of* the Super 8 Motel; the individual was trespassing on the property of the Super 8 Motel after being *asked to leave the property*; Defendants had *no reason to know* that the incident of June 20, 2020 would occur, and acted *reasonably in their ownership and operation of the subject Motel*. As a result, Defendants are entitled to summary judgment as a matter of law.

Further, if either of Plaintiff's claims against Defendant SRKBS survives, the void in Plaintiff's evidence prevents Plaintiff was piercing the corporate veil of Defendant SRKBS to hold the Individual Defendants liable. The deposition testimony, affidavits, and discovery

exchanged demonstrate no genuine issue of material fact that Defendant SRKBS was not an alter ego of Individual Defendants and interests of justice do not warrant piercing the corporate veil.

WHEREFORE, Defendants respectfully request that summary judgment be granted in their favor and against the Plaintiff on all claims, and that the Court award Defendants their costs and such further relief as the Court deems just and equitable.

Respectfully Submitted,

**EVANS & DIXON, L.L.C.**

/s/ James E. Godfrey, Jr.
James E. Godfrey, Jr., #79027 (Dist. of KS)
Kerry B. Banahan, # 79028 (Dist. of KS)
211 North Broadway, Suite 2500
St. Louis, Missouri 63102
314-552-4023 (Telephone)
314-884-4423 (Facsimile)
kbanahan@evans-dixon.com
jgodfrey@evans-dixon.com
*Attorneys for Defendant*

<u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on the 25th day of August, 2023, a true and correct copy of the above and foregoing was electronically filed with the Clerk of the Court by using the CM/ECF system and e-notification will be made to the following:

Jeffrey A. Wilson, #26527
Richard W. James, #19822
DeVaughn James Injury Lawyers
3241 North Toben
Wichita, KS  67226

Attorneys for Plaintiff Maella Blalock

/s/ James E. Godfrey, Jr.