Page 1

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF KANSAS

3               AT KANSAS CITY, KANSAS

4

5    MAELLA BLALOCK,    )

6    Plaintiff,         )

7    vs                 )  Case No. 21-CV-02552

8    SRKBS HOTEL, INC.,)

9    Defendant.         )

10   _____)

11               DEPOSITION OF

12               GLEN WHISBY

13

14            August 15, 2023

15             10:50 a.m.

16

17

18

19             Taken at:

20      Wichita Police Department - City Hall

21          455 North Main, 13th Floor

22           Wichita, Kansas 67202

23

24

     Job No. CS6045326

25   Kathy R. Bonfiglio, CSR-KS, CSR-MO, RPR

**EXHIBIT 5**

Page 2

1  APPEARANCES:
2     On behalf of the Plaintiff:
3        Mr. Jeffrey A. Wilson
4        DeVaughn James Injury Lawyers
5        3241 North Toben
6        Wichita, Kansas 67226
7        (316)977-9999
8        Fax: (316)425-0414
9        jwilson@devaughnjames.com
10
11    On behalf of the Defendant:
12       Ms. Kerry B. Banahan Dagestad
13       Evans & Dixon, LLC
14       211 North Broadway, Suite 2500
15       St. Louis, Missouri 63102
16       (314)552-4023
17       Fax: (314)884-4423
18       kbanahan@evans-dixon.com
19
20    On behalf of the City of Wichita, Kansas:
21       Mr. Erik S. Houghton
22       Deputy City Attorney
23       Department of Law
24       455 North Main, 13th Floor
25       Wichita, Kansas 67202

Page 3

1        (316)268-4648
2        Fax: (316)268-4335
3        ehoughton@wichita.gov
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1                TRANSCRIPT INDEX
2  APPEARANCES.................................   2
3  INDEX OF EXHIBITS.........................    5
4
5  EXAMINATION OF GLEN WHISBY:
6    BY MS. BANAHAN...............................   6
7    BY MR. WILSON...............................  35
8    BY MS. BANAHAN.............................   40
9    BY MR. WILSON...............................  47
10   BY MS. BANAHAN.............................   49
11   BY MR. WILSON...............................   50
12   BY MS. BANAHAN.............................   51
13   BY MR. WILSON...............................   52
14
15
16
17
18
19  REPORTER'S CERTIFICATE.......................  54
20
21  EXHIBIT CUSTODY
22  EXHIBITS RETAINED BY COURT REPORTER
23
24
25

Page 5

1                INDEX OF EXHIBITS
2  NUMBER       DESCRIPTION             MARKED
3  Defendant Q   Supplemental Report re: Glen
4              Whisby....................    10
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 6

1    GLEN WHISBY, III
2  having been first duly sworn on his oath to testify
3  the truth, the whole truth, and nothing but the
4  truth, testifies:
5        DIRECT EXAMINATION
6  BY MS. BANAHAN:
7    Q.  Please state your name for the record.
8    A.  Glen Whisby, the 3rd.
9    Q.  All right.  Mr. Whisby, are you currently
10  employed?
11    A.  Yes.
12    Q.  Who is your employer?
13    A.  Wichita Police Department.
14    Q.  What is your capacity within the Wichita
15  Police Department?
16    A.  I'm a patrol officer.
17    Q.  How long have you been a police officer?
18    A.  Four years.
19    Q.  When did you graduate from the Academy?
20    A.  2019.
21    Q.  Was that from the City of Wichita Police
22  Department academy?
23    A.  Yes.
24    Q.  Have you ever been a police officer
25  anywhere else other than the City of Wichita?

Page 7

1    A.  No.
2    Q.  What bureau do you work?
3    A.  North.
4    Q.  Are you on 4th watch?
5    A.  Yes.
6    Q.  Have you always been in the North Bureau?
7    A.  Yes.
8    Q.  Have you always been working 4th watch?
9    A.  Yes.
10    Q.  What is your beat?
11    A.  Forty-five.
12    Q.  Has it always been 45?
13    A.  No.  It's been 43.
14    Q.  Do you understand that you are here for
15  this deposition today pursuant to a subpoena?
16    A.  Yes.
17    Q.  And do you understand that that subpoena
18  is in regard to an incident that occurred on
19  June 20th of 2020?
20    A.  Yes.
21    Q.  Was the location of that call the Super 8
22  Hotel?
23    A.  Yes.
24    Q.  Is that part of either the 45 or 43-beat?
25    A.  No.  It's 46-beat.

Page 8

1    Q.  At the time of this incident what was
2  your beat?
3    A.  I was 48.
4    Q.  Do you currently ride with someone?
5    A.  No, not usually.  I ride by myself.
6    Q.  At that time did you ride with someone
7  else?
8    A.  Yes.
9    Q.  Would that have been Penner?
10    A.  Yes.
11    Q.  In what month did you graduate from the
12  academy?
13    A.  It's been awhile.
14    Q.  At the time of this incident in June of
15  2020 had you been an officer for about a year?
16    A.  Yes.
17    Q.  Prior to June 20 of 2020 had you been
18  involved in any other shooting investigations?
19    A.  Yes, I was.
20    Q.  How many?
21    A.  Say about eight.
22    Q.  Any at the Super 8 prior to this?
23    A.  Not that I remember.
24    Q.  As we sit here today, do you have some
25  level of recollection as to what occurred on

Page 9

1  June 20, 2020?
2    A.  Yes.
3    Q.  Did you do anything to prepare for your
4  deposition?
5    A.  Yes.  I went over my supplemental report.
6    Q.  Did you go over the general police
7  report?
8    A.  Not in general the whole.
9    Q.  I'm going to hand you what has been
10  marked as Defendant's Exhibit A.  Can you tell me
11  what that is?
12    A.  It's a Kansas Standard Offense Report.
13    Q.  What is the number on that report?
14    A.  Talking about the case number?
15    Q.  Correct.
16    A.  20C037022.
17    Q.  What is the date on that report?
18    A.  6-20 of 2020.
19    Q.  What is the location of that event?
20    A.  3741 North Rock.
21    Q.  To the best of your knowledge would that
22  be a copy of the report generated in the case we're
23  here to discuss today?
24    A.  Yes.
25    Q.  I'm going to hand you now what has been

3 (Pages 6 - 9)

1  marked as Defendant's Exhibit P. Can you tell me
2  what that is?
3      A.   That is the supplemental report.
4      Q.   Who drafted that report?
5      A.   Penner and Brandon.
6      Q.   That's who you were riding with on the
7  night of June 20th; correct?
8      A.   Correct.
9          (Whereupon Defendant's Exhibit Q was
10  marked for purposes of identification.)
11     Q.   I'm going to hand you what has been
12  marked as Defendant's Exhibit Q. What is that?
13     A.   Supplemental report.
14     Q.   Is that your supplemental report for the
15  incident of June 20, 2020?
16     A.   Yes.
17     Q.   Do Exhibits Q and P accompany Exhibit A?
18     A.   Yes.
19     Q.   I mean, those supplemental reports are
20  supplemental to Exhibit A?
21     A.   Yes.
22     Q.   Do you recall how it was that you first
23  reported to the Super 8 on that date?
24     A.   Yes. Me and Penner was riding around
25  48-beat, patrol. We heard over the radio that

1  there was a shooting so we got dispatched. We
2  heard over the radio that multiple people were shot
3  so we rushed to get there.
4      Q.   So even though that was not your typical
5  beat, because of the nature of the call --
6      A.   Yes.
7      Q.   -- you were called to report there?
8      A.   Correct.
9      Q.   And did you do so?
10     A.   Yes, we did.
11     Q.   What happened when you got to the
12  property?
13     A.   When we got to the property it was like
14  chaos. We set up a perimeter, made sure we got
15  people out to make sure for safety reasons. We
16  made a plan going in what we needed to do. We
17  assessed the victims as we got there.
18     Q.   Did conduct any interviews while you were
19  at the Super 8?
20     A.   Yes. I conducted a few.
21     Q.   Do you recall generally who it was you
22  interviewed?
23     A.   The first lady that I interviewed that I
24  remember her name was Ms. Blalock. She was from
25  Virginia. She was shot through her feet. She told

1  me that she didn't realize she was shot. When she
2  realized she was bleeding, she went into shock and
3  then after she got out of the shock, that's when
4  she called and that's when EMS and Fire came into
5  the room to assess her injuries.
6      Q.   Other than Ms. Blalock, who else do you
7  recall speaking with?
8      A.   I spoke to a couple of partygoers, Autumn
9  Beck. I remember speaking to her. Nadiyah, I
10  spoke to Nadiyah. They all told me there was a
11  party, a lot of gang members at the party wearing
12  red and there was some arguments at the party that
13  night. The manager came up to the party, told them
14  they have to get out. The party transgressed
15  outside, went outside and that's when tensions
16  started to rise. Nadiyah said that -- from what I
17  remember, she said that once they got outside the
18  fight had took place when she heard shots being
19  fired but she didn't see them shooting because she
20  was inside. The next person I talked to was
21  Zawriah McGowan. That's the last person. Tommie
22  Revuelata, she was the one that bought the room for
23  Zawriah for her party. Tommie said that the party
24  was just supposed to be a girls party. Zawriah
25  posted it on Snapchat and that's when she invited

1  everybody to come to the party. Once they got
2  there, Zawriah said she invited Mishael Jackson.
3  From what I remember, he's a Blood. She said he
4  came to the party and then she invited Jaylen
5  Thomas and he was a GD Folk member. She said
6  Jaylen was causing most of the problems from the
7  party and she was trying to keep him calm. She
8  don't know why he was acting the way he was acting
9  but she said he was the main person that was
10  causing all the tension, trying to fight everybody
11  inside the party. After that Zawriah, she came on
12  the property. She didn't want to be seen talking
13  to us because she didn't want other people around
14  seeing her talking to police officers so she got
15  scared and she decided to stop talking to me at
16  this point.
17     Q.   I'm going to go back over kind of what
18  you said. It sounds like first you spoke with
19  Maella Blalock; correct?
20     A.   Yes.
21     Q.   And Ms. Blalock reported to you that she
22  had been shot in the feet; correct?
23     A.   Yes.
24     Q.   Did Ms. Blalock report having seen the
25  person that shot her?

Page 14

1    A.   No.
2    Q.   Did Ms. Blalock report having seen any of
3  the individuals involved in the altercation?
4    A.   No.
5    Q.   Did Ms. Blalock report having seen,
6  having known that there was a party occurring at
7  the Super 8?
8    A.   No.
9    Q.   Did Ms. Blalock report having seen any of
10  the individuals enter the hotel?
11    A.   No.
12    Q.   And so at the point that she had been
13  shot, did Ms. Blalock have any idea as to what led
14  to her being shot?
15    A.   No, she did not.
16    Q.   Did you accompany Ms. Blalock from her
17  hotel room out of the hotel?
18    A.   No.  She was inside the hotel.
19    Q.   But eventually did she leave the hotel?
20    A.   Yes, but I wasn't there.
21    Q.   Who took her out?
22    A.   EMS and Fire.  She went to the hospital.
23    Q.   At that point had the scene been cleared
24  of witnesses?
25    A.   No.  There was witnesses everywhere.

Page 15

1    Q.   After you spoke with Ms. Blalock did you
2  then speak with Autumn Beck?
3    A.   Yes, correct.
4    Q.   Was Ms. Beck involved in the party at the
5  Super 8 Hotel?
6    A.   Yes.
7    Q.   In your report it states, "Autumn Beck
8  stated that once the manager came up and started to
9  tell people to leave, everyone started to gather
10  outside."  Is that an accurate statement?
11    A.   Yes.
12    Q.   Is it your understanding that the manager
13  or a clerk from the hotel asked the individuals to
14  leave the hotel?
15    A.   Yes.
16    Q.   Did the employee ask individuals to leave
17  prior to the fight taking place?
18    A.   Yes, they did.
19    Q.   Did the employee of the hotel ask the
20  individuals to leave before the shooting took
21  place?
22    A.   I do not know.
23    Q.   Well, at some point the employee asked
24  them to leave; correct?
25    A.   Correct.

Page 16

1    Q.   Okay, and at that point they were still
2  inside the hotel; correct?
3    A.   Yes, correct.
4    Q.   The shooting happened when they were
5  outside the hotel?
6    A.   Yes.
7    Q.   By nature of that, the shooting occurred
8  after the employee asked them to leave?
9    A.   That is correct.
10    Q.   Autumn goes on to say pursuant to your
11  report that, "The tension was rising when people
12  started to argue in the parking lot."  Is that
13  accurate?
14    A.   Yes, that's accurate.
15    Q.   It says, "Then all of a sudden Autumn
16  said people just started shooting and that is when
17  she ran and hid."  Is that accurate?
18    A.   Yes, that's accurate.
19    Q.   Based on that, was it your understanding
20  that both the fight and the shooting took place on
21  the exterior of the motel?
22    A.   Yes, correct.
23    Q.   You then spoke with Kaelyn Worlein; is
24  that correct?
25    A.   Yes.

Page 17

1    Q.   In your report you note that her story
2  was similar to Autumn's; fair?
3    A.   Yes, that's fair.
4    Q.   But you noted that Kaelyn said that there
5  was a lot of red?
6    A.   Yes.
7    Q.   And that she also said there were Bloods
8  at the party?
9    A.   Yes, correct.
10    Q.   How was it that you know that the color
11  red indicates someone is a member of the Bloods?
12    A.   I do a lot of traffic stops.  I'm
13  familiar with the gang members in my area.  So most
14  of the time when I stop them they are wearing red
15  bandanas or have something on Facebook, gang signs
16  and most of the color they are wearing is red and
17  black.  That's how I'm familiar with that gang and
18  how they operate.
19    Q.   That gang being the Bloods?
20    A.   The Bloods, yes, ma'am.
21    Q.   You referenced Facebook; correct?
22    A.   Yes.
23    Q.   Are you familiar with Sergeant Kimble?
24    A.   Yes, I am.
25    Q.   Is he your supervisor?

5 (Pages 14 - 17)

Page 18

1    A.  He's my supervisor, yes.
2    Q.   Yesterday Sergeant Kimble testified that
3  color alone is not enough to determine if someone
4  is a member of the gang.  Is that a fair statement?
5    A.   That is a fair statement.
6    Q.   Okay.  Would you agree with me that for a
7  member of the general public that's not a police
8  officer, the fact that someone is wearing red or
9  blue would not necessarily be an indicator that
10  they are a member of either the Crips or the
11  Bloods?
12        MR. WILSON: Object to form.
13    A.   Yes, correct.
14    Q.   (By Ms. Banahan) So, for instance, if
15  someone walked in here wearing a specific color,
16  that would not necessarily be an indicator of gang
17  membership?
18    A.   No.
19        MR. WILSON: Same objection; lack of
20  foundation.
21    Q.   (By Ms. Banahan) Fair?
22    A.   Fair.
23    Q.   And, in fact, would you also agree that
24  in addition to maybe a color, you as a police
25  officer would look for additional clues?

Page 19

1    A.   Most definitely, yes; correct.
2    Q.   Is that something that you have been
3  trained to do as an officer?
4    A.   Yes, I have.
5    Q.   Do you think you are in a better position
6  to assess that than a member of the general public?
7        MR. WILSON: Object to form, foundation.
8  You can answer.
9    A.   Yes.
10    Q.   (By Ms. Banahan) Would you agree with me
11  that part of that is that we don't want members of
12  the general public assuming that someone is a
13  member of a gang based only on physical
14  characteristics?
15        MR. WILSON: Object to form, foundation.
16  You can answer.
17    A.   Yes, correct; I agree.
18    Q.   (By Ms. Banahan) It looks like, based on
19  Exhibit Q, it looks like you also spoke to Nadiyah?
20    A.   Yes.
21    Q.   Nadiyah was friends -- was Nadiyah friends
22  with Zawriah McGowan?
23    A.   Yes.
24    Q.   In your report you state, "Nadiyah said
25  the shooting happened outside the hotel.  She said

Page 20

1  that once everyone was kicked out of her friend's
2  party, people started to gather outside and they
3  started to argue and that is when shots started to
4  ring out."  Does that statement seem accurate based
5  upon your investigation?
6    A.   Yes, yes.
7    Q.   And when you reference that everyone was
8  kicked out of her friend's party, are you
9  referencing the fact that they were kicked out by
10  an employee of the hotel?
11    A.   Yes, correct.
12    Q.   Do you know how much time passed between
13  the individuals being kicked out and the shots
14  being fired?
15    A.   No, I do not.
16    Q.   I'm going to hand you what has been
17  marked as Plaintiff's Exhibit 1 and 2.  Do you
18  recognize what these documents are?
19    A.   Yes, I do.
20    Q.   What is this?
21    A.   Camera footage from the Super 8.
22    Q.   Did you review the camera footage from
23  the Super 8?
24    A.   I do not remember.
25    Q.   Do you recognize the individual in this

Page 21

1  first photograph of Exhibit 1?
2    A.   No, I do not recognize him.
3    Q.   Knowing what you know from your
4  investigation, do you have any context as to what
5  is happening in the first seven photographs of
6  Exhibit 1?
7    A.   Looks like maybe an employee trying to
8  get these guys out of the hotel.
9    Q.   If we look halfway down on Exhibit 2,
10  does it look like they did in fact kick them out of
11  that room?
12    A.   Yes, correct.  It does look like that.
13    Q.   What time is the first photograph?
14    A.   2:23.
15    Q.   That looks like when he attempts to get
16  them to leave the room?
17    A.   Yes.
18    Q.   Now, if we look here at Exhibit 2, do you
19  see anyone with a firearm?
20    A.   Yes.
21    Q.   What time is that?
22    A.   That is 2:33.
23    Q.   Where is that individual located at that
24  point?
25    A.   He is outside the hotel in the parking

6 (Pages 18 - 21)

Page 22

1 lot.
2    Q.  How much time passed between this first
3 photograph on Exhibit 1 and the photograph you just
4 discussed on Exhibit 2?
5    A.  About nine or 10 minutes.
6    Q.  So 2:26 to 2:33 --
7    A.  Yes.
8    Q.  -- is about the time that passed?
9    A.  Yes.
10    Q.  If we look here in Exhibit 1, is there
11 anything that you notice about the party goers?
12    A.  Yes.  They are wearing different colors.
13    Q.  Would you agree with me that there's both
14 male and females?
15    A.  Yes.
16    Q.  Would you agree with me that there's both
17 African Americans as well as Caucasian individuals?
18    A.  Yes.
19    Q.  And/or Hispanic individual?
20    A.  Yes.
21    Q.  So in Exhibit 1 it appears that the party
22 goers are mixed in terms of races?
23    A.  That is correct.
24    Q.  Exhibit Q goes on to state that you spoke
25 with Erika Trotter.  Do you recall that?

Page 23

1    A.  No.
2    Q.  Do you want to take a look at Exhibit Q to
3 refresh your memory?
4    A.  Yes, Erika.  Yes.
5    Q.  Who is Erika Trotter?
6    A.  She's related, I guess, to the Super 8.
7 She came to Wichita for her mother's funeral.
8    Q.  Did she offer any information that was
9 valuable to you?
10    A.  Yes.  She said she saw the fight take
11 place outside and she said gave me information
12 where she saw -- she said she saw a black male
13 wearing a white T-shirt and white shorts.  They was
14 firing most outside.
15    Q.  Do you know who that individual was that
16 she identified?
17    A.  I do not.
18    Q.  Does the fact that he was wearing a white
19 shirt and black shorts mean anything to you in
20 terms of gang affiliation?
21    A.  No.
22    Q.  Your Exhibit Q goes on to state that you
23 spoke with Tommie Revuelata?
24    A.  Uh-huh.
25    Q.  Is she the individual who purchased the

Page 24

1 room?
2    A.  Yes, she's the one that purchased the
3 room.
4    Q.  Why did she purchase the room?
5    A.  She purchased the room for Zawriah so she
6 could have an all girls party.
7    Q.  Do you know why she purchased it for
8 Zawriah?
9    A.  I do not remember.  For a birthday party.
10    Q.  At that point was the intent at least of
11 Tommie and Zawriah to have some sort of gathering
12 with females?
13    A.  Just females.
14        MR. WILSON: Object to form.
15    Q.  (By Ms. Banahan) Is it your understanding
16 that the intent of Zawriah and Tommie was to have
17 some girls to the room?
18    A.  That is correct.
19    Q.  Is it also your understanding that that
20 plan didn't necessarily work out as intended?
21    A.  Yes.
22    Q.  And, in fact, some males showed up?
23    A.  Yes, they did.
24    Q.  Do you know whether those males were
25 present when the girls checked into the hotel?

Page 25

1    A.  No, they wasn't there initially.
2    Q.  Do you know how they got into the party?
3    A.  Through Snapchat.  Zawriah posted a
4 Snapchat and she let them in through the side doors
5 and everything.
6    Q.  Not through the main lobby?
7    A.  Not through the main lobby, no.
8    Q.  Did you in fact talk with Zawriah McGowan?
9    A.  Yes, I did talk with Zawriah.
10    Q.  Did she admit that she put the party on
11 Snapchat?
12    A.  Yes, she did.
13    Q.  Is Zawriah associated with any gang to
14 your knowledge?
15    A.  Not to my knowledge.
16    Q.  What about Tommie?
17    A.  Not to my knowledge, no.
18    Q.  What about Autumn Beck?
19    A.  Not to my knowledge, no.
20    Q.  What about Kaelyn Worlein?
21    A.  No.
22    Q.  So if I'm understanding correctly, the
23 girls who rented the room were not affiliated to
24 your knowledge with either the Bloods or the Crips?
25    A.  Or the GDs.

7 (Pages 22 - 25)

Page 26

1    Q.  Do you know who Jaylen Thomas is?
2    A.  I was familiar with the name.
3    Q.  Prior to June 20th?
4    A.  Prior to June 20th, yes.
5    Q.  You were familiar with the name?
6    A.  Familiar with the name, yeah.
7    Q.  How was it that you were familiar with the
8    name?
9    A.  He had a couple of run-ins with
10   enforcement.  I was trying to recognize and put
11   names to gang members.  At the time I was familiar
12   with him but I wasn't too familiar, if that makes
13   sense.
14   Q.  GD Folk, do they have a specific color?
15   A.  Gangster Disciples, they are black most of
16   the time.
17   Q.  Their outfit?
18   A.  Bandanas that they wear --
19   Q.  Are black?
20   A.  Yes.
21   Q.  In your report it says the Zawriah said
22   that Jaylen Thomas was the main one arguing with
23   people.
24   A.  Yes.
25   Q.  Is that what she told you?

Page 27

1    A.  Yes.  That's exactly what she told me.
2    Q.  Was it your understanding that Jaylen
3    Thomas got into some argument or altercation in the
4    parking lot?
5    A.  Yes.
6    Q.  Was it your understanding that the
7    individual with whom he got into an altercation
8    with had also been at the party?
9    A.  Yes.
10   Q.  Do you know what that altercation was
11   about?
12   A.  No, I do not.
13   Q.  Yesterday when we talked with Sergeant
14   Kimble we talked about the crime of opportunity
15   versus a targeted crime.
16   A.  Okay.
17   Q.  Do you understand generally what I mean
18   when I say those two words?
19   A.  Uh-huh.
20   Q.  Would you agree with me that a crime of
21   opportunity is a crime that someone commits because
22   the opportunity arises?
23   A.  Yes.
24   Q.  And would you agree with me that a
25   targeted crime is a crime that an individual

Page 28

1    commits against another individual specifically?
2    A.  Yes.
3    Q.  So when I spoke with Sergeant Kimble, I
4    gave him the example of someone who was pumping gas
5    and their keys are in the ignition and an
6    individual comes by, hops in the car and steals the
7    car.  Would you agree that's a crime of
8    opportunity?
9    A.  Yes, that's a crime of opportunity.
10   Q.  Also, when with Sergeant Kimble we talked
11   about this crime specifically and he agreed that
12   this was a targeted crime.  Would you agree with
13   that characterization as well?
14   A.  Yes, I agree with that.
15   Q.  Why would you agree that this was a
16   targeted crime?
17   A.  Just based off the fact there was two
18   different gang members from the different sets and
19   usually they don't get along.
20   Q.  Would another factor to consider be the
21   the fact that a crime started after an altercation
22   started?
23   A.  Yes.
24   Q.  Do you know who that evening had guns?
25   A.  No, I do not.

Page 29

1    Q.  Do you know who shot, who fired shots that
2    evening?
3    A.  No, I do not.
4    Q.  Do you recall watching the video of the
5    actual altercation?
6    A.  No.
7    Q.  Do you have any information as we sit here
8    who fired the bullets that struck Maella Blalock?
9    A.  No, I do not.
10   Q.  Do you have any indication as to the
11   location of the individual when they fired the
12   bullet that struck Ms. Blalock?
13   A.  Yes.  It had to be right here in that
14   parking lot where they were fighting.
15   Q.  Is that based upon the fact that you see
16   that photograph?
17   A.  Yes, and the fact she was on the first
18   floor.
19   Q.  But in regard to the specific shot that
20   injured Ms. Blalock, can you give me with any level
21   of certainty where the shooter was when they fired
22   that?
23   A.  It had to be in this general area right
24   here (indicating.)
25   Q.  But outside of a general area, can you be

8 (Pages 26 - 29)

Page 30

1 certain?
2    A.  Yeah.  I can't, honestly can't.  I just
3 saw where the bullet hole outside the hotel, how
4 they entered the building.  The shell casings were
5 located in the street.
6    Q.  Where were the shell casings located?
7    A.  Out in the parking lot.  They were
8 everywhere honestly.
9    Q.  You don't know which of those shell
10 casings corresponds to the bullet that hit Maella
11 Blalock; correct?
12    A.  No, ma'am, I do not.
13    Q.  Where in the parking lot were those shell
14 casings located?
15    A.  From what I remember, along the street
16 area right here (indicating.)
17    Q.  When you say the street area, what do you
18 mean by that?
19    A.  So like you have got your cars parked
20 along right there; so then where the cars travel so
21 right in the middle, in between the parking stalls.
22    Q.  Let's look at Defendant's Exhibit D.  Can
23 you tell me what this is?
24    A.  That's the aerial diagram of the Super 8.
25    Q.  Where on this map would the Super 8 be

Page 31

1 located?
2    A.  3741, right here (indicating.)
3    Q.  Where that circle --
4    A.  Yeah, where the circle is.
5    Q.  All right.  The area where you found the
6 casings, where would that be?
7    A.  Right here (indicating.)
8    Q.  Would that be where the green line is?
9    A.  The green line, yes.
10    Q.  Do you know what this building with the
11 square around it is?
12    A.  I think that's like adjacent apartment
13 buildings next to it.  I forget what it's called.
14    Q.  I'll represent to you that that's been
15 identified as the Comfort Inn and Suites.  Does that
16 make sense?
17    A.  That makes sense, yes.
18    Q.  The area that you were talking about where
19 cars drive, are you indicating this parking lot of
20 the Super 8?
21    A.  Yes, the parking lot of the Super 8; yes.
22    Q.  And then right to the south of it is the
23 parking lot for the Comfort Inn?
24    A.  Yes.
25    Q.  Is that accurate?

Page 32

1    A.  Yes.
2    Q.  Where the shell casings and bullets were
3 in that general area?
4    A.  Yes.  From what I remember, yes.
5    Q.  Other than conducting those interviews at
6 the scene, did you do anything else while at the
7 Super 8?
8    A.  From what I remember, I walked around,
9 checked cars to make sure, document on cars that
10 was hit.  But I got dragged back into the hotel to
11 secure the scene and stay by most of the evidence
12 in there.
13    Q.  Do you recall if you talked to any of the
14 employees from the hotel?
15    A.  Not that I remember.
16    Q.  After Ms. Blalock left on the stretcher
17 did you speak with her again?
18    A.  No, I did not.
19    Q.  After your initial investigation at the
20 scene did you conduct anymore investigation into
21 the cause of this shooting?
22    A.  Not that I remember, no.
23    Q.  At any point in your investigation did you
24 discover any firearms inside the Super 8?
25    A.  No, not that I remember.

Page 33

1    Q.  At any point in your investigation did you
2 determine that any gunfire had been exchanged
3 inside the Super 8?
4    A.  Not that I remember.
5    Q.  Do you think that would be something you
6 would remember?
7    A.  Yes.  I think that would be, yes.
8    Q.  To the best of your knowledge, did all of
9 the gunfire that was exchanged occur outside of the
10 Super 8?
11    A.  Yes.  From what I remember, yes.
12    Q.  And to the best of your knowledge, did the
13 altercation that ensued prior to the gunfire occur
14 in the parking lot?
15    A.  Yes, correct.
16    Q.  Do you know what individuals other than
17 Maella Blalock were injured by gunfire?
18    A.  No, no, I do not.
19    Q.  Do you know if Mr. Jaylen Thomas was
20 injured?
21    A.  No.  I don't remember.
22    Q.  Do you know who Marion Norwood is?
23    A.  No, I do not.
24    Q.  Do you know who Malik Banks is?
25    A.  That name sounds familiar.

9 (Pages 30 - 33)

1    Q.  As we sit here today can you give me
2  anything other than it sounds familiar?
3    A.  No, ma'am.
4    Q.  What about Torrance Shaw?
5    A.  No.
6    Q.  What about Deonte Minnis?
7    A.  That sounds familiar.
8    Q.  Based on the testimony you have given here
9  today, it sounds like to me your investigation
10  centered on what happened before gunfire was
11  exchanged, up until the point that the individuals
12  left the hotel.
13    A.  Yes; correct.
14    Q.  Is that fair?
15    A.  That's fair.
16    Q.  It sounds like some of the other officers
17  investigated what happened in the parking lot; is
18  that fair?
19    A.  Yes, that's fair.
20    Q.  Would you say that in terms of what you
21  are able to testify to, you are most comfortable
22  testifying about what happened inside the Super 8
23  before the gunfire was exchanged?
24    A.  Yes, correct.
25    Q.  I think that's all I have for you.

1            CROSS EXAMINATION
2  BY MR. WILSON:
3    Q.  Officer Whisby, how long have you been on
4  Beat 46?
5    A.  I was on Beat 45 for about, now about
6  three years.  I'm a relief officer for 45.
7    Q.  Have you ever been on Beat 46?
8    A.  I go back and forth.  If Psych is not
9  there I'll fill in.
10    Q.  I want to direct your attention -- can you
11  give him a copy of his report, direct your
12  attention to the second page -- I don't know if
13  it's the second page or not, talking about your
14  conversation with Zawriah.  Down here in the last
15  paragraph it says, "Zawriah also stated that she
16  spent most of the night trying to keep the peace at
17  the party due to all the arguing that was going on
18  at the party while it was active."  Do you see
19  that?
20    A.  Uh-huh.
21    Q.  Is that a yes?
22    A.  Yes.
23    Q.  Fair to say that even though the shooting
24  didn't happen inside the hotel, all the altercation
25  leading to it did?

1    A.  Yes.
2    Q.  I want to make sure I understand your
3  testimony.  You would agree with me color alone,
4  color of clothes someone is wearing is not enough
5  to determine if a person is in a gang?
6    A.  Yes.
7    Q.  But it is one indicator of gang
8  membership?
9    A.  Yes.
10    Q.  Would you agree with me if you have a lot
11  of people in a group wearing the same color, that
12  could also be an indicator of gang membership?
13    A.  Yes.
14    Q.  Officer, I want you to take a look at
15  Exhibits 1, 2, 3, 4, 5.  Can you identify any of
16  the people in these photographs?
17    A.  No.
18    Q.  Can you take a look at Exhibits 1 and 2 as
19  well.
20    A.  No.  I know this one but I forgot his name
21  (indicating).
22    Q.  You are pointing, is that Exhibit 1?
23    A.  Yes.
24    Q.  Looks like it's the second picture down on
25  the right-hand side, an individual wearing a red

1  shirt?
2    A.  Yeah.
3    Q.  So you recognize him but you don't know
4  his name?
5    A.  I've seen him a bunch of times but I
6  forgot his name.
7    Q.  Do you know whether or not he's a gang
8  member?
9    A.  He's a Crip.
10    Q.  Were there Crips, Bloods and GD Folk at
11  this party?
12    A.  Yes.
13    Q.  Recipe for disaster; do you agree?
14    A.  I agree.
15    Q.  Earlier you were pointing to Exhibit 2, I
16  believe, when you were saying -- you were pointing
17  to one of the photos, the shooters were here when
18  they fired the shots.
19    A.  Yes.
20    Q.  You are pointing to the 3rd photograph
21  down on Exhibit 2?
22    A.  Yeah.
23    Q.  Earlier you were asked about crimes of
24  opportunity versus targeted crime.  Do you remember
25  that?

Page 38

1    A.   Yes.
2    Q.   Sergeant Kimble talked to us about the
3  broken glass or broken window theory.  Are you
4  familiar with that?
5    A.   No.
6    Q.   Well, he used it to explain -- he was
7  using that to explain crime of opportunity.
8  Basically just was you have got a storefront with a
9  broken window.  If that doesn't get fixed it may
10 attract more people because it's in a delipidated
11 condition.  It attracts more crime if nothing is
12 done to fix it.  It builds and builds and builds.
13 Are you familiar with that concept or phrase?
14   A.   Yes.
15   Q.   One of the things Sergeant Kimble talked
16 about, if you have a business and there is a lot of
17 crime going on on the property and they don't do
18 anything about it, that can create opportunity for
19 crime.  I want to know if you agree with that.
20   A.   I do agree with that.
21   Q.   For instance, if a business owner knows
22 there's prostitution happening on the property and
23 they don't do anything to mitigate that that could
24 create for violent crime on the property?
25   A.   I agree.

Page 39

1    Q.   If a business knows there's drug activity
2  on the property that could also create an
3  opportunity for violent crime?
4    A.   I agree with that.
5    Q.   If the business owner has either direct
6  knowledge or been informed that there's gang
7  members on the property and they don't do anything
8  about that, that, too, can create an opportunity
9  for violent crime?
10   A.   I agree with that.
11   Q.   So my question to you, Officer Whisby, if
12 that's what the facts show that the SBKBS, who was
13 the owner of the Super 8, knows about prostitution,
14 drug dealing, gang members on its property, other
15 crimes happening on this property and a rising
16 crime rate on the property and they don't do
17 anything about it, that can create an opportunity
18 for violent crime?
19       MS. BANAHAN: Object to the form of the
20 question.
21   Q.   (By Mr. Wilson) You would agree?
22   A.   Yes, I agree.
23   Q.   The creation of an opportunity for
24 violent crime is going to lead towards gang members
25 coming to the property?

Page 40

1        MS. BANAHAN: I'll object to the form of
2  the question.
3    Q.   (By Mr. Wilson) Do you agree?
4    A.   Yes.
5    Q.   When you have gang members congregating on
6  a property, that creates an increased risk for
7  violent crime.  Do you agree?
8    A.   Yes.
9    Q.   So I know you said based on what you knew,
10 based on your investigation, you would agree
11 that this was a targeted crime.  If we assume
12 everything I just said was true, Super 8 was aware
13 of all of that crime, didn't do anything about it
14 and as a result gang members ended up on the
15 property and the shooting happened, would you
16 agree?
17   A.   Yes.
18       MS. BANAHAN: Objection.
19   Q.   (By Mr. Wilson) That's all the questions I
20 have, Officer Whisby.
21           REDIRECT EXAMINATION
22 BY MS. BANAHAN:
23   Q.   Officer Whisby, Mr. Wilson just asked you
24 a series of questions that required you to assume
25 the truth of some evidence that you have not seen;

Page 41

1  fair?
2    A.   Fair.
3    Q.   As you sit here today, you have not seen
4  evidence that the hotel knew or could have known of
5  gang activity; correct?
6    A.   Right.
7    Q.   Nor have you seen any evidence that the
8  hotel knew or could have known about prostitution
9  on the property; correct?
10   A.   Correct.
11   Q.   Mr. Wilson also asked you some questions
12 about whether people wearing a certain color could
13 be an indicator of gang affiliation; correct?
14   A.   Correct.
15   Q.   And you answered that it could be; right?
16   A.   Yes, it could be.
17   Q.   As a police officer is that something
18 that you are trained to look for?
19   A.   Yes, and other signs.
20   Q.   And I guess my question is, do you agree
21 with me that as a general proposition we do not
22 want businesses looking at an individual in a
23 certain color and assuming that they are a member
24 of a gang?
25       MR. WILSON: Object to form.

11 (Pages 38 - 41)

1    A.   Correct, yes.
2    Q.   (By Ms. Banahan) So at the Super 8 Motel,
3  if a boys youth baseball team comes in wearing red
4  shirts, would that be an indicator that they might
5  be a member of the Crips?
6    A.   No.
7    Q.   Likewise, if a family wearing all blue
8  comes in, is that an indicator that they might be a
9  member of the Crips?
10    A.   It depends.
11    Q.   Okay. Why does it depend?
12    A.   Based off my experience and there's
13  family members that are gang affiliated.  Moms,
14  aunties, cousins, so it's a family thing.
15    Q.   And you would need further information?
16    A.   I would need further information,
17  correct; yes.
18    Q.   In your opinion then, would it be fair for
19  the owner of a business to just assume --
20    A.   It would not be fair.
21    Q.   -- that because someone is a certain race
22  or wearing a certain color, they might be gang
23  affiliated?
24    A.   That wouldn't be fair.
25    Q.   Likewise, have you heard people use the

1  characterization that someone is in a gang when in
2  fact they are not actually in a gang?
3    A.   Yes, correct.
4    Q.   Or have you heard individuals say gang
5  activity and they are using gang activity
6  incorrectly?
7    A.   Yes.
8    Q.   Have you heard of instances where someone
9  is making a generalization based on the physical
10  appearance of a person?
11    A.   Yes.
12    Q.   Would you agree with me that that's not
13  something we want to encourage either?
14    A.   No, we don't.
15    Q.   Because ultimately if we use physical
16  characteristics to group people into different
17  categories, that's not necessarily proper either.
18    A.   No, it's not.
19    Q.   And the fact is that there are some
20  individuals who might be wearing a certain color or
21  be of a certain race who aren't members of a gang.
22    A.   Yes.
23    Q.   And that's probably more likely more
24  prevalent than members who are of a certain race,
25  wearing a certain color who are in a gang.

1    A.   Yes.
2    Q.   So to a lay person who is not a police
3  officer, looking at a group of people in a
4  different color is not going to tell them that they
5  are in a gang; correct?
6    A.   No, it's not.
7    Q.   Without substantiated proof that there's
8  been gang activity on the property of a business,
9  those signs are not something that they are
10  necessarily going to be looking out for; correct?
11    A.   Correct.
12    Q.   Based on the testimony you have given
13  today, the party that was held at the Super 8 was
14  not supposed to be a gang party; correct?
15    A.   No, it was not.
16         MR. WILSON: Object to form.
17    A.   No, it was not.
18    Q.   (By Ms. Banahan) It was supposed to be a
19  girls party; correct?
20    A.   Yes.
21    Q.   So I think Mr. Wilson talked about the
22  broken window theory; correct?
23    A.   Yes
24    Q.   You're not familiar with that theory?
25    A.   I was not.

1    Q.   Likewise, you're not familiar with the
2  calls for service logged for the Super 8; correct?
3    A.   Correct.
4    Q.   So any questions about prior instances of
5  crime on the property would be speculative on your
6  part; fair?
7    A.   Not necessarily.  I have been at the Super
8  8 multiple times for some past incidents.
9    Q.   Before June 20th?
10    A.   Before June 20th, yes.
11    Q.   As you sit here today do you have
12  knowledge of those exact --
13    A.   Just a little bit, yes.
14    Q.   Were any of them for gang-related
15  activity?
16    A.   No.  Some was for DV and people bringing
17  guns into the hotel.
18    Q.   The domestic violence reports that you
19  made, again, would those be targeted crimes?
20    A.   Yes.
21    Q.   We went over a number of reports with
22  Officer Penner to the Super 8 and he explained
23  domestic violence as an assault or a battery that
24  happened between two individuals that have some
25  type of intimate relationship.

12 (Pages 42 - 45)

Page 46

1    A.  Yes.
2    Q.  Whether it be a family relationship,
3  boyfriend/girlfriend, husband and wife.  Do you
4  agree with that?
5    A.  I agree with that.
6    Q.  He classified those as targeted crime.
7    A.  Yes.
8    Q.  Fair?
9    A.  Fair.
10    Q.  In the instances where you went to the
11  Super 8 for reports of firearms, were you called to
12  the Super 8 by the employees?
13    A.  I was.
14    Q.  Was that because they wanted to get --
15    A.  Firearms out of the hotel, yes.
16    Q.  Is that how you would have advised them to
17  act in that situation?
18    A.  Yes.
19    Q.  So that would go against kind of that
20  broken window theory; correct --
21      MR. WILSON: Object to form.
22    A.  Correct.
23    Q.  (By Ms. Banahan) -- in the fact they saw
24  something and they reported it to the best person;
25  right?

Page 47

1      MR. WILSON: Same objection.
2    A.  Yes.
3    Q.  (By Ms. Banahan) That person being the
4  Wichita Police?
5      MR. WILSON: Same objection.
6    A.  Yes.
7    Q.  (By Ms. Banahan) So as we sit here today,
8  it would not be your testimony that the hotel made
9  no effort to avoid crime on its property; correct?
10      MR. WILSON: Object to form.
11    A.  Yes.
12    Q.  (By Ms. Banahan) Would you also agree
13  that having surveillance cameras is a good step in
14  preventing or stopping crime?
15      MR. WILSON: Object to form.
16    A.  I would agree.
17    Q.  (By Ms. Banahan) Do you believe that the
18  hotel employee took the right step in asking the
19  individuals to leave?
20      MR. WILSON: Same objection.
21    A.  Yes.
22    Q.  That's all I have for you.
23      RECROSS EXAMINATION
24  BY MR. WILSON:
25    Q.  Officer Whisby, those party goers, were

Page 48

1  they part of a youth baseball team?
2    A.  No, they are not.
3    Q.  Ms. Banahan asked you some questions about
4  what we want.  We want hotels to assume people are
5  in gangs and things like that.  What I want to pose
6  to you, I think you agree, we don't want businesses
7  to make decisions on who to serve based off
8  assumptions; right?
9    A.  Yes, I agree.
10    Q.  For instance, we don't want people getting
11  kicked out because they are wearing a certain color
12  shirt.
13    A.  That is correct.
14    Q.  We don't want speculation or suspicion
15  that they are a gang member; right?
16    A.  Yes.
17    Q.  I think we were talking about something
18  different when I asked you, we still want hotels to
19  try to mitigate?
20    A.  Yes.
21    Q.  We want hotels to want to try to protect
22  the patrons?
23    A.  Yes.
24    Q.  To provide adequate security?
25    A.  That is correct.

Page 49

1    Q.  We want motels to be on the lookout for
2  crime on the property?
3    A.  Yes.
4    Q.  And even if they don't have substantiation
5  that someone is in fact a gang member, if they are
6  getting reports from multiple people saying there's
7  gang members they ought to do something about that,
8  shouldn't they?
9      MS. BANAHAN: Object to the form.
10    Q.  (By Mr. Wilson) You would agree?
11    A.  Yes.
12    Q.  I know when Ms. Banahan asked you you said
13  you weren't familiar with the broken window theory.
14  I think you told me you weren't familiar with the
15  label for it but the concept?
16    A.  Yes.
17    Q.  That's all I have.
18      FURTHER REDIRECT EXAMINATION
19  BY MS. BANAHAN:
20    Q.  Officer Whisby, just a couple.  You were
21  asked if the hotel should be on the lookout if they
22  were told gang members were on the property; right?
23    A.  Uh-huh.
24    Q.  And you stated that they should be; right?
25    A.  Yes, they should.

13 (Pages 46 - 49)

Page 50

1    Q.  If the notice to the hotel was an on-line
2  review that said that there was a gang banger
3  looking individual outside the hotel, would that
4  dilute a bit your opinion about that statement?
5    A.  Yeah.
6    Q.  Again, is that the kind of stuff we're
7  trying to avoid when we put characterizations on
8  people?
9    A.  Yes.
10   Q.  Because someone could be incorrectly
11  labeled in that scenario?
12        MR. WILSON: Same objection.
13   Q.  (By Ms. Banahan) Fair?
14   A.  I agree.
15   Q.  That's all I have.
16        FURTHER RECROSS EXAMINATION
17  BY MR. WILSON:
18   Q.  What if there was a citizen reviews
19  there's gang members on the property and employees
20  telling them there's gangs on the property?
21        MS. BANAHAN: I'll object to the form.
22   A.  No.  I have to go and investigate myself
23  to see.
24   Q.  (By Mr. Wilson) That's kind of what we're
25  talking about.  When they get something like that

Page 51

1  they don't have to automatically okay, we've got to
2  kick these people out?
3    A.  Yes.
4    Q.  They have got to go look; right?
5    A.  Yes.
6    Q.  They have got to do something; do some
7  type of looking, investigation to say is it true or
8  is it not; right?
9    A.  Yes.
10   Q.  That's all I have.
11        FURTHER REDIRECT EXAMINATION
12  BY MS. BANAHAN:
13   Q.  To follow up on that, if there's a review
14  on-line that says that there's a gang banger at the
15  hotel, unless that person has committed an active
16  crime, do you think that the hotel is in a position
17  to kick them out because someone thinks they look
18  like a gang banger?
19   A.  No.
20   Q.  You are in a position as a police officer
21  to investigate in a way that the general public is
22  not; correct?
23   A.  Correct, yes.
24   Q.  Do we want members of the general public
25  asking someone if they are a Blood or Crip or GD

Page 52

1  Folk?
2    A.  No.
3    Q.  Do we want members of the public assuming
4  they are a Blood or Crip or GD Folk?
5    A.  No.
6    Q.  That's all I have.
7        FURTHER RECROSS EXAMINATION
8  BY MR. WILSON:
9    Q.  You know what CPTED is?
10   A.  No.
11   Q.  Sergeant Kimble told us it's training
12  that Wichita Police Department offers to businesses
13  on mitigating crime, kind of teaching them how to
14  do that investigation.  Are you familiar with that
15  at all?
16   A.  No.
17   Q.  That's all I've got.
18        MR. HOUGHTON: We'll read and sign.
19        (Whereupon deposition proceedings were
20  concluded at 11:44 a.m.)
21
22
23
24
25

Page 53

1  I have read or have had read to me the foregoing
2  testimony recorded on pages 6 to 52, inclusive, and
3  the same is true and correct to my knowledge and
4  belief.
5
6        _____
7            GLEN WHISBY
8
9  STATE OF_____
10  _____COUNTY)
11  Subscribed and sworn to before me, the undersigned
12  authority this___day of_____, 2023.
13
14
15  _____
16  Notary Public
17
18  _____
19  (Commission Expires)
20
21
22
23
24
  Job No. CS6045326
25  Blalock vs SRKBS Hotel, LLC

14 (Pages 50 - 53)

Page 54

```
1                CERTIFICATE
2   STATE OF KANSAS)
3   SEDGWICK COUNTY)
4      I, Kathy R. Bonfiglio, a Certified Shorthand
5   Reporter for the State of Kansas, do hereby certify
6   that the within-named witness was by me first duly
7   sworn to testify the truth, that the testimony
8   given in response to the questions propounded, as
9   herein set forth, was first taken in machine
10  shorthand and reduced to writing with
11  computer-aided transcription, and is a true and
12  correct record of the testimony given by the
13  witness.  I certify that review of the testimony
14  was requested by the parties.  If any changes are
15  made by the deponent during the time period
16  allowed, they will be appended to the transcript.
17     I further certify that I am not a relative or
18  employee or attorney of any of the parties, or
19  financially interested in the action.
20     WITNESS my hand and official seal at Wichita,
21  Sedgwick County, Kansas, this 21st day
22  of August, 2023.
23
24         Kathy R. Bonfiglio, CSR RPR
25            VERITEXT LEGAL SOLUTIONS
```

Page 55

```
1   Eric Houghton, Esq.
2   ehoughton@wichita.gov
3            August 21, 2023
4   RE:   Blalock, Maella v. SBKBS Hotel, LLC
5      8/15/2023, Glen Whisby (#6045326)
6      The above-referenced transcript is available for
7   review.
8      Within the applicable timeframe, the witness should
9   read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12     The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  erratas-cs@veritext.com
16
17   Return completed errata within 30 days from
18  receipt of testimony.
19   If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22       Yours,
23       Veritext Legal Solutions
24
25
```

Page 56

```
1   Blalock, Maella v. SBKBS Hotel, LLC
2   Glen Whisby (#6045326)
3         E R R A T A  S H E E T
4   PAGE_____ LINE_____ CHANGE_____
5   _____
6   REASON_____
7   PAGE_____ LINE_____ CHANGE_____
8   _____
9   REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  Glen Whisby                     Date
25
```

| & | | |
| --- | --- | --- |

**&**  2:13

**0**

**02552**  1:7

**1**

**1**  20:17 21:1,6
  22:3,10,21
  36:15,18,22
**10**  5:4 22:5
**10:50**  1:15
**11:44**  52:20
**13th**  1:21 2:24
**15**  1:14
**17979**  54:23

**2**

**2**  4:2 20:17
  21:9,18 22:4
  36:15,18 37:15
  37:21
**20**  8:17 9:1
  10:15
**2019**  6:20
**2020**  7:19 8:15
  8:17 9:1,18
  10:15
**2023**  1:14
  53:12 54:22
  55:3
**20c037022**  9:16
**20th**  7:19 10:7
  26:3,4 45:9,10
**21**  1:7 55:3
**211**  2:14

**21st**  54:21
**2500**  2:14
**268-4335**  3:2
**268-4648**  3:1
**2:23**  21:14
**2:26**  22:6
**2:33**  21:22 22:6

**3**

**3**  36:15
**30**  55:17
**314**  2:16,17
**316**  2:7,8 3:1,2
**3241**  2:5
**35**  4:7
**3741**  9:20 31:2
**3rd**  6:8 37:20

**4**

**4**  36:15
**40**  4:8
**425-0414**  2:8
**43**  7:13,24
**45**  7:12,24 35:5
  35:6
**455**  1:21 2:24
**46**  7:25 35:4,7
**47**  4:9
**48**  8:3 10:25
**49**  4:10
**4th**  7:4,8

**5**

**5**  4:3 36:15
**50**  4:11
**51**  4:12

**52**  4:13 53:2
**54**  4:19
**552-4023**  2:16

**6**

**6**  4:6 53:2
**6-20**  9:18
**6045326**  55:5
  56:2
**63102**  2:15
**67202**  1:22
  2:25
**67226**  2:6

**8**

**8**  7:21 8:22
  10:23 11:19
  14:7 15:5
  20:21,23 23:6
  30:24,25 31:20
  31:21 32:7,24
  33:3,10 34:22
  39:13 40:12
  42:2 44:13
  45:2,8,22
  46:11,12
**8/15/2023**  55:5
**884-4423**  2:17

**9**

**977-9999**  2:7

**a**

**a.m.**  1:15 52:20
**able**  34:21
**above**  55:6
**academy**  6:19
  6:22 8:12

**accompany**
  10:17 14:16
**accuracy**  55:9
**accurate**  15:10
  16:13,14,17,18
  20:4 31:25
**acknowledg...**
  55:12
**act**  46:17
**acting**  13:8,8
**action**  54:19
**active**  35:18
  51:15
**activity**  39:1
  41:5 43:5,5
  44:8 45:15
**actual**  29:5
**actually**  43:2
**addition**  18:24
**additional**
  18:25
**adequate**  48:24
**adjacent**  31:12
**admit**  25:10
**advised**  46:16
**aerial**  30:24
**affiliated**  25:23
  42:13,23
**affiliation**
  23:20 41:13
**african**  22:17
**agree**  18:6,23
  19:10,17 22:13
  22:16 27:20,24
  28:7,12,14,15

**[agree - blalock]**

36:3,10 37:13
37:14 38:19,20
38:25 39:4,10
39:21,22 40:3
40:7,10,16
41:20 43:12
46:4,5 47:12
47:16 48:6,9
49:10 50:14
**agreed** 28:11
**aided** 54:11
**allotted** 55:20
**allowed** 54:16
**altercation**
14:3 27:3,7,10
28:21 29:5
33:13 35:24
**americans**
22:17
**answer** 19:8,16
**answered**
41:15
**anymore** 32:20
**apartment**
31:12
**appearance**
43:10
**appearances**
2:1 4:2
**appears** 22:21
**appended**
54:16
**applicable** 55:8
**area** 17:13
29:23,25 30:16

30:17 31:5,18
32:3
**argue** 16:12
20:3
**arguing** 26:22
35:17
**argument** 27:3
**arguments**
12:12
**arises** 27:22
**asked** 15:13,23
16:8 37:23
40:23 41:11
48:3,18 49:12
49:21
**asking** 47:18
51:25
**assault** 45:23
**assess** 12:5
19:6
**assessed** 11:17
**associated**
25:13
**assume** 40:11
40:24 42:19
48:4
**assuming** 19:12
41:23 52:3
**assumptions**
48:8
**attached** 55:11
**attempts** 21:15
**attention** 35:10
35:12

**attorney** 2:22
54:18 55:13
**attract** 38:10
**attracts** 38:11
**august** 1:14
54:22 55:3
**aunties** 42:14
**authority** 53:12
**automatically**
51:1
**autumn** 12:8
15:2,7 16:10
16:15 25:18
**autumn's** 17:2
**available** 55:6
**avoid** 47:9 50:7
**aware** 40:12
**awhile** 8:13

**b**

**b** 2:12
**back** 13:17
32:10 35:8
**banahan** 2:12
4:6,8,10,12 6:6
18:14,21 19:10
19:18 24:15
39:19 40:1,18
40:22 42:2
44:18 46:23
47:3,7,12,17
48:3 49:9,12
49:19 50:13,21
51:12
**bandanas**
17:15 26:18

**banger** 50:2
51:14,18
**banks** 33:24
**baseball** 42:3
48:1
**based** 16:19
19:13,18 20:4
28:17 29:15
34:8 40:9,10
42:12 43:9
44:12 48:7
**basically** 38:8
**battery** 45:23
**beat** 7:10,24,25
8:2 10:25 11:5
35:4,5,7
**beck** 12:9 15:2
15:4,7 25:18
**behalf** 2:2,11
2:20
**belief** 53:4
**believe** 37:16
47:17
**best** 9:21 33:8
33:12 46:24
**better** 19:5
**birthday** 24:9
**bit** 45:13 50:4
**black** 17:17
23:12,19 26:15
26:19
**blalock** 1:5
11:24 12:6
13:19,21,24
14:2,5,9,13,16

**[blalock - context]**

15:1 29:8,12
29:20 30:11
32:16 33:17
53:25 55:4
56:1
**bleeding** 12:2
**blood** 13:3
51:25 52:4
**bloods** 17:7,11
17:19,20 18:11
25:24 37:10
**blue** 18:9 42:7
**bonfiglio** 1:25
54:4,24
**bought** 12:22
**boyfriend** 46:3
**boys** 42:3
**brandon** 10:5
**bringing** 45:16
**broadway** 2:14
**broken** 38:3,3
38:9 44:22
46:20 49:13
**building** 30:4
31:10
**buildings** 31:13
**builds** 38:12,12
38:12
**bullet** 29:12
30:3,10
**bullets** 29:8
32:2
**bunch** 37:5
**bureau** 7:2,6

**business** 38:16
38:21 39:1,5
42:19 44:8
**businesses**
41:22 48:6
52:12

**c**

**call** 7:21 11:5
**called** 11:7 12:4
31:13 46:11
**calls** 45:2
**calm** 13:7
**camera** 20:21
20:22
**cameras** 47:13
**capacity** 6:14
**car** 28:6,7
**cars** 30:19,20
31:19 32:9,9
**case** 1:7 9:14
9:22
**casings** 30:4,6
30:10,14 31:6
32:2
**categories**
43:17
**caucasian**
22:17
**cause** 32:21
**causing** 13:6,10
**centered** 34:10
**certain** 30:1
41:12,23 42:21
42:22 43:20,21
43:24,25 48:11

**certainty** 29:21
**certificate** 4:19
54:1
**certified** 54:4
**certify** 54:5,13
54:17
**change** 56:4,7
56:10,13,16,19
**changes** 54:14
55:10
**chaos** 11:14
**characteristics**
19:14 43:16
**characterizati...**
28:13 43:1
**characterizati...**
50:7
**checked** 24:25
32:9
**circle** 31:3,4
**citizen** 50:18
**city** 1:3,20 2:20
2:22 6:21,25
**classified** 46:6
**cleared** 14:23
**clerk** 15:13
**clothes** 36:4
**clues** 18:25
**color** 17:10,16
18:3,15,24
26:14 36:3,4
36:11 41:12,23
42:22 43:20,25
44:4 48:11

**colors** 22:12
**come** 13:1
**comes** 28:6
42:3,8
**comfort** 31:15
31:23
**comfortable**
34:21
**coming** 39:25
**commission**
53:19
**commits** 27:21
28:1
**committed**
51:15
**completed**
55:17
**computer**
54:11
**concept** 38:13
49:15
**concluded**
52:20
**condition** 38:11
**conduct** 11:18
32:20
**conducted**
11:20
**conducting**
32:5
**congregating**
40:5
**consider** 28:20
**context** 21:4

**conversation** 35:14
**copies** 55:14
**copy** 9:22 35:11
**correct** 9:15 10:7,8 11:8 13:19,22 15:3 15:24,25 16:2 16:3,9,22,24 17:9,21 18:13 19:1,17 20:11 21:12 22:23 24:18 30:11 33:15 34:13,24 41:5,9,10,13,14 42:1,17 43:3 44:5,10,11,14 44:19,22 45:2 45:3 46:20,22 47:9 48:13,25 51:22,23 53:3 54:12
**correctly** 25:22
**corresponds** 30:10
**counsel** 55:14
**county** 53:10 54:3,21
**couple** 12:8 26:9 49:20
**court** 1:1 4:22
**cousins** 42:14
**cpted** 52:9

**create** 38:18,24 39:2,8,17
**creates** 40:6
**creation** 39:23
**crime** 27:14,15 27:20,21,25,25 28:7,9,11,12,16 28:21 37:24 38:7,11,17,19 38:24 39:3,9 39:16,18,24 40:7,11,13 45:5 46:6 47:9 47:14 49:2 51:16 52:13
**crimes** 37:23 39:15 45:19
**crip** 37:9 51:25 52:4
**crips** 18:10 25:24 37:10 42:5,9
**cross** 35:1
**cs** 55:15
**cs6045326** 1:24 53:24
**csr** 1:25,25 54:24
**currently** 6:9 8:4
**custody** 4:21
**cv** 1:7

**d**

**d** 30:22
**dagestad** 2:12
**date** 9:17 10:23 56:24
**day** 53:12 54:21
**days** 55:17
**dealing** 39:14
**decided** 13:15
**decisions** 48:7
**defendant** 1:9 2:11 5:3
**defendant's** 9:10 10:1,9,12 30:22
**definitely** 19:1
**delipidated** 38:10
**deonte** 34:6
**department** 1:20 2:23 6:13 6:15,22 52:12
**depend** 42:11
**depends** 42:10
**deponent** 54:15 55:13
**deposing** 55:13
**deposition** 1:11 7:15 9:4 52:19
**deputy** 2:22
**description** 5:2
**determine** 18:3 33:2 36:5

**devaughn** 2:4
**devaughnjam...** 2:9
**diagram** 30:24
**different** 22:12 28:18,18 43:16 44:4 48:18
**dilute** 50:4
**direct** 6:5 35:10 35:11 39:5
**disaster** 37:13
**disciples** 26:15
**discover** 32:24
**discuss** 9:23
**discussed** 22:4
**dispatched** 11:1
**district** 1:1,2
**dixon** 2:13
**dixon.com** 2:18
**document** 32:9
**documents** 20:18
**domestic** 45:18 45:23
**doors** 25:4
**drafted** 10:4
**dragged** 32:10
**drive** 31:19
**drug** 39:1,14
**due** 35:17
**duly** 6:2 54:6
**dv** 45:16

| e | | | |
|---|---|---|---|
| **e**  56:3,3,3 | **erratas**  55:15 | **expires**  53:19 | **fax**  2:8,17 3:2 |
| **earlier**  37:15 | **esq**  55:1 | **explain**  38:6,7 | **feet**  11:25 |
| 37:23 | **evans**  2:13,18 | **explained** | 13:22 |
| **effort**  47:9 | **evening**  28:24 | 45:22 | **females**  22:14 |
| **ehoughton**  3:3 | 29:2 | **exterior**  16:21 | 24:12,13 |
| 55:2 | **event**  9:19 | f | **fight**  12:18 |
| **eight**  8:21 | **eventually** | | 13:10 15:17 |
| **either**  7:24 | 14:19 | **facebook**  17:15 | 16:20 23:10 |
| 18:10 25:24 | **everybody**  13:1 | 17:21 | **fighting**  29:14 |
| 39:5 43:13,17 | 13:10 | **fact**  18:8,23 | **fill**  35:9 |
| **employed**  6:10 | **evidence**  32:11 | 20:9 21:10 | **financially** |
| **employee**  15:16 | 40:25 41:4,7 | 23:18 24:22 | 54:19 |
| 15:19,23 16:8 | **exact**  45:12 | 25:8 28:17,21 | **fire**  12:4 14:22 |
| 20:10 21:7 | **exactly**  27:1 | 29:15,17 43:2 | **firearm**  21:19 |
| 47:18 54:18 | **examination** | 43:19 46:23 | **firearms**  32:24 |
| **employees** | 4:5 6:5 35:1 | 49:5 | 46:11,15 |
| 32:14 46:12 | 40:21 47:23 | **factor**  28:20 | **fired**  12:19 |
| 50:19 | 49:18 50:16 | **facts**  39:12 | 20:14 29:1,8 |
| **employer**  6:12 | 51:11 52:7 | **fails**  55:19 | 29:11,21 37:18 |
| **ems**  12:4 14:22 | **example**  28:4 | **fair**  17:2,3 18:4 | **firing**  23:14 |
| **encourage** | **exchanged**  33:2 | 18:5,21,22 | **first**  6:2 10:22 |
| 43:13 | 33:9 34:11,23 | 34:14,15,18,19 | 11:23 13:18 |
| **ended**  40:14 | **exhibit**  4:21 | 35:23 41:1,2 | 21:1,5,13 22:2 |
| **enforcement** | 9:10 10:1,9,12 | 42:18,20,24 | 29:17 54:6,9 |
| 26:10 | 10:17,20 19:19 | 45:6 46:8,9 | **five**  7:11 |
| **ensued**  33:13 | 20:17 21:1,6,9 | 50:13 | **fix**  38:12 |
| **enter**  14:10 | 21:18 22:3,4 | **familiar**  17:13 | **fixed**  38:9 |
| **entered**  30:4 | 22:10,21,24 | 17:17,23 26:2 | **floor**  1:21 2:24 |
| **eric**  55:1 | 23:2,22 30:22 | 26:5,6,7,11,12 | 29:18 |
| **erik**  2:21 | 36:22 37:15,21 | 33:25 34:2,7 | **folk**  13:5 26:14 |
| **erika**  22:25 | **exhibits**  4:3,22 | 38:4,13 44:24 | 37:10 52:1,4 |
| 23:4,5 | 5:1 10:17 | 45:1 49:13,14 | **follow**  51:13 |
| **errata**  55:11,13 | 36:15,18 | 52:14 | **footage**  20:21 |
| 55:17 | **experience** | **family**  42:7,13 | 20:22 |
| | 42:12 | 42:14 46:2 | |

**[foregoing - hotel]** Page 6

| | | | h |
|---|---|---|---|
| **foregoing** 53:1 | 43:5,21,25 | **given** 34:8 | |
| **forget** 31:13 | 44:5,8,14 | 44:12 54:8,12 | **h** 56:3 |
| **forgot** 36:20 | 45:14 48:15 | **glass** 38:3 | **halfway** 21:9 |
| 37:6 | 49:5,7,22 50:2 | **glen** 1:12 4:5 | **hall** 1:20 |
| **form** 18:12 | 50:19 51:14,18 | 5:3 6:1,8 53:7 | **hand** 9:9,25 |
| 19:7,15 24:14 | **gangs** 48:5 | 55:5 56:2,24 | 10:11 20:16 |
| 39:19 40:1 | 50:20 | **go** 9:6 13:17 | 36:25 54:20 |
| 41:25 44:16 | **gangster** 26:15 | 35:8 46:19 | **happen** 35:24 |
| 46:21 47:10,15 | **gas** 28:4 | 50:22 51:4 | **happened** |
| 49:9 50:21 | **gather** 15:9 | **goers** 22:11,22 | 11:11 16:4 |
| **forth** 35:8 54:9 | 20:2 | 47:25 | 19:25 34:10,17 |
| **forty** 7:11 | **gathering** | **goes** 16:10 | 34:22 40:15 |
| **found** 31:5 | 24:11 | 22:24 23:22 | 45:24 |
| **foundation** | **gd** 13:5 26:14 | **going** 9:9,25 | **happening** 21:5 |
| 18:20 19:7,15 | 37:10 51:25 | 10:11 11:16 | 38:22 39:15 |
| **four** 6:18 | 52:4 | 13:17 20:16 | **heard** 10:25 |
| **friend's** 20:1,8 | **gds** 25:25 | 35:17 38:17 | 11:2 12:18 |
| **friends** 19:21 | **general** 9:6,8 | 39:24 44:4,10 | 42:25 43:4,8 |
| 19:21 | 18:7 19:6,12 | **good** 47:13 | **held** 44:13 |
| **funeral** 23:7 | 29:23,25 32:3 | **graduate** 6:19 | **hid** 16:17 |
| **further** 42:15 | 41:21 51:21,24 | 8:11 | **hispanic** 22:19 |
| 42:16 49:18 | **generalization** | **green** 31:8,9 | **hit** 30:10 32:10 |
| 50:16 51:11 | 43:9 | **group** 36:11 | **hole** 30:3 |
| 52:7 54:17 | **generally** 11:21 | 43:16 44:3 | **honestly** 30:2,8 |
| | 27:17 | **guess** 23:6 | **hops** 28:6 |
| g | **generated** 9:22 | 41:20 | **hospital** 14:22 |
| **gang** 12:11 | **getting** 48:10 | **gunfire** 33:2,9 | **hotel** 1:8 7:22 |
| 17:13,15,17,19 | 49:6 | 33:13,17 34:10 | 14:10,17,17,18 |
| 18:4,16 19:13 | **girlfriend** 46:3 | 34:23 | 14:19 15:5,13 |
| 23:20 25:13 | **girls** 12:24 24:6 | **guns** 28:24 | 15:14,19 16:2 |
| 26:11 28:18 | 24:17,25 25:23 | 45:17 | 16:5 19:25 |
| 36:5,7,12 37:7 | 44:19 | **guys** 21:8 | 20:10 21:8,25 |
| 39:6,14,24 | **give** 29:20 34:1 | | 24:25 30:3 |
| 40:5,14 41:5 | 35:11 | | 32:10,14 34:12 |
| 41:13,24 42:13 | | | 35:24 41:4,8 |
| 42:22 43:1,2,4 | | | |

45:17 46:15
47:8,18 49:21
50:1,3 51:15
51:16 53:25
55:4 56:1
**hotels** 48:4,18
48:21
**houghton** 2:21
52:18 55:1
**huh** 23:24
27:19 35:20
49:23
**husband** 46:3

**i**

**idea** 14:13
**identification**
10:10
**identified**
23:16 31:15
**identify** 36:15
**ignition** 28:5
**iii** 6:1
**incident** 7:18
8:1,14 10:15
**incidents** 45:8
**inclusive** 53:2
**incorrectly**
43:6 50:10
**increased** 40:6
**index** 4:1,3 5:1
**indicates** 17:11
**indicating**
29:24 30:16
31:2,7,19
36:21

**indication**
29:10
**indicator** 18:9
18:16 36:7,12
41:13 42:4,8
**individual**
20:25 21:23
22:19 23:15,25
27:7,25 28:1,6
29:11 36:25
41:22 50:3
**individuals**
14:3,10 15:13
15:16,20 20:13
22:17 33:16
34:11 43:4,20
45:24 47:19
**information**
23:8,11 29:7
42:15,16
**informed** 39:6
**initial** 32:19
**initially** 25:1
**injured** 29:20
33:17,20
**injuries** 12:5
**injury** 2:4
**inn** 31:15,23
**ins** 26:9
**inside** 12:20
13:11 14:18
16:2 32:24
33:3 34:22
35:24

**instance** 18:14
38:21 48:10
**instances** 43:8
45:4 46:10
**intended** 24:20
**intent** 24:10,16
**interested**
54:19
**interviewed**
11:22,23
**interviews**
11:18 32:5
**intimate** 45:25
**investigate**
50:22 51:21
**investigated**
34:17
**investigation**
20:5 21:4
32:19,20,23
33:1 34:9
40:10 51:7
52:14
**investigations**
8:18
**invited** 12:25
13:2,4
**involved** 8:18
14:3 15:4

**j**

**jackson** 13:2
**james** 2:4
**jaylen** 13:4,6
26:1,22 27:2
33:19

**jeffrey** 2:3
**job** 1:24 53:24
**june** 7:19 8:14
8:17 9:1 10:7
10:15 26:3,4
45:9,10
**jwilson** 2:9

**k**

**kaelyn** 16:23
17:4 25:20
**kansas** 1:2,3,3
1:22 2:6,20,25
9:12 54:2,5,21
**kathy** 1:25 54:4
54:24
**kbanahan** 2:18
**keep** 13:7 35:16
**kerry** 2:12
**keys** 28:5
**kick** 21:10 51:2
51:17
**kicked** 20:1,8,9
20:13 48:11
**kimble** 17:23
18:2 27:14
28:3,10 38:2
38:15 52:11
**kind** 13:17
46:19 50:6,24
52:13
**knew** 40:9 41:4
41:8
**know** 13:8
15:22 17:10
20:12 21:3

23:15 24:7,24
25:2 26:1
27:10 28:24
29:1 30:9
31:10 33:16,19
33:22,24 35:12
36:20 37:3,7
38:19 40:9
49:12 52:9
**knowing** 21:3
**knowledge**
9:21 25:14,15
25:17,19,24
33:8,12 39:6
45:12 53:3
**known** 14:6
41:4,8
**knows** 38:21
39:1,13
**ks** 1:25

**l**

**label** 49:15
**labeled** 50:11
**lack** 18:19
**lady** 11:23
**law** 2:23
**lawyers** 2:4
**lay** 44:2
**lead** 39:24
**leading** 35:25
**leave** 14:19
15:9,14,16,20
15:24 16:8
21:16 47:19

**led** 14:13
**left** 32:16 34:12
**legal** 54:25
55:23
**level** 8:25 29:20
**likely** 43:23
**likewise** 42:7
42:25 45:1
**line** 31:8,9 50:1
51:14 56:4,7
56:10,13,16,19
**little** 45:13
**llc** 2:13 53:25
55:4 56:1
**lobby** 25:6,7
**located** 21:23
30:5,6,14 31:1
**location** 7:21
9:19 29:11
**logged** 45:2
**long** 6:17 35:3
**look** 18:25 21:9
21:10,12,18
22:10 23:2
30:22 36:14,18
41:18 51:4,17
**looking** 41:22
44:3,10 50:3
51:7
**lookout** 49:1,21
**looks** 19:18,19
21:7,15 36:24
**lot** 12:11 16:12
17:5,12 22:1
27:4 29:14

30:7,13 31:19
31:21,23 33:14
34:17 36:10
38:16
**louis** 2:15

**m**

**ma'am** 17:20
30:12 34:3
**machine** 54:9
**made** 11:14,16
45:19 47:8
54:15
**maella** 1:5
13:19 29:8
30:10 33:17
55:4 56:1
**main** 1:21 2:24
13:9 25:6,7
26:22
**make** 11:15
31:16 32:9
36:2 48:7
**makes** 26:12
31:17
**making** 43:9
**male** 22:14
23:12
**males** 24:22,24
**malik** 33:24
**manager** 12:13
15:8,12
**map** 30:25
**marion** 33:22
**marked** 5:2
9:10 10:1,10

10:12 20:17
**mcgowan**
12:21 19:22
25:8
**mean** 10:19
23:19 27:17
30:18
**member** 13:5
17:11 18:4,7
18:10 19:6,13
37:8 41:23
42:5,9 48:15
49:5
**members** 12:11
17:13 19:11
26:11 28:18
39:7,14,24
40:5,14 42:13
43:21,24 49:7
49:22 50:19
51:24 52:3
**membership**
18:17 36:8,12
**memory** 23:3
**middle** 30:21
**minnis** 34:6
**minutes** 22:5
**mishael** 13:2
**missouri** 2:15
**mitigate** 38:23
48:19
**mitigating**
52:13
**mixed** 22:22

**mo** 1:25
**moms** 42:13
**month** 8:11
**motel** 16:21
  42:2
**motels** 49:1
**mother's** 23:7
**multiple** 11:2
  45:8 49:6

**n**

**nadiyah** 12:9
  12:10,16 19:19
  19:21,21,24
**name** 6:7 11:24
  26:2,5,6,8
  33:25 36:20
  37:4,6
**named** 54:6
**names** 26:11
**nature** 11:5
  16:7
**necessarily**
  18:9,16 24:20
  43:17 44:10
  45:7
**need** 42:15,16
**needed** 11:16
**night** 10:7
  12:13 35:16
**nine** 22:5
**north** 1:21 2:5
  2:14,24 7:3,6
  9:20
**norwood** 33:22

**notary** 53:16
**note** 17:1 55:10
**noted** 17:4
**notice** 22:11
  50:1
**number** 5:2
  9:13,14 45:21

**o**

**oath** 6:2
**object** 18:12
  19:7,15 24:14
  39:19 40:1
  41:25 44:16
  46:21 47:10,15
  49:9 50:21
**objection** 18:19
  40:18 47:1,5
  47:20 50:12
**occur** 33:9,13
**occurred** 7:18
  8:25 16:7
**occurring** 14:6
**offense** 9:12
**offer** 23:8
**offers** 52:12
**officer** 6:16,17
  6:24 8:15 18:8
  18:25 19:3
  35:3,6 36:14
  39:11 40:20,23
  41:17 44:3
  45:22 47:25
  49:20 51:20
**officers** 13:14
  34:16

**official** 54:20
**okay** 16:1 18:6
  27:16 42:11
  51:1
**once** 12:17 13:1
  15:8 20:1
**operate** 17:18
**opinion** 42:18
  50:4
**opportunity**
  27:14,21,22
  28:8,9 37:24
  38:7,18 39:3,8
  39:17,23
**ought** 49:7
**outfit** 26:17
**outside** 12:15
  12:15,17 15:10
  16:5 19:25
  20:2 21:25
  23:11,14 29:25
  30:3 33:9 50:3
**owner** 38:21
  39:5,13 42:19

**p**

**p** 10:1,17
**page** 35:12,13
  56:4,7,10,13,16
  56:19
**pages** 53:2
**paragraph**
  35:15
**parked** 30:19
**parking** 16:12
  21:25 27:4

29:14 30:7,13
  30:21 31:19,21
  31:23 33:14
  34:17
**part** 7:24 19:11
  45:6 48:1
**parties** 54:14
  54:18
**party** 12:11,11
  12:12,13,14,23
  12:23,24 13:1
  13:4,7,11 14:6
  15:4 17:8 20:2
  20:8 22:11,21
  24:6,9 25:2,10
  27:8 35:17,18
  37:11 44:13,14
  44:19 47:25
**partygoers**
  12:8
**passed** 20:12
  22:2,8
**past** 45:8
**patrol** 6:16
  10:25
**patrons** 48:22
**peace** 35:16
**penner** 8:9 10:5
  10:24 45:22
**people** 11:2,15
  13:13 15:9
  16:11,16 20:2
  26:23 36:11,16
  38:10 41:12
  42:25 43:16

| | | | |
|---|---|---|---|
| 44:3 45:16 48:4,10 49:6 50:8 51:2 | **pointing** 36:22 37:15,16,20 **police** 1:20 6:13 6:15,17,21,24 | 50:19,20 **proposition** 41:21 **propounded** | **race** 42:21 43:21,24 **races** 22:22 **radio** 10:25 |
| **perimeter** 11:14 | 9:6 13:14 18:7 18:24 41:17 | 54:8 **prostitution** | 11:2 **ran** 16:17 |
| **period** 54:15 **person** 12:20 | 44:2 47:4 51:20 52:12 | 38:22 39:13 41:8 | **rate** 39:16 **read** 52:18 53:1 |
| 12:21 13:9,25 36:5 43:10 | **pose** 48:5 **position** 19:5 | **protect** 48:21 **provide** 48:24 | 53:1 55:9 **realize** 12:1 |
| 44:2 46:24 47:3 51:15 | 51:16,20 **posted** 12:25 | **psych** 35:8 **public** 18:7 | **realized** 12:2 **reason** 55:11 |
| **photograph** 21:1,13 22:3,3 | 25:3 **prepare** 9:3 | 19:6,12 51:21 51:24 52:3 | 56:6,9,12,15,18 56:21 |
| 29:16 37:20 **photographs** | **present** 24:25 **prevalent** | 53:16 **pumping** 28:4 | **reasons** 11:15 **recall** 10:22 |
| 21:5 36:16 **photos** 37:17 | 43:24 **preventing** | **purchase** 24:4 **purchased** | 11:21 12:7 22:25 29:4 |
| **phrase** 38:13 **physical** 19:13 | 47:14 **prior** 8:17,22 | 23:25 24:2,5,7 **purposes** 10:10 | 32:13 **receipt** 55:18 |
| 43:9,15 **picture** 36:24 | 15:17 26:3,4 33:13 45:4 | **pursuant** 7:15 16:10 | **recipe** 37:13 **recognize** |
| **place** 12:18 15:17,21 16:20 | **probably** 43:23 **problems** 13:6 | **put** 25:10 26:10 50:7 | 20:18,25 21:2 26:10 37:3 |
| 23:11 **plaintiff** 1:6 2:2 | **proceedings** 52:19 | **q** | **recollection** 8:25 |
| **plaintiff's** 20:17 | **proof** 44:7 **proper** 43:17 | **question** 39:11 39:20 40:2 | **record** 6:7 54:12 |
| **plan** 11:16 24:20 | **property** 11:12 11:13 13:12 | 41:20 **questions** 40:19 | **recorded** 53:2 **recross** 47:23 |
| **please** 6:7 **point** 13:16 | 38:17,22,24 39:2,7,14,15,16 | 40:24 41:11 45:4 48:3 54:8 | 50:16 52:7 **red** 12:12 17:5 |
| 14:12,23 15:23 16:1 21:24 | 39:25 40:6,15 41:9 44:8 45:5 | **r** | 17:11,14,16 18:8 36:25 |
| 24:10 32:23 33:1 34:11 | 47:9 49:2,22 | **r** 1:25 54:4,24 56:3,3 | 42:3 |

[redirect - shooting]                                                Page 11

**redirect** 40:21 49:18 51:11
**reduced** 54:10
**reference** 20:7
**referenced** 17:21 55:6
**referencing** 20:9
**refresh** 23:3
**regard** 7:18 29:19
**related** 23:6 45:14
**relationship** 45:25 46:2
**relative** 54:17
**relief** 35:6
**remember** 8:23 11:24 12:9,17 13:3 20:24 24:9 30:15 32:4,8,15,22,25 33:4,6,11,21 37:24
**rented** 25:23
**report** 5:3 9:5,7 9:12,13,17,22 10:3,4,13,14 11:7 13:24 14:2,5,9 15:7 16:11 17:1 19:24 26:21 35:11
**reported** 10:23 13:21 46:24

**reporter** 4:22 54:5
**reporter's** 4:19
**reports** 10:19 45:18,21 46:11 49:6
**represent** 31:14
**requested** 54:14
**required** 40:24
**response** 54:8
**result** 40:14
**retained** 4:22
**return** 55:13,17
**review** 20:22 50:2 51:13 54:13 55:7
**reviews** 50:18
**revuelata** 12:22 23:23
**ride** 8:4,5,6
**riding** 10:6,24
**right** 6:9 29:13 29:23 30:16,20 30:21 31:2,5,7 31:22 36:25 41:6,15 46:25 47:18 48:8,15 49:22,24 51:4 51:8
**ring** 20:4
**rise** 12:16
**rising** 16:11 39:15

**risk** 40:6
**rock** 9:20
**room** 12:5,22 14:17 21:11,16 24:1,3,4,5,17 25:23
**rpr** 1:25 54:24
**run** 26:9
**rushed** 11:3

**s**

**s** 2:21 56:3
**safety** 11:15
**saw** 23:10,12 23:12 30:3 46:23
**saying** 37:16 49:6
**says** 16:15 26:21 35:15 51:14
**sbkbs** 39:12 55:4 56:1
**scared** 13:15
**scenario** 50:11
**scene** 14:23 32:6,11,20
**seal** 54:20
**second** 35:12 35:13 36:24
**secure** 32:11
**security** 48:24
**sedgwick** 54:3 54:21
**see** 12:19 21:19 29:15 35:18

50:23
**seeing** 13:14
**seem** 20:4
**seen** 13:12,24 14:2,5,9 37:5 40:25 41:3,7
**sense** 26:13 31:16,17
**sent** 55:14
**sergeant** 17:23 18:2 27:13 28:3,10 38:2 38:15 52:11
**series** 40:24
**serve** 48:7
**service** 45:2
**set** 11:14 54:9
**sets** 28:18
**seven** 21:5
**shaw** 34:4
**sheet** 55:11
**shell** 30:4,6,9 30:13 32:2
**shirt** 23:13,19 37:1 48:12
**shirts** 42:4
**shock** 12:2,3
**shooter** 29:21
**shooters** 37:17
**shooting** 8:18 11:1 12:19 15:20 16:4,7 16:16,20 19:25 32:21 35:23 40:15

| | | | |
|---|---|---|---|
| shorthand 54:4 | speaking 12:7,9 | steals 28:6 | supervisor |
| 54:10 | specific 18:15 | step 47:13,18 | 17:25 18:1 |
| shorts 23:13,19 | 26:14 29:19 | stop 13:15 | supplemental |
| shot 11:2,25 | specifically | 17:14 | 5:3 9:5 10:3,13 |
| 12:1 13:22,25 | 28:1,11 | stopping 47:14 | 10:14,19,20 |
| 14:13,14 29:1 | speculation | stops 17:12 | supposed 12:24 |
| 29:19 | 48:14 | storefront 38:8 | 44:14,18 |
| shots 12:18 | speculative | story 17:1 | sure 11:14,15 |
| 20:3,13 29:1 | 45:5 | street 30:5,15 | 32:9 36:2 |
| 37:18 | spent 35:16 | 30:17 | surveillance |
| show 39:12 | spoke 12:8,10 | stretcher 32:16 | 47:13 |
| showed 24:22 | 13:18 15:1 | struck 29:8,12 | suspicion 48:14 |
| side 25:4 36:25 | 16:23 19:19 | stuff 50:6 | sworn 6:2 |
| sign 52:18 | 22:24 23:23 | subpoena 7:15 | 53:11 54:7 |
| 55:12 | 28:3 | 7:17 | |
| signature 54:23 | square 31:11 | subscribed | t |
| signed 55:20 | srkbs 1:8 53:25 | 53:11 | t 23:13 56:3,3 |
| signs 17:15 | st 2:15 | substantiated | take 23:2,10 |
| 41:19 44:9 | stalls 30:21 | 44:7 | 36:14,18 |
| similar 17:2 | standard 9:12 | substantiation | taken 1:19 54:9 |
| sit 8:24 29:7 | started 12:16 | 49:4 | talk 25:8,9 |
| 34:1 41:3 | 15:8,9 16:12 | sudden 16:15 | talked 12:20 |
| 45:11 47:7 | 16:16 20:2,3,3 | suite 2:14 | 27:13,14 28:10 |
| situation 46:17 | 28:21,22 | suites 31:15 | 32:13 38:2,15 |
| snapchat 12:25 | state 6:7 19:24 | super 7:21 8:22 | 44:21 |
| 25:3,4,11 | 22:24 23:22 | 10:23 11:19 | talking 9:14 |
| solutions 54:25 | 53:9 54:2,5 | 14:7 15:5 | 13:12,14,15 |
| 55:23 | stated 15:8 | 20:21,23 23:6 | 31:18 35:13 |
| sort 24:11 | 35:15 49:24 | 30:24,25 31:20 | 48:17 50:25 |
| sounds 13:18 | statement | 31:21 32:7,24 | targeted 27:15 |
| 33:25 34:2,7,9 | 15:10 18:4,5 | 33:3,10 34:22 | 27:25 28:12,16 |
| 34:16 | 20:4 50:4 | 39:13 40:12 | 37:24 40:11 |
| south 31:22 | states 1:1 15:7 | 42:2 44:13 | 45:19 46:6 |
| speak 15:2 | stay 32:11 | 45:2,7,22 | teaching 52:13 |
| 32:17 | | 46:11,12 | team 42:3 48:1 |

| | | | |
|---|---|---|---|
| tell  9:10 10:1 | three  35:6 | travel  30:20 | **v** |
| 15:9 30:23 | time  8:1,6,14 | trotter  22:25 | |
| 44:4 | 17:14 20:12 | 23:5 | v  55:4 56:1 |
| telling  50:20 | 21:13,21 22:2 | true  40:12 51:7 | valuable  23:9 |
| tension  13:10 | 22:8 26:11,16 | 53:3 54:11 | verify  55:9 |
| 16:11 | 54:15 55:19 | truth  6:3,3,4 | veritext  54:25 |
| tensions  12:15 | timeframe  55:8 | 40:25 54:7 | 55:14,23 |
| terms  22:22 | times  37:5 45:8 | try  48:19,21 | veritext.com |
| 23:20 34:20 | toben  2:5 | trying  13:7,10 | 55:15 |
| testified  18:2 | today  7:15 8:24 | 21:7 26:10 | versus  27:15 |
| testifies  6:4 | 9:23 34:1,9 | 35:16 50:7 | 37:24 |
| testify  6:2 | 41:3 44:13 | two  27:18 | victims  11:17 |
| 34:21 54:7 | 45:11 47:7 | 28:17 45:24 | video  29:4 |
| testifying  34:22 | told  11:25 | type  45:25 51:7 | violence  45:18 |
| testimony  34:8 | 12:10,13 26:25 | typical  11:4 | 45:23 |
| 36:3 44:12 | 27:1 49:14,22 | **u** | violent  38:24 |
| 47:8 53:2 54:7 | 52:11 | uh  23:24 27:19 | 39:3,9,18,24 |
| 54:12,13 55:9 | tommie  12:21 | 35:20 49:23 | 40:7 |
| 55:18 | 12:23 23:23 | ultimately | virginia  11:25 |
| theory  38:3 | 24:11,16 25:16 | 43:15 | vs  1:7 53:25 |
| 44:22,24 46:20 | took  12:18 | undersigned | **w** |
| 49:13 | 14:21 15:20 | 53:11 | walked  18:15 |
| thing  42:14 | 16:20 47:18 | understand | 32:8 |
| things  38:15 | torrance  34:4 | 7:14,17 27:17 | want  13:12,13 |
| 48:5 | towards  39:24 | 36:2 | 19:11 23:2 |
| think  19:5 | traffic  17:12 | understanding | 35:10 36:2,14 |
| 31:12 33:5,7 | trained  19:3 | 15:12 16:19 | 38:19 41:22 |
| 34:25 44:21 | 41:18 | 24:15,19 25:22 | 43:13 48:4,4,5 |
| 48:6,17 49:14 | training  52:11 | 27:2,6 | 48:6,10,14,18 |
| 51:16 | transcript  4:1 | united  1:1 | 48:21,21 49:1 |
| thinks  51:17 | 54:16 55:6,20 | use  42:25 43:15 | 51:24 52:3 |
| thomas  13:5 | transcription | used  38:6 55:20 | wanted  46:14 |
| 26:1,22 27:3 | 54:11 | using  38:7 43:5 | watch  7:4,8 |
| 33:19 | transgressed | usually  8:5 | watching  29:4 |
| | 12:14 | 28:19 | way  13:8 51:21 |

| | |
|---|---|
| **we've** 51:1 | 47:1,5,10,15,20 |
| **wear** 26:18 | 47:24 49:10 |
| **wearing** 12:11 | 50:12,17,24 |
| 17:14,16 18:8 | 52:8 |
| 18:15 22:12 | **window** 38:3,9 |
| 23:13,18 36:4 | 44:22 46:20 |
| 36:11,25 41:12 | 49:13 |
| 42:3,7,22 | **witness** 54:6,13 |
| 43:20,25 48:11 | 54:20 55:8,10 |
| **went** 9:5 12:2 | 55:12,19 |
| 12:15 14:22 | **witnesses** 14:24 |
| 45:21 46:10 | 14:25 |
| **whisby** 1:12 | **words** 27:18 |
| 4:5 5:4 6:1,8,9 | **work** 7:2 24:20 |
| 35:3 39:11 | **working** 7:8 |
| 40:20,23 47:25 | **worlein** 16:23 |
| 49:20 53:7 | 25:20 |
| 55:5 56:2,24 | **writing** 54:10 |
| **white** 23:13,13 | **y** |
| 23:18 | **yeah** 26:6 30:2 |
| **wichita** 1:20,22 | 31:4 37:2,22 |
| 2:6,20,25 6:13 | 50:5 |
| 6:14,21,25 | **year** 8:15 |
| 23:7 47:4 | **years** 6:18 35:6 |
| 52:12 54:20 | **yesterday** 18:2 |
| **wichita.gov** 3:3 | 27:13 |
| 55:2 | **youth** 42:3 48:1 |
| **wife** 46:3 | **z** |
| **wilson** 2:3 4:7,9 | **zawriah** 12:21 |
| 4:11,13 18:12 | 12:23,24 13:2 |
| 18:19 19:7,15 | 13:11 19:22 |
| 24:14 35:2 | 24:5,8,11,16 |
| 39:21 40:3,19 | 25:3,8,9,13 |
| 40:23 41:11,25 | 26:21 35:14,15 |
| 44:16,21 46:21 | |

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.