Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF KANSAS

3                    AT KANSAS CITY, KANSAS

4

5        MAELLA BLALOCK,      )

6        Plaintiff,           )

7        vs                   )

8        SRKBS HOTEL, LLC,    )

9        Defendant.           )

10       _____)

11              DEPOSITION OF STEVEN ABASOLO

12

13                   August 14, 2023

14                     1:05 p.m.

15

16

17

18                     Taken at:

19        Wichita Police Department – City Hall

20         455 North Main Street, 13th Floor

21            Wichita, Kansas 67202

22

23

24

         Job No. CS6045267

25       Kathy R. Bonfiglio, CSR-KS, CSR-MO, RPR   **EXHIBIT 6**

Page 2

```
1  APPEARANCES:
2     On behalf of the Plaintiff:
3        Mr. Jeffrey A. Wilson
4        DeVaughn James Injury Lawyers
5        3241 North Toben Street
6        Wichita, Kansas 67226
7        (316)977-9999
8        Fax: (316)425-0414
9
10    On behalf of the Defendant:
11       Ms. Kerry B. Banahan
12       Evans & Dixon, LLC
13       211 North Broadway, Suite 2500
14       St. Louis, Missouri 63102
15       (314)552-4023
16       Fax: (314)884-4423
17       kbanahan@evans-dixon.com
18
19    On behalf of the City of Wichita, Kansas:
20       Mr. Erik S. Houghton
21       Deputy City Attorney
22       Department of Law
23       455 North Main, 13th Floor
24       Wichita, Kansas 67202
25       (316)268-4681
```

Page 4

```
1        TRANSCRIPT INDEX
2  APPEARANCES..................................  2
3  INDEX OF EXHIBITS..........................  5
4
5  EXAMINATION OF STEVEN ABASOLO:
6  BY MS. BANAHAN...............................  6
7  BY MR. WILSON................................ 46
8  BY MS. BANAHAN............................... 53
9
18 REPORTER'S CERTIFICATE....................... 59
19
20 EXHIBIT CUSTODY
21 EXHIBITS RETAINED BY COURT REPORTER
```

Page 3

```
1  Fax: (316)268-4335
2  ehoughton@wichita.gov
```

Page 5

```
1        INDEX OF EXHIBITS
2  NUMBER        DESCRIPTION        MARKED
3  Defendant Exhibit A   Kansas Standard
4           Offense Report.....   23
5  Defendant Exhibit B   Supplemental Report
6           Case 20C037022.....   33
8  Plaintiff Exhibit 1   Color video footage.  51
9  Plaintiff Exhibit 2   Color video footage.  51
```

Page 6

1            STEVEN ABASOLO,
2    having been first duly sworn on his oath to testify
3    the truth, the whole truth, and nothing but the
4    truth, testifies:
5            DIRECT EXAMINATION
6    BY MS. BANAHAN:
7        Q.  Please state your full name for the
8    record.
9        A.  Steven Abasolo.
10       Q.  Mr. Abasolo, are you currently
11   employed?
12       A.  Yes.
13       Q.  Where are you employed?
14       A.  With the Wichita Police Department.
15       Q.  What is your rank or position within
16   the police department?
17       A.  I'm a community response officer for
18   the North Bureau.
19       Q.  How long have you been a police
20   officer?
21       A.  Five and a half years.
22       Q.  What is your date of birth?
23       A.  ▓▓/▓▓/▓▓.
24       Q.  Can you describe for me briefly how an
25   individual becomes a police officer within the City

Page 7

1    of Wichita?
2        A.  First you are either recruited or you
3    find out your own path to get there.  First thing
4    is you go on-line and fill out a brief application
5    and print out a pretty extensive background packet
6    that you fill out.  Once that background packet is
7    completed you will take it to the training academy
8    and give it to a detective, where they will go
9    through the background and see if there's anything
10   they need to worry about or anything that would
11   keep you from being a police officer.  From there
12   you will get a first interview which will be first
13   contact.  Through there they will get general
14   information from you, family and stuff like that;
15   give you the type of environment you are going to
16   be working in; make sure it's what you want to do.
17   From there you will do a series of other interviews
18   which will be a command staff.  That's actually
19   your final interview.  I'll actually back up.
20   Before your command staff you will go through a
21   physical, a polygraph and a psych evaluation and
22   then you will have your command staff meeting.  If
23   they deem it necessary for you to move on, you will
24   have the meeting with the Chief who will ultimately
25   decide if he will allow you into the academy.

Page 8

1        Q.  After that process you go through the
2    academy; is that fair?
3        A.  Yes.
4        Q.  How long of a program is that?
5        A.  Six months.
6        Q.  Once you graduate from the police
7    academy, do you choose what position?
8        A.  No.  Once you graduate they will assign
9    you to a bureau as a patrol officer.  There you
10   will go through a three-month field training.  You
11   will do -- if, say, I'm going to 4th shift, I'll do
12   two weeks on 4th shift and I'll do a week on 3rd, a
13   week on 2nd and a week on 1st and then I'll do an
14   additional two weeks back on 4th which will be my
15   primary shift if that's where they choose to put
16   me.
17       Q.  Does everyone that graduates from the
18   academy then start as a patrol officer?
19       A.  Yes.
20       Q.  Currently are you a patrol officer?
21       A.  No.
22       Q.  Currently you are a community response
23   officer; correct?
24       A.  Yes.
25       Q.  How long have you been a community

Page 9

1    response officer?
2        A.  Three years.
3        Q.  Prior to being a community response
4    officer did you hold any other position other than
5    patrol officer?
6        A.  No.
7        Q.  What is your role and responsibilities
8    as a response officer?
9        A.  As a CRT, for short is what we call it,
10   it's primarily dealing with gangs, narcotics and
11   anything to do with violent crime scenes and stuff
12   like that.
13       Q.  When you say it's dealing with gangs,
14   narcotics and violent crimes, how so?
15       A.  Well, either be -- usually our hours
16   are from 3:00 a.m. or sorry, 5:00 p.m. to 3 a.m.,
17   which are the primary response times that we -- I
18   guess let me rephrase that, the primary times that
19   normally violent crime happens which is shootings,
20   homicides, stabbings, anything like that, domestic
21   violence.  We'll respond to those and assist with
22   the investigation.  We are given more tools and
23   more training to assist on those and ultimately
24   either identify a suspect and go find that suspect
25   and have them arrested.

3 (Pages 6 - 9)

1    Q.   Okay, and would you say that a CRO has
2   more training --
3        A.   CRT.
4        Q.   CRT?
5        A.   Yes.
6        Q.   Has more training than a patrol officer
7   with responding to gangs, narcotics and violent
8   crimes.  What kind of training will go on there?
9        A.   We'll do entry training which we are
10   the main entry into homes during search warrants
11   and stuff like that aside from SWAT and stuff like
12   that.  We also do an extensive gang training which
13   is we'll host a gang conference every year which is
14   the Kansas Gang Officers Association.  We will go
15   through that training.  We will learn identifying
16   different types of gangs, gang hand signs and
17   ultimately the way that individuals are doing
18   criminal activity, either this day and age, social
19   media and stuff like that.  We also hold -- we'll
20   go through what we call complaint training which is
21   teaching us how to work drug complaints, going
22   through the process from identifying the complaint
23   all the way to ultimately writing that search
24   warrant and executing that search warrant.
25        Q.   I want to ask you couple of questions

1   about the gang conference and identifying signs of
2   individuals which is what you just talked about.
3   What kind of topics do you cover at the gang
4   conference?
5        A.   It is a large variety.  Sometimes it's
6   not just about gangs.  It could be just about how
7   to properly document a confidential informant, how
8   to look for different behaviors and people who are
9   carrying firearms such as their behavior as a
10   person.
11        Q.   As a police officer what can you tell
12   me about identifying gang behaviors?
13        A.   It's different all the way around.
14   Specifically to the city of Wichita I'm not a gang
15   expert.  I just want that to be known, but how I
16   have been trained in hand signs.  Gang members use
17   social media such as if they are associated with
18   the Crips they will normally use emojis such as the
19   handicapped sign.  They will change, if a letter is
20   supposed to be -- if they are calling somebody
21   "bud" they won't so use a C and capitalize that
22   which is taking out the B which is their rival for
23   Blood and also and putting N so it would be because
24   or something like that and they will wear blue,
25   they will use phrases such as they will call each

1   other cuz which is a term of endearment for a Crip
2   to Crip language and they will also hang around
3   with other individuals who identify such as within
4   the same gang or the same set; same street also,
5   same hundred block.
6        Q.   In Wichita, if we're talking about gang
7   activity, is that typically categorized into Crips
8   and Bloods?
9        A.   Yes.  Those are just two of the many,
10   yes.
11        Q.   Okay.  But those are two, I guess,
12   gangs that are known to Wichita Police Department;
13   is that fair?
14        A.   Yes.
15        Q.   With the Crips, what color do they
16   wear?
17        A.   Blue.
18        Q.   The Bloods, what color do they wear?
19        A.   Red.
20        Q.   Now, this might sound like a silly
21   question but to a lay person, is there anything
22   other than that color in their clothing that
23   denotes their association with one gang or the
24   other?
25        A.   Not in their clothing, no.

1        Q.   So, for instance, when you are
2   describing the Crips wear blue, that could be any
3   blue clothing item; fair?
4        A.   Fair, but not always.  They don't
5   always wear blue.  They don't always wear red.
6   They coordinate.  It just depends on -- I guess the
7   term "showing out" is kind of what we hear which
8   means they are representing their colors or
9   something like that but they don't wear blue or red
10   constantly.
11        Q.   When they do wear blue or red, is that
12   clothing all the same or is it just a blue-colored
13   clothing item or a red-colored clothing?
14        A.   Blue clothing or red.
15        Q.   So another way to ask this is do
16   members of the Crips have a blue shirt that says
17   Crips on it?
18        A.   No.
19        Q.   Other than clothing items, is there any
20   way for police by looking at a gang member to
21   identify them as either being a member of the Crips
22   or a member of the Bloods?
23        A.   It depends.  Is it somebody that is
24   well known to us or is it somebody that I don't
25   know?

Page 14

1    Q.  Let's say if it's someone that you
2  don't know.
3    A.  Somebody that I don't know right off
4  the bat, no.  If I'm just meeting someone, no.
5  Anybody could be wearing just those colors.  It's
6  going to take more effort and more -- I guess more
7  evidence in a way to be able to deem them a gang
8  member.  It's not just clothing.
9    Q.  So if you are a member of the general
10  public that has no training in gangs, would it be
11  easily discernible to determine if someone is a
12  member of either the Crips or the Bloods?
13        MR. WILSON: Object to form.
14    A.  No.
15    Q.  (By Ms. Banahan) Would you expect that
16  a lay person would be able to identify a member of
17  either the Crips or Bloods just by eyesight?
18        MR. WILSON: Same objection.  Calls for
19  expert opinion.
20    A.  No.
21    Q.  (By Ms. Banahan) Assuming that that
22  individual is unknown to you in that you have not
23  arrested them before or seen their photograph, if
24  someone walked in here right now would you be able
25  to identify them as being a Crip or a Blood?

Page 15

1        MR. WILSON: Object to form. You can
2  answer.
3    A.  No.
4    Q.  (By Ms. Banahan) Do you do any type of
5  training with the general public as to how to
6  identify gang activity?
7    A.  I do not.
8    Q.  What about the Wichita Police
9  Department?
10    A.  I'm not aware of any.
11    Q.  When did you graduate from the police
12  academy?
13    A.  I believe it was -- I want to say
14  January of 2019.
15    Q.  Have you given your deposition in your
16  capacity as a police officer before?
17    A.  No.
18    Q.  Do you understand that you are here
19  today to give your deposition pursuant to a
20  subpoena that's been issued to the Wichita Police
21  Department?
22    A.  Yes.
23    Q.  Do you understand that that subpoena
24  was issued by my office?
25    A.  Yes.

Page 16

1    Q.  And you and I have never met before;
2  correct?
3    A.  No.
4    Q.  Do you understand that that subpoena is
5  in reference to a June 20, 2020 shooting event in
6  the city of Wichita?
7    A.  Yes.
8    Q.  Do you understand that that shooting
9  event took place at or near the Super 8 Motel?
10    A.  Yes.
11    Q.  Generally speaking, do you know the
12  incident that I'm referencing?
13    A.  Yes.
14    Q.  Have you in any way prepared for your
15  deposition here today?
16    A.  Watched my Axon and read my report.
17        MR. WILSON: Now may be a good time, do
18  you have copies of the subpoena?  You never gave us
19  those.
20        (Off the record discussion.)
21    Q.  (By Ms. Banahan) When you reviewed your
22  body cam footage was there anything on that body
23  cam footage -- strike that.
24        When you reviewed the police report in
25  preparation for this deposition, was there anything

Page 17

1  in that report that seemed incorrect to you or is
2  no longer applicable in that report?
3    A.  Not that I can recall, no.
4    Q.  At the time of the incident what was
5  your position with the City of Wichita?
6    A.  Patrol officer.
7    Q.  At that moment had you held that
8  position for about a year and a half?
9    A.  Yes.
10    Q.  Do you know the address of the Super 8
11  Motel?
12    A.  I do not, no.  Not right now I don't.
13    Q.  I'll represent to you that the address
14  is 3741 North Rock Road.  Does that sound accurate?
15    A.  Yes.
16    Q.  And you would otherwise have no reason
17  to dispute that; correct?
18    A.  No.
19    Q.  Earlier you referenced 4th watch.  Is
20  that the title of the shift for patrol officers?
21    A.  Yes.
22    Q.  What is the time for that shift?
23    A.  Start time is 9:00 p.m. and it's to
24  7:00 a.m.
25    Q.  At the time of the incident we're here

5 (Pages 14 - 17)

Page 18

1    to discuss today were you working 4th watch?
2        A.  Yes.
3        Q.  Were you still in that rotation or was
4    that your permanent shift?
5        A.  Permanent shift.
6        Q.  At the time of this incident did you
7    have a partner?
8        A.  Yes.
9        Q.  Who was that partner?
10       A.  Brian Malcolm.
11       Q.  How long was Officer Malcolm your
12   partner?
13       A.  Just for this shift?
14       Q.  Well, how long had he been your partner
15   as of June 20, 2020?
16       A.  I wouldn't be able to give specifics.
17   It varied from time to time.  Sometimes we rode
18   with two officers, sometimes we rode alone, but I
19   would say he was my primary partner for the
20   majority of that year and a half.
21       Q.  Do you know currently what capacity
22   Officer Malcolm works?
23       A.  He is a 4th shift patrol officer for
24   the North Bureau.
25       Q.  All right.  What is the North Bureau?

Page 19

1        A.  The North Bureau, so the Wichita Police
2    Department is separated field wise which would be
3    Patrol and things like that and four different
4    bureaus.  There's north, east, south and west and
5    those are designated.  They have boundaries.  I
6    don't know what those boundaries are.  They are
7    boundaries that Patrol North takes care of what
8    is north of a certain boundary.  East officers take
9    care of whatever is east of a certain boundary and
10   south and west are the same thing.
11       Q.  So if I'm understanding what you're
12   saying correctly, there's patrol officers for the
13   north, there's patrol officers for the east, patrol
14   officers for the west and patrol officers for the
15   south; fair?
16       A.  Yes.
17       Q.  Though you don't know, and it sounds
18   like you don't know specifically sitting here today
19   what the boundaries would have been for the North
20   Bureau?
21       A.  No.
22       Q.  Did the Super 8 fall within the
23   boundaries for the North Bureau?
24       A.  Yes.
25       Q.  Generally speaking, what type of

Page 20

1    criminal activity would you see in the North
2    Bureau?
3        A.  Gang activity, drive-by's, shootings,
4    drug sales, drug use, domestic violence, car theft,
5    auto accidents and your simple traffic violations
6    and trespassing.
7        Q.  So it sounds like you saw it all; is
8    that fair?
9        A.  Yes.
10       Q.  Is that true of all the different
11   bureaus or is crime in Wichita concentrated in one
12   area more than the other?
13       A.  All the different bureaus.  I've only
14   worked on the Patrol north side so I wouldn't be
15   able to speak for the other two bureaus.
16       Q.  As a CRT officer are you assigned to a
17   specific bureau?
18       A.  Yes.
19       Q.  What bureau are you currently assigned?
20       A.  North.
21       Q.  Were you ever assigned to a different
22   patrol post other than the North Bureau?
23       A.  No.
24       Q.  Prior to June 20th of 2020 had you been
25   to the Super 8 Motel that we are discussing here

Page 21

1    today?
2        A.  Yes.
3        Q.  Do you know how many times?
4        A.  No, I do not.
5        Q.  More than five or less than five?
6        A.  I would say more than five.
7        Q.  Has that been in a year and a half time
8    span?
9        A.  I believe so.
10       Q.  Had you ever responded to a shooting at
11   the Super 8 Motel prior to June 20th of 2020?
12       A.  I cannot remember that.  I responded to
13   a lot of different shootings that year.  I can't
14   remember specifically if it was there or not.
15       Q.  As we sit here today do you have any
16   recollection of a different shooting at the Super 8
17   Motel?
18       A.  No.
19       Q.  As you sit here today do you have any
20   level of recollection as to the incident that we
21   are here to discuss?
22       A.  Yes.
23       Q.  Can you tell me generally speaking what
24   you recall about that incident?
25       A.  My partner and I, Brian Malcolm,

6 (Pages 18 - 21)

Page 22

1  responded to a shooting.  I remember us coming or
2  approaching Super 8 from the south which would be
3  about the 3600-block and as we come into the
4  parking lot, it would be the south parking lot of
5  the Super 8, and we are obstructed from a male who
6  was standing out saying that there are two people
7  running and they are running west through the
8  parking lot.  At that point myself and Officer
9  Malcolm, who we were still in our patrol car, we
10 accelerate through the parking lot to catch up to
11 them.  As we can see them, I can see a black male
12 and another one running behind a big storage
13 container.  As they are doing that we hear one
14 gunshot.  We exit our patrol car and end up holding
15 both at gun point.  The individual that was Jaylen,
16 Jaylen Thomas, I believe, he is struck one time in
17 the right pectoral muscle which ends up exiting out
18 his arm pit area.  At that point I began to
19 question him, asking who shot him or if he knows
20 who shot him, which he tells me no.  He gives me a
21 story that they are inside the hotel room when a
22 fight breaks out and he walks outside and that's
23 when he's ultimately shot.  During a canvas of the
24 area, over a wall, two officers end up locating two
25 firearms when they threw them over the wall which

Page 23

1  was the gunshot we heard as we were right next to
2  them.
3        Q.  I'm going to back you up.  When you
4  first were told of the shooting at the Super 8, did
5  that come over the radio?
6        A.  Yes.
7        Q.  Were you and Officer Malcolm the first
8  officers to arrive on scene?
9        A.  I believe there were two other officers
10 that were there just seconds before us.
11       Q.  Do you know the names of those
12 officers?
13       A.  I know one of them was Ryan Masenthin
14 but I do not know the second.
15       Q.  Who did you report directly to at the
16 time of this incident?
17       A.  Sergeant Paul Kimble.
18       Q.  At some point did Sergeant Kimble make
19 his way to the scene?
20       A.  Yes.
21            (Whereupon Defendant's Exhibit A was
22 marked for purposes of identification.)
23       Q.  I'm going to hand you what has been
24 marked as Defendant's Exhibit A.  Can you tell me
25 what this is?

Page 24

1        A.  Yes.  This is the general report of the
2  incident.
3        Q.  Is that the report that is generated
4  whenever an officer responds to an event in the
5  city of Wichita?
6        A.  Yes.
7        Q.  Is this the report for June 20th of
8  2020?
9        A.  Yes.
10       Q.  Can you turn to the second page of that
11 exhibit.  At the bottom of page 2 there's a section
12 called Narrative; correct?
13       A.  Yes.
14       Q.  Can you read to yourself is fine that
15 narrative report and just tell me when you are
16 done.
17       A.  Yeah.
18            (Pause in proceedings.)
19       A.  Okay.
20       Q.  Having reviewed the narrative section
21 of your report, is there anything else in that
22 narrative section that you wish to change, alter or
23 expand upon?
24       A.  No.
25       Q.  So generally speaking, is the narrative

Page 25

1  portion of this police report accurate insofar as
2  you know?
3        A.  Yes.
4        Q.  Was that portion of the report written
5  by you?
6        A.  Yes.
7        Q.  When you write a police report how do
8  you do that?
9        A.  With a Microsoft Word on computer.
10       Q.  Are you dictating?
11       A.  No, I'm typing it out.
12       Q.  If we go through that narrative report,
13 it states that you were flagged down by a witness
14 that stated that a black male with a white T-shirt
15 had been shot?
16       A.  Yes.
17       Q.  Was that individual Jaylen Thomas?
18       A.  Yes.
19       Q.  "I attempted to stop two black males
20 wearing a white T-shirt."  Do you know the identity
21 --
22       A.  Jaylen Thomas and Marion Norwood.
23       Q.  It says, "Officer Malcolm ordered,
24 yelled for both suspects to stop but they continued
25 running."  Again, is that Jaylen and Marion?

7 (Pages 22 - 25)

Page 26

1    A.   Yes.
2    Q.   "While running I could see both
3 suspects running with their hands in their waist
4 bands."  Is that accurate?
5    A.   Yes.
6    Q.   "I then lost sight of them when they
7 went behind a red storage container."  Is that
8 fair?
9    A.   Yes.
10    Q.   At that point, is that when you heard
11 the gun go off?
12    A.   Yes.
13    Q.   Did you later find out that that gun
14 had been shot?
15    A.   Yes.
16    Q.   Had it been shot by an individual or
17 did it go off by itself?
18    A.   I'm not aware of how it was shot.  I
19 know I was told by other officers that it still had
20 the casing.  The casing never ejected out of the
21 port indicating that it was a jammed fire which
22 some force caused that gun to fire on its own.
23    Q.   Had both Jaylen and Marion been shot?
24    A.   Yes.
25    Q.   And Jaylen had been shot where?

Page 27

1    A.   In the upper right pectoral muscle.
2    Q.   Where had Marion been shot?
3    A.   In his calf.  I know in his calf but I
4 forgot which one.
5    Q.   Do you recall what time you arrived on
6 scene?
7    A.   I think the call came in about 3:02 but
8 I believe we arrived at about 3:05.
9    Q.   Do you know who made the call --
10    A.   No.
11    Q.   -- at 3:02?  By the time that you
12 arrived at 3:05 how many individuals were in the
13 parking lot?
14    A.   I don't know specific number.  Maybe
15 ten.
16    Q.   Would that have included Jaylen and
17 Marion?
18    A.   Yes.  Jaylen and Marion.
19    Q.   It says, "Both Marion and Jaylen stated
20 they didn't know what happened; that someone
21 started shooting in the parking lot."
22    A.   Yes.
23    Q.   Ultimately did you investigate what had
24 caused someone to starting shooting in the parking
25 lot?

Page 28

1    A.   Yes, but I don't believe that was ever
2 determined.
3    Q.   Prior to this incident were Jaylen and
4 Marion known to you as a law enforcement officer?
5    A.   No.
6    Q.   When you arrived on scene could they be
7 easily identified by you as either a member of the
8 Crips or the Bloods?
9    A.   No.
10    Q.   Do you have any knowledge as we sit
11 here today if they were in fact members of a gang?
12    A.   I know both of them are.  What gang
13 that is to my knowledge right now I do not know.
14    Q.   How do you know that they are gang
15 members?
16    A.   I have worked previous cases or more
17 recent cases where both of them have been
18 identified, located with firearms and located with
19 other documented gang members.
20    Q.   Did that knowledge come to fruition
21 following this incident?
22    A.   Yes.
23    Q.   So I guess another way to put that,
24 when you arrived on scene could you immediately
25 classify them as being gang members?

Page 29

1    A.   No.
2    Q.   Did you interview Maella Blalock?
3    A.   No, I did not.
4    Q.   The portion of your report that reads,
5 "It was then learned that Maella Blalock was
6 sleeping in Room 216 had been shot in both feet
7 while sleeping in her bed."  How did you learn that
8 information?
9    A.   From another officer.  I don't know if
10 it was the specific officer that interviewed her or
11 I just know there was an officer that was present
12 at the time in her room.
13    Q.   It goes on to say, "I then reviewed the
14 footage from the Super 8."  When did you review
15 security footage from the Super 8?
16    A.   I want to say maybe an hour after this.
17 I know a manager had to show up and allow us into
18 the system.
19    Q.   All right.  So after you arrive on
20 scene and detain Jaylen and Marion, what happened
21 next?
22    A.   They were both transported to the
23 hospital where they were, I guess, accompanied by
24 two other officers.  Officer Masenthin was with
25 Jaylen, I believe, and they were transported to the

8 (Pages 26 - 29)

Page 30

1  hospital. After that, that's when I started trying
2  to review camera footage and locating any
3  witnesses.
4      Q. As a patrol officer who responded to
5  the scene, did you take any part in the
6  investigation following the initial response?
7      A. Reviewing video footage and I was also
8  shown cell phone footage of the incident.
9      Q. Do you recall the name of the manager
10 who came to the hotel?
11     A. I do not.
12     Q. Does the name Mark Stark sound familiar
13 to you?
14     A. Yes.
15     Q. Did you speak with anyone else from the
16 motel?
17     A. Other than the clerk at the time, which
18 I have no idea of the clerk at the time. That was
19 another officer that got that individual's name but
20 that was it.
21     Q. Does the name Greg Townsend sound
22 familiar?
23     A. It does not.
24     Q. Did you speak to the clerk at all?
25     A. Briefly just to get, to ask them if

Page 31

1  they were able to get into the video system.
2      Q. Were you able to speak with the clerk
3  regarding what had occurred prior to the call being
4  made?
5      A. I think I asked general questions; did
6  she see the shooting, did she know what room they
7  came out of and stuff like that, which I don't
8  believe that she was -- he or she was able to
9  provide that information. I can't remember if it
10 was a male or female.
11     Q. How long were you on the scene after
12 the shooting or after arriving?
13     A. I want to say six or seven hours.
14     Q. During that six or seven-hour time
15 period what did you do?
16     A. Continued to review video footage.
17 Also, that cell phone footage which caught the
18 audio/video of the actual shooting and also
19 maintained scene security was my job.
20     Q. What did you learn, if anything, from
21 the cell phone footage?
22     A. The cell phone footage, it was taken
23 from a room that was on the second floor. While
24 looking at it you can see there were a group
25 of black males and black females and also a white

Page 32

1  male who seemed to be standing out smoking a
2  cigarette not involved in the argument. You could
3  see a black male wearing a red long-sleeved shirt
4  with dreads down to his shoulder. It appeared he
5  has a gun in his hand. It's got the shape of the
6  gun, color of a gun. The way he's holding it
7  appears to be something that it would be a gun.
8      Q. When you say that you saw a black male
9  in a red shirt with dreads, was that inside or
10 outside of the motel?
11     A. This was outside in the south parking
12 lot.
13     Q. The individual with the red shirt and
14 the dreads, had you seen this individual before in
15 your capacity as an officer for the City of
16 Wichita?
17     A. No.
18     Q. Did you see any video footage from the
19 hotel security system of the interior of the hotel?
20     A. I do not recall.
21     Q. Of the video that you do recall
22 reviewing, was that from the exterior camera?
23     A. Yes.
24     Q. Other than that cell phone footage --
25     A. Yes.

Page 33

1      Q. -- the video that you are referencing
2  with the individual holding a firearm, was that
3  surveillance footage or cell phone footage?
4      A. Cell phone footage.
5      Q. Was that taken inside or outside the
6  hotel?
7      A. The person was holding their arm outside
8  the window over so they were on the second floor.
9      Q. So the individual who took the cell
10 phone footage was inside the hotel but the
11 individual with the gun was outside the hotel?
12     A. Yes.
13     Q. Was that cell phone footage from a
14 partygoer or another hotel guest?
15     A. Another hotel guest.
16     Q. After reviewing that footage did you
17 make any determination as to what had occurred?
18     A. It appeared to have been an argument
19 between the black male in the red shirt and Jaylen
20 and Marion. I believe the black male made a
21 reference such as, "Who said they were going to
22 bust on me," which was from my experience has been
23 a term who is going to shoot me or shoot at me.
24         (Whereupon Deposition Exhibit
25 Defendant's No. B was marked for purposes of

9 (Pages 30 - 33)

Page 34

1  identification.)
2      Q.  I'm going to hand you what I'm marking
3  as Defendant's Exhibit B, pages 32 of 43.  Do you
4  recognize what this document is?
5      A.  Yes.
6      Q.  What is this?
7      A.  This is the supplemental report.
8  Basically it's an add-on to my general report which
9  is right here.
10      Q.  When are supplemental reports drafted?
11      A.  It really, it varies.  It could be from
12  since I was the general report author, any officer
13  after me, whether it be my partner or any other
14  officer on scene, they would do a supplemental
15  report.
16      Q.  Why are they drafted?
17      A.  Just to add any information that that
18  officer got from anybody else on scene.
19      Q.  Now, at the bottom of the supplemental
20  report it says Name and ID?
21      A.  Yes.
22      Q.  It says your name there; is that
23  accurate?
24      A.  Yes.
25      Q.  So would this portion of the

Page 35

1  supplemental report have been drafted by you?
2      A.  Yes.
3      Q.  It says Report Time 6-22-2020, 1:26.
4  Would that have been the date and time on which it
5  was drafted?
6      A.  Yes.
7      Q.  Now, as part of this report it says,
8  "While investigating this I was reviewing camera
9  footage.  I watched a group of black males and
10  females appearing to have an argument in the south
11  parking lot of the Super 8."  Does that accurately
12  reflect the security footage that you reviewed?
13      A.  Yes.
14      Q.  It says, "During the argument a black
15  male wearing a red, long-sleeved shirt with the
16  word "Swoosh" on it was with long dreadlocks is
17  seen entering the camera's view with what appeared
18  to be a long magazine sticking out of his right
19  pocket."
20      A.  Yes.
21      Q.  Is that what you just described for us?
22      A.  I think I said -- just now I said it
23  was in his hand.  That report would probably be
24  more accurate.
25      Q.  "Red, long-sleeved shirt with the word

Page 36

1  "Swoosh" on it.  Is that accurate?
2      A.  Yes.
3      Q.  Does "Swoosh" have any meaning to you
4  in terms of gang lingo?
5      A.  No.
6      Q.  It sounds to me like it might have been
7  a Nike brand shirt?
8      A.  Yes.
9      Q.  The male can be heard in a cell phone
10  video that was obtained yelling, "Who said they
11  would bust on me."  Fair?
12      A.  Yes.
13      Q.  "In the video I could also see two
14  males that were identified as Marion Norwood and
15  Jaylen Thomas yelling back."  Fair?
16      A.  Yes.
17      Q.  "You can then see Malik Banks
18  attempting to restrain the male in the red,
19  long-sleeve shirt who now has the gun in his right
20  hand."  Do you know who Malik Banks is?
21      A.  Another victim.  I believe he was
22  located inside the doorway.  I want to say it's the
23  very center doorway that comes out to the south
24  parking lot.  He was located in there with a
25  gunshot wound to his body.  I do not know exactly

Page 37

1  where.
2      Q.  Prior to June 20th of 2020 did you know
3  who Malik Banks was?
4      A.  No.
5      Q.  You identify him by name in this report
6  as being a person in the video.  Do you know where
7  you learned of his identity?
8      A.  I believe it was from other officers, I
9  know for sure, and then reviewing their
10  supplemental reports.
11      Q.  "The male in the red, long-sleeve shirt
12  is then seen shooting multiple rounds in the
13  direction of Jaylen and Marion who were also firing
14  back but it is not clear who fired first."  Is that
15  an accurate depiction of what you watched?
16      A.  Yes.
17      Q.  Then it says, "The black male in the
18  long sleeve is then seen running east to the front
19  of the Super 8 along with Davion Gunter and
20  Torrance Shaw who were both documented Crip
21  members."  Is that all accurate?
22      A.  Yes.
23      Q.  Would that depict what you saw?
24      A.  Yes.
25      Q.  Prior to June 20th of 2020 did you know

10 (Pages 34 - 37)

Page 38

1  who Davion Gunter was?
2      A.  Yes.
3      Q.  Who was he?
4      A.  I think he was just -- there he was
5  just a partygoer.  I had a previous case where I
6  wasn't the author of his case but I was involved in
7  a traffic stop where he was found with a firearm
8  after being convicted of a felony.
9      Q.  Do you know who Torrance Shaw is?
10     A.  Yes.
11     Q.  How do you know who Torrance Shaw is?
12     A.  Torrance Shaw, also from past
13  experience, is a traffic stop with other officers.
14  I just met him on a traffic stop.  I didn't have
15  any sort of arrest over him or anything like that.
16     Q.  Again, would that have been prior to
17  June 20th of 2020?
18     A.  Yes.
19     Q.  In this report it says that they are
20  documented Crips.  Is that accurate?
21     A.  Torrance Shaw is actually a documented
22  Blood gang member now.
23     Q.  What about Davion Gunter?
24     A.  Gunter is still a documented Crip
25  member.

Page 39

1      Q.  Do you know if Malik Banks has any gang
2  affiliation?
3      A.  I do not.
4      Q.  What about Marion Norwood?
5      A.  Marion Norwood, I think I said earlier,
6  I know he is flagged as a gang member but I do not
7  know which one.
8      Q.  What about Deonte Minnis?
9      A.  Minnis is flagged as a Blood gang
10  member.
11     Q.  When you say that these individuals are
12  flagged or documented as a gang member, what goes
13  into giving them that designation?
14     A.  We have a Gang Intelligence section
15  that has criteria that they need to go through to
16  document people as gang members.  Whether they have
17  openly admitted that they are a gang member; if
18  they are juveniles, if their parents have said my
19  son is this type of gang member or daughter; if
20  they have been stopped multiple times with gang
21  members.  Social media again is a big indicator to
22  most people who will affiliate themselves with
23  gangs tend to put different types of colors,
24  emojis, something that will indicate what gang they
25  are from and also the social media to disrespect

Page 40

1  other gang members.  There's a large criteria,
2  different criteria that they basically have to meet
3  three of them to become, I believe.  I'm not for
4  sure on that.
5      Q.  If the Wichita Police are flagging or
6  labeling someone as a gang member, is that done
7  haphazardly or after a thorough investigation of
8  that person?
9      A.  After a thorough investigation of that
10  person.
11     Q.  Is that list published anywhere for the
12  public?
13     A.  I'm not for sure.
14     Q.  Okay.  Like if you have seen Americas
15  Most Wanted and they list the FBI's top ten
16  fugitives, do you know what I'm talking about?
17     A.  Yes.
18     Q.  Does the Wichita Police Department do
19  that in terms of gang member rosters for public
20  access?
21     A.  No.
22     Q.  It says, "I then researched Facebook
23  and found that Jaquan, who was not seen at the
24  Super 8, being tagged in post together along with
25  Torrance and Deonte Minnis, who matches the facial

Page 41

1  features as the shooter in the red, long-sleeved
2  shirt but due to the quality of the video I was
3  unable to get a positive ID."  Do you know who
4  Jaquan is?
5      A.  I do not.  I believe that was a
6  Facebook name.  It's a big trend, not just with
7  gang members, with a lot of people they don't use
8  their real name.  They use a slang name or
9  something like that.
10     Q.  Did you ever determine the identity of
11  the individual who had the red shirt on and the
12  long dreadlocks?
13     A.  I did not.
14     Q.  Do you know if anyone ever determined
15  the identity of that individual?
16     A.  No.
17     Q.  Do you know if any arrests were made in
18  connection with the incident at the Super 8 on
19  June 20th of 2020?
20     A.  No, I do not.
21     Q.  Do you know if any convictions were
22  secured with regard to the incident of June 20,
23  2020?
24     A.  I do not.
25     Q.  Following the incident, other than what

11 (Pages 38 - 41)

Page 42

1  we've talked about here today, did you continue to
2  investigate what had occurred?
3      A.  No.
4      Q.  Have you ever spoken with any employees
5  of the Super 8 other than on the night of the
6  incident?
7      A.  I believe on other instances but I do
8  not recall what they were.
9      Q.  Following the June 20, 2020 incident do
10  you recall speaking with any employees about this
11  specific incident?
12      A.  No.
13      Q.  Have you heard of the term
14  interpersonal crime?
15      A.  No.
16      Q.  How would you define a random crime?
17      A.  Something that -- I could not give an
18  honest -- I guess it would vary.
19      Q.  The shooting event at the Super 8
20  Motel, did that appear to be the result of an
21  argument between the individual with the
22  dreadlocks, Jaylen Thomas and Marion Norwood?
23          MR. WILSON:  Object to the foundation.
24      A.  Yes.
25      Q.  (By Ms. Banahan) Did you investigate

Page 43

1  the cause of the shooting?
2      A.  No.
3      Q.  Did you investigate how the shooting
4  occurred?
5      A.  Yes.
6      Q.  Based on what you observed did the
7  individual with the red shirt get into some type of
8  verbal or physical altercation with Jaylen Thomas
9  and Marion Norwood?
10          MR. WILSON:  Same objection.  You may
11  answer.
12      A.  Yes.
13      Q.  (By Ms. Banahan) Following that verbal
14  or physical altercation were shots fired?
15      A.  Yes.
16      Q.  Once shots had been fired do you know
17  where the individual with the dreadlocks went?
18      A.  He ran to the east of the Super 8,
19  around the building and I believe he ran out of
20  camera view.
21      Q.  Do you know if he left the shooting on
22  foot or by car?
23      A.  In the dispatch it was in a car.
24      Q.  Based on your investigation is it your
25  opinion that shots were fired because of the

Page 44

1  altercation?
2          MR. WILSON:  Object to form, foundation.
3  You can answer.
4      A.  Yes.
5      Q.  (By Ms. Banahan) Going back to when I
6  asked you about interpersonal crime, did it appear
7  to you that the shots were directed at the
8  individuals who were arguing with one another?
9          MR. WILSON:  Same objection.
10      A.  Yes.
11      Q.  (By Ms. Banahan) Meaning that it
12  appeared as though the gunfire was intended for the
13  individuals involved in the altercation?
14          MR. WILSON:  Same objection.
15      Q.  (By Ms. Banahan) Fair?
16      A.  Yes.
17      Q.  And what I'm trying to get your opinion
18  on is whether this was a random shooting for the
19  purpose of firing a gun versus a shooting that was
20  the result of an argument?
21          MR. WILSON:  Same objection.  You can
22  answer.
23      A.  It was a shooting the result of an
24  argument.
25      Q.  (By Ms. Banahan) Based upon appearance

Page 45

1  alone, would you have expected the night clerk to
2  have recognized these individuals as being members
3  of either the Crips or the Bloods?
4          MR. WILSON:  Object to form; calls for
5  speculation.  You may answer.
6      A.  No.
7      Q.  (By Ms. Banahan) Without police
8  training would you have expected the clerk to have
9  recognized these individuals as known members of a
10  gang?
11          MR. WILSON:  Object to form and
12  foundation.  You can answer.
13      A.  No.
14      Q.  (By Ms. Banahan) Were you ever told by
15  anyone during the course of your investigation that
16  these individuals had been kicked out of the Super
17  8 Motel?
18      A.  No, I was not aware of that.
19      Q.  Were you ever made aware of anyone who
20  stated that shots were fired inside the Super 8
21  Motel?
22      A.  No.
23      Q.  Is it your understanding that shots
24  were fired in the parking lot?
25      A.  Yes.

12 (Pages 42 - 45)

Page 46

1    Q.  I think that's all that I have for you
2  but Mr. Wilson might have a few questions.
3           CROSS EXAMINATION
4  BY MR. WILSON:
5    Q.  We'll keep this brief.  If I understand
6  your testimony right, officer, you didn't become a
7  community response officer until after the
8  shooting; is that fair?
9    A.  Yes.
10    Q.  You mentioned something that clearly
11  your response time was 5:00 p.m. to 7:00 a.m.  Is
12  that when violent crime typically happens?
13    A.  No.
14    Q.  I thought you mentioned something
15  that's the primary response time.
16    A.  Primary response time for us.  We would
17  be the primary response.  We have a day team and we
18  also have a night team.
19    Q.  Are you aware of any gangs that have
20  pink as their colors?
21    A.  No.
22    Q.  The Bloods, do they sometimes wear
23  different shades of red?
24    A.  Yes.
25    Q.  Do some of those sometimes appear to be

Page 47

1  pink or magenta?
2    A.  It could be.
3    Q.  Have you encountered gang members
4  engaging in prostitution-like activities?
5    A.  Yes.
6    Q.  Is that fairly common?
7           MS. BANAHAN: I'll object to the form.
8    A.  Not with my personal experience, no.
9    Q.  (By Mr. Wilson) Have you encountered
10  gang members engaging in petty thefts before?
11           MS. BANAHAN: Object to the form.
12    A.  Yes.
13    Q.  (By Mr. Wilson) Is that common?
14    A.  Yes.
15    Q.  Have you engaged gang members engaging
16  in drug activities?
17    A.  Yes.
18    Q.  You mentioned you were not a gang
19  expert; right?
20    A.  Right.
21    Q.  But we talked a little bit earlier or
22  Ms. Banahan talked about ways to identify gang
23  members and we talked a lot about appearance,
24  colors, things of that nature.  Are there any other
25  way to identify gang activity other than appearance

Page 48

1  of persons?
2    A.  Appearance of a person?
3    Q.  I mean, other than their appearance,
4  like what they do or who they hang with or where
5  they frequent?
6    A.  Places of frequency such as certain
7  bars, certain streets and then also comes down to
8  the type of car that they drive or the things they
9  put on social media.  It varies from different
10  things even.  There are certain gangs that run the
11  cocaine trade, certain gangs that run the fentanyl
12  trade here in Wichita.  It just depends.
13    Q.  Okay.  Ms. Banahan asked you some
14  questions about would you expect a public member to
15  understand.  Sticking with what you said, I wanted
16  to ask you a follow-up on that.  If a business
17  customer is telling them there's gang activity on
18  the property, that would be one way of them to be
19  aware of gang activity on the property?
20    A.  Yes.
21    Q.  If business employees are saying
22  there's people that appear to be gang members on a
23  property, is that a way for a hotel or business to
24  know or suspect there's gang activity on the
25  property?

Page 49

1           MS. BANAHAN: I'll object to form.
2    A.  Yes.
3    Q.  (By Mr. Wilson) The area where the
4  Super 8 is located, that's on North Rock Road;
5  right?
6    A.  Yes.
7    Q.  Just south of Bel Aire, north of
8  Bradley Fair; is that right?
9    A.  Yes.
10    Q.  Is that generally a good area of town,
11  bad area of town?
12    A.  Generally a good area.  The hotel, the
13  hotel itself or hotels, because there's more than
14  one there, many people come in from out of town.
15  We have had our fair share of problems there, not
16  generally that specific area but just that area
17  where the hotels sit.
18    Q.  One of the things we did in this case
19  was we deposed Ryan Schneider.  Do you know who
20  Ryan Schneider is?  I believe he was a community
21  response officer at the time of the shooting.
22    A.  Yes.
23    Q.  One of the things he said in his
24  deposition was: "Just from history with that hotel
25  and specifically compared to the other one, I

13 (Pages 46 - 49)

Page 50

1 believe it's the Comfort Inn next door, I did not
2 have as many issues with the Comfort Inn as I did
3 with the Super 8." In your own experience would
4 you agree with that; that there were more issues
5 with the Super 8 than the Comfort Inn?
6     A.  Yes.
7     Q.  He continued on page 1 of his
8 deposition when I asked him, "The level of crime at
9 the Super 8 property when you were a community
10 police officer, can you tell me one way or the
11 other whether it was higher than other hotels in
12 the area, lower, about the same?" And his answer
13 was, "I would say it was probably higher than the
14 other hotels in the area." Any reason to disagree
15 with Officer Schneider?
16         MS. BANAHAN: I'll object to form. You
17 can answer.
18     A.  No.
19     Q.  (By Mr. Wilson) Did I hear you right
20 that no one was ever able to identify the
21 individual in the long-sleeve red shirt?
22     A.  At the time of my investigation, no.
23     Q.  I want to show you -- these are a
24 couple of pages from our retained expert's report
25 and I have some screen shots from surveillance

Page 51

1 footage. I guess we'll have this marked as
2 Exhibit -- the first page will be Exhibit 1, I
3 guess --
4         (Whereupon Deposition Exhibit Nos. 1
5 and 2 were marked for purposes of identification.)
6     Q.  So you have Exhibits 1 and 2 in front
7 of you. Exhibit 1 should be marked as page number
8 85 in the bottom; is that fair?
9     A.  Yes.
10     Q.  I just wanted to -- so the bottom
11 left-hand, can you tell, is that the individual in
12 the long-sleeved red shirt with "Swoosh" on it?
13     A.  Yes.
14     Q.  Did you see in either one of these
15 exhibits Mr. Norwood?
16     A.  Marion?
17     Q.  Yes.
18     A.  Yes, in the top right-hand corner.
19     Q.  Top right-hand corner?
20     A.  He is the male standing --
21     Q.  I'm going to hand you a yellow
22 highlighter. If you could just circle Norwood for
23 me. There's a green gel highlighter for the
24 record.
25         (Whereupon witness complied.)

Page 52

1     Q.  Does that show up okay?
2     A.  Yes.
3     Q.  So you circled Norwood in the top
4 right-hand screen grab on page 85 of Exhibit 1?
5     A.  Yes.
6     Q.  Then looking through the rest of those
7 photos, do you see Jaylen Thomas?
8     A.  I'm sorry, the one I just circled is
9 Jaylen.
10     Q.  Okay.
11     A.  My mistake.
12     Q.  No worries. The one you circled in
13 green is Jaylen Thomas?
14     A.  Yes.
15     Q.  Do you see Marion Norwood anywhere in
16 these screen grabs?
17     A.  Not that I can see, no.
18     Q.  So at least --
19     A.  I believe Marion was wearing a white
20 shirt, too. Potentially could be this one right
21 here but I cannot say for sure (indicating.)
22     Q.  You are pointing to the individual
23 across the doorway from Mr. Thomas?
24     A.  Yes.
25     Q.  If you go over to Exhibit 2, there's a

Page 53

1 couple of screen grabs down here, kind of the 3rd
2 row from the top. Do these depict the gentleman in
3 the red shirt holding a firearm and holding to fire
4 it?
5     A.  Yes. Talking about this photo
6 (indicating)?
7     Q.  I think you can see the gun right in
8 his left hand (indicating.)
9     A.  Yes.
10     Q.  Are you familiar with GD Folk?
11     A.  Yes.
12     Q.  Is that a subset of the Crips or Bloods
13 or is that a separate?
14     A.  That is a separate. The G stands for
15 Gangster and the D stands for Disciple.
16     Q.  Is it fair to say also that gang
17 members congregating in an area can sometimes lead
18 to violence?
19     A.  Yes.
20     Q.  That is all I have for you.
21         REDIRECT EXAMINATION
22 BY MS. BANAHAN:
23     Q.  Just a few follow-up questions.
24 Mr. Wilson asked you if you have seen gang members
25 engaging in petty theft and your answer was yes;

14 (Pages 50 - 53)

Page 54

1  correct?
2      A.  Yes.
3      Q.  Have you seen members of the public
4  that are not gang members engaging in petty theft?
5      A.  Yes.
6      Q.  Is that fairly common?
7      A.  Yes.
8      Q.  Are the majority of petty thefts
9  committed by non-gang members, to your knowledge?
10      MR. WILSON: Object to foundation.
11      I'm not sure.
12      Q.  (By Ms. Banahan) Prostitution, can that
13  occur by non-gang members?
14      A.  Yes.
15      Q.  Have you seen prostitution occur where
16  either the prostitute or the person purchasing
17  sexual services is not a member of a gang?
18      A.  Yes.
19      Q.  Have you seen drug use where the person
20  selling the drugs or purchasing the drugs is not a
21  member of a gang?
22      A.  Yes.
23      Q.  Battery, have you seen in your time as
24  a police officer a battery where the person
25  engaging in the battery or being battered is not a

Page 55

1  member of a gang?
2      A.  Yes.
3      Q.  Based on that is it fair to say that
4  all of those crimes that we just reviewed can occur
5  by gang members and not by gang members?
6      A.  Yes.
7      Q.  Looking at Plaintiff's Exhibit 1, does
8  it appear to you that the individuals who were
9  engaged in the shooting event were in fact at the
10  same party --
11      A.  Yes.
12      Q.  -- or at the same place?
13      A.  Yes.
14      Q.  Does that signal to you that they each
15  other knew well enough to be at the same place at
16  the same time?
17      A.  No.
18      Q.  Well, in any event, they were at the
19  same place at the same time?
20      A.  They were there at the same time but I
21  do not believe they knew each other.
22      Q.  Do you believe that the altercation
23  occurred because of some -- do you know why the
24  altercation occurred?
25      A.  From what I gathered from the video,

Page 56

1  the cell phone video to be exact, it was an
2  argument of some sort.  I don't know if it occurred
3  in the hotel room or outside, but ultimately shots
4  were fired because of that argument outside.
5      Q.  Looking at Exhibit 1, does it appear
6  that some of the party goers were either Hispanic
7  or Caucasian?
8      A.  Yes.
9      Q.  Looking at the top left of this page of
10  photographs, do you recognize the individuals at
11  the top left?
12      A.  Yes.  I believe he was a clerk there.
13  I do not believe -- I can't remember if he was the
14  one I was talking to.
15      Q.  Do you know what is going on with him
16  in these photographs?
17      A.  Yeah.  It appears he's going up to the
18  room and from the rest of the footage it seems
19  either telling them to leave.
20      Q.  Based on the time stamps on these
21  photographs in Exhibit 1 as opposed to the time
22  stamps in Exhibit 2, does it appear that he asked
23  them to leave before shots were fired?
24      A.  Yes.
25      Q.  That's all the questions I have.

Page 57

1      MR. WILSON: Nothing further.
2      MR. HOUGHTON: Nothing from me.  We'll
3  read and sign.
4      THE REPORTER: Where would like me to
5  send the transcript?
6      MR. HOUGHTON: To my office.
7      (Whereupon deposition proceedings were
8  concluded at 2:11 p.m.)

15 (Pages 54 - 57)

Page 58

1   I have read or have had read to me the foregoing
2   testimony recorded on pages 6 to 57, inclusive, and
3   the same is true and correct to my knowledge and
4   belief.
5
6   _____
7          STEVEN ABASOLO
8
9
10  STATE OF_____)
11  _____COUNTY)
12  Subscribed and sworn to before me, the undersigned
13  authority this___day of_____, 2023.
14
15
16  _____
17  Notary Public
18
19  _____
20  (Commission Expires)
21
22
23
24
    Job No. CS6045267
25  Blalock vs SRKBS Hotel, LLC

Page 59

1              CERTIFICATE
2   STATE OF KANSAS)
3   SEDGWICK COUNTY)
4       I, Kathy R. Bonfiglio, a Certified Shorthand
5   Reporter for the State of Kansas, do hereby certify
6   that the within-named witness was by me first duly
7   sworn to testify the truth, that the testimony
8   given in response to the questions propounded, as
9   herein set forth, was first taken in machine
10  shorthand and reduced to writing with
11  computer-aided transcription, and is a true and
12  correct record of the testimony given by the
13  witness.  I certify that review of the testimony
14  was requested by the parties. If any changes are
15  made by the deponent during the time period
16  allowed, they will be appended to the transcript.
17      I further certify that I am not a relative or
18  employee or attorney of any of the parties, or
19  financially interested in the action.
20      WITNESS my hand and official seal at Wichita,
21  Sedgwick County, Kansas, this 21st day
22  of August, 2023.
23
24          Kathy R. Bonfiglio, CSR RPR
25          VERITEXT LEGAL SOLUTIONS

Page 60

1   Eric Houghton, Esq.
2   ehoughton@wichita.gov
3          August 21, 2023
4   RE:   Blalock, Maella v. SBKBS Hotel, LLC
5       8/14/2023, Steven Abasolo (#6045267)
6       The above-referenced transcript is available for
7   review.
8       Within the applicable timeframe, the witness should
9   read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12      The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  erratas-cs@veritext.com
16
17   Return completed errata within 30 days from
18  receipt of testimony.
19   If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22          Yours,
23          Veritext Legal Solutions
24
25

Page 61

1   Blalock, Maella v. SBKBS Hotel, LLC
2   Steven Abasolo (#6045267)
3        E R R A T A  S H E E T
4   PAGE_____ LINE_____ CHANGE_____
5   _____
6   REASON_____
7   PAGE_____ LINE_____ CHANGE_____
8   _____
9   REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  Steven Abasolo                 Date
25

16 (Pages 58 - 61)

**[& - action]** Page 1

| & | | 5 | 9 |
|---|---|---|---|

**&** 2:12

**1**

**1** 5:8 50:7 51:2
51:4,6,7 52:4
55:7 56:5,21
**11-23** 6:23
**13th** 1:20 2:23
**14** 1:13
**17979** 59:23
**1:05** 1:14
**1:26** 35:3
**1st** 8:13

**2**

**2** 4:2 5:9 24:11
51:5,6 52:25
56:22
**20** 16:5 18:15
41:22 42:9
**2019** 15:14
**2020** 16:5
18:15 20:24
21:11 24:8
37:2,25 38:17
41:19,23 42:9
**2023** 1:13
58:13 59:22
60:3
**20c037022** 5:6
**20th** 20:24
21:11 24:7
37:2,25 38:17
41:19

**21** 60:3
**211** 2:13
**216** 29:6
**21st** 59:21
**23** 5:4
**2500** 2:13
**268-4335** 3:1
**268-4681** 2:25
**2:11** 57:8
**2nd** 8:13

**3**

**3** 9:16
**30** 60:17
**314** 2:15,16
**316** 2:7,8,25
3:1
**32** 34:3
**3241** 2:5
**33** 5:6
**3600** 22:3
**3741** 17:14
**3:00** 9:16
**3:02** 27:7,11
**3:05** 27:8,12
**3rd** 8:12 53:1

**4**

**425-0414** 2:8
**43** 34:3
**455** 1:20 2:23
**46** 4:7
**4th** 8:11,12,14
17:19 18:1,23

**5** 4:3
**51** 5:8,9
**53** 4:8
**552-4023** 2:15
**57** 58:2
**59** 4:18
**5:00** 9:16 46:11

**6**

**6** 4:6 58:2
**6-22-2020** 35:3
**6045267** 60:5
61:2
**63102** 2:14
**67202** 1:21
2:24
**67226** 2:6

**7**

**7:00** 17:24
46:11

**8**

**8** 16:9 17:10
19:22 20:25
21:11,16 22:2
22:5 23:4
29:14,15 35:11
37:19 40:24
41:18 42:5,19
43:18 45:17,20
49:4 50:3,5,9
**8/14/2023** 60:5
**85** 51:8 52:4
**884-4423** 2:16

**92** 6:23
**977-9999** 2:7
**9:00** 17:23

**a**

**a.m.** 9:16,16
17:24 46:11
**abasolo** 1:11
4:5 6:1,9,10
58:7 60:5 61:2
61:24
**able** 14:7,16,24
18:16 20:15
31:1,2,8 50:20
**above** 60:6
**academy** 7:7,25
8:2,7,18 15:12
**accelerate**
22:10
**access** 40:20
**accidents** 20:5
**accompanied**
29:23
**accuracy** 60:9
**accurate** 17:14
25:1 26:4
34:23 35:24
36:1 37:15,21
38:20
**accurately**
35:11
**acknowledg...**
60:12
**action** 59:19

**activities** 47:4
47:16
**activity** 10:18
12:7 15:6 20:1
20:3 47:25
48:17,19,24
**actual** 31:18
**actually** 7:18
7:19 38:21
**add** 34:8,17
**additional** 8:14
**address** 17:10
17:13
**admitted** 39:17
**affiliate** 39:22
**affiliation** 39:2
**age** 10:18
**agree** 50:4
**aided** 59:11
**aire** 49:7
**allotted** 60:20
**allow** 7:25
29:17
**allowed** 59:16
**alter** 24:22
**altercation**
43:8,14 44:1
44:13 55:22,24
**americas** 40:14
**answer** 15:2
43:11 44:3,22
45:5,12 50:12
50:17 53:25
**anybody** 14:5
34:18

**appear** 42:20
44:6 46:25
48:22 55:8
56:5,22
**appearance**
44:25 47:23,25
48:2,3
**appearances**
2:1 4:2
**appeared** 32:4
33:18 35:17
44:12
**appearing**
35:10
**appears** 32:7
56:17
**appended**
59:16
**applicable** 17:2
60:8
**application** 7:4
**approaching**
22:2
**area** 20:12
22:18,24 49:3
49:10,11,12,16
49:16 50:12,14
53:17
**arguing** 44:8
**argument** 32:2
33:18 35:10,14
42:21 44:20,24
56:2,4
**arm** 22:18 33:7

**arrest** 38:15
**arrested** 9:25
14:23
**arrests** 41:17
**arrive** 23:8
29:19
**arrived** 27:5,8
27:12 28:6,24
**arriving** 31:12
**aside** 10:11
**asked** 31:5 44:6
48:13 50:8
53:24 56:22
**asking** 22:19
**assign** 8:8
**assigned** 20:16
20:19,21
**assist** 9:21,23
**associated**
11:17
**association**
10:14 12:23
**assuming** 14:21
**attached** 60:11
**attempted**
25:19
**attempting**
36:18
**attorney** 2:21
59:18 60:13
**audio** 31:18
**august** 1:13
59:22 60:3
**author** 34:12
38:6

**authority** 58:13
**auto** 20:5
**available** 60:6
**aware** 15:10
26:18 45:18,19
46:19 48:19
**axon** 16:16

**b**

**b** 2:11 5:5
11:22 33:25
34:3
**back** 7:19 8:14
23:3 36:15
37:14 44:5
**background**
7:5,6,9
**bad** 49:11
**banahan** 2:11
4:6,8 6:6 14:15
14:21 15:4
16:21 42:25
43:13 44:5,11
44:15,25 45:7
45:14 47:7,11
47:22 48:13
49:1 50:16
53:22 54:12
**bands** 26:4
**banks** 36:17,20
37:3 39:1
**bars** 48:7
**based** 43:6,24
44:25 55:3
56:20

**basically** 34:8 40:2

**bat** 14:4

**battered** 54:25

**battery** 54:23 54:24,25

**bed** 29:7

**began** 22:18

**behalf** 2:2,10 2:19

**behavior** 11:9

**behaviors** 11:8 11:12

**bel** 49:7

**belief** 58:4

**believe** 15:13 21:9 22:16 23:9 27:8 28:1 29:25 31:8 33:20 36:21 37:8 40:3 41:5 42:7 43:19 49:20 50:1 52:19 55:21,22 56:12,13

**big** 22:12 39:21 41:6

**birth** 6:22

**bit** 47:21

**black** 22:11 25:14,19 31:25 31:25 32:3,8 33:19,20 35:9 35:14 37:17

**blalock** 1:5 29:2,5 58:25 60:4 61:1

**block** 12:5 22:3

**blood** 11:23 14:25 38:22 39:9

**bloods** 12:8,18 13:22 14:12,17 28:8 45:3 46:22 53:12

**blue** 11:24 12:17 13:2,3,5 13:9,11,12,14 13:16

**body** 16:22,22 36:25

**bonfiglio** 1:25 59:4,24

**bottom** 24:11 34:19 51:8,10

**boundaries** 19:5,6,7,19,23

**boundary** 19:8 19:9

**bradley** 49:8

**brand** 36:7

**breaks** 22:22

**brian** 18:10 21:25

**brief** 7:4 46:5

**briefly** 6:24 30:25

**broadway** 2:13

**bud** 11:21

**building** 43:19

**bureau** 6:18 8:9 18:24,25 19:1,20,23 20:2,17,19,22

**bureaus** 19:4 20:11,13,15

**business** 48:16 48:21,23

**bust** 33:22 36:11

**by's** 20:3

**c**

**c** 11:21

**calf** 27:3,3

**call** 9:9 10:20 11:25 27:7,9 31:3

**called** 24:12

**calling** 11:20

**calls** 14:18 45:4

**cam** 16:22,23

**camera** 30:2 32:22 35:8 43:20

**camera's** 35:17

**canvas** 22:23

**capacity** 15:16 18:21 32:15

**capitalize** 11:21

**car** 20:4 22:9 22:14 43:22,23 48:8

**care** 19:7,9

**carrying** 11:9

**case** 5:6 38:5,6 49:18

**cases** 28:16,17

**casing** 26:20,20

**catch** 22:10

**categorized** 12:7

**caucasian** 56:7

**caught** 31:17

**cause** 43:1

**caused** 26:22 27:24

**cell** 30:8 31:17 31:21,22 32:24 33:3,4,9,13 36:9 56:1

**center** 36:23

**certain** 19:8,9 48:6,7,10,11

**certificate** 4:18 59:1

**certified** 59:4

**certify** 59:5,13 59:17

**change** 11:19 24:22 61:4,7 61:10,13,16,19

**changes** 59:14 60:10

**chief** 7:24

**choose** 8:7,15

**cigarette** 32:2

**[circle - davion]**

circle 51:22
circled 52:3,8
  52:12
city 1:3,19 2:19
  2:21 6:25
  11:14 16:6
  17:5 24:5
  32:15
classify 28:25
clear 37:14
clearly 46:10
clerk 30:17,18
  30:24 31:2
  45:1,8 56:12
clothing 12:22
  12:25 13:3,12
  13:13,13,14,19
  14:8
cocaine 48:11
color 5:8,9
  12:15,18,22
  32:6
colored 13:12
  13:13
colors 13:8
  14:5 39:23
  46:20 47:24
come 22:3 23:5
  28:20 49:14
comes 36:23
  48:7
comfort 50:1,2
  50:5
coming 22:1

command 7:18
  7:20,22
commission
  58:20
committed 54:9
common 47:6
  47:13 54:6
community
  6:17 8:22,25
  9:3 46:7 49:20
  50:9
compared
  49:25
complaint
  10:20,22
complaints
  10:21
completed 7:7
  60:17
complied 51:25
computer 25:9
  59:11
concentrated
  20:11
concluded 57:8
conference
  10:13 11:1,4
confidential
  11:7
congregating
  53:17
connection
  41:18
constantly
  13:10

contact 7:13
container
  22:13 26:7
continue 42:1
continued
  25:24 31:16
  50:7
convicted 38:8
convictions
  41:21
coordinate
  13:6
copies 16:18
  60:14
corner 51:18
  51:19
correct 8:23
  16:2 17:17
  24:12 54:1
  58:3 59:12
correctly 19:12
counsel 60:14
county 58:11
  59:3,21
couple 10:25
  50:24 53:1
course 45:15
court 1:1 4:21
cover 11:3
crime 9:11,19
  20:11 42:14,16
  44:6 46:12
  50:8
crimes 9:14
  10:8 55:4

criminal 10:18
  20:1
crip 12:1,2
  14:25 37:20
  38:24
crips 11:18
  12:7,15 13:2
  13:16,17,21
  14:12,17 28:8
  38:20 45:3
  53:12
criteria 39:15
  40:1,2
cro 10:1
cross 46:3
crt 9:9 10:3,4
  20:16
cs 60:15
cs6045267 1:24
  58:24
csr 1:25,25
  59:24
currently 6:10
  8:20,22 18:21
  20:19
custody 4:20
customer 48:17
cuz 12:1

**d**

d 53:15
date 6:22 35:4
  61:24
daughter 39:19
davion 37:19
  38:1,23

**day** 10:18
    46:17 58:13
    59:21
**days** 60:17
**dealing** 9:10,13
**decide** 7:25
**deem** 7:23 14:7
**defendant** 1:9
    2:10 5:3,5
**defendant's**
    23:21,24 33:25
    34:3
**define** 42:16
**denotes** 12:23
**deonte** 39:8
    40:25
**department**
    1:19 2:22 6:14
    6:16 12:12
    15:9,21 19:2
    40:18
**depends** 13:6
    13:23 48:12
**depict** 37:23
    53:2
**depiction** 37:15
**deponent** 59:15
    60:13
**deposed** 49:19
**deposing** 60:13
**deposition** 1:11
    15:15,19 16:15
    16:25 33:24
    49:24 50:8
    51:4 57:7

**deputy** 2:21
**describe** 6:24
**described**
    35:21
**describing** 13:2
**description** 5:2
**designated**
    19:5
**designation**
    39:13
**detain** 29:20
**detective** 7:8
**determination**
    33:17
**determine**
    14:11 41:10
**determined**
    28:2 41:14
**devaughn** 2:4
**dictating** 25:10
**different** 10:16
    11:8,13 19:3
    20:10,13,21
    21:13,16 39:23
    40:2 46:23
    48:9
**direct** 6:5
**directed** 44:7
**direction** 37:13
**directly** 23:15
**disagree** 50:14
**discernible**
    14:11
**disciple** 53:15

**discuss** 18:1
    21:21
**discussing**
    20:25
**discussion**
    16:20
**dispatch** 43:23
**dispute** 17:17
**disrespect**
    39:25
**district** 1:1,2
**dixon** 2:12
**dixon.com** 2:17
**document** 11:7
    34:4 39:16
**documented**
    28:19 37:20
    38:20,21,24
    39:12
**doing** 10:17
    22:13
**domestic** 9:20
    20:4
**door** 50:1
**doorway** 36:22
    36:23 52:23
**drafted** 34:10
    34:16 35:1,5
**dreadlocks**
    35:16 41:12
    42:22 43:17
**dreads** 32:4,9
    32:14
**drive** 20:3 48:8

**drug** 10:21
    20:4,4 47:16
    54:19
**drugs** 54:20,20
**due** 41:2
**duly** 6:2 59:6

**e**

**e** 61:3,3,3
**earlier** 17:19
    39:5 47:21
**easily** 14:11
    28:7
**east** 19:4,8,9,13
    37:18 43:18
**effort** 14:6
**ehoughton** 3:2
    60:2
**either** 7:2 9:15
    9:24 10:18
    13:21 14:12,17
    28:7 45:3
    51:14 54:16
    56:6,19
**ejected** 26:20
**emojis** 11:18
    39:24
**employed** 6:11
    6:13
**employee** 59:18
**employees** 42:4
    42:10 48:21
**encountered**
    47:3,9
**endearment**
    12:1

**[ends - forth]**                                                                          Page 6

| | | | |
|---|---|---|---|
| **ends**  22:17 | 51:2,2,4,7 52:4 | **fairly**  47:6 54:6 | **first**  6:2 7:2,3 |
| **enforcement** | 52:25 55:7 | **fall**  19:22 | 7:12,12 23:4,7 |
| 28:4 | 56:5,21,22 | **familiar**  30:12 | 37:14 51:2 |
| **engaged**  47:15 | **exhibits**  4:3,21 | 30:22 53:10 | 59:6,9 |
| 55:9 | 5:1 51:6,15 | **family**  7:14 | **five**  6:21 21:5,5 |
| **engaging**  47:4 | **exit**  22:14 | **fax**  2:8,16 3:1 | 21:6 |
| 47:10,15 53:25 | **exiting**  22:17 | **fbi's**  40:15 | **flagged**  25:13 |
| 54:4,25 | **expand**  24:23 | **features**  41:1 | 39:6,9,12 |
| **entering**  35:17 | **expect**  14:15 | **feet**  29:6 | **flagging**  40:5 |
| **entry**  10:9,10 | 48:14 | **felony**  38:8 | **floor**  1:20 2:23 |
| **environment** | **expected**  45:1,8 | **female**  31:10 | 31:23 33:8 |
| 7:15 | **experience** | **females**  31:25 | **folk**  53:10 |
| **eric**  60:1 | 33:22 38:13 | 35:10 | **follow**  48:16 |
| **erik**  2:20 | 47:8 50:3 | **fentanyl**  48:11 | 53:23 |
| **errata**  60:11,13 | **expert**  11:15 | **field**  8:10 19:2 | **following**  28:21 |
| 60:17 | 14:19 47:19 | **fight**  22:22 | 30:6 41:25 |
| **erratas**  60:15 | **expert's**  50:24 | **fill**  7:4,6 | 42:9 43:13 |
| **esq**  60:1 | **expires**  58:20 | **final**  7:19 | **foot**  43:22 |
| **evaluation**  7:21 | **extensive**  7:5 | **financially** | **footage**  5:8,9 |
| **evans**  2:12,17 | 10:12 | 59:19 | 16:22,23 29:14 |
| **event**  16:5,9 | **exterior**  32:22 | **find**  7:3 9:24 | 29:15 30:2,7,8 |
| 24:4 42:19 | **eyesight**  14:17 | 26:13 | 31:16,17,21,22 |
| 55:9,18 | | **fine**  24:14 | 32:18,24 33:3 |
| **evidence**  14:7 | **f** | **fire**  26:21,22 | 33:3,4,10,13,16 |
| **exact**  56:1 | | 53:3 | 35:9,12 51:1 |
| **exactly**  36:25 | **facebook**  40:22 | **firearm**  33:2 | 56:18 |
| **examination** | 41:6 | 38:7 53:3 | **force**  26:22 |
| 4:5 6:5 46:3 | **facial**  40:25 | **firearms**  11:9 | **foregoing**  58:1 |
| 53:21 | **fact**  28:11 55:9 | 22:25 28:18 | **forgot**  27:4 |
| **executing** | **fails**  60:19 | **fired**  37:14 | **form**  14:13 |
| 10:24 | **fair**  8:2 12:13 | 43:14,16,25 | 15:1 44:2 45:4 |
| **exhibit**  4:20 5:3 | 13:3,4 19:15 | 45:20,24 56:4 | 45:11 47:7,11 |
| 5:5,8,9 23:21 | 20:8 26:8 | 56:23 | 49:1 50:16 |
| 23:24 24:11 | 36:11,15 44:15 | **firing**  37:13 | **forth**  59:9 |
| 33:24 34:3 | 46:8 49:8,15 | 44:19 | |
| | 51:8 53:16 | | |
| | 55:3 | | |

**[found - hold]**

| | | | |
|---|---|---|---|
| **found**  38:7 | **gangs**  9:10,13 | 23:3,23 33:21 | **h** |
| 40:23 | 10:7,16 11:6 | 33:23 34:2 | |
| **foundation** | 12:12 14:10 | 44:5 51:21 | **h**  61:3 |
| 42:23 44:2 | 39:23 46:19 | 56:15,17 | **half**  6:21 17:8 |
| 45:12 54:10 | 48:10,11 | **good**  16:17 | 18:20 21:7 |
| **four**  19:3 | **gangster**  53:15 | 49:10,12 | **hall**  1:19 |
| **frequency**  48:6 | **gathered**  55:25 | **grab**  52:4 | **hand**  10:16 |
| **frequent**  48:5 | **gd**  53:10 | **grabs**  52:16 | 11:16 23:23 |
| **front**  37:18 | **gel**  51:23 | 53:1 | 32:5 34:2 |
| 51:6 | **general**  7:13 | **graduate**  8:6,8 | 35:23 36:20 |
| **fruition**  28:20 | 14:9 15:5 24:1 | 15:11 | 51:11,18,19,21 |
| **fugitives**  40:16 | 31:5 34:8,12 | **graduates**  8:17 | 52:4 53:8 |
| **full**  6:7 | **generally**  16:11 | **green**  51:23 | 59:20 |
| **further**  57:1 | 19:25 21:23 | 52:13 | **handicapped** |
| 59:17 | 24:25 49:10,12 | **greg**  30:21 | 11:19 |
| | 49:16 | **group**  31:24 | **hands**  26:3 |
| **g** | **generated**  24:3 | 35:9 | **hang**  12:2 48:4 |
| | **gentleman**  53:2 | **guess**  9:18 | **haphazardly** |
| **g**  53:14 | **give**  7:8,15 | 12:11 13:6 | 40:7 |
| **gang**  10:12,13 | 15:19 18:16 | 14:6 28:23 | **happened** |
| 10:14,16 11:1 | 42:17 | 29:23 42:18 | 27:20 29:20 |
| 11:3,12,14,16 | **given**  9:22 | 51:1,3 | **happens**  9:19 |
| 12:4,6,23 | 15:15 59:8,12 | **guest**  33:14,15 | 46:12 |
| 13:20 14:7 | **gives**  22:20 | **gun**  22:15 | **hear**  13:7 22:13 |
| 15:6 20:3 | **giving**  39:13 | 26:11,13,22 | 50:19 |
| 28:11,12,14,19 | **go**  7:4,8,20 8:1 | 32:5,6,6,7 | **heard**  23:1 |
| 28:25 36:4 | 8:10 9:24 10:8 | 33:11 36:19 | 26:10 36:9 |
| 38:22 39:1,6,9 | 10:14,20 25:12 | 44:19 53:7 | 42:13 |
| 39:12,14,16,17 | 26:11,17 39:15 | **gunfire**  44:12 | **held**  17:7 |
| 39:19,20,24 | 52:25 | **gunshot**  22:14 | **higher**  50:11,13 |
| 40:1,6,19 41:7 | **goers**  56:6 | 23:1 36:25 | **highlighter** |
| 45:10 47:3,10 | **goes**  29:13 | **gunter**  37:19 | 51:22,23 |
| 47:15,18,22,25 | 39:12 | 38:1,23,24 | **hispanic**  56:6 |
| 48:17,19,22,24 | **going**  7:15 8:11 | | **history**  49:24 |
| 53:16,24 54:4 | 10:21 14:6 | | **hold**  9:4 10:19 |
| 54:9,13,17,21 | | | |
| 55:1,5,5 | | | |

**holding** 22:14 32:6 33:2,7 53:3,3
**homes** 10:10
**homicides** 9:20
**honest** 42:18
**hospital** 29:23 30:1
**host** 10:13
**hotel** 1:8 22:21 30:10 32:19,19 33:6,10,11,14 33:15 48:23 49:12,13,24 56:3 58:25 60:4 61:1
**hotels** 49:13,17 50:11,14
**houghton** 2:20 57:2,6 60:1
**hour** 29:16 31:14
**hours** 9:15 31:13
**hundred** 12:5

**i**

**idea** 30:18
**identification** 23:22 34:1 51:5
**identified** 28:7 28:18 36:14
**identify** 9:24 12:3 13:21 14:16,25 15:6

37:5 47:22,25 50:20
**identifying** 10:15,22 11:1 11:12
**identity** 25:20 37:7 41:10,15
**immediately** 28:24
**incident** 16:12 17:4,25 18:6 21:20,24 23:16 24:2 28:3,21 30:8 41:18,22 41:25 42:6,9 42:11
**included** 27:16
**inclusive** 58:2
**incorrect** 17:1
**index** 4:1,3 5:1
**indicate** 39:24
**indicating** 26:21 52:21 53:6,8
**indicator** 39:21
**individual** 6:25 14:22 22:15 25:17 26:16 32:13,14 33:2 33:9,11 41:11 41:15 42:21 43:7,17 50:21 51:11 52:22
**individual's** 30:19

**individuals** 10:17 11:2 12:3 27:12 39:11 44:8,13 45:2,9,16 55:8 56:10
**informant** 11:7
**information** 7:14 29:8 31:9 34:17
**initial** 30:6
**injury** 2:4
**inn** 50:1,2,5
**inside** 22:21 32:9 33:5,10 36:22 45:20
**insofar** 25:1
**instance** 13:1
**instances** 42:7
**intelligence** 39:14
**intended** 44:12
**interested** 59:19
**interior** 32:19
**interpersonal** 42:14 44:6
**interview** 7:12 7:19 29:2
**interviewed** 29:10
**interviews** 7:17
**investigate** 27:23 42:2,25 43:3

**investigating** 35:8
**investigation** 9:22 30:6 40:7 40:9 43:24 45:15 50:22
**involved** 32:2 38:6 44:13
**issued** 15:20,24
**issues** 50:2,4
**item** 13:3,13
**items** 13:19

**j**

**james** 2:4
**jammed** 26:21
**january** 15:14
**jaquan** 40:23 41:4
**jaylen** 22:15,16 25:17,22,25 26:23,25 27:16 27:18,19 28:3 29:20,25 33:19 36:15 37:13 42:22 43:8 52:7,9,13
**jeffrey** 2:3
**job** 1:24 31:19 58:24
**june** 16:5 18:15 20:24 21:11 24:7 37:2,25 38:17 41:19,22 42:9

**juveniles** 39:18

**k**

**kansas** 1:2,3,3
 1:21 2:6,19,24
 5:3 10:14 59:2
 59:5,21
**kathy** 1:25 59:4
 59:24
**kbanahan** 2:17
**keep** 7:11 46:5
**kerry** 2:11
**kicked** 45:16
**kimble** 23:17
 23:18
**kind** 10:8 11:3
 13:7 53:1
**knew** 55:15,21
**know** 13:25
 14:2,3 16:11
 17:10 18:21
 19:6,17,18
 21:3 23:11,13
 23:14 25:2,20
 26:19 27:3,9
 27:14,20 28:12
 28:13,14 29:9
 29:11,17 31:6
 36:20,25 37:2
 37:6,9,25 38:9
 38:11 39:1,6,7
 40:16 41:3,14
 41:17,21 43:16
 43:21 48:24
 49:19 55:23
 56:2,15

**knowledge**
 28:10,13,20
 54:9 58:3
**known** 11:15
 12:12 13:24
 28:4 45:9
**knows** 22:19
**ks** 1:25

**l**

**labeling** 40:6
**language** 12:2
**large** 11:5 40:1
**law** 2:22 28:4
**lawyers** 2:4
**lay** 12:21 14:16
**lead** 53:17
**learn** 10:15
 29:7 31:20
**learned** 29:5
 37:7
**leave** 56:19,23
**left** 43:21 51:11
 53:8 56:9,11
**legal** 59:25
 60:23
**letter** 11:19
**level** 21:20 50:8
**line** 7:4 61:4,7
 61:10,13,16,19
**lingo** 36:4
**list** 40:11,15
**little** 47:21
**llc** 1:8 2:12
 58:25 60:4
 61:1

**located** 28:18
 28:18 36:22,24
 49:4
**locating** 22:24
 30:2
**long** 6:19 8:4
 8:25 18:11,14
 31:11 32:3
 35:15,16,18,25
 36:19 37:11,18
 41:1,12 50:21
 51:12
**longer** 17:2
**look** 11:8
**looking** 13:20
 31:24 52:6
 55:7 56:5,9
**lost** 26:6
**lot** 21:13 22:4,4
 22:8,10 27:13
 27:21,25 32:12
 35:11 36:24
 41:7 45:24
 47:23
**louis** 2:14
**lower** 50:12

**m**

**machine** 59:9
**made** 27:9 31:4
 33:20 41:17
 45:19 59:15
**maella** 1:5 29:2
 29:5 60:4 61:1
**magazine**
 35:18

**magenta** 47:1
**main** 1:20 2:23
 10:10
**maintained**
 31:19
**majority** 18:20
 54:8
**make** 7:16
 23:18 33:17
**malcolm** 18:10
 18:11,22 21:25
 22:9 23:7
 25:23
**male** 22:5,11
 25:14 31:10
 32:1,3,8 33:19
 33:20 35:15
 36:9,18 37:11
 37:17 51:20
**males** 25:19
 31:25 35:9
 36:14
**malik** 36:17,20
 37:3 39:1
**manager** 29:17
 30:9
**marion** 25:22
 25:25 26:23
 27:2,17,18,19
 28:4 29:20
 33:20 36:14
 37:13 39:4,5
 42:22 43:9
 51:16 52:15,19

**[mark - officers]**

mark  30:12
marked  5:2
  23:22,24 33:25
  51:1,5,7
marking  34:2
masenthin
  23:13 29:24
matches  40:25
mean  48:3
meaning  36:3
  44:11
means  13:8
media  10:19
  11:17 39:21,25
  48:9
meet  40:2
meeting  7:22
  7:24 14:4
member  13:20
  13:21,22 14:8
  14:9,12,16
  28:7 38:22,25
  39:6,10,12,17
  39:19 40:6,19
  48:14 54:17,21
  55:1
members  11:16
  13:16 28:11,15
  28:19,25 37:21
  39:16,21 40:1
  41:7 45:2,9
  47:3,10,15,23
  48:22 53:17,24
  54:3,4,9,13
  55:5,5

mentioned
  46:10,14 47:18
met  16:1 38:14
microsoft  25:9
minnis  39:8,9
  40:25
missouri  2:14
mistake  52:11
mo  1:25
moment  17:7
month  8:10
months  8:5
motel  16:9
  17:11 20:25
  21:11,17 30:16
  32:10 42:20
  45:17,21
move  7:23
multiple  37:12
  39:20
muscle  22:17
  27:1

**n**

n  11:23
name  6:7 30:9
  30:12,19,21
  34:20,22 37:5
  41:6,8,8
named  59:6
names  23:11
narcotics  9:10
  9:14 10:7
narrative  24:12
  24:15,20,22,25
  25:12

nature  47:24
near  16:9
necessary  7:23
need  7:10 39:15
never  16:1,18
  26:20
night  42:5 45:1
  46:18
nike  36:7
non  54:9,13
normally  9:19
  11:18
north  1:20 2:5
  2:13,23 6:18
  17:14 18:24,25
  19:1,4,7,8,13
  19:19,23 20:1
  20:14,20,22
  49:4,7
norwood  25:22
  36:14 39:4,5
  42:22 43:9
  51:15,22 52:3
  52:15
nos  51:4
notary  58:17
note  60:10
number  5:2
  27:14 51:7

**o**

oath  6:2
object  14:13
  15:1 42:23
  44:2 45:4,11
  47:7,11 49:1

50:16 54:10
objection  14:18
  43:10 44:9,14
  44:21
observed  43:6
obstructed
  22:5
obtained  36:10
occur  54:13,15
  55:4
occurred  31:3
  33:17 42:2
  43:4 55:23,24
  56:2
offense  5:4
office  15:24
  57:6
officer  6:17,20
  6:25 7:11 8:9
  8:18,20,23 9:1
  9:4,5,8 10:6
  11:11 15:16
  17:6 18:11,22
  18:23 20:16
  22:8 23:7 24:4
  25:23 28:4
  29:9,10,11,24
  30:4,19 32:15
  34:12,14,18
  46:6,7 49:21
  50:10,15 54:24
officers  10:14
  17:20 18:18
  19:8,12,13,14
  19:14 22:24

23:8,9,12
26:19 29:24
37:8 38:13
**official** 59:20
**okay** 10:1
12:11 24:19
40:14 48:13
52:1,10
**once** 7:6 8:6,8
43:16
**openly** 39:17
**opinion** 14:19
43:25 44:17
**opposed** 56:21
**ordered** 25:23
**outside** 22:22
32:10,11 33:5
33:7,11 56:3,4
**own** 7:3 26:22
50:3

**p**

**p.m.** 1:14 9:16
17:23 46:11
57:8
**packet** 7:5,6
**page** 24:10,11
50:7 51:2,7
52:4 56:9 61:4
61:7,10,13,16
61:19
**pages** 34:3
50:24 58:2
**parents** 39:18
**parking** 22:4,4
22:8,10 27:13

27:21,24 32:11
35:11 36:24
45:24
**part** 30:5 35:7
**parties** 59:14
59:18
**partner** 18:7,9
18:12,14,19
21:25 34:13
**party** 55:10
56:6
**partygoer**
33:14 38:5
**past** 38:12
**path** 7:3
**patrol** 8:9,18
8:20 9:5 10:6
17:6,20 18:23
19:3,7,12,13,13
19:14 20:14,22
22:9,14 30:4
**paul** 23:17
**pause** 24:18
**pectoral** 22:17
27:1
**people** 11:8
22:6 39:16,22
41:7 48:22
49:14
**period** 31:15
59:15
**permanent**
18:4,5
**person** 11:10
12:21 14:16

33:7 37:6 40:8
40:10 48:2
54:16,19,24
**personal** 47:8
**persons** 48:1
**petty** 47:10
53:25 54:4,8
**phone** 30:8
31:17,21,22
32:24 33:3,4
33:10,13 36:9
56:1
**photo** 53:5
**photograph**
14:23
**photographs**
56:10,16,21
**photos** 52:7
**phrases** 11:25
**physical** 7:21
43:8,14
**pink** 46:20 47:1
**pit** 22:18
**place** 16:9
55:12,15,19
**places** 48:6
**plaintiff** 1:6 2:2
5:8,9
**plaintiff's** 55:7
**please** 6:7
**pocket** 35:19
**point** 22:8,15
22:18 23:18
26:10

**pointing** 52:22
**police** 1:19 6:14
6:16,19,25
7:11 8:6 11:11
12:12 13:20
15:8,11,16,20
16:24 19:1
25:1,7 40:5,18
45:7 50:10
54:24
**polygraph** 7:21
**port** 26:21
**portion** 25:1,4
29:4 34:25
**position** 6:15
8:7 9:4 17:5,8
**positive** 41:3
**post** 20:22
40:24
**potentially**
52:20
**preparation**
16:25
**prepared** 16:14
**present** 29:11
**pretty** 7:5
**previous** 28:16
38:5
**primarily** 9:10
**primary** 8:15
9:17,18 18:19
46:15,16,17
**print** 7:5
**prior** 9:3 20:24
21:11 28:3

31:3 37:2,25
38:16
**probably** 35:23
50:13
**problems** 49:15
**proceedings**
24:18 57:7
**process** 8:1
10:22
**program** 8:4
**properly** 11:7
**property** 48:18
48:19,23,25
50:9
**propounded**
59:8
**prostitute**
54:16
**prostitution**
47:4 54:12,15
**provide** 31:9
**psych** 7:21
**public** 14:10
15:5 40:12,19
48:14 54:3
58:17
**published**
40:11
**purchasing**
54:16,20
**purpose** 44:19
**purposes** 23:22
33:25 51:5
**pursuant** 15:19

**put** 8:15 28:23
39:23 48:9
**putting** 11:23

**q**

**quality** 41:2
**question** 12:21
22:19
**questions** 10:25
31:5 46:2
48:14 53:23
56:25 59:8

**r**

**r** 1:25 59:4,24
61:3,3
**radio** 23:5
**ran** 43:18,19
**random** 42:16
44:18
**rank** 6:15
**read** 16:16
24:14 57:3
58:1,1 60:9
**reads** 29:4
**real** 41:8
**really** 34:11
**reason** 17:16
50:14 60:11
61:6,9,12,15,18
61:21
**recall** 17:3
21:24 27:5
30:9 32:20,21
42:8,10

**receipt** 60:18
**recent** 28:17
**recognize** 34:4
56:10
**recognized**
45:2,9
**recollection**
21:16,20
**record** 6:8
16:20 51:24
59:12
**recorded** 58:2
**recruited** 7:2
**red** 12:19 13:5
13:9,11,13,14
26:7 32:3,9,13
33:19 35:15,25
36:18 37:11
41:1,11 43:7
46:23 50:21
51:12 53:3
**redirect** 53:21
**reduced** 59:10
**reference** 16:5
33:21
**referenced**
17:19 60:6
**referencing**
16:12 33:1
**reflect** 35:12
**regard** 41:22
**regarding** 31:3
**relative** 59:17
**remember**
21:12,14 22:1

31:9 56:13
**rephrase** 9:18
**report** 5:4,5
16:16,24 17:1
17:2 23:15
24:1,3,7,15,21
25:1,4,7,12
29:4 34:7,8,12
34:15,20 35:1
35:3,7,23 37:5
38:19 50:24
**reporter** 4:21
57:4 59:5
**reporter's** 4:18
**reports** 34:10
37:10
**represent**
17:13
**representing**
13:8
**requested**
59:14
**researched**
40:22
**respond** 9:21
**responded**
21:10,12 22:1
30:4
**responding**
10:7
**responds** 24:4
**response** 6:17
8:22 9:1,3,8,17
30:6 46:7,11
46:15,16,17

**[response - shooting]** Page 13

49:21 59:8
**responsibilities**
9:7
**rest** 52:6 56:18
**restrain** 36:18
**result** 42:20
44:20,23
**retained** 4:21
50:24
**return** 60:13,17
**review** 29:14
30:2 31:16
59:13 60:7
**reviewed** 16:21
16:24 24:20
29:13 35:12
55:4
**reviewing** 30:7
32:22 33:16
35:8 37:9
**right** 14:3,24
17:12 18:25
22:17 23:1
27:1 28:13
29:19 34:9
35:18 36:19
46:6 47:19,20
49:5,8 50:19
51:18,19 52:4
52:20 53:7
**rival** 11:22
**road** 17:14
49:4
**rock** 17:14 49:4

**rode** 18:17,18
**role** 9:7
**room** 22:21
29:6,12 31:6
31:23 56:3,18
**rosters** 40:19
**rotation** 18:3
**rounds** 37:12
**row** 53:2
**rpr** 1:25 59:24
**run** 48:10,11
**running** 22:7,7
22:12 25:25
26:2,3 37:18
**ryan** 23:13
49:19,20

**s**

**s** 2:20 61:3
**sales** 20:4
**saw** 20:7 32:8
37:23
**saying** 19:12
22:6 48:21
**says** 13:16
25:23 27:19
34:20,22 35:3
35:7,14 37:17
38:19 40:22
**sbkbs** 60:4 61:1
**scene** 23:8,19
27:6 28:6,24
29:20 30:5
31:11,19 34:14
34:18

**scenes** 9:11
**schneider**
49:19,20 50:15
**screen** 50:25
52:4,16 53:1
**seal** 59:20
**search** 10:10,23
10:24
**second** 23:14
24:10 31:23
33:8
**seconds** 23:10
**section** 24:11
24:20,22 39:14
**secured** 41:22
**security** 29:15
31:19 32:19
35:12
**sedgwick** 59:3
59:21
**see** 7:9 20:1
22:11,11 26:2
31:6,24 32:3
32:18 36:13,17
51:14 52:7,15
52:17 53:7
**seemed** 17:1
32:1
**seems** 56:18
**seen** 14:23
32:14 35:17
37:12,18 40:14
40:23 53:24
54:3,15,19,23

**selling** 54:20
**send** 57:5
**sent** 60:14
**separate** 53:13
53:14
**separated** 19:2
**sergeant** 23:17
23:18
**series** 7:17
**services** 54:17
**set** 12:4 59:9
**seven** 31:13,14
**sexual** 54:17
**shades** 46:23
**shape** 32:5
**share** 49:15
**shaw** 37:20
38:9,11,12,21
**sheet** 60:11
**shift** 8:11,12,15
17:20,22 18:4
18:5,13,23
**shirt** 13:16
25:14,20 32:3
32:9,13 33:19
35:15,25 36:7
36:19 37:11
41:2,11 43:7
50:21 51:12
52:20 53:3
**shoot** 33:23,23
**shooter** 41:1
**shooting** 16:5,8
21:10,16 22:1
23:4 27:21,24

**[shooting - super]**                                                      Page 14

31:6,12,18
37:12 42:19
43:1,3,21
44:18,19,23
46:8 49:21
55:9
**shootings**  9:19
20:3 21:13
**short**  9:9
**shorthand**  59:4
59:10
**shot**  22:19,20
22:23 25:15
26:14,16,18,23
26:25 27:2
29:6
**shots**  43:14,16
43:25 44:7
45:20,23 50:25
56:3,23
**shoulder**  32:4
**show**  29:17
50:23 52:1
**showing**  13:7
**shown**  30:8
**side**  20:14
**sight**  26:6
**sign**  11:19 57:3
60:12
**signal**  55:14
**signature**  59:23
**signed**  60:20
**signs**  10:16
11:1,16

**silly**  12:20
**simple**  20:5
**sit**  21:15,19
28:10 49:17
**sitting**  19:18
**six**  8:5 31:13,14
**slang**  41:8
**sleeping**  29:6,7
**sleeve**  36:19
37:11,18 50:21
**sleeved**  32:3
35:15,25 41:1
51:12
**smoking**  32:1
**social**  10:18
11:17 39:21,25
48:9
**solutions**  59:25
60:23
**somebody**
11:20 13:23,24
14:3
**son**  39:19
**sorry**  9:16 52:8
**sort**  38:15 56:2
**sound**  12:20
17:14 30:12,21
**sounds**  19:17
20:7 36:6
**south**  19:4,10
19:15 22:2,4
32:11 35:10
36:23 49:7
**span**  21:8

**speak**  20:15
30:15,24 31:2
**speaking**  16:11
19:25 21:23
24:25 42:10
**specific**  20:17
27:14 29:10
42:11 49:16
**specifically**
11:14 19:18
21:14 49:25
**specifics**  18:16
**speculation**
45:5
**spoken**  42:4
**srkbs**  1:8 58:25
**st**  2:14
**stabbings**  9:20
**staff**  7:18,20,22
**stamps**  56:20
56:22
**standard**  5:3
**standing**  22:6
32:1 51:20
**stands**  53:14,15
**stark**  30:12
**start**  8:18
17:23
**started**  27:21
30:1
**starting**  27:24
**state**  6:7 58:10
59:2,5
**stated**  25:14
27:19 45:20

**states**  1:1 25:13
**steven**  1:11 4:5
6:1,9 58:7 60:5
61:2,24
**sticking**  35:18
48:15
**stop**  25:19,24
38:7,13,14
**stopped**  39:20
**storage**  22:12
26:7
**story**  22:21
**street**  1:20 2:5
12:4
**streets**  48:7
**strike**  16:23
**struck**  22:16
**stuff**  7:14 9:11
10:11,11,19
31:7
**subpoena**
15:20,23 16:4
16:18
**subscribed**
58:12
**subset**  53:12
**suite**  2:13
**super**  16:9
17:10 19:22
20:25 21:11,16
22:2,5 23:4
29:14,15 35:11
37:19 40:24
41:18 42:5,19
43:18 45:16,20

**[super - truth]**

49:4 50:3,5,9
**supplemental**
5:5 34:7,10,14
34:19 35:1
37:10
**supposed** 11:20
**sure** 7:16 37:9
40:4,13 52:21
54:11
**surveillance**
33:3 50:25
**suspect** 9:24,24
48:24
**suspects** 25:24
26:3
**swat** 10:11
**swoosh** 35:16
36:1,3 51:12
**sworn** 6:2
58:12 59:7
**system** 29:18
31:1 32:19

**t**

**t** 25:14,20 61:3
61:3
**tagged** 40:24
**take** 7:7 14:6
19:8 30:5
**taken** 1:18
31:22 33:5
59:9
**takes** 19:7
**talked** 11:2
42:1 47:21,22
47:23

**talking** 12:6
40:16 53:5
56:14
**teaching** 10:21
**team** 46:17,18
**tell** 11:11 21:23
23:24 24:15
50:10 51:11
**telling** 48:17
56:19
**tells** 22:20
**ten** 27:15 40:15
**tend** 39:23
**term** 12:1 13:7
33:23 42:13
**terms** 36:4
40:19
**testifies** 6:4
**testify** 6:2 59:7
**testimony** 46:6
58:2 59:7,12
59:13 60:9,18
**theft** 20:4
53:25 54:4
**thefts** 47:10
54:8
**thing** 7:3 19:10
**things** 19:3
47:24 48:8,10
49:18,23
**think** 27:7 31:5
35:22 38:4
39:5 46:1 53:7
**thomas** 22:16
25:17,22 36:15

42:22 43:8
52:7,13,23
**thorough** 40:7
40:9
**thought** 46:14
**three** 8:10 9:2
40:3
**threw** 22:25
**time** 16:17 17:4
17:22,23,25
18:6,17,17
21:7 22:16
23:16 27:5,11
29:12 30:17,18
31:14 35:3,4
46:11,15,16
49:21 50:22
54:23 55:16,19
55:20 56:20,21
59:15 60:19
**timeframe** 60:8
**times** 9:17,18
21:3 39:20
**title** 17:20
**toben** 2:5
**today** 15:19
16:15 18:1
19:18 21:1,15
21:19 28:11
42:1
**together** 40:24
**told** 23:4 26:19
45:14
**took** 16:9 33:9

**tools** 9:22
**top** 40:15 51:18
51:19 52:3
53:2 56:9,11
**topics** 11:3
**torrance** 37:20
38:9,11,12,21
40:25
**town** 49:10,11
49:14
**townsend**
30:21
**trade** 48:11,12
**traffic** 20:5
38:7,13,14
**trained** 11:16
**training** 7:7
8:10 9:23 10:2
10:6,8,9,12,15
10:20 14:10
15:5 45:8
**transcript** 4:1
57:5 59:16
60:6,20
**transcription**
59:11
**transported**
29:22,25
**trend** 41:6
**trespassing**
20:6
**true** 20:10 58:3
59:11
**truth** 6:3,3,4
59:7

**[trying - witness]**                                                   Page 16

| | | | |
|---|---|---|---|
| **trying** 30:1 | **use** 11:16,18,21 | **vs** 1:7 58:25 | **week** 8:12,13 |
| 44:17 | 11:25 20:4 | **w** | 8:13 |
| **turn** 24:10 | 41:7,8 54:19 | | **weeks** 8:12,14 |
| **two** 8:12,14 | **used** 60:20 | **waist** 26:3 | **went** 26:7 |
| 12:9,11 18:18 | **usually** 9:15 | **walked** 14:24 | 43:17 |
| 20:15 22:6,24 | **v** | **walks** 22:22 | **west** 19:4,10,14 |
| 22:24 23:9 | | **wall** 22:24,25 | 22:7 |
| 25:19 29:24 | **v** 60:4 61:1 | **want** 7:16 | **white** 25:14,20 |
| 36:13 | **varied** 18:17 | 10:25 11:15 | 31:25 52:19 |
| **type** 7:15 15:4 | **varies** 34:11 | 15:13 29:16 | **wichita** 1:19,21 |
| 19:25 39:19 | 48:9 | 31:13 36:22 | 2:6,19,24 6:14 |
| 43:7 48:8 | **variety** 11:5 | 50:23 | 7:1 11:14 12:6 |
| **types** 10:16 | **vary** 42:18 | **wanted** 40:15 | 12:12 15:8,20 |
| 39:23 | **verbal** 43:8,13 | 48:15 51:10 | 16:6 17:5 19:1 |
| **typically** 12:7 | **verify** 60:9 | **warrant** 10:24 | 20:11 24:5 |
| 46:12 | **veritext** 59:25 | 10:24 | 32:16 40:5,18 |
| **typing** 25:11 | 60:14,23 | **warrants** 10:10 | 48:12 59:20 |
| **u** | **veritext.com** | **watch** 17:19 | **wichita.gov** 3:2 |
| | 60:15 | 18:1 | 60:2 |
| **ultimately** 7:24 | **versus** 44:19 | **watched** 16:16 | **wilson** 2:3 4:7 |
| 9:23 10:17,23 | **victim** 36:21 | 35:9 37:15 | 14:13,18 15:1 |
| 22:23 27:23 | **video** 5:8,9 | **way** 10:17,23 | 16:17 42:23 |
| 56:3 | 30:7 31:1,16 | 11:13 13:15,20 | 43:10 44:2,9 |
| **unable** 41:3 | 31:18 32:18,21 | 14:7 16:14 | 44:14,21 45:4 |
| **undersigned** | 33:1 36:10,13 | 23:19 28:23 | 45:11 46:2,4 |
| 58:12 | 37:6 41:2 | 32:6 47:25 | 47:9,13 49:3 |
| **understand** | 55:25 56:1 | 48:18,23 50:10 | 50:19 53:24 |
| 15:18,23 16:4 | **view** 35:17 | **ways** 47:22 | 54:10 57:1 |
| 16:8 46:5 | 43:20 | **we've** 42:1 | **window** 33:8 |
| 48:15 | **violations** 20:5 | **wear** 11:24 | **wise** 19:2 |
| **understanding** | **violence** 9:21 | 12:16,18 13:2 | **wish** 24:22 |
| 19:11 45:23 | 20:4 53:18 | 13:5,5,9,11 | **witness** 25:13 |
| **united** 1:1 | **violent** 9:11,14 | 46:22 | 51:25 59:6,13 |
| **unknown** 14:22 | 9:19 10:7 | **wearing** 14:5 | 59:20 60:8,10 |
| **upper** 27:1 | 46:12 | 25:20 32:3 | 60:12,19 |
| | | 35:15 52:19 | |

**[witnesses - yellow]**                                    Page 17

**witnesses**  30:3
**word**  25:9
  35:16,25
**work**  10:21
**worked**  20:14
  28:16
**working**  7:16
  18:1
**works**  18:22
**worries**  52:12
**worry**  7:10
**wound**  36:25
**write**  25:7
**writing**  10:23
  59:10
**written**  25:4

**y**

**yeah**  24:17
  56:17
**year**  10:13 17:8
  18:20 21:7,13
**years**  6:21 9:2
**yelled**  25:24
**yelling**  36:10
  36:15
**yellow**  51:21

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.