Page 1

1          IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF KANSAS

3                 AT KANSAS CITY, KANSAS

4

5     MAELLA BLALOCK,    )

6     Plaintiff,         )

7     vs                 ) Case No. 21-CV-02552

8     SRKBS HOTEL, LLC,  )

9     Defendant.         )

10    _____)

11                   DEPOSITION OF

12                    PAUL KIMBLE

13

14                  August 14, 2023

15                    3:49 p.m.

16

17

18                    Taken at:

19        Wichita Police Department - City Hall

20           455 North Main - 13th Floor

21             Wichita, Kansas 67202

22

23

24

      Job No. CS6045267

25    Kathy R. Bonfiglio, CSR-KS, CSR-MO, RPR    **EXHIBIT 7**

Page 2

```
1   APPEARANCES:
2       On behalf of the Plaintiff:
3           Mr. Jeffrey A. Wilson
4           DeVaughn James Injury Lawyers
5           3241 North Toben
6           Wichita, Kansas 67226
7           (316)977-9999
8           Fax: (316)425-0414
9           jwilson@devaughnjames.com
10
11      On behalf of the Defendant:
12          Ms. Kerry B. Banahan Degestad
13          Evans & Dixon, LLC
14          211 North Broadway, Suite 2500
15          St. Louis, Missouri 63102
16          (314)552-4023
17          Fax: (314)884-4423
18          kbanahan@evans-dixon.com
19
20      On behalf of the City of Wichita, Kansas:
21          Mr. Eric S. Houghton
22          Deputy City Attorney
23          Department of Law
24          455 North Main, 13th Floor
25          Wichita, Kansas 67202
```

Page 3

```
1           (316)268-4681
2           Fax: (316)268-4335
3           ehoughton@wichita.gov.
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1                   TRANSCRIPT INDEX
2   APPEARANCES.................................  2
3   INDEX OF EXHIBITS............................  5
4
5   EXAMINATION OF PAUL KIMBLE:
6       BY MS. BANAHAN...............................  6
7       BY MR. WILSON................................ 46
8       BY MS. BANAHAN............................... 54
9
10
11
12
13
14
15
16
17
18      REPORTER'S CERTIFICATE......................
19
20      EXHIBIT CUSTODY
21      EXHIBITS RETAINED BY COURT REPORTER
22
23
24
25
```

Page 5

```
1                   INDEX OF EXHIBITS
2   NUMBER          DESCRIPTION          MARKED
3   Defendant Exhibit D  Overhead aerial
4                   diagram of Super 8...   15
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Veritext Legal Solutions
800-567-8658                                      973-410-4098

1          PAUL KIMBLE,
2  having been first duly sworn to testify the truth,
3  the whole truth, and nothing but the truth,
4  testifies:
5          DIRECT EXAMINATION
6  BY MS. BANAHAN:
7      Q.  Please state your name for the record.
8      A.  Paul Kimble.  Would you like me to
9  spell it?
10     Q.  K-I-M-B-L-E?
11     A.  That is correct.
12     Q.  My neighbor who is a police officer has
13  the same last name.
14     A.  Lucky him.
15     Q.  Lucky guy.  Are you currently employed?
16     A.  Yes, I am.
17     Q.  Who is your employer?
18     A.  City of Wichita.
19     Q.  Are you a police officer with the City
20  of Wichita?
21     A.  Yes, assigned as a sergeant.
22     Q.  How long have you worked for the City
23  of Wichita?
24     A.  Thirty years.
25     Q.  How long have you been sergeant?

1      A.  Since 2014; nine years.
2      Q.  As sergeant are you assigned to a
3  specific bureau?
4      A.  Yes.
5      Q.  What bureau is that?
6      A.  North.
7      Q.  Have you been assigned to the North
8  Bureau since 2014?
9      A.  I think it was '15 is when I came up
10  there; in around that range.
11     Q.  As a sergeant in the North Bureau, can
12  you describe for me generally what your
13  responsibilities are in that capacity?
14     A.  My responsibilities are basically to
15  manage the officers that are actually out making
16  the calls; to manage scenes; to handle any type of
17  complaint that comes in; work on any disciplinary
18  action that is needed to be taken reference to
19  employees and that's pretty much it in a small
20  nutshell.
21     Q.  During your time as a sergeant for the
22  North Bureau did you manage Officer Abasolo?
23     A.  Yes.
24     Q.  Did you also manage Officer Malcolm?
25     A.  Yes.

1      Q.  Do you still manage either of those
2  individuals?
3      A.  Malcolm.
4      Q.  Do you understand that you are here
5  today pursuant to a subpoena?
6      A.  Yes.
7      Q.  And do you understand that that
8  subpoena was issued in regard to a case filed by
9  Maella Blalock against the Super 8 Motel?
10     A.  Yes.
11     Q.  Do you understand that that underlying
12  lawsuit is in regard to an incident that occurred
13  at the Super 8 Motel on June 20th of 2020?
14     A.  Yes.
15     Q.  Do you understand that to be the date
16  of a shooting that occurred at the Super 8?
17     A.  Yes.
18     Q.  Are you familiar generally with what
19  I'm talking about?
20     A.  Yes.
21     Q.  Did you in fact investigate that
22  shooting?
23     A.  I helped manage the scene but I wasn't
24  the investigator assigned to that.
25     Q.  Do you understand who the investigator

1  assigned was?
2      A.  It would have been Tony Banberger.
3      Q.  Are detectives also assigned to
4  specific bureaus?
5      A.  No.  They are assigned here on the 6th
6  floor of the City Building in Persons Crimes.
7      Q.  So do detectives generally work
8  according to the type of crime as opposed to the
9  location of the crime?
10     A.  Correct.
11     Q.  Have you worked with Detective
12  Banberger before?
13     A.  Yes.
14     Q.  I'm learning a lot of names today.  As
15  someone who would manage the scene, what does that
16  entail?
17     A.  So what I would be looking at is to
18  make sure that we contact as many people involved
19  in the incident as we can; basically determine if
20  we have suspects that we can arrest at that time;
21  victims, make sure that they are getting to
22  hospitals if they are injured; making sure that we
23  are controlling the scene, collecting everything
24  and as much as information as we can to bring this
25  to a resolution in court.

1    Q.  So does a lot -- I understand that
2    there's a detective who is assigned to the
3    investigation of the crime, but does a fair amount
4    of work actually go into investigating by patrol
5    officers and/or sergeants after the incident
6    occurred?
7    A.  Yes.
8    Q.  Would it be fair to say that although
9    you're not the primary investigator a lot of what
10   happens probably in the first two, three,
11   five hours after is in fact done by either you as a
12   sergeant or your patrol officers?
13   A.  Yes.
14   Q.  Do you have a general familiarity with
15   the facts of this case?
16   A.  I do.
17   Q.  Had you been to the Super 8 Motel prior
18   to June 20, 2020?
19   A.  Yes.
20   Q.  Would that have been in your capacity
21   as a sergeant?
22   A.  Yes.
23   Q.  Do you recall ever going to the Super 8
24   Motel located on North Rock Road for any shootings
25   other than the one we're here to discuss today?

1    A.  Not that I can recollect.
2    Q.  Do you think that that was something
3    that you would have some level of recollection?
4    A.  Yes.  If I was there I would hopefully
5    have remembered it.
6    Q.  On June 20 of 2020 did you report to
7    the scene after Officers Abasolo and Malcolm were
8    called there?
9    A.  Yes.  I actually went to the hospital
10   first.  I wasn't needed there.  I knew this was a
11   large scene; was assigned there first and then I
12   went there and assisted and mainly kind of took
13   over.
14   Q.  Do sergeants work the same shift as
15   their patrol officers that they manage?
16   A.  Yes.
17   Q.  So on June of 2020 would you have been
18   working 4th watch?
19   A.  Yes; that is correct.
20   Q.  How did you first come to learn of the
21   incident?
22   A.  It was dispatched.  A 9-1-1 call came
23   in and 9-1-1 dispatched officers to the shooting.
24   Q.  Do you know who placed the 9-1-1 call?
25   A.  I do not.

1    Q.  Do you know what the call came across
2    as?
3    A.  I believe it came out as a shooting;
4    that there was 20 to 30 shots that had been fired
5    and had somebody had been shot.
6    Q.  Do you know if the person that had been
7    shot was Maella Blalock?
8    A.  We found her at a later time.  We did
9    not find her right away.  We found two other
10   victims that we located before her.
11   Q.  Who were those two victims?
12   A.  That was going to be -- I think his
13   first name is -- last name is Norwood.  I think
14   Marlon.
15   Q.  Marion maybe?
16   A.  Marion, yeah.
17   Q.  Do you know the name of the other
18   individual?
19   A.  Jaylen Thomas, I think.
20   Q.  Other than Marion Norwood and Jaylen
21   Thomas, were there any other individuals who had
22   been shot?
23   A.  Yes.  A guy by the name of -- I think
24   it's Mishael -- I can't remember his last name.
25   Q.  Anyone else that you can think of?

1    A.  No.  Physically got contacted by
2    bullets, no.  If you want me to refer to the report
3    I can find Mishael's last name.
4    Q.  That's okay for now.  In addition to
5    Mishael, Marion and Jaylen, was the only other
6    individual known to you to have been shot have been
7    Maella Blalock?
8    A.  Yes.
9    Q.  When you went to the hospital did you
10   speak to either Marion, Jaylen or Mishael?
11   A.  No.  I didn't speak to any of the
12   victims.  There was two hospitals.  One is Wesley
13   Main and Wesley Woodlawn.  Since Wesley Woodlawn
14   was the closest I went there looking for
15   individuals that would have walked in or been
16   driven to the hospital and there were none that
17   actually we had in contact at that time so I went
18   to the scene.
19   Q.  When you got to the scene what did you
20   do?
21   A.  So it was a pretty chaotic scene and we
22   were shorthanded as far as officers so I pretty
23   much stayed in the parking lot where the shooting
24   happened.  So it was on the south side of the
25   building.  There was a lot of cartridge casings out

Page 14

1  there, commonly referred to as shell casings, so I
2  kind of kept security over that area as best I
3  could while I allowed other officers to start
4  making contact with anyone inside of the Super 8 to
5  try to obtain witnesses, suspects and/or victims.
6      Q.  Did you conduct any interviews on the
7  scene?
8      A.  No.
9      Q.  Have you ever spoken with Maella
10  Blalock?
11     A.  No.
12     Q.  Where were the shell casings that you
13  identified located relative to the motel?
14     A.  So they would have been near the side
15  entrance, which would be on the south side of the
16  building in the parking lot area and that would
17  have been between the Comfort Inn, which is further
18  south of the Super 8, and basically two adjacent
19  parking lots.
20     Q.  The Super 8 and the Comfort Inn have
21  two adjacent parking lots?
22     A.  Yes.
23     Q.  And the shell casings were found in the
24  area closest to where those parking lots intersect?
25     A.  Yes.  It would have been more on the

Page 15

1  Super 8 property between -- there was basically
2  cars can park on the north side right up against
3  the Super 8 and cars that park on the south side of
4  the parking lot and they were right between and
5  there was some that were around the cars.
6      Q.  So when you say the north and south
7  side, do you mean that if you park on the south
8  most portion of the Comfort Inn, your car would be
9  closest to the north most portion of the Super 8?
10     A.  I think we're on the exact same page
11  but so, yes.  The building would sit to the north
12  and you would park right next to the building and
13  then you can also park, drive through there and
14  then you can park on the south side of the parking
15  lot for the Comfort Inn.  So there's like a lane
16  where you can drive through.
17     Q.  That separates the two parking lots?
18     A.  Separates the parking lot for the Super
19  8 --
20     Q.  From the parking lot of the Comfort
21  Inn?
22         MR. WILSON:  If you have the CSI report,
23  there's an overhead aerial.
24         (Whereupon Defendant's Exhibit No. D
25  was marked for purposes of identification.)

Page 16

1      Q.  I'll hand you what has been marked as
2  Defendant's D.  Do you recognize what this is?
3      A.  Yeah.  I'm going to flip it this way.
4  North would be facing this direction.  I do
5  recognize it.
6      Q.  What is that?
7      A.  This would be an overhead aerial view
8  of where the Super 8 is, Comfort Inn and other
9  buildings.
10     Q.  So I'm going to hand you my pen.  Can
11  you circle for me where the Super 8 is on this map?
12     A.  I'll put a small circle.  That's the
13  Super 8 there (indicating.)
14     Q.  And then can you draw a square to where
15  the Comfort Inn is?
16     A.  The Comfort Inn is right here
17  (indicating).
18     Q.  A moment ago you just testified where
19  you found the shell casings.  Where were the
20  majority of the shell casings located?
21     A.  In this area where most of the casings
22  (indicating).
23     Q.  Could you maybe draw an arrow with your
24  initials to show where they spanned.
25     A.  (Witness indicating).

Page 17

1      Q.  Why don't you highlight the line you
2  just drew.  That way we can make sure that we see
3  it.
4      A.  Sure.  Absolutely.  Most of them were
5  in this general area here (indicating.)  There were
6  some that were further to the west but there might
7  have been only about a few if I can remember
8  correctly but most of them were in this span here
9  that I can recollect (indicating.)
10     Q.  As part of managing the scene, is it
11  your job to oversee the collection of evidence?
12     A.  We call a lab investigator to do that
13  just because we did -- some of the smaller scenes
14  we'll work but this one was pretty large so one of
15  the lab investigators who could actually measure
16  out the scene a little bit better than what patrol
17  officers can do or what I can do so I called a lab
18  investigator actually to do that, but oversee and
19  make sure that things are collected yes, I would
20  oversee that.
21     Q.  And so would it be fair to say even if
22  you're not the one physically collecting the
23  evidence on the scene you are making sure that the
24  appropriate people are coming to collect that
25  evidence?

5 (Pages 14 - 17)

Page 18

1    A.  Correct.
2    Q.  In this case that would have been a
3  crime scene investigator?
4    A.  Yes.
5    Q.  To your knowledge, were the shell
6  casings collected in the exterior of the Super 8
7  Motel?
8    A.  That is correct.
9    Q.  Do you know if any shell casings were
10  collected inside the Super 8 Motel?
11    A.  I believe there was one found inside
12  the Super 8.
13    Q.  Would that have been in the room
14  belonging to Maella Blalock?
15    A.  No.  That was found, I believe, in the
16  entranceway, if I can remember correctly and I
17  mean, but there was one found inside of the first
18  floor as you enter in that south entrance.
19    Q.  Do you know how that shell casing got
20  into the south entrance of the Super 8 Motel?
21    A.  I do not.
22    Q.  Do you know if any bullets collected
23  from the interior of the Super 8 Motel?
24    A.  After reading over the reports I
25  learned that they did collect bullets out of the

Page 19

1  wall of the Super 8 that had been embedded into the
2  wall of the Super 8.
3    Q.  To your knowledge, were anymore shots
4  fired inside the interior of the Super 8?
5    A.  I do not believe there were any shots
6  fired inside.  If you need me to clarify I will be
7  happy to do that.
8        MR. WILSON:  I might have a few
9  follow-ups.
10    Q.  (By Ms. Banahan) As part of your job as
11  sergeant for the North Bureau, would you review the
12  police reports that are written by your officers?
13    A.  I do.  On this particular case I did
14  not.  Most of the reports were completed by the
15  time I had already gone home.
16    Q.  Okay.
17    A.  Somebody else, another sergeant would
18  have reviewed the reports.
19    Q.  So how does that work in terms of
20  officers requirements for reporting specific
21  incidents?
22    A.  I'm not sure --
23    Q.  Sure.  When an officer such as Officer
24  Malcolm, Officer Abasolo reports to the scene of a
25  call, do they generate the report that same day?

Page 20

1    A.  They should.  Sometimes they will do it
2  the next day.  If it is something that is coming
3  close to the end of their shift, sometimes they
4  will hold the case and report that the next day.
5    Q.  When they create supplemental reports,
6  do you review those supplemental reports?
7    A.  Not always.
8    Q.  What determines whether or not you are
9  going to review a supplemental report?
10    A.  Usually if it is attached in the case
11  at the time that we're approving the case.
12    Q.  Okay. When you say approving the case,
13  what does that mean?
14    A.  That means looking over what we call
15  the incident report and making sure that all the
16  information in there is as accurate as we can get.
17  A lot of times officers call in supplemental
18  reports or they will do them, they will type them
19  in and submit them at a later time.
20    Q.  I understand that you did not conduct
21  any interviews at the scene, nor did you generate
22  the police report; fair?
23    A.  That's fair.
24    Q.  That said, do you have a general
25  recollection of what occurred on June 20, 2020 at

Page 21

1  the Super 8 Motel?
2    A.  I do.
3    Q.  Can you tell me what that is?
4    A.  Yes.  So from my understanding, and
5  this is information that had been given to me from
6  officers, from the reviewing all the reports --
7    Q.  Let me stop you there.  So though you
8  have not generated the report and you did not
9  review it at the time it was written, since that
10  date have you reviewed the police report in
11  connection with this incident?
12    A.  Yes.
13    Q.  And I wanted to clarify that because I
14  think I asked you if you reviewed it and your
15  answer was no, but if I understand correctly, you
16  didn't review it on the day of?
17    A.  That is correct.  I did not review it
18  on the day of.
19    Q.  As we sit here today you have in fact
20  reviewed the report?
21    A.  I also watched video of the outside
22  incident that had occurred as well.  I believe
23  Officer Abasolo obtained that and we watched it at
24  the Super 8 on their video.
25    Q.  So I apologize for interrupting you,

6 (Pages 18 - 21)

1 but if you would go ahead and tell me what
2 generally is your recollection of what occurred on
3 June 20th.
4     A. Sure. When the shooting came out, we
5 arrived, we did find two individuals that were
6 running from the scene. They were running to the
7 west and that would have been along 36th Street.
8 Officer Malcolm and Abasolo and Masenthin came in
9 contact with those two individuals. From my
10 understanding one or both of those individuals had
11 guns. One of the individuals admitted to throwing
12 the guns over the fence and one of the guns
13 discharged when it was thrown over the fence. And
14 I can't remember which one threw it over the fence.
15 I'm sorry, I can't remember which one threw it
16 over. Those two individuals were shot. One was
17 shot in the, I believe, upper leg and one was shot
18 in the chest area. Both of those individuals went
19 to the hospital which would have been Norwood and
20 Thomas.
21     Q. Ultimately were you able to determine
22 what individuals had fired guns at or near the
23 Super 8 property on June 20, 2020?
24     A. From interviews I believe it was Jaylen
25 had fired a gun -- no, sorry. Jaylen said he did

1 not fire a gun. It was Norwood that said that he
2 fired a gun and he said he fired it in self-defense
3 because somebody was firing at him. We never found
4 the other shooter who was a black male wearing a
5 red, long-sleeved like shirt that had writing on it
6 and he had dreadlocks but he was seen in the video
7 with a gun, a magazine firing as well.
8     Q. When you say he was seen in the video
9 with a gun and magazine, that image, was it outside
10 of the Super 8 Motel?
11     A. Yes. It was very close to the south
12 door.
13     Q. Is that south door where the casing was
14 actually found inside of the Super 8?
15     A. I believe so, yes.
16     Q. So is it fair to say that you believe
17 you know who the shooter was; you just don't know
18 that individual's identity?
19     A. Yes. That particular person, yes, that
20 was one of the three shooters that we had
21 identified.
22     Q. Do you know if any arrests were ever
23 made in connection with the case?
24     A. No.
25     Q. So then would it be fair to say that

1 there were no convictions made in relation to this
2 shooting event?
3     A. As far as I know that is correct.
4     Q. You stated that you reviewed security
5 footage from the night of the incident; is that
6 accurate?
7     A. Yes.
8     Q. If you take a look there at Plaintiff's
9 Exhibit 1 and Plaintiff's Exhibit 2, do you
10 recognize the images on those documents?
11     A. Yes. When I viewed them they
12 weren't -- I was looking outside at a different
13 view of -- it was a video basically of cameras
14 going down into the parking lot. It wasn't this
15 view but it's the same incident. I don't recognize
16 this but I do recognize this and this (indicating.)
17     Q. Okay. Is it possible that you also
18 reviewed video taken by a cell phone?
19     A. It could have been a cell phone, yes.
20     Q. Do you see the individual whose
21 identity remains unknown but who you believe to be
22 the other shooter?
23     A. Yes.
24     Q. Is he in that photograph?
25     A. Yes.

1     Q. Is it on Exhibit 1 or Exhibit 2?
2     A. It's on Exhibit 2.
3     Q. What is he wearing?
4     A. He's wearing a red, long-sleeve shirt,
5 looks like he has longer hair, and you can see what
6 appears to be a gun possibly in his back pocket
7 area, back pants area and then you can see him
8 extending the gun out in the other picture as well.
9     Q. Are the only photographs where you see
10 the gun the photographs or the still frames from
11 the exterior of the motel?
12     A. I don't see any of the interior
13 photographs.
14     Q. Do you see either Mr. Thomas or Mr.
15 Norwood in those still frames?
16     A. I did not see either one of them and I
17 don't know them by sight.
18     Q. Do you know if either of those
19 individuals are affiliated with a gang here in
20 Wichita?
21     A. I believe Norwood and Thomas are
22 affiliated in gangs but I do not know what set they
23 are.
24     Q. Did you know that prior to June of 2020
25 or is that something you learned after?

7 (Pages 22 - 25)

Page 26

1    A.  I would say after.

2    Q.  In looking at these still photographs

3  would you be able to tell me from those photographs

4  if any of those individuals are involved in a gang?

5    A.  No.  A lot of things go into

6  determining if somebody is in a gang.  A lot of it

7  is admission to it; if they have tattoos related to

8  gang activity; if they are flashing gang signs; if

9  they are associating with other gang members and

10  things of that nature.  A lot of people say that

11  you can determine it by their clothing somebody is

12  wearing but what we have seen over the years is

13  that the intermixing of clothing helps protect

14  their identity of being involved in a gang.

15    Q.  Would it be a fair statement to say

16  that even if a gang has a color, they are not

17  wearing a shirt that says -- that's red and it says

18  Bloods across it?

19    A.  No, that is correct.

20    Q.  So just the way that I'm wearing a

21  black dress today, by nature, if that color was to

22  be associated with a gang, color alone would not be

23  enough to say that person is in a gang; fair?

24    A.  That is correct.

25    Q.  We'll let the record reflect I'm not.

Page 27

1  Now, the individual -- I'll represent to you that

2  the individual over here is an employee of the

3  hotel (indicating.)

4    A.  Okay.

5    Q.  Is there anything in this still frame

6  that you can see that would have definitively clued

7  him in that any individuals in this photograph is a

8  member of a gang?

9    A.  No, not by the photographs alone.  We

10  could have heard conversations or things like that

11  but I can't say that just by the still photographs.

12    Q.  Without having some level of knowledge

13  as to gang activity, would it be difficult for a

14  lay person to know that something was a reference

15  to a gang?

16        MR. WILSON: Object to form and

17  foundation.  You can answer.

18    A.  I'm sorry, could you repeat the

19  question?

20    Q.  (By Ms. Banahan) Sure.  So earlier we

21  deposed Officer Abasolo and he had some knowledge

22  as to gang activity.  We then deposed Officer

23  Malcolm who doesn't have the same level of training

24  in gang activity.  Generally speaking, does that

25  sound accurate based on what you know of those two

Page 28

1  officers?

2    A.  Yes; that is correct.

3    Q.  And what it sounded like to me is that

4  Officer Malcolm was generally less familiar with

5  what might go into classifying someone as a gang

6  member than Officer Abasolo because he didn't have

7  any specialized training?

8    A.  Yes.

9    Q.  Would that also be true of a member of

10  the general public, that they would have less

11  training in identifying gang signs or gang language

12  or gang colors than a member of the public?

13    A.  Yes.

14        MR. WILSON: Object to form.

15    Q.  (By Ms. Banahan) Does the Wichita

16  Police Department issue any type of list of known

17  gang members to business owners or the general

18  public?

19    A.  No.

20    Q.  If someone is a known Crip or a known

21  Blood, is that generally a phrase that's applicable

22  for the Wichita Police Department?

23    A.  It usually would be for law enforcement

24  purposes only or if I'm under subpoena or something

25  like that.

Page 29

1    Q.  I'm going to hand you what has been

2  marked as Defendant's Exhibit B.  Can you tell me

3  what this is?

4    A.  It's a supplemental report by Officer

5  Abasolo.

6    Q.  Supplemental reports are generated

7  after the initial report?

8    A.  That is correct, or they can be done at

9  the same time and attached in so it would just

10  depend on when they did it.  Usually there's a time

11  that it's attached or done.

12    Q.  I think the report date on that one

13  says June 22nd.

14    A.  Correct.

15    Q.  Have you seen this document before

16  today?

17    A.  Yes.

18    Q.  Officer Abasolo writes, that in regard

19  to the shooting, "In the video I could also see two

20  males that were identified as Marion Norwood and

21  Jaylen Thomas yelling back at the male in the red,

22  long-sleeve shirt."  Would that reference be to the

23  individual whose identity we don't know?

24    A.  Yes.

25    Q.  And does that match your recollection

Page 30

1  of what you saw on the security footage?
2      A.  Yes.
3      Q.  It goes on to say, "You can then see
4  Malik Banks attempting to restrain the male in the
5  red, long-sleeve shirt who now has a gun in his
6  right hand, attempting to point it in the direction
7  of Jaylen and Marion who are seen running behind
8  cars towards the Comfort Inn parking lot."  Does
9  that match your recollection of what you saw on the
10  security footage?
11      A.  Yes.
12      Q.  So Jaylen and Marion are running
13  towards the Comfort Inn that you identified here on
14  Exhibit B; is that accurate?
15      A.  Yes.  They would have been running --
16  from what we could determine is that they were
17  running more in an east and south direction.
18      Q.  Would you mind --
19      A.  Marking the directions?
20      Q.  Correct.
21      A.  Sure.
22      Q.  And then you could just initial it.
23      A.  This would be north, this would be
24  south, this would be east and this would be west
25  (indicating.)

Page 31

1      Q.  So when you saw Jaylen and Marion
2  running, they were running in what direction?
3      A.  They were running in a southeast
4  direction away.  So it would have been in this
5  direction from the south door, it would have been
6  in this area (indicating.)
7      Q.  Just past that line --
8      A.  Yeah.
9      Q.  -- that you highlighted in green?
10      A.  Uh-huh.
11      Q.  Okay. Did the male wearing the red
12  shirt run away from the scene?
13      A.  I did not see that portion of it.  I
14  learned in the reports that he left in an east
15  direction.
16      Q.  Are there any businesses located to the
17  east of the Super 8?
18      A.  Yeah.  There's a couple of businesses.
19  At that time they would have been closed.
20      Q.  What are those businesses?
21      A.  I can't remember off the top of my
22  head.  At that time I know there was a restaurant
23  either in front of the Comfort Inn or right here
24  and there was a shoe store but I do not know if
25  they are still there at this time.

Page 32

1      Q.  So the report goes on to say, "The male
2  in the red, long-sleeve shirt is then seen shooting
3  multiple rounds in the direction of Jaylen and
4  Marion who were also firing back but it is not
5  clear who fired first."  Does that match what you
6  watched on the security footage?
7      A.  Yes.  It happened so quick you couldn't
8  really determine who fired first.
9      Q.  But did you determine that the people
10  who were firing were the unidentified individuals,
11  Marion and/or Jaylen?
12      A.  Yes.
13      Q.  What it sounds like from Officer
14  Abasolo's report is that Jaylen and Marion are
15  running as the unknown individual is shooting at
16  them and they are returning fire.
17      A.  Yes.
18      Q.  Do you have any knowledge as you sit
19  here today the location of Jaylen and Marion when
20  they returned fire?
21      A.  No.
22      Q.  Can you say with any level of
23  specificity where exactly on the parking lot they
24  were located?
25      A.  When they were firing?

Page 33

1      Q.  Correct.
2      A.  Basically that would be determined by
3  the cartridge casings where they were found; shell
4  casings, by the video, but I do not know where,
5  exactly where in that parking lot.  I can't
6  remember exactly but I did see them in the video
7  they were further to the southeast of the door.
8      Q.  To the south and east of the door while
9  they were firing?
10      A.  That's where I saw them in the video.
11  I saw them crouching down.  Looks like they were
12  firing but I can't say for sure that that's where
13  they were.  The video had no sound.
14      Q.  How far do casings travel?
15      A.  Usually they can travel several feet
16  when they are ejected from the firearm and
17  depending on the port of the firearm they can fire
18  either right or left. The most common way is to
19  the right but some of them do fire to the left.
20      Q.  Can they fire forwards or backwards?
21      A.  The cartridge casings?
22      Q.  Correct.
23      A.  Yes.  They could with wind and/or how
24  the gun is being held move that direction but they
25  are normally ported out of the gun either to the

9 (Pages 30 - 33)

Page 34

1  left or right of the gun.
2      Q.  And that's obviously affected by
3  whether or not the person that's shooting the gun
4  is moving; correct?
5      A.  Yes, and how they are holding the gun,
6  too.  If they are holding it at a different angle
7  it might port forward or backward but it would
8  depend on how they are holding that gun.
9      Q.  If Jaylen and Marion are running
10 southeast as they are shooting, then if the
11 cartridges are moving to the left or right, that
12 could either be closer to the Super 8 or closer to
13 the Comfort Inn; right?
14     A.  It should be -- if they are running it
15 would be in the direction that they are running and
16 could be either to the left or right of them
17 depending on which way that gun is ported.  I did
18 not look at the firearm so I couldn't tell you
19 which way those guns ported or ejected.  I would
20 probably say that would be the more proper term to
21 say than ported.
22     Q.  Do you know if any investigation was
23 done into what gun discharged the bullet that
24 eventually hit Maella Blalock?
25     A.  In the report I did not see any

Page 35

1  information about that.
2      Q.  So in terms of what gun that bullet
3  came from, as we sit here today having in front of
4  documents subpoenaed from the Wichita Police
5  Department that you have reviewed, can you tell me
6  with any level of specificity whether that bullet
7  came from a gun fired by Jaylen Thomas?
8      A.  I don't know.
9      Q.  Would you have the same answer in
10 regard to a gun fired by Marion Norwood?
11     A.  My answer would be the same.  I don't
12 know.
13     Q.  Would your answer also be the same in
14 regard to a gun fired by that unknown individual?
15     A.  It would be the same.  I don't know.
16     Q.  Likewise, because we don't know what
17 gun that bullet came from, would you be able to
18 tell me where in proximity to Maella Blalock's room
19 that weapon was discharged?
20     A.  No.
21     Q.  Because again, you don't know who fired
22 it; correct?
23     A.  That is correct.
24     Q.  Nor do you know where in proximity to
25 the Super 8 Motel that bullet came; fair?

Page 36

1      A.  Yes.
2      Q.  Is it possible that shots would have
3  been fired actually from one of the neighboring
4  properties?
5          MR. WILSON: Object to form and
6  foundation.
7      A.  I do not believe so.  The angle it went
8  into would have been more of a direct firing into
9  the Super 8.  It was not something that would have
10 come from another property, in my opinion.  It
11 would have been something that happened that
12 evening, would have happened by somebody firing in
13 close proximity to the property.
14     Q.  And I think my question is, because
15 Jaylen and Marion are running, because the unknown
16 individual is running, is it possible that when
17 they fired their guns they were in fact in one of
18 the neighboring parking lots?
19         MR. WILSON: Same objection.
20     A.  I would say they were not in one of
21 the neighboring parking lots.
22     Q.  (By Ms. Banahan) Is it possible they
23 could have been here in the Comfort Inn?
24         MR. WILSON: Objection.
25     A.  In the parking lot they could have,

Page 37

1  yes.
2      Q.  (By Ms. Banahan) In the parking lot of
3  the Comfort Inn?
4      A.  Yes.
5      Q.  Because in fact, based on your
6  testimony, it looked like Marion and Jaylen were
7  headed to that area you described where those two
8  parking lots meet; correct?
9      A.  Correct.
10     Q.  And so we could not rule out the
11 possibility that their gun was fired in this
12 Comfort Inn parking lot; fair?
13         MR. WILSON: Same objection; asked and
14 answered.
15     A.  That is fair.
16     Q.  (By Ms. Banahan) And the distance
17 between those two parking lots, if I understand
18 your testimony correctly, is close enough to
19 account for the traveling of those casings;
20 correct?
21     A.  They butt up against each other so yes,
22 you could fire the gun in either parking lot and
23 the casing could or the cartridge casing could end
24 up --
25     Q.  If I understand what you're saying

Page 38

1  about the travel distance of casings, they can go
2  several feet to either side, fair --
3      A.  Yes.
4      Q.  -- from where the gun was ejected?
5      A.  Where the gun was fired and the
6  cartridge ejects, yes.
7      Q.  That opinion is based on your knowledge
8  of crime scenes over your career of 30 some odd
9  years; correct?
10     A.  And firing guns, yes.
11     Q.  And I assume that you have fired guns
12  or had training in the firing of guns for 30 years
13  as a police officer?
14     A.  That is correct.
15     Q.  As a sergeant in charge of scenes, are
16  you given basic training into the collection of
17  evidence?
18     A.  Yes.
19     Q.  And does that include shell casings and
20  bullets from the scene of a shooting?
21     A.  Yes.
22     Q.  Does that include basic training on the
23  trajectory of commonly used firearms?
24     A.  I'm not following.
25     Q.  Your training in the collection of

Page 39

1  evidence, does that include determining where you
2  might find shell casings and bullets and how those
3  travel?
4      A.  I think it would depend on if we could
5  determine where the person was standing and it
6  would depend on what direction that gun would
7  eject, right or left, as to where we would find
8  those casings.
9      Q.  Okay.  But as part of your training and
10  knowledge, does that include knowing generally the
11  distance that bullets and/or shell casings travel?
12     A.  Shell casings, bullets, it would depend
13  what they strike, how far they travel.  Bullets can
14  travel a long way and I don't -- I can't tell you
15  any -- I don't have any firsthand knowledge on how
16  far bullets will travel.
17     Q.  This goes on to read, "The black male
18  in the long-sleeve shirt is then seen running east
19  to the front of the Super 8 along with Torrance
20  Shaw and Davion Gunter."  Does that match your
21  recollection of what you saw in the video?
22     A.  I did not see the portion of where he
23  left.  I read that in the reports that that was
24  documented that the male in the red long-sleeve
25  shirt ran east.

Page 40

1      Q.  Davion Gunter, did you know him prior
2  to June 20, 2020?
3      A.  No.
4      Q.  What about Torrance Shaw?
5      A.  No.
6      Q.  It says they are both documented gang
7  members.  Because you didn't know them prior to
8  that date were you aware they were documented Crip
9  members?
10     A.  No.
11     Q.  Would that have been information that
12  was contained by the Wichita Police Department?
13     A.  I can't say for sure unless I looked at
14  their database.  It could definitely be.
15     Q.  If we look back at Plaintiff's
16  Exhibit 1, were any of those individuals still at
17  the scene when you arrived?
18     A.  Not that I saw and I spent most of my
19  time outside and officers came to me advising me of
20  information so I was -- I spent most of my time
21  outside and not in the actual inside of the
22  property.  But I don't recognize them just by
23  looking at them.
24     Q.  It looks like the still frames here are
25  taken from inside the Super 8.  Do you agree with

Page 41

1  me?
2      A.  Yes.
3      Q.  Those are -- I should have pointed out,
4  those are contained in Exhibit 1; correct?
5      A.  Yes.
6      Q.  Do you have any context for what is
7  going on in these still frames?
8      A.  It looks like from what I can tell is
9  the manager or who I identified as the manager is
10  going to a door and contacting people that are in
11  that apartment -- hotel room.  I don't know which
12  door that is but I know that there was a party in
13  Room 319.
14     Q.  From what you can see here on
15  Exhibit 1, do the photographs in the bottom three
16  rows appear to be occupants of that party?
17     A.  I would say yes.
18     Q.  Would the same be true then for the top
19  two rows of photographs here in Plaintiff's
20  Exhibit 2?
21     A.  Yes.
22     Q.  Would you agree with me that the
23  occupants of the party are both African American
24  and Caucasian and/or Hispanic?
25     A.  Yes.

11 (Pages 38 - 41)

Page 42

1    Q.   Meaning that not everyone at the party
2 was African American; fair?
3    A.   Yes, that is correct.
4    Q.   Do you have any information that any
5 shots were fired inside the Super 8?
6    A.   No.  We did not find any evidence that
7 shots were fired inside of the Super 8, nor video
8 to match that.
9    Q.   A second ago you testified that you
10 believe the manager had asked the individuals to
11 leave the hotel.  Do you know where you got that
12 information from?
13   A.   It was in the reports.
14   Q.   Do you know why a shooting or why
15 gunfire transpired once individuals left the hotel?
16   A.   I know that from reading the reports
17 and from talking to the officers out there that
18 there was a disturbance at the party inside the
19 room and that the people that were having the
20 party, which was mainly females, and there was a
21 person who rented the room was a female, she wanted
22 everyone out because of the disturbance and then my
23 understanding, that went outside to that south
24 entrance and further disturbance occurs out there
25 and that's when the shots are fired.

Page 43

1    Q.   So the individuals involved in the
2 altercation outside of the Super 8 had been at the
3 party together inside the Super 8?
4    A.   From my understanding, yes.
5    Q.   And it appears as though they got into
6 either a verbal or a physical altercation that
7 ultimately led to shots being fired; fair?
8    A.   Yes, it sounds like and from what I saw
9 it looked more like a verbal altercation than a
10 physical.  What you are looking at in Exhibit 2 in
11 this picture it looks like this individual is
12 holding him back try to prevent something else
13 further from going on and then that's when he
14 basically fires upon Jaylen Thomas and Marion
15 Norwood.
16   Q.   It looks like the gunfire was exchanged
17 at what time?
18   A.   According to this video it's 2:33.
19   Q.   What time did the manager appear to ask
20 them to leave the hotel?
21   A.   According to this video it's looking
22 like he approaches at 2:26.
23   Q.   Do you understand what I mean when I
24 say the term "interpersonal crime"?
25   A.   No.

Page 44

1    Q.   What about the term "targeted
2 incident"?
3    A.   Yes.
4    Q.   Would I be correct in saying that a
5 targeted incident is when someone intends to commit
6 a crime against another person based on that
7 person's identity?  Let me ask it a better way.  A
8 targeted crime is when a person commits a crime
9 against another person for a specific reason.  Is
10 that fair?
11   A.   Yes.  That would be a targeted crime in
12 my opinion, yes.
13   Q.   And then if we say that a random crime
14 is a crime where the crime is committed for
15 purposes of committing the crime regardless of who
16 it's committed upon?
17   A.   Yeah.  That would be one definition of
18 a random crime.
19   Q.   So if someone is pumping gas and an
20 individual comes up and steals their car while they
21 are pumping gas, that would be a random crime;
22 fair?
23   A.   A random crime or crime of opportunity.
24   Q.   If someone gets in an altercation with
25 another individual and they intend on battering or

Page 45

1 assaulting that individual, that would be a
2 targeted crime; fair?
3    A.   In my opinion, yes.
4    Q.   In this instance these individuals were
5 engaged in a fight; correct?
6    A.   Yes.
7    Q.   And so would this shooting then be
8 defined by a targeted crime against an unknown
9 individual against Jaylen Thomas or Marion Norwood?
10   A.   The fight from my understanding was
11 verbal.  It wasn't physical that I know of, but the
12 exchange of their conversation from my
13 understanding was that they were having some sort
14 of altercation between the two.  I was not aware of
15 any physical fight that broke out.
16   Q.   And I apologize.  I might be using the
17 word fight in terms of words exchanged --
18   A.   Sure.
19   Q.   -- interchangeably with maybe the more
20 common definition of physical violence.
21   A.   Sure.
22   Q.   As you know they were involved in some
23 sort of verbal altercation --
24   A.   Yes.
25   Q.   -- which then led to the shooting?

12 (Pages 42 - 45)

Page 46

1     A. Yes.
2     Q. And your investigation would have
3 revealed that the shooting had an intended target?
4     A. Yes.
5     Q. All right. I think that's all that I
6 have for you and I appreciate your time.
7           CROSS EXAMINATION
8 BY MR. WILSON:
9     Q. I've just got a few for you, Sergeant
10 Kimble. We're set to go to trial in 2024. I
11 didn't know if you had any plans to retire. You
12 have been with the department 30 years and I think
13 that's around the time the maximum pension kicks
14 in.
15     A. If I'm needed, I'm needed or I should
16 say I hope to be around.
17     Q. Don't we all. You mentioned you had
18 been to the Super 8 before the shooting took place.
19 Do you remember anything about the circumstances of
20 that?
21     A. So we have had several disturbances, a
22 lot of things started happening at the Super 8 so I
23 started seeing an increase in calls there.
24     Q. Do you know when approximately you
25 started seeing an increase in calls?

Page 47

1     A. When the property changed hands from
2 the Wichita Inn to the Super 8 we started slowly
3 see an increase in calls.
4     Q. I want to make sure we have got this
5 for the record. So on this Exhibit D, which is the
6 overview, you drew a line and highlighted it in
7 between with an approximate area where the shell
8 casings were found and then you drew a circle over
9 the Super 8 and a square over the Comfort Inn; is
10 that fair?
11     A. Yes.
12     Q. I wanted to make sure we had that for
13 the record. You also drew east/south/west on the
14 map which is helpful.
15     A. Yes.
16     Q. I wanted to ask you, my understanding
17 of the Super 8 property, I'll hand this to you here
18 in second, is that there's one entrance here at the
19 front of the hotel. There's an entrance here in
20 the back and one entrance on the north and south
21 side approximately halfway between the east and
22 west side of the hotel. Is that your
23 understanding?
24     A. Yes.
25     Q. You mentioned seeing some video of the

Page 48

1 shooting from a view from the second floor.
2     A. I believe it was an overhead view of
3 when it occurred and I can't remember if it was
4 from like a video cell phone or if it was from
5 video at the hotel.
6     Q. What I'm going to play for you here is a
7 video taken from a cell phone by a guest on the
8 second floor. It's about 52 seconds. I just want
9 you to watch it and tell me if that's the video you
10 are referring to.
11           (Whereupon video was played.)
12     A. Yeah, that's it.
13     Q. My understanding based on what you have
14 testified here today, no determination was made as
15 to where the bullet was fired from that ultimately
16 hit my client, Maella Blalock?
17     A. No. We couldn't determine where the
18 person was when that bullet was fired.
19     Q. But as far as you can tell, all the
20 bullets were fired while in the Super 8 parking
21 lot?
22           MS. BANAHAN: Object to form.
23     A. I would believe they would be in close
24 proximity or in the Comfort Inn parking lot. We
25 found no other casings to lead us to believe that

Page 49

1 there was any shots fired anywhere else.
2     Q. (By Mr. Wilson) Did you find any
3 casings in the Comfort Inn parking lot?
4     A. I cannot off the top of my head. If we
5 did I just --
6     Q. Okay. I didn't mean to interrupt.
7     A. I can't remember if we did or did not.
8     Q. I know that there was crime scene
9 investigators that went out to the scene to process
10 it. Is that the right word?
11     A. That is correct, yes.
12     Q. And I take it they would probably be
13 the best person to talk to about what their
14 findings and what they were able to determine; is
15 that fair?
16     A. Yes.
17     Q. You mentioned just a minute ago the
18 phrase "crime of opportunity." Tell me what you
19 mean by that.
20     A. So that would be an example that would
21 be like the car while somebody is pumping gas.
22 Somebody might walk by, see the keys are in the
23 ignition, this is a great opportunity for me to
24 steal the car. Keys are in place. The person is
25 walking to go pay for gas and I can take the car

13 (Pages 46 - 49)

1 easily. That would lead to be a crime of
2 opportunity where just the factors are just right
3 for me taking.
4     Q. So in other words, that would be a
5 crime that occurs where for whatever reason the
6 opportunity has arisen to commit the crime?
7     A. Yes.
8     Q. Did you say that you would classify
9 this as a crime of opportunity, this shooting
10 incident?
11     A. No. I would classify it more a crime,
12 a targeted event. They are targeting -- it appears
13 that the two individuals, the two groups, Jaylen
14 Thomas and Marion Norwood are having some sort of
15 argument with this person that is in the red shirt
16 that has long sleeves and that whichever group
17 fired first, that this is a targeted event. They
18 are trying to fire upon that person and harm either
19 the person in the red shirt or Norwood or Thomas,
20 in my opinion.
21     Q. Right, right. I want to also ask you,
22 so one of the people we deposed in this case is, I
23 believe, Detective Ryan Schneider. Are you
24 familiar with him?
25     A. Yes.

1     Q. One of the things he told us is that
2 part of the community policing officer role is to
3 basically help address concerns with businesses,
4 crime on their property; kind of teach them how to
5 do CPTED training, you mentioned referred to as
6 CPTED. What is that?
7     A. That is basically commonly referred to
8 as the broken window theory. So if you have a
9 property that is in disrepair, that you are seeing
10 basically things not being kept up, lighting isn't
11 good, you're not doing strong management skills,
12 depending on the type of property, that it's more
13 susceptible to crime than other properties that
14 might be keeping good lighting, good management
15 skills, making sure the property is kept well,
16 things of that nature.
17     Q. What do you mean by good management
18 skills?
19     A. So if there is a problem at a property
20 and management is not addressing those problems,
21 then you could see more crime. So an example would
22 be, let's say a fast food restaurant that allows
23 for trash to be left overfilling a parking lot,
24 broken down cars, that would be more susceptible
25 to, in my opinion, to crime. And people just like

1 milling around that property instead of telling
2 people you need to leave and cleaning up trash and
3 things like that, you could see more crime develop
4 because it is not kept well, you're not seeing good
5 skills as far as keeping problems away from that
6 property.
7     Q. So you mentioned like if the property
8 was having issues and they weren't addressing would
9 an example with a rising extent of crime on the
10 property?
11     A. Yes.
12     Q. If I'm understanding you right, if that
13 happens and it's not addressed that could lead to
14 more crime happening on the property?
15     A. Yes.
16     Q. I assume it could lead to people
17 intending to commit crime to be on the property?
18         MS. BANAHAN: I'll object to the form.
19     Q. (By Mr. Wilson) The broken window
20 theory, broken glass theory, it's kind of a theory
21 you create an environment that is inducive to crime
22 is going to happen; is that fair?
23     A. Yes.
24     Q. One of the ways you create an
25 environment inducive to crime is not doing anything

1 about the crime that is happening; fair?
2     A. Yes.
3     Q. The last question I think I have for
4 you, I meant to ask Officer Abasolo about this but
5 I didn't get to it, he mentioned in his narrative
6 that he found Snapchat videos. Are you familiar
7 with seeing that in the report?
8     A. Yes.
9     Q. We have sent a subpoena for anything
10 related to the case. I haven't seen any Snapchat
11 videos. Do you know what happened?
12     A. I never saw those videos but I know
13 that Snapchat is hard to save those.
14     Q. Right.
15     A. And it is hard to basically recover
16 those once they are gone.
17     Q. Okay. So going back to the CPTED
18 training, is that something a business can request?
19     A. Sure.
20     Q. What happens when they do that? How is
21 that done?
22     A. I think we have a couple of certified
23 people that are trained in CPTED that can go out
24 and make suggestions. Anyone who has been in
25 community policing, which I have, has knowledge of

Page 54

```
1   CPTED things and can make suggestions to businesses
2   to help improve the safety and security of the
3   business.
4        Q.  Okay. Does that cost the businesses
5   anything?
6        A.  I do not believe the initial contact
7   costs negative.  I don't believe any follow-up, if
8   they have follow-up questions or concerns, most of
9   the time we'll come out and talk to them about it
10  and try to help out.
11       Q.  Basically it's like the City of Wichita
12  Police Department, they are willing to kind of work
13  with businesses on an ongoing basis to help them
14  mitigate crime; is that fair?
15       A.  Yes.
16       Q.  Do you know whether or not anyone at
17  the Super 8 ever requested any type of CPTED
18  training?
19       A.  Not that I'm aware of.
20       Q.  That's all I have.
21           REDIRECT EXAMINATION
22  BY MS. BANAHAN:
23       Q.  Earlier you testified that here in
24  Exhibit 1 the manager or the clerk, whoever this
25  individual is, asked the party goers to leave the
```

Page 55

```
1   hotel; correct?
2        A.  You identified them as the manager.  I
3   don't know him.
4        Q.  I think he's actually the clerk.
5        A.  Okay.  So I did learn from the reports
6   that he asked for the party, he went up and told
7   the people to leave prior to this whole disturbance
8   happening.
9        Q.  Okay.  Would that be an appropriate
10  action for the hotel to ask them to leave?
11           MR. WILSON: Object to form, foundation.
12  You can answer.
13       A.  Yes.  That would be one of the steps to
14  do, yes.
15       Q.  (By Ms. Banahan) And, in fact, after he
16  asked them to leave the incident occurred less than
17  five minutes later; correct?
18       A.  Yes.
19       Q.  I don't have anything else.
20           MR. WILSON: Nothing further.
21           MR. HOUGHTON: We'll read and sign.
22           (Whereupon deposition proceedings
23  concluded at 4:55 p.m.)
24
25
```

Page 56

```
1   I have read or have had read to me the foregoing
2   testimony recorded on pages 6 to 55, inclusive, and
3   the same is true and correct to my knowledge and
4   belief.
5
6       _____
7           PAUL KIMBLE
8
9   STATE OF_____)
10  _____COUNTY)
11  Subscribed and sworn to before me, the undersigned
12  authority, this___day of_____, 2023.
13
14
15  _____
16  Notary Public
17
18  _____
19  (Commission Expires)
20
21
22
23
24
    Job No. CS6045267
25  Blalock vs SRKBS Hotel, LLC
```

Page 57

```
1           CERTIFICATE
2   STATE OF KANSAS)
3   SEDGWICK COUNTY)
4       I, Kathy R. Bonfiglio, a Certified Shorthand
5   Reporter for the State of Kansas, do hereby certify
6   that the within-named witness was by me first duly
7   sworn to testify the truth, that the testimony
8   given in response to the questions propounded, as
9   herein set forth, was first taken in machine
10  shorthand and reduced to writing with
11  computer-aided transcription, and is a true and
12  correct record of the testimony given by the
13  witness.  I certify that review of the testimony
14  was requested by the parties.  If any changes are
15  made by the deponent during the time period
16  allowed, they will be appended to the transcript.
17      I further certify that I am not a relative or
18  employee or attorney of any of the parties, or
19  financially interested in the action.
20      WITNESS my hand and official seal at Wichita,
21  Sedgwick County, Kansas, this 21st day
22  of August, 2023.
23
24      Kathy R. Bonfiglio, CSR RPR
25      VERITEXT LEGAL SOLUTIONS
```

15 (Pages 54 - 57)

Page 58

1  Eric Houghton, Esq.
2  ehoughton@wichita.gov
3          August 21, 2023
4  RE:  Blalock, Maella v. SBKBS Hotel, LLC
5    8/14/2023, Paul Kimble (#6045267)
6    The above-referenced transcript is available for
7  review.
8    Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  erratas-cs@veritext.com
16
17  Return completed errata within 30 days from
18  receipt of testimony.
19    If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22          Yours,
23          Veritext Legal Solutions
24
25

Page 59

1  Blalock, Maella v. SBKBS Hotel, LLC
2  Paul Kimble (#6045267)
3          E R R A T A   S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  Paul Kimble          Date
25

16 (Pages 58 - 59)

| & | | |
|---|---|---|
| **&**  2:13 | | |

**0**

**02552**  1:7

**1**

**1**  24:9 25:1
  40:16 41:4,15
  54:24
**13th**  1:20 2:24
**14**  1:14
**15**  5:4 7:9
**17979**  57:23

**2**

**2**  4:2 24:9 25:1
  25:2 41:20
  43:10
**20**  10:18 11:6
  12:4 20:25
  22:23 40:2
**2014**  7:1,8
**2020**  8:13
  10:18 11:6,17
  20:25 22:23
  25:24 40:2
**2023**  1:14
  56:12 57:22
  58:3
**2024**  46:10
**20th**  8:13 22:3
**21**  1:7 58:3
**211**  2:14
**21st**  57:21
**22nd**  29:13

**2500**  2:14
**268-4335**  3:2
**268-4681**  3:1
**2:26**  43:22
**2:33**  43:18

**3**

**30**  12:4 38:8,12
  46:12 58:17
**314**  2:16,17
**316**  2:7,8 3:1,2
**319**  41:13
**3241**  2:5
**36th**  22:7
**3:49**  1:15

**4**

**425-0414**  2:8
**455**  1:20 2:24
**46**  4:7
**4:55**  55:23
**4th**  11:18

**5**

**5**  4:3
**52**  48:8
**54**  4:8
**55**  56:2
**552-4023**  2:16

**6**

**6**  4:6 56:2
**6045267**  58:5
  59:2
**63102**  2:15
**67202**  1:21
  2:25

**67226**  2:6
**6th**  9:5

**8**

**8**  5:4 8:9,13,16
  10:17,23 14:4
  14:18,20 15:1
  15:3,9,19 16:8
  16:11,13 18:6
  18:10,12,20,23
  19:1,2,4 21:1
  21:24 22:23
  23:10,14 31:17
  34:12 35:25
  36:9 39:19
  40:25 42:5,7
  43:2,3 46:18
  46:22 47:2,9
  47:17 48:20
  54:17
**8/14/2023**  58:5
**884-4423**  2:17

**9**

**9-1-1**  11:22,23
  11:24
**977-9999**  2:7

**a**

**abasolo**  7:22
  11:7 19:24
  21:23 22:8
  27:21 28:6
  29:5,18 53:4
**abasolo's**  32:14
**able**  22:21 26:3
  35:17 49:14

**above**  58:6
**absolutely**  17:4
**account**  37:19
**accuracy**  58:9
**accurate**  20:16
  24:6 27:25
  30:14
**acknowledg...**
  58:12
**action**  7:18
  55:10 57:19
**activity**  26:8
  27:13,22,24
**actual**  40:21
**actually**  7:15
  10:4 11:9
  13:17 17:15,18
  23:14 36:3
  55:4
**addition**  13:4
**address**  51:3
**addressed**
  52:13
**addressing**
  51:20 52:8
**adjacent**  14:18
  14:21
**admission**  26:7
**admitted**  22:11
**advising**  40:19
**aerial**  5:3 15:23
  16:7
**affected**  34:2
**affiliated**  25:19
  25:22

**african** 41:23
42:2
**ago** 16:18 42:9
49:17
**agree** 40:25
41:22
**ahead** 22:1
**aided** 57:11
**allotted** 58:20
**allowed** 14:3
57:16
**allows** 51:22
**altercation**
43:2,6,9 44:24
45:14,23
**american** 41:23
42:2
**amount** 10:3
**angle** 34:6 36:7
**answer** 21:15
27:17 35:9,11
35:13 55:12
**answered**
37:14
**anymore** 19:3
**apartment**
41:11
**apologize** 21:25
45:16
**appear** 41:16
43:19
**appearances**
2:1 4:2
**appears** 25:6
43:5 50:12

**appended**
57:16
**applicable**
28:21 58:8
**appreciate** 46:6
**approaches**
43:22
**appropriate**
17:24 55:9
**approving**
20:11,12
**approximate**
47:7
**approximately**
46:24 47:21
**area** 14:2,16,24
16:21 17:5
22:18 25:7,7
31:6 37:7 47:7
**argument**
50:15
**arisen** 50:6
**arrest** 9:20
**arrests** 23:22
**arrived** 22:5
40:17
**arrow** 16:23
**asked** 21:14
37:13 42:10
54:25 55:6,16
**assaulting** 45:1
**assigned** 6:21
7:2,7 8:24 9:1
9:3,5 10:2
11:11

**assisted** 11:12
**associated**
26:22
**associating**
26:9
**assume** 38:11
52:16
**attached** 20:10
29:9,11 58:11
**attempting**
30:4,6
**attorney** 2:22
57:18 58:13
**august** 1:14
57:22 58:3
**authority** 56:12
**available** 58:6
**aware** 40:8
45:14 54:19

**b**

**b** 2:12 6:10
29:2 30:14
**back** 25:6,7
29:21 32:4
40:15 43:12
47:20 53:17
**backward** 34:7
**backwards**
33:20
**banahan** 2:12
4:6,8 6:6 19:10
27:20 28:15
36:22 37:2,16
48:22 52:18
54:22 55:15

**banberger** 9:2
9:12
**banks** 30:4
**based** 27:25
37:5 38:7 44:6
48:13
**basic** 38:16,22
**basically** 7:14
9:19 14:18
15:1 24:13
33:2 43:14
51:3,7,10
53:15 54:11
**basis** 54:13
**battering** 44:25
**behalf** 2:2,11
2:20
**belief** 56:4
**believe** 12:3
18:11,15 19:5
21:22 22:17,24
23:15,16 24:21
25:21 36:7
42:10 48:2,23
48:25 50:23
54:6,7
**belonging**
18:14
**best** 14:2 49:13
**better** 17:16
44:7
**bit** 17:16
**black** 23:4
26:21 39:17

**[blalock - comfort]**                                                  Page 3

| | | | |
|---|---|---|---|
| **blalock** 1:5 8:9 12:7 13:7 14:10 18:14 34:24 48:16 56:25 58:4 59:1 | 51:3 54:1,4,13 **butt** 37:21 | 38:1,19 39:2,8 39:11,12 47:8 48:25 49:3 **caucasian** 41:24 | **clerk** 54:24 55:4 **client** 48:16 **close** 20:3 23:11 36:13 |

**blalock** 1:5 8:9
12:7 13:7
14:10 18:14
34:24 48:16
56:25 58:4
59:1
**blalock's** 35:18
**blood** 28:21
**bloods** 26:18
**bonfiglio** 1:25
57:4,24
**bottom** 41:15
**bring** 9:24
**broadway** 2:14
**broke** 45:15
**broken** 51:8,24
52:19,20
**building** 9:6
13:25 14:16
15:11,12
**buildings** 16:9
**bullet** 34:23
35:2,6,17,25
48:15,18
**bullets** 13:2
18:22,25 38:20
39:2,11,12,13
39:16 48:20
**bureau** 7:3,5,8
7:11,22 19:11
**bureaus** 9:4
**business** 28:17
53:18 54:3
**businesses**
31:16,18,20

51:3 54:1,4,13
**butt** 37:21

**c**

**call** 11:22,24
12:1 17:12
19:25 20:14,17
**called** 11:8
17:17
**calls** 7:16 46:23
46:25 47:3
**cameras** 24:13
**capacity** 7:13
10:20
**car** 15:8 44:20
49:21,24,25
**career** 38:8
**cars** 15:2,3,5
30:8 51:24
**cartridge** 13:25
33:3,21 37:23
38:6
**cartridges**
34:11
**case** 1:7 8:8
10:15 18:2
19:13 20:4,10
20:11,12 23:23
50:22 53:10
**casing** 18:19
23:13 37:23,23
**casings** 13:25
14:1,12,23
16:19,20,21
18:6,9 33:3,4
33:14,21 37:19

38:1,19 39:2,8
39:11,12 47:8
48:25 49:3
**caucasian**
41:24
**cell** 24:18,19
48:4,7
**certificate** 4:18
57:1
**certified** 53:22
57:4
**certify** 57:5,13
57:17
**change** 59:4,7
59:10,13,16,19
**changed** 47:1
**changes** 57:14
58:10
**chaotic** 13:21
**charge** 38:15
**chest** 22:18
**circle** 16:11,12
47:8
**circumstances**
46:19
**city** 1:3,19 2:20
2:22 6:18,19
6:22 9:6 54:11
**clarify** 19:6
21:13
**classify** 50:8,11
**classifying** 28:5
**cleaning** 52:2
**clear** 32:5

**clerk** 54:24
55:4
**client** 48:16
**close** 20:3
23:11 36:13
37:18 48:23
**closed** 31:19
**closer** 34:12,12
**closest** 13:14
14:24 15:9
**clothing** 26:11
26:13
**clued** 27:6
**collect** 17:24
18:25
**collected** 17:19
18:6,10,22
**collecting** 9:23
17:22
**collection**
17:11 38:16,25
**color** 26:16,21
26:22
**colors** 28:12
**come** 11:20
36:10 54:9
**comes** 7:17
44:20
**comfort** 14:17
14:20 15:8,15
15:20 16:8,15
16:16 30:8,13
31:23 34:13
36:23 37:3,12
47:9 48:24

49:3

**coming**  17:24
20:2

**commission**
56:19

**commit**  44:5
50:6 52:17

**commits**  44:8

**committed**
44:14,16

**committing**
44:15

**common**  33:18
45:20

**commonly**  14:1
38:23 51:7

**community**
51:2 53:25

**complaint**  7:17

**completed**
19:14 58:17

**computer**
57:11

**concerns**  51:3
54:8

**concluded**
55:23

**conduct**  14:6
20:20

**connection**
21:11 23:23

**contact**  9:18
13:17 14:4
22:9 54:6

**contacted**  13:1

**contacting**
41:10

**contained**
40:12 41:4

**context**  41:6

**controlling**
9:23

**conversation**
45:12

**conversations**
27:10

**convictions**
24:1

**copies**  58:14

**correct**  6:11
9:10 11:19
18:1,8 21:17
24:3 26:19,24
28:2 29:8,14
30:20 33:1,22
34:4 35:22,23
37:8,9,20 38:9
38:14 41:4
42:3 44:4 45:5
49:11 55:1,17
56:3 57:12

**correctly**  17:8
18:16 21:15
37:18

**cost**  54:4

**costs**  54:7

**counsel**  58:14

**county**  56:10
57:3,21

**couple**  31:18
53:22

**court**  1:1 4:21
9:25

**cpted**  51:5,6
53:17,23 54:1
54:17

**create**  20:5
52:21,24

**crime**  9:8,9
10:3 18:3 38:8
43:24 44:6,8,8
44:11,13,14,14
44:15,18,21,23
44:23 45:2,8
49:8,18 50:1,5
50:6,9,11 51:4
51:13,21,25
52:3,9,14,17,21
52:25 53:1
54:14

**crimes**  9:6

**crip**  28:20 40:8

**cross**  46:7

**crouching**
33:11

**cs**  58:15

**cs6045267**  1:24
56:24

**csi**  15:22

**csr**  1:25,25
57:24

**currently**  6:15

**custody**  4:20

**cv**  1:7

**d**

**d**  5:3 15:24
16:2 47:5

**database**  40:14

**date**  8:15 21:10
29:12 40:8
59:24

**davion**  39:20
40:1

**day**  19:25 20:2
20:4 21:16,18
56:12 57:21

**days**  58:17

**defendant**  1:9
2:11 5:3

**defendant's**
15:24 16:2
29:2

**defense**  23:2

**defined**  45:8

**definitely**  40:14

**definition**
44:17 45:20

**definitively**
27:6

**degestad**  2:12

**department**
1:19 2:23
28:16,22 35:5
40:12 46:12
54:12

**depend**  29:10
34:8 39:4,6,12

**depending**
33:17 34:17
51:12
**deponent** 57:15
58:13
**deposed** 27:21
27:22 50:22
**deposing** 58:13
**deposition** 1:11
55:22
**deputy** 2:22
**describe** 7:12
**described** 37:7
**description** 5:2
**detective** 9:11
10:2 50:23
**detectives** 9:3,7
**determination**
48:14
**determine** 9:19
22:21 26:11
30:16 32:8,9
39:5 48:17
49:14
**determined**
33:2
**determines**
20:8
**determining**
26:6 39:1
**devaughn** 2:4
**devaughnjam...**
2:9
**develop** 52:3

**diagram** 5:4
**different** 24:12
34:6
**difficult** 27:13
**direct** 6:5 36:8
**direction** 16:4
30:6,17 31:2,4
31:5,15 32:3
33:24 34:15
39:6
**directions**
30:19
**discharged**
22:13 34:23
35:19
**disciplinary**
7:17
**discuss** 10:25
**dispatched**
11:22,23
**disrepair** 51:9
**distance** 37:16
38:1 39:11
**district** 1:1,2
**disturbance**
42:18,22,24
55:7
**disturbances**
46:21
**dixon** 2:13
**dixon.com** 2:18
**document**
29:15
**documented**
39:24 40:6,8

**documents**
24:10 35:4
**doing** 51:11
52:25
**door** 23:12,13
31:5 33:7,8
41:10,12
**draw** 16:14,23
**dreadlocks**
23:6
**dress** 26:21
**drew** 17:2 47:6
47:8,13
**drive** 15:13,16
**driven** 13:16
**duly** 6:2 57:6

**e**

**e** 6:10 59:3,3,3
**earlier** 27:20
54:23
**easily** 50:1
**east** 30:17,24
31:14,17 33:8
39:18,25 47:13
47:21
**ehoughton** 3:3
58:2
**either** 8:1 10:11
13:10 25:14,16
25:18 31:23
33:18,25 34:12
34:16 37:22
38:2 43:6
50:18

**eject** 39:7
**ejected** 33:16
34:19 38:4
**ejects** 38:6
**embedded** 19:1
**employed** 6:15
**employee** 27:2
57:18
**employees** 7:19
**employer** 6:17
**enforcement**
28:23
**engaged** 45:5
**entail** 9:16
**enter** 18:18
**entrance** 14:15
18:18,20 42:24
47:18,19,20
**entranceway**
18:16
**environment**
52:21,25
**eric** 2:21 58:1
**errata** 58:11,13
58:17
**erratas** 58:15
**esq** 58:1
**evans** 2:13,18
**evening** 36:12
**event** 24:2
50:12,17
**eventually**
34:24
**evidence** 17:11
17:23,25 38:17

**[evidence - further]**     Page 6

39:1 42:6
**exact** 15:10
**exactly** 32:23
33:5,6
**examination**
4:5 6:5 46:7
54:21
**example** 49:20
51:21 52:9
**exchange** 45:12
**exchanged**
43:16 45:17
**exhibit** 4:20 5:3
15:24 24:9,9
25:1,1,2 29:2
30:14 40:16
41:4,15,20
43:10 47:5
54:24
**exhibits** 4:3,21
5:1
**expires** 56:19
**extending** 25:8
**extent** 52:9
**exterior** 18:6
25:11

**f**

**facing** 16:4
**fact** 8:21 10:11
21:19 36:17
37:5 55:15
**factors** 50:2
**facts** 10:15
**fails** 58:19

**fair** 10:3,8
17:21 20:22,23
23:16,25 26:15
26:23 35:25
37:12,15 38:2
42:2 43:7
44:10,22 45:2
47:10 49:15
52:22 53:1
54:14
**familiar** 8:18
28:4 50:24
53:6
**familiarity**
10:14
**far** 13:22 24:3
33:14 39:13,16
48:19 52:5
**fast** 51:22
**fax** 2:8,17 3:2
**feet** 33:15 38:2
**female** 42:21
**females** 42:20
**fence** 22:12,13
22:14
**fight** 45:5,10,15
45:17
**filed** 8:8
**financially**
57:19
**find** 12:9 13:3
22:5 39:2,7
42:6 49:2
**findings** 49:14

**fire** 23:1 32:16
32:20 33:17,19
33:20 37:22
50:18
**firearm** 33:16
33:17 34:18
**firearms** 38:23
**fired** 12:4 19:4
19:6 22:22,25
23:2,2 32:5,8
35:7,10,14,21
36:3,17 37:11
38:5,11 42:5,7
42:25 43:7
48:15,18,20
49:1 50:17
**fires** 43:14
**firing** 23:3,7
32:4,10,25
33:9,12 36:8
36:12 38:10,12
**first** 6:2 10:10
11:10,11,20
12:13 18:17
32:5,8 50:17
57:6,9
**firsthand** 39:15
**five** 10:11
55:17
**flashing** 26:8
**flip** 16:3
**floor** 1:20 2:24
9:6 18:18 48:1
48:8

**follow** 19:9
54:7,8
**following** 38:24
**food** 51:22
**footage** 24:5
30:1,10 32:6
**foregoing** 56:1
**form** 27:16
28:14 36:5
48:22 52:18
55:11
**forth** 57:9
**forward** 34:7
**forwards** 33:20
**found** 12:8,9
14:23 16:19
18:11,15,17
23:3,14 33:3
47:8 48:25
53:6
**foundation**
27:17 36:6
55:11
**frame** 27:5
**frames** 25:10
25:15 40:24
41:7
**front** 31:23
35:3 39:19
47:19
**further** 14:17
17:6 33:7
42:24 43:13
55:20 57:17

| g | | | |
|---|---|---|---|
| **gang** 25:19 | 20:9 24:14 | 47:17 57:20 | **hope** 46:16 |
| 26:4,6,8,8,9,14 | 29:1 41:7,10 | **handle** 7:16 | **hopefully** 11:4 |
| 26:16,22,23 | 43:13 48:6 | **hands** 47:1 | **hospital** 11:9 |
| 27:8,13,15,22 | 52:22 53:17 | **happen** 52:22 | 13:9,16 22:19 |
| 27:24 28:5,11 | **good** 51:11,14 | **happened** | **hospitals** 9:22 |
| 28:11,12,17 | 51:14,17 52:4 | 13:24 32:7 | 13:12 |
| 40:6 | **great** 49:23 | 36:11,12 53:11 | **hotel** 1:8 27:3 |
| **gangs** 25:22 | **green** 31:9 | **happening** | 41:11 42:11,15 |
| **gas** 44:19,21 | **group** 50:16 | 46:22 52:14 | 43:20 47:19,22 |
| 49:21,25 | **groups** 50:13 | 53:1 55:8 | 48:5 55:1,10 |
| **general** 10:14 | **guest** 48:7 | **happens** 10:10 | 56:25 58:4 |
| 17:5 20:24 | **gun** 22:25 23:1 | 52:13 53:20 | 59:1 |
| 28:10,17 | 23:2,7,9 25:6,8 | **happy** 19:7 | **houghton** 2:21 |
| **generally** 7:12 | 25:10 30:5 | **hard** 53:13,15 | 55:21 58:1 |
| 8:18 9:7 22:2 | 33:24,25 34:1 | **harm** 50:18 | **hours** 10:11 |
| 27:24 28:4,21 | 34:3,5,8,17,23 | **head** 31:22 | **huh** 31:10 |
| 39:10 | 35:2,7,10,14,17 | 49:4 | i |
| **generate** 19:25 | 37:11,22 38:4 | **headed** 37:7 | |
| 20:21 | 38:5 39:6 | **heard** 27:10 | **identification** |
| **generated** 21:8 | **gunfire** 42:15 | **held** 33:24 | 15:25 |
| 29:6 | 43:16 | **help** 51:3 54:2 | **identified** |
| **getting** 9:21 | **guns** 22:11,12 | 54:10,13 | 14:13 23:21 |
| **given** 21:5 | 22:12,22 34:19 | **helped** 8:23 | 29:20 30:13 |
| 38:16 57:8,12 | 36:17 38:10,11 | **helpful** 47:14 | 41:9 55:2 |
| **glass** 52:20 | 38:12 | **helps** 26:13 | **identifying** |
| **go** 10:4 22:1 | **gunter** 39:20 | **highlight** 17:1 | 28:11 |
| 26:5 28:5 38:1 | 40:1 | **highlighted** | **identity** 23:18 |
| 46:10 49:25 | **guy** 6:15 12:23 | 31:9 47:6 | 24:21 26:14 |
| 53:23 | h | **hispanic** 41:24 | 29:23 44:7 |
| **goers** 54:25 | | **hit** 34:24 48:16 | **ignition** 49:23 |
| **goes** 30:3 32:1 | **h** 59:3 | **hold** 20:4 | **image** 23:9 |
| 39:17 | **hair** 25:5 | **holding** 34:5,6 | **images** 24:10 |
| **going** 10:23 | **halfway** 47:21 | 34:8 43:12 | **improve** 54:2 |
| 12:12 16:3,10 | **hall** 1:19 | **home** 19:15 | **incident** 8:12 |
| | **hand** 16:1,10 | | 9:19 10:5 |
| | 29:1 30:6 | | 11:21 20:15 |

21:11,22 24:5
24:15 44:2,5
50:10 55:16
**incidents** 19:21
**include** 38:19
38:22 39:1,10
**inclusive** 56:2
**increase** 46:23
46:25 47:3
**index** 4:1,3 5:1
**indicating**
16:13,17,22,25
17:5,9 24:16
27:3 30:25
31:6
**individual**
12:18 13:6
24:20 27:1,2
29:23 32:15
35:14 36:16
43:11 44:20,25
45:1,9 54:25
**individual's**
23:18
**individuals** 8:2
12:21 13:15
22:5,9,10,11,16
22:18,22 25:19
26:4 27:7
32:10 40:16
42:10,15 43:1
45:4 50:13
**inducive** 52:21
52:25

**information**
9:24 20:16
21:5 35:1
40:11,20 42:4
42:12
**initial** 29:7
30:22 54:6
**initials** 16:24
**injured** 9:22
**injury** 2:4
**inn** 14:17,20
15:8,15,21
16:8,15,16
30:8,13 31:23
34:13 36:23
37:3,12 47:2,9
48:24 49:3
**inside** 14:4
18:10,11,17
19:4,6 23:14
40:21,25 42:5
42:7,18 43:3
**instance** 45:4
**intend** 44:25
**intended** 46:3
**intending**
52:17
**intends** 44:5
**interchangea...**
45:19
**interested**
57:19
**interior** 18:23
19:4 25:12

**intermixing**
26:13
**interpersonal**
43:24
**interrupt** 49:6
**interrupting**
21:25
**intersect** 14:24
**interviews** 14:6
20:21 22:24
**investigate**
8:21
**investigating**
10:4
**investigation**
10:3 34:22
46:2
**investigator**
8:24,25 10:9
17:12,18 18:3
**investigators**
17:15 49:9
**involved** 9:18
26:4,14 43:1
45:22
**issue** 28:16
**issued** 8:8
**issues** 52:8

**j**

**james** 2:4
**jaylen** 12:19,20
13:5,10 22:24
22:25 29:21
30:7,12 31:1
32:3,11,14,19

34:9 35:7
36:15 37:6
43:14 45:9
50:13
**jeffrey** 2:3
**job** 1:24 17:11
19:10 56:24
**june** 8:13 10:18
11:6,17 20:25
22:3,23 25:24
29:13 40:2
**jwilson** 2:9

**k**

**k** 6:10
**kansas** 1:2,3,3
1:21 2:6,20,25
57:2,5,21
**kathy** 1:25 57:4
57:24
**kbanahan** 2:18
**keeping** 51:14
52:5
**kept** 14:2 51:10
51:15 52:4
**kerry** 2:12
**keys** 49:22,24
**kicks** 46:13
**kimble** 1:12 4:5
6:1,8 46:10
56:7 58:5 59:2
59:24
**kind** 11:12 14:2
51:4 52:20
54:12

**knew**  11:10
**know**  11:24
  12:1,6,17 18:9
  18:19,22 23:17
  23:17,22 24:3
  25:17,18,22,24
  27:14,25 29:23
  31:22,24 33:4
  34:22 35:8,12
  35:15,16,21,24
  40:1,7 41:11
  41:12 42:11,14
  42:16 45:11,22
  46:11,24 49:8
  53:11,12 54:16
  55:3
**knowing**  39:10
**knowledge**
  18:5 19:3
  27:12,21 32:18
  38:7 39:10,15
  53:25 56:3
**known**  13:6
  28:16,20,20
**ks**  1:25

**l**

**l**  6:10
**lab**  17:12,15,17
**lane**  15:15
**language**  28:11
**large**  11:11
  17:14
**law**  2:23 28:23
**lawsuit**  8:12

**lawyers**  2:4
**lay**  27:14
**lead**  48:25 50:1
  52:13,16
**learn**  11:20
  55:5
**learned**  18:25
  25:25 31:14
**learning**  9:14
**leave**  42:11
  43:20 52:2
  54:25 55:7,10
  55:16
**led**  43:7 45:25
**left**  31:14 33:18
  33:19 34:1,11
  34:16 39:7,23
  42:15 51:23
**leg**  22:17
**legal**  57:25
  58:23
**level**  11:3 27:12
  27:23 32:22
  35:6
**lighting**  51:10
  51:14
**likewise**  35:16
**line**  17:1 31:7
  47:6 59:4,7,10
  59:13,16,19
**list**  28:16
**little**  17:16
**llc**  1:8 2:13
  56:25 58:4
  59:1

**located**  10:24
  12:10 14:13
  16:20 31:16
  32:24
**location**  9:9
  32:19
**long**  6:22,25
  23:5 25:4
  29:22 30:5
  32:2 39:14,18
  39:24 50:16
**longer**  25:5
**look**  24:8 34:18
  40:15
**looked**  37:6
  40:13 43:9
**looking**  9:17
  13:14 20:14
  24:12 26:2
  40:23 43:10,21
**looks**  25:5
  33:11 40:24
  41:8 43:11,16
**lot**  9:14 10:1,9
  13:23,25 14:16
  15:4,15,18,20
  20:17 24:14
  26:5,6,10 30:8
  32:23 33:5
  36:25 37:2,12
  37:22 46:22
  48:21,24 49:3
  51:23
**lots**  14:19,21,24
  15:17 36:18,21

  37:8,17
**louis**  2:15
**lucky**  6:14,15

**m**

**m**  6:10
**machine**  57:9
**made**  23:23
  24:1 48:14
  57:15
**maella**  1:5 8:9
  12:7 13:7 14:9
  18:14 34:24
  35:18 48:16
  58:4 59:1
**magazine**  23:7
  23:9
**main**  1:20 2:24
  13:13
**majority**  16:20
**make**  9:18,21
  17:2,19 47:4
  47:12 53:24
  54:1
**making**  7:15
  9:22 14:4
  17:23 20:15
  51:15
**malcolm**  7:24
  8:3 11:7 19:24
  22:8 27:23
  28:4
**male**  23:4
  29:21 30:4
  31:11 32:1
  39:17,24

**[males - officers]**                                                Page 10

**males**  29:20
**malik**  30:4
**manage**  7:15
  7:16,22,24 8:1
  8:23 9:15
  11:15
**management**
  51:11,14,17,20
**manager**  41:9,9
  42:10 43:19
  54:24 55:2
**managing**
  17:10
**map**  16:11
  47:14
**marion**  12:15
  12:16,20 13:5
  13:10 29:20
  30:7,12 31:1
  32:4,11,14,19
  34:9 35:10
  36:15 37:6
  43:14 45:9
  50:14
**marked**  5:2
  15:25 16:1
  29:2
**marking**  30:19
**marlon**  12:14
**masenthin**  22:8
**match**  29:25
  30:9 32:5
  39:20 42:8
**maximum**
  46:13

**mean**  15:7
  18:17 20:13
  43:23 49:6,19
  51:17
**meaning**  42:1
**means**  20:14
**meant**  53:4
**measure**  17:15
**meet**  37:8
**member**  27:8
  28:6,9,12
**members**  26:9
  28:17 40:7,9
**mentioned**
  46:17 47:25
  49:17 51:5
  52:7 53:5
**milling**  52:1
**mind**  30:18
**minute**  49:17
**minutes**  55:17
**mishael**  12:24
  13:5,10
**mishael's**  13:3
**missouri**  2:15
**mitigate**  54:14
**mo**  1:25
**moment**  16:18
**motel**  8:9,13
  10:17,24 14:13
  18:7,10,20,23
  21:1 23:10
  25:11 35:25
**move**  33:24

**moving**  34:4,11
**multiple**  32:3

**n**

**name**  6:7,13
  12:13,13,17,23
  12:24 13:3
**named**  57:6
**names**  9:14
**narrative**  53:5
**nature**  26:10
  26:21 51:16
**near**  14:14
  22:22
**need**  19:6 52:2
**needed**  7:18
  11:10 46:15,15
**negative**  54:7
**neighbor**  6:12
**neighboring**
  36:3,18,21
**never**  23:3
  53:12
**night**  24:5
**nine**  7:1
**normally**  33:25
**north**  1:20 2:5
  2:14,24 7:6,7
  7:11,22 10:24
  15:2,6,9,11
  16:4 19:11
  30:23 47:20
**norwood**  12:13
  12:20 22:19
  23:1 25:15,21
  29:20 35:10

**43:15 45:9**
  50:14,19
**notary**  56:16
**note**  58:10
**number**  5:2
**nutshell**  7:20

**o**

**object**  27:16
  28:14 36:5
  48:22 52:18
  55:11
**objection**  36:19
  36:24 37:13
**obtain**  14:5
**obtained**  21:23
**obviously**  34:2
**occupants**
  41:16,23
**occurred**  8:12
  8:16 10:6
  20:25 21:22
  22:2 48:3
  55:16
**occurs**  42:24
  50:5
**odd**  38:8
**officer**  6:12,19
  7:22,24 19:23
  19:23,24 21:23
  22:8 27:21,22
  28:4,6 29:4,18
  32:13 38:13
  51:2 53:4
**officers**  7:15
  10:5,12 11:7

11:15,23 13:22
14:3 17:17
19:12,20 20:17
21:6 28:1
40:19 42:17
**official**  57:20
**okay**  13:4
19:16 20:12
24:17 27:4
31:11 39:9
49:6 53:17
54:4 55:5,9
**once**  42:15
53:16
**ongoing**  54:13
**opinion**  36:10
38:7 44:12
45:3 50:20
51:25
**opportunity**
44:23 49:18,23
50:2,6,9
**opposed**  9:8
**outside**  21:21
23:9 24:12
40:19,21 42:23
43:2
**overfilling**
51:23
**overhead**  5:3
15:23 16:7
48:2
**oversee**  17:11
17:18,20

**overview**  47:6
**owners**  28:17

**p**

**p.m.**  1:15 55:23
**page**  15:10
59:4,7,10,13,16
59:19
**pages**  56:2
**pants**  25:7
**park**  15:2,3,7
15:12,13,14
**parking**  13:23
14:16,19,21,24
15:4,14,17,18
15:20 24:14
30:8 32:23
33:5 36:18,21
36:25 37:2,8
37:12,17,22
48:20,24 49:3
51:23
**part**  17:10
19:10 39:9
51:2
**particular**
19:13 23:19
**parties**  57:14
57:18
**party**  41:12,16
41:23 42:1,18
42:20 43:3
54:25 55:6
**past**  31:7
**patrol**  10:4,12
11:15 17:16

**paul**  1:12 4:5
6:1,8 56:7 58:5
59:2,24
**pay**  49:25
**pen**  16:10
**pension**  46:13
**people**  9:18
17:24 26:10
32:9 41:10
42:19 50:22
51:25 52:2,16
53:23 55:7
**period**  57:15
**person**  12:6
23:19 26:23
27:14 34:3
39:5 42:21
44:6,8,9 48:18
49:13,24 50:15
50:18,19
**person's**  44:7
**persons**  9:6
**phone**  24:18,19
48:4,7
**photograph**
24:24 27:7
**photographs**
25:9,10,13
26:2,3 27:9,11
41:15,19
**phrase**  28:21
49:18
**physical**  43:6
43:10 45:11,15
45:20

**physically**  13:1
17:22
**picture**  25:8
43:11
**place**  46:18
49:24
**placed**  11:24
**plaintiff**  1:6 2:2
**plaintiff's**  24:8
24:9 40:15
41:19
**plans**  46:11
**play**  48:6
**played**  48:11
**please**  6:7
**pocket**  25:6
**point**  30:6
**pointed**  41:3
**police**  1:19 6:12
6:19 19:12
20:22 21:10
28:16,22 35:4
38:13 40:12
54:12
**policing**  51:2
53:25
**port**  33:17 34:7
**ported**  33:25
34:17,19,21
**portion**  15:8,9
31:13 39:22
**possibility**
37:11
**possible**  24:17
36:2,16,22

possibly  25:6
pretty  7:19
  13:21,22 17:14
prevent  43:12
primary  10:9
prior  10:17
  25:24 40:1,7
  55:7
probably  10:10
  34:20 49:12
problem  51:19
problems  51:20
  52:5
proceedings
  55:22
process  49:9
proper  34:20
properties  36:4
  51:13
property  15:1
  22:23 36:10,13
  40:22 47:1,17
  51:4,9,12,15,19
  52:1,6,7,10,14
  52:17
propounded
  57:8
protect  26:13
proximity
  35:18,24 36:13
  48:24
public  28:10,12
  28:18 56:16
pumping  44:19
  44:21 49:21

purposes  15:25
  28:24 44:15
pursuant  8:5
put  16:12

**q**

question  27:19
  36:14 53:3
questions  54:8
  57:8
quick  32:7

**r**

r  1:25 57:4,24
  59:3,3
ran  39:25
random  44:13
  44:18,21,23
range  7:10
read  39:17,23
  55:21 56:1,1
  58:9
reading  18:24
  42:16
really  32:8
reason  44:9
  50:5 58:11
  59:6,9,12,15,18
  59:21
recall  10:23
receipt  58:18
recognize  16:2
  16:5 24:10,15
  24:16 40:22
recollect  11:1
  17:9

recollection
  11:3 20:25
  22:2 29:25
  30:9 39:21
record  6:7
  26:25 47:5,13
  57:12
recorded  56:2
recover  53:15
red  23:5 25:4
  26:17 29:21
  30:5 31:11
  32:2 39:24
  50:15,19
redirect  54:21
reduced  57:10
refer  13:2
reference  7:18
  27:14 29:22
referenced  58:6
referred  14:1
  51:5,7
referring  48:10
reflect  26:25
regard  8:8,12
  29:18 35:10,14
regardless
  44:15
related  26:7
  53:10
relation  24:1
relative  14:13
  57:17
remains  24:21

remember
  12:24 17:7
  18:16 22:14,15
  31:21 33:6
  46:19 48:3
  49:7
remembered
  11:5
rented  42:21
repeat  27:18
report  11:6
  13:2 15:22
  19:25 20:4,9
  20:15,22 21:8
  21:10,20 29:4
  29:7,12 32:1
  32:14 34:25
  53:7
reporter  4:21
  57:5
reporter's  4:18
reporting
  19:20
reports  18:24
  19:12,14,18,24
  20:5,6,18 21:6
  29:6 31:14
  39:23 42:13,16
  55:5
represent  27:1
request  53:18
requested
  54:17 57:14
requirements
  19:20

| | | | |
|---|---|---|---|
| **resolution** 9:25 | **role** 51:2 | 38:20 40:17 | **sergeant** 6:21 |
| **response** 57:8 | **room** 18:13 | 49:8,9 | 6:25 7:2,11,21 |
| **responsibilities** | 35:18 41:11,13 | **scenes** 7:16 | 10:12,21 19:11 |
| 7:13,14 | 42:19,21 | 17:13 38:8,15 | 19:17 38:15 |
| **restaurant** | **rounds** 32:3 | **schneider** | 46:9 |
| 31:22 51:22 | **rows** 41:16,19 | 50:23 | **sergeants** 10:5 |
| **restrain** 30:4 | **rpr** 1:25 57:24 | **seal** 57:20 | 11:14 |
| **retained** 4:21 | **rule** 37:10 | **second** 42:9 | **set** 25:22 46:10 |
| **retire** 46:11 | **run** 31:12 | 47:18 48:1,8 | 57:9 |
| **return** 58:13,17 | **running** 22:6,6 | **seconds** 48:8 | **several** 33:15 |
| **returned** 32:20 | 30:7,12,15,17 | **security** 14:2 | 38:2 46:21 |
| **returning** | 31:2,2,3 32:15 | 24:4 30:1,10 | **shaw** 39:20 |
| 32:16 | 34:9,14,15 | 32:6 54:2 | 40:4 |
| **revealed** 46:3 | 36:15,16 39:18 | **sedgwick** 57:3 | **sheet** 58:11 |
| **review** 19:11 | **ryan** 50:23 | 57:21 | **shell** 14:1,12,23 |
| 20:6,9 21:9,16 | **s** | **see** 17:2 24:20 | 16:19,20 18:5 |
| 21:17 57:13 | | 25:5,7,9,12,14 | 18:9,19 33:3 |
| 58:7 | **s** 2:21 59:3 | 25:16 27:6 | 38:19 39:2,11 |
| **reviewed** 19:18 | **safety** 54:2 | 29:19 30:3 | 39:12 47:7 |
| 21:10,14,20 | **save** 53:13 | 31:13 33:6 | **shift** 11:14 20:3 |
| 24:4,18 35:5 | **saw** 30:1,9 31:1 | 34:25 39:22 | **shirt** 23:5 25:4 |
| **reviewing** 21:6 | 33:10,11 39:21 | 41:14 47:3 | 26:17 29:22 |
| **right** 12:9 15:2 | 40:18 43:8 | 49:22 51:21 | 30:5 31:12 |
| 15:4,12 16:16 | 53:12 | 52:3 | 32:2 39:18,25 |
| 30:6 31:23 | **saying** 37:25 | **seeing** 46:23,25 | 50:15,19 |
| 33:18,19 34:1 | 44:4 | 47:25 51:9 | **shoe** 31:24 |
| 34:11,13,16 | **says** 26:17,17 | 52:4 53:7 | **shooter** 23:4,17 |
| 39:7 46:5 | 29:13 40:6 | **seen** 23:6,8 | 24:22 |
| 49:10 50:2,21 | **sbkbs** 58:4 59:1 | 26:12 29:15 | **shooters** 23:20 |
| 50:21 52:12 | **scene** 8:23 9:15 | 30:7 32:2 | **shooting** 8:16 |
| 53:14 | 9:23 11:7,11 | 39:18 53:10 | 8:22 11:23 |
| **rising** 52:9 | 13:18,19,21 | **self** 23:2 | 12:3 13:23 |
| **road** 10:24 | 14:7 17:10,16 | **sent** 53:9 58:14 | 22:4 24:2 |
| **rock** 10:24 | 17:23 18:3 | **separates** 15:17 | 29:19 32:2,15 |
| | 19:24 20:21 | 15:18 | 34:3,10 38:20 |
| | 22:6 31:12 | | |

42:14 45:7,25
46:3,18 48:1
50:9
**shootings**  10:24
**shorthand**  57:4
57:10
**shorthanded**
13:22
**shot**  12:5,7,22
13:6 22:16,17
22:17
**shots**  12:4 19:3
19:5 36:2 42:5
42:7,25 43:7
49:1
**show**  16:24
**side**  13:24
14:14,15 15:2
15:3,7,14 38:2
47:21,22
**sight**  25:17
**sign**  55:21
58:12
**signature**  57:23
**signed**  58:20
**signs**  26:8
28:11
**sit**  15:11 21:19
32:18 35:3
**skills**  51:11,15
51:18 52:5
**sleeve**  25:4
29:22 30:5
32:2 39:18,24

**sleeved**  23:5
**sleeves**  50:16
**slowly**  47:2
**small**  7:19
16:12
**smaller**  17:13
**snapchat**  53:6
53:10,13
**solutions**  57:25
58:23
**somebody**  12:5
19:17 23:3
26:6,11 36:12
49:21,22
**sorry**  22:15,25
27:18
**sort**  45:13,23
50:14
**sound**  27:25
33:13
**sounded**  28:3
**sounds**  32:13
43:8
**south**  13:24
14:15,18 15:3
15:6,7,14
18:18,20 23:11
23:13 30:17,24
31:5 33:8
42:23 47:13,20
**southeast**  31:3
33:7 34:10
**span**  17:8
**spanned**  16:24

**speak**  13:10,11
**speaking**  27:24
**specialized**
28:7
**specific**  7:3 9:4
19:20 44:9
**specificity**
32:23 35:6
**spell**  6:9
**spent**  40:18,20
**spoken**  14:9
**square**  16:14
47:9
**srkbs**  1:8 56:25
**st**  2:15
**standing**  39:5
**start**  14:3
**started**  46:22
46:23,25 47:2
**state**  6:7 56:9
57:2,5
**stated**  24:4
**statement**
26:15
**states**  1:1
**stayed**  13:23
**steal**  49:24
**steals**  44:20
**steps**  55:13
**stop**  21:7
**store**  31:24
**street**  22:7
**strike**  39:13
**strong**  51:11

**submit**  20:19
**subpoena**  8:5,8
28:24 53:9
**subpoenaed**
35:4
**subscribed**
56:11
**suggestions**
53:24 54:1
**suite**  2:14
**super**  5:4 8:9
8:13,16 10:17
10:23 14:4,18
14:20 15:1,3,9
15:18 16:8,11
16:13 18:6,10
18:12,20,23
19:1,2,4 21:1
21:24 22:23
23:10,14 31:17
34:12 35:25
36:9 39:19
40:25 42:5,7
43:2,3 46:18
46:22 47:2,9
47:17 48:20
54:17
**supplemental**
20:5,6,9,17
29:4,6
**sure**  9:18,21,22
17:2,4,19,23
19:22,23 20:15
22:4 27:20
30:21 33:12

**[sure - type]**

40:13 45:18,21
47:4,12 51:15
53:19
**susceptible**
51:13,24
**suspects** 9:20
14:5
**sworn** 6:2
56:11 57:7

**t**

**t** 59:3,3
**take** 24:8 49:12
49:25
**taken** 1:18 7:18
24:18 40:25
48:7 57:9
**talk** 49:13 54:9
**talking** 8:19
42:17
**target** 46:3
**targeted** 44:1,5
44:8,11 45:2,8
50:12,17
**targeting** 50:12
**tattoos** 26:7
**teach** 51:4
**tell** 21:3 22:1
26:3 29:2
34:18 35:5,18
39:14 41:8
48:9,19 49:18
**telling** 52:1
**term** 34:20
43:24 44:1

**terms** 19:19
35:2 45:17
**testified** 16:18
42:9 48:14
54:23
**testifies** 6:4
**testify** 6:2 57:7
**testimony** 37:6
37:18 56:2
57:7,12,13
58:9,18
**theory** 51:8
52:20,20,20
**things** 17:19
26:5,10 27:10
46:22 51:1,10
51:16 52:3
54:1
**think** 7:9 11:2
12:12,13,19,23
12:25 15:10
21:14 29:12
36:14 39:4
46:5,12 53:3
53:22 55:4
**thirty** 6:24
**thomas** 12:19
12:21 22:20
25:14,21 29:21
35:7 43:14
45:9 50:14,19
**three** 10:10
23:20 41:15
**threw** 22:14,15

**throwing** 22:11
**thrown** 22:13
**time** 7:21 9:20
12:8 13:17
19:15 20:11,19
21:9 29:9,10
31:19,22,25
40:19,20 43:17
43:19 46:6,13
54:9 57:15
58:19
**timeframe** 58:8
**times** 20:17
**toben** 2:5
**today** 8:5 9:14
10:25 21:19
26:21 29:16
32:19 35:3
48:14
**together** 43:3
**told** 51:1 55:6
**tony** 9:2
**took** 11:12
46:18
**top** 31:21 41:18
49:4
**torrance** 39:19
40:4
**towards** 30:8
30:13
**trained** 53:23
**training** 27:23
28:7,11 38:12
38:16,22,25
39:9 51:5

53:18 54:18
**trajectory**
38:23
**transcript** 4:1
57:16 58:6,20
**transcription**
57:11
**transpired**
42:15
**trash** 51:23
52:2
**travel** 33:14,15
38:1 39:3,11
39:13,14,16
**traveling** 37:19
**trial** 46:10
**true** 28:9 41:18
56:3 57:11
**truth** 6:2,3,3
57:7
**try** 14:5 43:12
54:10
**trying** 50:18
**two** 10:10 12:9
12:11 13:12
14:18,21 15:17
22:5,9,16
27:25 29:19
37:7,17 41:19
45:14 50:13,13
**type** 7:16 9:8
20:18 28:16
51:12 54:17

| u | v | | |
|---|---|---|---|
| **uh**  31:10 | **v**  58:4 59:1 | **watch**  11:18 | **willing**  54:12 |
| **ultimately** | **verbal**  43:6,9 | 48:9 | **wilson**  2:3 4:7 |
| 22:21 43:7 | 45:11,23 | **watched**  21:21 | 15:22 19:8 |
| 48:15 | **verify**  58:9 | 21:23 32:6 | 27:16 28:14 |
| **under**  28:24 | **veritext**  57:25 | **way**  16:3 17:2 | 36:5,19,24 |
| **underlying** | 58:14,23 | 26:20 33:18 | 37:13 46:8 |
| 8:11 | **veritext.com** | 34:17,19 39:14 | 49:2 52:19 |
| **undersigned** | 58:15 | 44:7 | 55:11,20 |
| 56:11 | **victims**  9:21 | **ways**  52:24 | **wind**  33:23 |
| **understand**  8:4 | 12:10,11 13:12 | **weapon**  35:19 | **window**  51:8 |
| 8:7,11,15,25 | 14:5 | **wearing**  23:4 | 52:19 |
| 10:1 20:20 | **video**  21:21,24 | 25:3,4 26:12 | **witness**  16:25 |
| 21:15 37:17,25 | 23:6,8 24:13 | 26:17,20 31:11 | 57:6,13,20 |
| 43:23 | 24:18 29:19 | **went**  11:9,12 | 58:8,10,12,19 |
| **understanding** | 33:4,6,10,13 | 13:9,14,17 | **witnesses**  14:5 |
| 21:4 22:10 | 39:21 42:7 | 22:18 36:7 | **woodlawn** |
| 42:23 43:4 | 43:18,21 47:25 | 42:23 49:9 | 13:13,13 |
| 45:10,13 47:16 | 48:4,5,7,9,11 | 55:6 | **word**  45:17 |
| 47:23 48:13 | **videos**  53:6,11 | **wesley**  13:12 | 49:10 |
| 52:12 | 53:12 | 13:13,13 | **words**  45:17 |
| **unidentified** | **view**  16:7 24:13 | **west**  17:6 22:7 | 50:4 |
| 32:10 | 24:15 48:1,2 | 30:24 47:13,22 | **work**  7:17 9:7 |
| **united**  1:1 | **viewed**  24:11 | **whichever** | 10:4 11:14 |
| **unknown**  24:21 | **violence**  45:20 | 50:16 | 17:14 19:19 |
| 32:15 35:14 | **vs**  1:7 56:25 | **wichita**  1:19,21 | 54:12 |
| 36:15 45:8 | | 2:6,20,25 6:18 | **worked**  6:22 |
| **upper**  22:17 | w | 6:20,23 25:20 | 9:11 |
| **ups**  19:9 | **walk**  49:22 | 28:15,22 35:4 | **working**  11:18 |
| **used**  38:23 | **walked**  13:15 | 40:12 47:2 | **writes**  29:18 |
| 58:20 | **walking**  49:25 | 54:11 57:20 | **writing**  23:5 |
| **using**  45:16 | **wall**  19:1,2 | **wichita.gov** | 57:10 |
| **usually**  20:10 | **want**  13:2 47:4 | 58:2 | **written**  19:12 |
| 28:23 29:10 | 48:8 50:21 | **wichita.gov.** | 21:9 |
| 33:15 | **wanted**  21:13 | 3:3 | |
| | 42:21 47:12,16 | | |

**[yeah - yelling]**                                            Page 17

| y |
|---|
| **yeah** 12:16 |
| 16:3 31:8,18 |
| 44:17 48:12 |
| **years** 6:24 7:1 |
| 26:12 38:9,12 |
| 46:12 |
| **yelling** 29:21 |

Federal Rules of Civil Procedure

Rule 30


(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.