Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF KANSAS

3                   AT KANSAS CITY, KANSAS

4

5     MAELLA BLALOCK,    )

6     Plaintiff,         )

7     vs                 ) Case No. 21-CV-02552

8     SRKBS HOTEL, LLC,  )

9     Defendant.         )

10    _____)

11                    DEPOSITION OF

12                   RYAN MASENTHIN

13

14                  August 15, 2023

15                    9:02 a.m.

16

17

18

19                    Taken at:

20        Wichita Police Department - City Hall

21             455 North Main, 13th Floor

22                Wichita, Kansas 67202

23

24

      Job No. CS6045326

25    Kathy R. Bonfiglio, CSR-KS, CSR-MO, RPR

**EXHIBIT 10**

Page 2

```
 1  APPEARANCES:
 2      On behalf of the Plaintiff:
 3          Mr. Jeffrey A. Wilson
 4          DeVaughn James Injury Lawyers
 5          3241 North Toben
 6          Wichita, Kansas 67226
 7          (316)977-9999
 8          Fax: (316)425-0414
 9          jwilson@devaughnjames.com
10
11      On behalf of the Defendant:
12          Ms. Kerry B. Banahan Dagestad
13          Evans & Dixon, LLC
14          211 North Broadway, Suite 2500
15          St. Louis, Missouri 63102
16          (314)552-4023
17          Fax: (314)884-4423
18          kbanahan@evans-dixon.com
19
20      On behalf of the City of Wichita, Kansas:
21          Mr. Erik S. Houghton
22          Deputy City Attorney
23          Department of Law
24          455 North Main, 13th Floor
25          Wichita, Kansas 67202
```

Page 3

```
 1          (316)268-4681
 2          Fax: (316)268-4335
 3          ehoughton@wichita.gov.
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1              TRANSCRIPT INDEX
 2  APPEARANCES..................................  2
 3  INDEX OF EXHIBITS..........................   5
 4
 5  EXAMINATION OF RYAN MASENTHIN:
 6  BY MS. BANAHAN.............................   6
 7  BY MR. WILSON..............................  33
 8  BY MS. BANAHAN.............................  37
 9  BY MR. WILSON..............................  40
10  BY MS. BANAHAN.............................  43
11
12
13
14
15
16
17  REPORTER'S CERTIFICATE.......................  45
18
19  EXHIBIT CUSTODY
20  EXHIBITS RETAINED BY COURT
21
22
23
24
25
```

Page 5

```
 1              INDEX OF EXHIBITS
 2  NUMBER          DESCRIPTION              MARKED
 3  Defendant E    Supplemental Information
 4                 Report re: Case 20C037022     23
 5  Plaintiff 3    Color camera shots 1:49..     33
 6  Plaintiff 4    Color camera shots 1:49..     33
 7  Plaintiff 5    Color camera shots.......     33
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

2 (Pages 2 - 5)

1
2
3          RYAN MASENTHIN,
4 having been first duly sworn on his oath to testify
5 the truth, the whole truth, and nothing but the
6 truth, testifies:
7          DIRECT EXAMINATION
8 BY MS. BANAHAN:
9     Q.  Please state your name for the record.
10    A.  Officer Ryan Masenthin.  ID 2651.
11    Q.  Officer Masenthin, I assume that you are
12 with the City of Wichita Police Department?
13    A.  I am.
14    Q.  How long have you worked in that
15 capacity?
16    A.  It will be five years in January so like
17 4-1/2.
18    Q.  In what capacity are you currently
19 employed with the police department?
20    A.  I am a police patrol officer.
21    Q.  Have you always been a patrol officer?
22    A.  Yes.
23    Q.  Is the City of Wichita the first
24 department that you have worked at?
25    A.  It is.

1     Q.  Did you attend the police academy
2 through the City of Wichita?
3     A.  Yes.
4     Q.  What bureau do you work in?
5     A.  North.
6     Q.  What shift do you work?
7     A.  Fourth.
8     Q.  Have you always worked in the North
9 Bureau?
10    A.  Yes.
11    Q.  Have you always worked the 4th watch?
12    A.  Yes.
13    Q.  Do you currently have a partner?
14    A.  I don't have a partner per se but I
15 ride -- Officer Newland is who I ride with a lot
16 but it's not an official partner.
17    Q.  How does that work with the City of
18 Wichita Police Department in terms of partners
19 versus who you ride with?
20    A.  So some specialty units they will be
21 assigned a partner.  That's like a CRT unit or like
22 Investigations is, but Patrol we don't have any
23 partners.  We're all individually and I would say
24 most patrol officers ride individually, but once
25 you get a little bit senior on a shift we have more

1 capacity and they allow people to double up.
2     Q.  When you do ride with someone, is that
3 person typically Officer Newland?
4     A.  Typically, yes.
5     Q.  Has that been true since 2019?
6     A.  No.  We've probably been riding off and
7 on for the last two, two and a half years.  It
8 wouldn't have been the case for this call.
9     Q.  With regard to this call who would you
10 have riding with at the time?
11    A.  Nobody.
12    Q.  So you just referenced this call.  Do
13 you understand that you are here today pursuant to
14 a subpoena?
15    A.  Yes.
16    Q.  Do you understand that that subpoena
17 relates to an incident on June 20th of 2020?
18    A.  Yes.
19    Q.  Do you understand that that incident
20 included a response to the Super 8 Motel on North
21 Rock Road?
22    A.  I do.
23    Q.  Have you done anything to prepare for
24 your deposition?
25    A.  I have.

1     Q.  What have you done?
2     A.  I spoke with my supervisor or who was on
3 scene at the time and I reviewed my report.
4     Q.  Who was your supervisor?
5     A.  Sergeant Kimble.
6     Q.  Have you reviewed the full police
7 report?
8     A.  My report only.
9     Q.  When you say my report, did you draft a
10 supplemental report?
11    A.  Yes, Supplemental report.  At the time
12 we did a different kind of recordkeeping so I added
13 a supplemental names report as well as my
14 supplemental narrative.
15    Q.  As you sit here today do you have any
16 level of personal recollection as to what occurred
17 on June 20th of 2020?
18    A.  I do.
19    Q.  Can you tell me generally what that
20 personal recollection is?
21    A.  I can't remember the exact time the call
22 came out but it was early in the morning and it was
23 a shooting call that happened at that address, the
24 Super 8.  I believe it's 3741 North Rock.  Several
25 calls were coming in about multiple people being

Page 10

1  shot and shots being fired and I was -- several
2  officers arrived on scene generally around the same
3  time. I was one of those officers that was first
4  on scene and I was directed by bystanders that
5  pointed me in the direction of a neighboring hotel,
6  the Comfort Inn, that said there was people had
7  been shot over in that direction. I ran,
8  physically ran over there. Officer Malcolm and
9  Officer Abasolo arrived on scene in their patrol
10  car. They drove over to that direction. They beat
11  me over there. When I was running over there I
12  heard a loud pop which I thought was a gunfire and
13  when I got over there Officer Abasola and Malcolm
14  had contacted two different individuals. One of
15  those would be Jaylen Thomas and I believe the
16  other gentleman's name is Norwood. I'm not sure on
17  that, and it was discovered that both of those
18  individuals had been shot. I assisted in
19  immediately giving aid to both of those individuals
20  and searching them for weapons. It was discovered
21  that two handguns were thrown over a wall and one
22  of those had appeared to have gone off when it was
23  thrown over, which was the noise I heard, but I
24  didn't have anything to do with those firearms.
25  That was just what was told to me throughout the

Page 11

1  investigation. I assisted the EMS with finding and
2  attending to their injuries and then I rode in the
3  ambulance to Wesley Medical Center with Jaylen.
4  When I got to -- on the way to the hospital I was
5  asking him preliminary questions about like what
6  happened, what was going on. He said that there
7  was a large party in one of the rooms, possibly on
8  the second floor, about 30 people inside the room.
9  The females had asked them to leave or the parties
10  to vacate and then as he exited out, the building's
11  front faces east and there was a door on the south
12  side of the building. In the middle of the complex
13  he says he exited out that door and when he exited
14  out shots were fired and that's all I got out of
15  that interview. I later -- there was another
16  individual, a 3rd individual that was injured at
17  the hotel and he originally drove himself to Wesley
18  Woodlawn. I believe his name was Mishael or
19  however you say, Jackson and then he was
20  transported by EMS from Wesley Woodlawn to Wesley
21  Main. I didn't go into a deep interview with him
22  but I did collect his clothes, get them to lab as
23  well as Jaylen's and then he gave me consent to
24  have his car processed, Jackson did, and the
25  officer at Wesley Woodlawn processed his car. I

Page 12

1  then ran a background check. I did the firearms
2  found in close proximity to Jaylen and it was found
3  that he had a prior felony conviction so I read him
4  Miranda before further talking to him about the
5  incident. After reading him Miranda he agreed to
6  speak with me.
7      Q. I'm going to stop you there --
8      A. Go ahead.
9      Q. -- and kind of back up and we'll go
10  over it a little bit piece by piece.
11      A. Sure.
12      Q. If I'm understanding correctly, you
13  arrived on the scene prior to Officer Malcolm and
14  Abasolo?
15      A. Exactly.
16      Q. And at that point how did you find out
17  about the call at the Super 8 Motel?
18      A. It was dispatched.
19      Q. And so you would have learned then about
20  it over the radio?
21      A. Correct.
22      Q. And when that came in over Dispatch,
23  what was the type of call?
24      A. Shooting call.
25      Q. Is that a typical call that you would

Page 13

1  respond to 4th watch, North Bureau?
2      A. In what regard?
3      Q. Had you responded to the scene of a
4  shooting before?
5      A. Yeah. I do respond to a lot of
6  shootings.
7      Q. Do you know if you had ever responded to
8  a shooting at the Super 8?
9      A. No.
10      Q. That was a bad question. Had you ever
11  responded to a shooting at the Super 8?
12      A. Not that Super 8.
13      Q. I think you testified that when you
14  arrived --
15      A. I'm sorry. I should clarify. Not to
16  my recollection I remember. I don't remember any
17  previous shootings that I've responded to at that
18  Super 8.
19      Q. If I understand correctly, when you
20  arrived at the Super 8, and I'm going to show you
21  what has been marked as Exhibit D, you ran in a
22  southeastern direction?
23      A. I arrived on scene right around here and
24  I ran over to here. This is where Jaylen and I
25  believe another individual, his name was Norwood

4 (Pages 10 - 13)

Page 14

1  were found (indicating.)
2      Q.  I'm going to stop you there since the
3  court reporter is taking down everything we say
4  so --
5      A.  Yes.
6      Q.  -- we just have to make a verbal record
7  of it.  It looks to me like you stated that you
8  arrived at the Super 8 on the southeast corner;
9  fair?
10     A.  Yes.
11     Q.  And then you showed me with your finger
12  that Jaylen and Marion Norwood were eventually --
13     A.  Contacted on the northwest corner of the
14  Comfort Inn Suites property.  It's like between
15  west and northwest.
16     Q.  So where you are pointing on here is
17  west of the Super 8; correct?
18     A.  Correct.
19     Q.  When you first spoke with Marion Norwood
20  and Jaylen Thomas, were they on the property of the
21  Super 8?
22     A.  No.
23     Q.  That loud pop that you heard when you
24  arrived on the property, did you ever recover the
25  source of that loud pop?

Page 15

1      A.  So when I was running I was on the
2  Comfort -- like the north side, just on the north
3  side of the building of the Comfort Inn Suites
4  building and officers had already -- Officer
5  Abasolo and Malcolm, I believe, were riding
6  together and they had already went around me and as
7  soon as they made the corner is when I heard the
8  pop.
9      Q.  I'm going to stop you there.  The
10  corner of the Comfort Inn?
11     A.  The northwest corner of the Comfort Inn
12  and then when I rounded the corner that's when they
13  had already -- two individuals were already laying
14  on the ground.  I never -- to answer your question,
15  I never personally had anything to do with the
16  firearms.  It was just reported to me that they
17  were found on the other side and it appeared that
18  one of them had gone off when it was thrown.
19     Q.  When you say that it appeared that they
20  were found on the other side, the other side of
21  what?
22     A.  The other side of over the wall that's
23  on the west side of this property.
24     Q.  Were those guns that are alleged to have
25  gone off on the property of the Comfort Inn and

Page 16

1  Suites or the Super 8?
2      A.  Well, when I heard the pop it would have
3  been on the Comfort Inn Suites.  I don't know if
4  the ballistics or casings or any of the
5  investigation after the shooting would have tied
6  them back to the Super 8.
7      Q.  Were you involved in any of the
8  investigation of the casings or the bullets and/or
9  their location?
10     A.  I was around on scene but I didn't have
11  any direct involvement in processing any of that.
12     Q.  Did you observe any bullets or casings
13  at the scene?
14     A.  I did.
15     Q.  Where were those located?
16     A.  They were -- that same door on the south
17  side of the Super 8, there was multiple shell
18  casings in this parking lot here right outside that
19  door and I also observed multiple strikes to the
20  south side of the building.
21     Q.  Did you observe any bullets or casings
22  in the Comfort Inn parking lot?
23     A.  I don't recall.  I don't know.
24     Q.  You don't know?
25     A.  I don't know.

Page 17

1      Q.  How long were you on the scene after
2  arriving but before going to the hospital?
3      A.  Very short.  Long enough for EMS to
4  initially treat them and get them into the
5  ambulance and then I was gone.  I had arrived back
6  to the scene to help after my interview and that's
7  when I seen the things that I evidently knew.
8      Q.  Did you accompany Mr. Thomas to the
9  hospital by yourself?
10     A.  Yes.
11     Q.  When you got to the hospital did you
12  follow him to either the Emergency Department or
13  treatment door?
14     A.  Trauma bay, yes.
15     Q.  How long after arriving at the hospital
16  did you interview Mr. Thomas?
17     A.  I can't recall how long of a time span
18  it was at the hospital.  It was a very chaotic
19  scene out there due to the amount of people, the
20  amount of people shot, the amount of people we were
21  dealing with and the amount of officers that we had
22  available to us.  So there was a lot of moving
23  parts.  I'm trying to figure out if the two
24  individuals -- I'm going to call them Norwood just
25  out of simplicity; Norwood and Jaylen, if they were

5 (Pages 14 - 17)

Page 18

1  suspects in there or just sheer victims.  There was
2  trying to figure all that out.  Jaylen ended up not
3  having -- he was shot in the chest, his right upper
4  chest but it was a flesh wound only.  He was
5  released pretty quick.  I would assume -- I can't
6  recall the exact amount of time but I would assume
7  I found out about his Triple I and interviewed him.
8  I can't give a time frame.
9      Q.  What do you mean by Triple I?
10     A.  Triple I is just a criminal record
11  history.
12     Q.  At that point where you were at the
13  hospital and conducting an interview of Jaylen, did
14  you have any knowledge as to whether he had a gang
15  affiliation?
16     A.  I know afterwards I believe that I was
17  informed that he had gang affiliation.  When I ran
18  his name, if he was listed in our database at the
19  time, SPIDER, which is our system with records,
20  they would have informed me that he was a gang
21  member.  Signal 33 is what we would have called it.
22  I can't recall if they would have told me if he was
23  or wasn't.
24     Q.  Do you have any special training in
25  recognizing gang members?

Page 19

1      A.  Just through what I have had in the
2  academy.  I don't have any specialized training
3  outside of that.
4      Q.  Yesterday we deposed Officer Abasolo and
5  it sounded like he has had specialized training in
6  gangs because of what his current position is.
7      A.  He's very knowledgeable on gangs.
8      Q.  Because you specialize in something
9  different, that would not be true in regard to your
10  training with gangs; correct?
11     A.  Correct.
12     Q.  When you arrived on the scene was there
13  anything about the appearance of either Norwood or
14  Thomas that indicated to you that they were members
15  of a gang?
16     A.  Nothing that really spoke out to me
17  immediately.  Colors is something that gang members
18  tend to wear when they associate it with, for
19  example, like Blood gang members tend to wear red.
20  I didn't see -- they weren't wearing all blue or
21  all red.  I believe Jaylen was wearing a white
22  T-shirt, nothing that readily made me think he was
23  a gang member.  There wasn't like -- sometimes if
24  they are throwing a party for like somebody that
25  has died they will wear like a Rest In Peace type

Page 20

1  of shirt with their photo on it.  I didn't see
2  anything.  He may have had tattoos and nothing when
3  I was on the scene that I would identify
4  immediately.
5      Q.  With the color comment that you made if
6  a gang member is wearing either red or blue, does
7  that immediately signal that they are a member of a
8  gang?
9      A.  No.  Just like I'll give an example.
10  Just like if somebody doesn't have their headlights
11  on the car at night doesn't mean they are drunk but
12  it's one clue.
13     Q.  Is color alone enough to signal to the
14  general public that someone might be a member of a
15  gang?
16     A.  To the general public?
17     Q.  Correct.
18         MR. WILSON: Object to form.  You can
19  answer.
20     A.  I don't know.  It could be perceived
21  that way.  If someone was wearing an all blue
22  jumpsuit or something like that or wearing like a
23  bandana or thing that would be kind of, I guess,
24  portrayed that way.
25     Q.  (By Ms. Banahan) Let me ask this.  I

Page 21

1  guess the fact that someone is wearing a red
2  sweatshirt, is that enough to say well, that person
3  must be a Blood?
4         MR. WILSON: Same objection.
5      A.  No.
6      Q.  (By Ms. Banahan) If someone is wearing
7  a blue T-shirt is that enough to say they might be
8  a Crip?
9         MR. WILSON: Same objection.
10     A.  No, in my opinion.
11     Q.  (By Ms. Banahan) How long were you at
12  the hospital with Mr. Thomas?
13     A.  I can't recall.  Probably, if I
14  were -- just based off of a rusty memory being
15  nearly three years ago, probably over an hour.
16     Q.  After that hour period did you then
17  head back to the scene?
18     A.  Yes.
19     Q.  How long were you at the scene once you
20  arrived back?
21     A.  I believe I was on overtime so it was
22  after seven.
23     Q.  After 7:00 a.m.?
24     A.  After 7:00 a.m..
25     Q.  Once you returned back to the scene

6 (Pages 18 - 21)

Page 22

1　what did you do while there?
2　　A.　Because there was such a large scene we
3　had a lot of vehicles blocking off parking lots; a
4　lot of officers assisting with the lab to collect
5　shell casings, to process cars, the building.  So
6　all of that needed, the scene needed to be
7　protected and I assisted with keeping people out of
8　the scene and helping move vehicles and things
9　things like that.  I eventually helped process --
10　at the Wichita Police Department we ask people to
11　sign waivers and ask to search for cars.  Instead
12　of just a verbal response we ask them -- sometimes
13　it's not all the time but in these serious kind of
14　cases we like to have a written form.  So those
15　officers got got written permission to sign the
16　waivers, to document the vehicles or building.  A
17　lot of those officers gave me their written waivers
18　and I submitted those but besides that, besides
19　scene security and turning in some waivers, I
20　didn't do much as far as the investigative part on
21　scene.
22　　Q.　Did you interview any witnesses once you
23　returned back to the scene?
24　　A.　No.
25　　Q.　Did you ever speak with an individual by

Page 23

1　the name of Maella Blalock?
2　　A.　No.
3　　Q.　Did you speak with anyone potentially
4　involved in the shooting other than Jaylen Thomas?
5　　A.　Mr. Jackson, who I previously had
6　mentioned, and then I didn't interview anybody
7　else.
8　　　(Whereupon Defendant's Exhibit E was
9　marked for purposes of identification.)
10　　Q.　I am going to hand you what we'll mark
11　as Defendant's Exhibit E.
12　　A.　That's my report.
13　　Q.　Is that the report that you would have
14　drafted in your capacity as an officer from the
15　City of Wichita following this incident?
16　　A.　Correct.
17　　Q.　Have you reviewed Exhibit E in
18　preparation for today?
19　　A.　Correct.
20　　Q.　I'm going to go over this with you and I
21　want you to just tell me if what is contained in
22　the report is accurate based on your recollection.
23　　A.　Okay.
24　　Q.　"When I arrived on scene I was flagged
25　down by a citizen that was pointing to the west

Page 24

1　side of" and then in parenthesis it says "Comfort
2　Inn and Suites, stating that someone was shot over
3　there."  Is that accurate?
4　　A.　That is correct.
5　　Q.　Do you know who the individual was that
6　flagged you down?
7　　A.　I do not.
8　　Q.　And that individual told you that there
9　was an individual who had been shot and that that
10　individual was at the Comfort Inn and Suites?
11　　A.　Correct.
12　　Q.　Did you later find out that that
13　individual was Jaylen Thomas?
14　　A.　That person that was shot?
15　　Q.　Correct.
16　　A.　Correct.
17　　Q.　As we sit here today do you have any
18　information as to where Jaylen Thomas was when he
19　was shot?
20　　A.　Like specifically?
21　　Q.　Correct.
22　　A.　He told me that he was on Super 8
23　property.
24　　Q.　Do you have any information as to where
25　the shooter was standing?

Page 25

1　　A.　Just from what Jaylen told me.  So
2　Jaylen said that he exited that center door on the
3　south side of the Super 8 and when he stepped out
4　there was a large crowd of people.  He presumed
5　that it was from the party and that he also
6　attended and as soon as he stepped out, his words,
7　20-plus shots were fired.  He was struck.  So by
8　his description it was that it was inside that
9　parking lot on the south side of the Super 8.
10　　Q.　Further down in this report it says, "I
11　then rode with Jaylen inside the ambulance to
12　Wesley Medical Center.  Two guns were located on
13　the other side of a wall that Jaylen and the other
14　male.  It was later found that one of the guns
15　thrown over the wall fired."  Again, is that wall
16　on the property of the Comfort Inn?
17　　A.　I'm assuming that it's on the easement
18　between the two properties.  That wall I'm speaking
19　of is on the Comfort Inn.
20　　Q.　"Jaylen stated that he was at a party
21　but did not know whose party it was."  Jaylen said,
22　"stated that he did not know who fired the shots."
23　As we sit here today do you know the identity of
24　the individual who fired shots at Jaylen?
25　　A.　No.

7 (Pages 22 - 25)

Page 26

1    Q.  Do you know if anyone knows the
2  identity, anyone with the Wichita Police Department
3  knows the identity of the person who fired the
4  shots at Jaylen Thomas or Marion Norwood?
5    A.  I personally don't.
6    Q.  Have you reviewed any security footage
7  in relation to the incident?
8    A.  No.
9    Q.  Have you reviewed any cell phone
10  footage?
11    A.  No.
12    Q.  I'm going to show you what is marked as
13  Plaintiff's Exhibit 1.  Do you recognize Jaylen
14  Thomas in any of these photographs?
15    A.  This could be him (indicating.)
16    Q.  In the white shirt?
17    A.  In the white shirt, yeah.
18    Q.  I'm going to hand you what has been
19  marked as Plaintiff's Exhibit 2.  Do you recognize
20  Jaylen Thomas in any of those photographs?
21    A.  I want to say he was wearing a
22  short-sleeved shirt, not a tank top, but I don't
23  readily -- I photographed him and submitted a photo
24  of him but I don't readily recognize him in any of
25  these photos.

Page 27

1    Q.  Is this the first time that you have
2  seen these photographs?
3    A.  Correct.
4    Q.  I'll represent to you that these are
5  stills from cameras at the Super 8.  Is this the
6  first time that you would have seen any footage
7  from those surveillance cameras?
8    A.  Yes.
9    Q.  Is it fair to say that you do not know
10  anything about the description of the individual
11  accused to have shot Jaylen and/or Marion?
12    A.  Correct.
13    Q.  So then you would not be able to pick
14  out the shooter looking at these still photographs;
15  fair?
16    A.  Correct.  I'll clarify that there was in
17  the call text, in any kind of shooting call there's
18  lots of information that comes in from lots of
19  different calling parties.  I did not have time to
20  read all of the call texts in this particular
21  instance prior to me arriving on scene.  There may
22  have been a description given in that call text of
23  a shooter but I don't recall it.
24    Q.  As we sit here today you don't recall
25  that description?

Page 28

1    A.  No.
2    Q.  Going back to Exhibit E, which is your
3  report, you write, "I asked Jaylen if he knew
4  Norwood had a firearm with him and he said that he
5  did not."  Is that accurate to your recollection?
6    A.  That Norwood didn't have a firearm or
7  just that statement?
8    Q.  That statement.
9    A.  Yes, that is correct.
10    Q.  "Jaylen also said that he was unarmed
11  and never had a firearm."
12    A.  Yes.
13    Q.  "I explained to him that Norwood
14  admitted using his firearm in self-defense but
15  Jaylen still stated that he never shot or had any
16  firearms."  Do you recall him making that
17  statement?
18    A.  Yes.
19    Q.  "I then asked him if we would locate a
20  firearm on the scene and he said they would not."
21  Do you recall him making that statement?
22    A.  Yes.
23    Q.  Did you later determine that Jaylen did
24  have a firearm on the scene?
25    A.  So the firearms would have been

Page 29

1  collected by another officer and I would have
2  assumed that they would have been submitted for
3  prints and DNA.  I have no idea if they came back
4  to Jaylen or not.
5    Q.  To the best of your knowledge, was it
6  Jaylen's position that he was unaware that Marion
7  Norwood was armed at the party?
8    A.  That is his position, yes.
9    Q.  Did you speak with or see any of the
10  other party goers?
11    A.  Yes.  There was still several people on
12  scene when we arrived.  I couldn't give you any
13  description of them, though.
14    Q.  When you arrived on scene for the first
15  time?
16    A.  Correct.
17    Q.  When you arrived back on scene for the
18  second time did you speak with any of those party
19  goers?
20    A.  No.
21    Q.  Do you have any information about the
22  injuries sustained by Maella Blalock?
23    A.  I do.
24    Q.  What information is that?
25    A.  I was informed that via radio traffic

8 (Pages 26 - 29)

Page 30

1  and afterwards kind of a debrief that there was --
2  she was sleeping -- I believe she was out of town,
3  traveling here for work or something similar to
4  that and she was sleeping in her room at the Super
5  8 when a bullet went through from the outside on
6  the south side and her room was adjacent or was
7  part of that south side of the apartment or the
8  hotel complex. I'm not sure what floor she was on.
9  Actually, I think she was on the first floor but I
10 could be wrong and then she was shot through both
11 of her feet.
12     Q.  Where did you learn that information?
13     A.  I don't know.
14     Q.  Do you know who shot Maella Blalock?
15     A.  No.
16     Q.  Do you know with what gun Maella
17 Blalock was shot?
18     A.  No.
19     Q.  Do you know the position of the shooter
20 when the gun was fired that ultimately made contact
21 with Maella Blalock?
22     A.  Just with my experience with
23 ballistics, they would have had to have been on the
24 south side of that building somewhere.
25     Q.  Do you know if any investigation was

Page 31

1  conducted to determine what gun was fired -- well,
2  strike that.
3         Do you know if any investigation into
4  the bullet that struck Maella Blalock was conducted
5  by the Wichita Police Department?
6     A.  I can only assume that there would have
7  been.
8     Q.  Do you know if any arrests were made in
9  connection with this case?
10    A.  No, I don't.
11    Q.  Do you know if any convictions were
12 secured in this case?
13    A.  I believe there have been no
14 convictions.
15    Q.  Do you know if the identity of the
16 individual who shot Jaylen Thomas has ever been
17 discovered?
18    A.  I don't.
19    Q.  Do you know whether there was an
20 altercation on the parking lot between Jaylen
21 Thomas, Marion Norwood and another individual?
22    A.  So through Jaylen's interview he put
23 himself as a complete bystander victim. I
24 personally don't believe that, but that's just a
25 personal belief. I have no idea of his involvement

Page 32

1  actually. It would be interesting to see the
2  footage, but from his standpoint he said that he
3  exited the door. This was through the Miranda
4  interview, sorry, he exited the door on the south
5  side of the Super 8 and there was a disturbance
6  between a group of males and females and then shots
7  were fired, lots of shots. I believe he said
8  20-plus. He said that he was struck with one of
9  those. He hid behind the car and was struck with
10 one of those rounds and he was unarmed and he
11 claimed to not be part of any of it.
12    Q.  And you stated you did not believe him,
13 though?
14    A.  I did not believe him.
15    Q.  Why not?
16    A.  I could say through my training and
17 experience just the type of cooperation and I do a
18 lot of different kinds of interviews. My primary
19 beat is Wesley Medical Center, it contains that, so
20 I respond to a lot of shooting victims so I
21 interview a lot of people and it was just a hunch
22 on my belief. There's no -- it's just through my
23 training and experience I believe he had more to do
24 with the altercation than he perceived himself but
25 there's no factual. That's just a belief on my

Page 33

1  end.
2     Q.  Officer, I think that's all I have for
3  you for now. I'm sure Mr. Wilson has some
4  follow-up questions.
5             CROSS EXAMINATION
6  BY MR. WILSON:
7     Q.  Let's mark Exhibits 3, 4 and 5.
8         (Whereupon Deposition Exhibit Nos. 3, 4
9  and 5 were marked for purposes of identification.)
10    Q.  Officer, I've handed you what has been
11 marked Exhibits 3, 4, and 5.
12    A.  Yes.
13    Q.  Do you recognize any of the individuals
14 in these still shots from this?
15    A.  Yes, I do.
16    Q.  Who do you recognize and which exhibit?
17    A.  Well, right off, 5 and 3. These are the
18 two individuals that I contacted on the west side
19 of the Comfort Inn.
20    Q.  Is one of them Jaylen Thomas?
21    A.  Yes.
22    Q.  Do you know if the other one is Marion
23 Norwood?
24    A.  Just based off my report and me asking
25 Jaylen if Norwood has a gun, I'm assuming that at

9 (Pages 30 - 33)

Page 34

1  the time I knew that the other individual was
2  Norwood. I could not tell that the male in the red
3  shoes was Norwood but I would believe it was and it
4  was the male that was shot in the leg on the other
5  side of the Comfort Inn.
6      Q.  So you can't say with 100 percent
7  certainty who it is but you know it was a male?
8      A.  Yes.
9      Q.  If the other reports in the case
10  indicate that was Norwood --
11      A.  That would be correct.
12      Q.  I wanted to play a video from the hotel
13  footage. First of all, I'm going to stop right
14  there. This is time stamped camera three, time
15  stamped at 2:33 a.m. and 36 seconds. Do you
16  recognize the scene that this depicts?
17      A.  Yes.
18      Q.  What is it?
19      A.  That would be the southeast out of that
20  center door of the Super 8.
21      Q.  So the south door of the Super 8?
22      A.  Yes.
23      Q.  So the sidewalk area we see, is that
24  just outside that south door?
25      A.  I would assume so.

Page 35

1      Q.  I'm going to play a little bit of this
2  and ask you questions about it. It's a little
3  choppy for some reason but we should be able to
4  see. I'll pause it there. Do you recognize any of
5  these individuals? This is at 2:33 and 43 seconds.
6      A.  I recognize that male in the red is
7  carrying a gun. I do not recognize any other
8  individuals, though.
9      Q.  And you just saw an event that occurred
10  and I paused it at 2:33 and 52 seconds. Did you
11  observe the individual in the red hoody or
12  long-sleeve shirt fire his firearm?
13      A.  Correct.
14      Q.  He was standing on the sidewalk just
15  outside the south door of the Super 8 Hotel?
16      A.  Correct.
17          MR. WILSON: Are you going to want to use
18  this?
19          (Off the record discussion.)
20      Q.  What I'm going to show you now is footage
21  taken by a guest at the hotel from the second floor
22  on the cell phone. Have you ever seen such a video
23  before?
24      A.  No.
25          (Whereupon the video was played.)

Page 36

1      Q.  So I was hoping to be able to pause it to
2  see the other people that were firing shots. I
3  couldn't quite get a good shot of that but based on
4  what you just saw and the video you watched before
5  that, do you believe all the shots were fired from
6  the Super 8 property?
7      A.  Yes.
8      Q.  Earlier you were asked about whether any
9  casings were found on the Comfort Inn Suites
10  property. Is it fair to state you are relying on
11  your memory to answer that question?
12      A.  Yes.
13      Q.  If other documents in the case, for
14  instance the CSI report, documents all the evidence
15  was found, those indicate one casing was found on
16  the Eagle Rock Apartments property, you wouldn't
17  have any reason to dispute that, would you?
18      A.  No.
19      Q.  If the evidence from that CSI lab report
20  indicates that all of the other shell casings were
21  found on the Super 8 property you wouldn't have any
22  reason to dispute that either?
23      A.  No.
24      Q.  Earlier you were asked about a statement
25  in your report where Jaylen Thomas said that he

Page 37

1  didn't have a firearm, he didn't fire a firearm and
2  I want to make sure your answer was clear. You
3  were asked was that correct. When you answered
4  yes, were you saying that statement in your report
5  is correct, like you said it correctly or were you
6  saying that you can confirm that Jaylen did not in
7  fact have a firearm?
8      A.  I was confirming that Jaylen reported
9  that to me. I don't know the actual truth, just
10  Jaylen's perspective, what he told me.
11      Q.  Those are all the questions I have.
12          REDIRECT EXAMINATION
13  BY MS. BANAHAN:
14      Q.  Officer, we just watched two separate
15  videos; correct?
16      A.  Uh-huh.
17      Q.  In the first video how many shooters
18  did you see?
19      A.  One that I recall.
20      Q.  In which direction was that shooter
21  firing?
22      A.  South and southwest.
23      Q.  Away from the Super 8; correct?
24      A.  Correct.
25      Q.  So the video that we watched, would it

Page 38

1  be your opinion that any of the shots we saw fired
2  could have impacted the Super 8 behind him?
3      A.  From the first video?
4      Q.  Correct.
5      A.  Yeah.
6      Q.  In the second video how many shooters
7  did you see?
8      A.  I only got to watch the one time and I
9  don't know.
10     Q.  Was the only shooter that you could
11 clearly see the individual that was also in the
12 first video?
13     A.  My eyes were trained on him during that
14 time.  If I could examine it one more time I might
15 be able to identify more but at this time I can't.
16     Q.  Do you want to watch it again?
17     MR. WILSON: It will take me a second to
18 pull it up but yeah, we can pull it up.
19     (Whereupon video clip from cell phone
20 played.)
21     A.  It looks like there was a male wearing a
22 white T-shirt that had his arm like this.  Could
23 have been firing but I couldn't tell for sure.
24     Q.  (By Ms. Banahan) So in that video is
25 the only person who you can tell for sure firing,

Page 39

1  that is firing a firearm the individual in the red
2  shirt?
3      A.  Yes.
4      Q.  Is that individual firing away from the
5  Super 8?
6      A.  Yeah.  He may have fired a few at the
7  ground but I don't believe that -- unless it was a
8  ricochet, I don't believe any of them would have
9  directly impacted the Super 8.
10     Q.  Is it your understanding that another
11 individual was firing a gun somewhere else towards
12 the Super 8?
13     A.  Evidence would show that, yes.
14     Q.  But in that video we can't see that
15 individual; correct?
16     A.  Correct.
17     Q.  That video gives us a fairly extensive
18 view of the Super 8 parking lot; correct?
19     A.  Yes.
20     Q.  But in watching that you would agree
21 with me that we actually did not see an individual
22 standing in that area of the parking lot firing the
23 gun; correct?
24     A.  Unless the male wearing the white shirt
25 was pointing the gun back towards the guy in the

Page 40

1  red.  I couldn't tell if he was holding a firearm
2  and doing this or not, but in that, other than that
3  I couldn't see anybody readily firing in that view.
4      Q.  To narrow that response down a little
5  bit, would it be fair to say that in that video
6  that we just watched which shows the Super 8
7  parking lot, you could not see an individual firing
8  shots in the northbound direction?
9      A.  Correct.
10     Q.  That's all I have for you.
11         RECROSS EXAMINATION
12 BY MR. WILSON:
13     Q.  Let's take one more look at this video.
14 Do you recognize any of the individuals time
15 stamped four seconds in this video?
16     A.  Can I look at Exhibit 5 again?
17     Q.  Sure.
18     A.  Go to the next frame.  This person here
19 could be Jaylen but I couldn't confirm.  That does
20 appear to be Jaylen.
21     Q.  I fast forwarded to five seconds in the
22 video.  So at five seconds there's a group of
23 people and kind of a gentleman standing to the far
24 right of the group just behind the white -- looks
25 like a convertible car.  You think that might be

Page 41

1  Jaylen?
2      A.  Correct.
3      Q.  Is that based on looking at Exhibit 5?
4      A.  Correct.
5      Q.  Well, let me back up a little bit first.
6  As we play this video we go to three seconds.  I
7  want you to keep an eye on the Comfort Inn parking
8  lot.  Tell me, do you see anybody standing there?
9      A.  I do not see anybody.
10     Q.  Now, I believe, if you will agree with
11 me, watching the video it appears that the
12 individual in the long-sleeved shirt or hoody who
13 fired his firearm was having an argument with
14 someone?
15     A.  Yes.
16     Q.  Based on the fact there's a group of
17 people in the Super 8 parking lot and we can see no
18 one in the Comfort Inn parking lot, do you agree
19 with me most likely the individual in the red hoody
20 or long-sleeved shirt was arguing with somebody in
21 the Super 8 parking lot?
22     A.  I would.
23     Q.  Go a little bit further.  I fast
24 forwarded to 15 seconds in the video.  So we see
25 this individual that ultimately fired shots at

11 (Pages 38 - 41)

1  20 seconds in this video approach some of the
2  people from the group.  Do you agree?
3      A.  Yes.
4      Q.  This gentleman, I believe, is on
5  Exhibit 4.
6      A.  I recognize him on Exhibit 5 as well.
7      Q.  We're talking about the gentleman
8  standing furthest to the south at
9  21 seconds in the video?
10     A.  Correct.
11     Q.  A little unorthodox.  So fast forward a
12 little bit further.  I guess my last question to
13 you, officer, I know you didn't make a
14 determination of who fired the shots, where they
15 were standing, but if other officers who were
16 involved in the investigation would say they
17 identified three people who were shooting on the
18 property; Norwood, Thomas and this unidentified
19 individual in the long-sleeved shirt, would you
20 have any reason to dispute?
21         MS. BANAHAN: Object to the form of the
22 question.  You can answer.
23     A.  I would have no reason to.
24     Q.  (By Mr. Wilson) Do you know what the
25 colors are for the Gangster Disciple gang, GD?

---

1      A.  I should.
2      Q.  If you don't it's no problem.  I'm just
3  curious.
4      A.  I don't want to give a wrong answer.
5      Q.  Fair enough.  That's all I have for you .
6         REDIRECT EXAMINATION
7  BY MS. BANAHAN:
8      Q.  Officer, just to follow up, I asked you
9  some questions about the video that you watched;
10 correct?
11     A.  Yes.
12     Q.  Then we just went over those videos again
13 kind frame by frame fashion; correct?
14     A.  Correct.
15     Q.  Did that change any of your answers to my
16 previous questions?
17     A.  No.
18     Q.  That' all I have.
19         MR. HOUGHTON: We will read and sign.
20         (Whereupon deposition proceedings were
21 concluded at 10:20 a.m.)
22
23
24
25

---

1  I have read or had read to me the foregoing
2  testimony record on pages 6 to 43, inclusive, and
3  the same is true and correct to my knowledge and
4  belief.
5
6      _____
7      RYAN MASENTHIN
8
9
10 STATE OF_____)
11 _____COUNTY)
12 Subscribed and sworn to before me, the undersigned
13 authority this___day of_____, 2023.
14
15
16 _____
17 Notary Public
18
19 _____
20 (Commission Expires)
21
22
23
24
25 Job No. CS6045326
   Blalock vs SRKBS Hotel, LLC

---

1         CERTIFICATE
2  STATE OF KANSAS)
3  SEDGWICK COUNTY)
4      I, Kathy R. Bonfiglio, a Certified Shorthand
5  Reporter for the State of Kansas, do hereby certify
6  that the within-named witness was by me first duly
7  sworn to testify the truth, that the testimony
8  given in response to the questions propounded, as
9  herein set forth, was first taken in machine
10 shorthand and reduced to writing with
11 computer-aided transcription, and is a true and
12 correct record of the testimony given by the
13 witness.  I certify that review of the testimony
14 was requested by the parties.  If any changes are
15 made by the deponent during the time period
16 allowed, they will be appended to the transcript.
17     I further certify that I am not a relative or
18 employee or attorney of any of the parties, or
19 financially interested in the action.
20     WITNESS my hand and official seal at Wichita,
21 Sedgwick County, Kansas, this 21st day
22 of August, 2023.
23
24     Kathy R. Bonfiglio, CSR RPR
25     VERITEXT LEGAL SOLUTIONS

---

12 (Pages 42 - 45)

Page 46

1  Eric Houghton, Esq.
2  ehoughton@wichita.gov
3        August 21, 2023
4  RE:   Blalock, Maella v. SBKBS Hotel, LLC
5    8/15/2023, Ryan Masenthin (#6045326)
6     The above-referenced transcript is available for
7  review.
8      Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12     The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  erratas-cs@veritext.com
16
17   Return completed errata within 30 days from
18  receipt of testimony.
19    If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22        Yours,
23        Veritext Legal Solutions
24
25

Page 47

1  Blalock, Maella v. SBKBS Hotel, LLC
2  Ryan Masenthin (#6045326)
3        E R R A T A   S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  Ryan Masenthin              Date
25

13 (Pages 46 - 47)

| & | 3 | 63102  2:15 | above  46:6 |
|---|---|---|---|

**&**

**&**  2:13

**0**

**02552**  1:7

**1**

**1**  26:13
**100**  34:6
**10:20**  43:21
**13th**  1:21 2:24
**15**  1:14 41:24
**17979**  45:23
**1:49**  5:5,6

**2**

**2**  4:2 26:19
**20**  25:7 32:8
  42:1
**2019**  8:5
**2020**  8:17 9:17
**2023**  1:14
  44:13 45:22
  46:3
**20c037022**  5:4
**20th**  8:17 9:17
**21**  1:7 42:9
  46:3
**211**  2:14
**21st**  45:21
**23**  5:4
**2500**  2:14
**2651**  6:10
**268-4335**  3:2
**268-4681**  3:1
**2:33**  34:15 35:5
  35:10

**3**

**3**  5:5 33:7,8,11
  33:17
**30**  11:8 46:17
**314**  2:16,17
**316**  2:7,8 3:1,2
**3241**  2:5
**33**  4:7 5:5,6,7
  18:21
**36**  34:15
**37**  4:8
**3741**  9:24
**3rd**  11:16

**4**

**4**  5:6 33:7,8,11
  42:5
**4-1/2**  6:17
**40**  4:9
**425-0414**  2:8
**43**  4:10 35:5
  44:2
**45**  4:17
**455**  1:21 2:24
**4th**  7:11 13:1

**5**

**5**  4:3 5:7 33:7,9
  33:11,17 40:16
  41:3 42:6
**52**  35:10
**552-4023**  2:16

**6**

**6**  4:6 44:2
**6045326**  46:5
  47:2

**63102**  2:15
**67202**  1:22
  2:25
**67226**  2:6

**7**

**7:00**  21:23,24

**8**

**8**  8:20 9:24
  12:17 13:8,11
  13:12,18,20
  14:8,17,21
  16:1,6,17
  24:22 25:3,9
  27:5 30:5 32:5
  34:20,21 35:15
  36:6,21 37:23
  38:2 39:5,9,12
  39:18 40:6
  41:17,21
**8/15/2023**  46:5
**884-4423**  2:17

**9**

**977-9999**  2:7
**9:02**  1:15

**a**

**a.m.**  1:15 21:23
  34:15 43:21
**a.m..**  21:24
**abasola**  10:13
**abasolo**  10:9
  12:14 15:5
  19:4
**able**  27:13 35:3
  36:1 38:15

**above**  46:6
**academy**  7:1
  19:2
**accompany**
  17:8
**accuracy**  46:9
**accurate**  23:22
  24:3 28:5
**accused**  27:11
**acknowledg...**
  46:12
**action**  45:19
**actual**  37:9
**actually**  30:9
  32:1 39:21
**added**  9:12
**address**  9:23
**adjacent**  30:6
**admitted**  28:14
**affiliation**
  18:15,17
**ago**  21:15
**agree**  39:20
  41:10,18 42:2
**agreed**  12:5
**ahead**  12:8
**aid**  10:19
**aided**  45:11
**alleged**  15:24
**allotted**  46:20
**allow**  8:1
**allowed**  45:16
**altercation**
  31:20 32:24

**ambulance**
11:3 17:5
25:11
**amount** 17:19
17:20,20,21
18:6
**answer** 15:14
20:19 36:11
37:2 42:22
43:4
**answered** 37:3
**answers** 43:15
**anybody** 23:6
40:3 41:8,9
**apartment** 30:7
**apartments**
36:16
**appear** 40:20
**appearance**
19:13
**appearances**
2:1 4:2
**appeared** 10:22
15:17,19
**appears** 41:11
**appended**
45:16
**applicable** 46:8
**approach** 42:1
**area** 34:23
39:22
**arguing** 41:20
**argument**
41:13

**arm** 38:22
**armed** 29:7
**arrests** 31:8
**arrived** 10:2,9
12:13 13:14,20
13:23 14:8,24
17:5 19:12
21:20 23:24
29:12,14,17
**arriving** 17:2
17:15 27:21
**asked** 11:9 28:3
28:19 36:8,24
37:3 43:8
**asking** 11:5
33:24
**assigned** 7:21
**assisted** 10:18
11:1 22:7
**assisting** 22:4
**associate** 19:18
**assume** 6:11
18:5,6 31:6
34:25
**assumed** 29:2
**assuming** 25:17
33:25
**attached** 46:11
**attend** 7:1
**attended** 25:6
**attending** 11:2
**attorney** 2:22
45:18 46:13
**august** 1:14
45:22 46:3

**authority** 44:13
**available** 17:22
46:6

**b**

**b** 2:12
**back** 12:9 16:6
17:5 21:17,20
21:25 22:23
28:2 29:3,17
39:25 41:5
**background**
12:1
**bad** 13:10
**ballistics** 16:4
30:23
**banahan** 2:12
4:6,8,10 6:8
20:25 21:6,11
37:13 38:24
42:21 43:7
**bandana** 20:23
**based** 21:14
23:22 33:24
36:3 41:3,16
**bay** 17:14
**beat** 10:10
32:19
**behalf** 2:2,11
2:20
**belief** 31:25
32:22,25 44:4
**believe** 9:24
10:15 11:18
13:25 15:5
18:16 19:21

21:21 30:2
31:13,24 32:7
32:12,14,23
34:3 36:5 39:7
39:8 41:10
42:4
**best** 29:5
**bit** 7:25 12:10
35:1 40:5 41:5
41:23 42:12
**blalock** 1:5
23:1 29:22
30:14,17,21
31:4 44:25
46:4 47:1
**blocking** 22:3
**blood** 19:19
21:3
**blue** 19:20 20:6
20:21 21:7
**bonfiglio** 1:25
45:4,24
**broadway** 2:14
**building** 11:12
15:3,4 16:20
22:5,16 30:24
**building's**
11:10
**bullet** 30:5 31:4
**bullets** 16:8,12
16:21
**bureau** 7:4,9
13:1
**bystander**
31:23

**bystanders**
 10:4

**c**

**call** 8:8,9,12
 9:21,23 12:17
 12:23,24,25
 17:24 27:17,17
 27:20,22
**called** 18:21
**calling** 27:19
**calls** 9:25
**camera** 5:5,6,7
 34:14
**cameras** 27:5,7
**capacity** 6:15
 6:18 8:1 23:14
**car** 10:10 11:24
 11:25 20:11
 32:9 40:25
**carrying** 35:7
**cars** 22:5,11
**case** 1:7 5:4 8:8
 31:9,12 34:9
 36:13
**cases** 22:14
**casing** 36:15
**casings** 16:4,8
 16:12,18,21
 22:5 36:9,20
**cell** 26:9 35:22
 38:19
**center** 11:3
 25:2,12 32:19
 34:20

**certainty** 34:7
**certificate** 4:17
 45:1
**certified** 45:4
**certify** 45:5,13
 45:17
**change** 43:15
 47:4,7,10,13,16
 47:19
**changes** 45:14
 46:10
**chaotic** 17:18
**check** 12:1
**chest** 18:3,4
**choppy** 35:3
**citizen** 23:25
**city** 1:3,20 2:20
 2:22 6:12,23
 7:2,17 23:15
**claimed** 32:11
**clarify** 13:15
 27:16
**clear** 37:2
**clearly** 38:11
**clip** 38:19
**close** 12:2
**clothes** 11:22
**clue** 20:12
**collect** 11:22
 22:4
**collected** 29:1
**color** 5:5,6,7
 20:5,13
**colors** 19:17
 42:25

**comes** 27:18
**comfort** 10:6
 14:14 15:2,3
 15:10,11,25
 16:3,22 24:1
 24:10 25:16,19
 33:19 34:5
 36:9 41:7,18
**coming** 9:25
**comment** 20:5
**commission**
 44:20
**complete** 31:23
**completed**
 46:17
**complex** 11:12
 30:8
**computer**
 45:11
**concluded**
 43:21
**conducted** 31:1
 31:4
**conducting**
 18:13
**confirm** 37:6
 40:19
**confirming**
 37:8
**connection**
 31:9
**consent** 11:23
**contact** 30:20
**contacted**
 10:14 14:13

 33:18
**contained**
 23:21
**contains** 32:19
**convertible**
 40:25
**conviction** 12:3
**convictions**
 31:11,14
**cooperation**
 32:17
**copies** 46:14
**corner** 14:8,13
 15:7,10,11,12
**correct** 12:21
 14:17,18 19:10
 19:11 20:17
 23:16,19 24:4
 24:11,15,16,21
 27:3,12,16
 28:9 29:16
 34:11 35:13,16
 37:3,5,15,23,24
 38:4 39:15,16
 39:18,23 40:9
 41:2,4 42:10
 43:10,13,14
 44:3 45:12
**correctly** 12:12
 13:19 37:5
**counsel** 46:14
**county** 44:11
 45:3,21
**court** 1:1 4:20
 14:3

| | | | |
|---|---|---|---|
| **criminal** 18:10 | 6:19,24 7:18 | **discussion** | **eagle** 36:16 |
| **crip** 21:8 | 17:12 22:10 | 35:19 | **earlier** 36:8,24 |
| **cross** 33:5 | 26:2 31:5 | **dispatch** 12:22 | **early** 9:22 |
| **crowd** 25:4 | **depicts** 34:16 | **dispatched** | **easement** 25:17 |
| **crt** 7:21 | **deponent** 45:15 | 12:18 | **east** 11:11 |
| **cs** 46:15 | 46:13 | **dispute** 36:17 | **ehoughton** 3:3 |
| **cs6045326** 1:24 | **deposed** 19:4 | 36:22 42:20 | 46:2 |
| 44:24 | **deposing** 46:13 | **district** 1:1,2 | **either** 17:12 |
| **csi** 36:14,19 | **deposition** 1:11 | **disturbance** | 19:13 20:6 |
| **csr** 1:25,25 | 8:24 33:8 | 32:5 | 36:22 |
| 45:24 | 43:20 | **dixon** 2:13 | **emergency** |
| **curious** 43:3 | **deputy** 2:22 | **dixon.com** 2:18 | 17:12 |
| **current** 19:6 | **description** 5:2 | **dna** 29:3 | **employed** 6:19 |
| **currently** 6:18 | 25:8 27:10,22 | **document** | **employee** 45:18 |
| 7:13 | 27:25 29:13 | 22:16 | **ems** 11:1,20 |
| **custody** 4:19 | **determination** | **documents** | 17:3 |
| **cv** 1:7 | 42:14 | 36:13,14 | **ended** 18:2 |
| **d** | **determine** | **doing** 40:2 | **eric** 46:1 |
| **d** 13:21 | 28:23 31:1 | **door** 11:11,13 | **erik** 2:21 |
| **dagestad** 2:12 | **devaughn** 2:4 | 16:16,19 17:13 | **errata** 46:11,13 |
| **database** 18:18 | **devaughnjam...** | 25:2 32:3,4 | 46:17 |
| **date** 47:24 | 2:9 | 34:20,21,24 | **erratas** 46:15 |
| **day** 44:13 | **died** 19:25 | 35:15 | **esq** 46:1 |
| 45:21 | **different** 9:12 | **double** 8:1 | **evans** 2:13,18 |
| **days** 46:17 | 10:14 19:9 | **draft** 9:9 | **event** 35:9 |
| **dealing** 17:21 | 27:19 32:18 | **drafted** 23:14 | **eventually** |
| **debrief** 30:1 | **direct** 6:7 16:11 | **drove** 10:10 | 14:12 22:9 |
| **deep** 11:21 | **directed** 10:4 | 11:17 | **evidence** 36:14 |
| **defendant** 1:9 | **direction** 10:5 | **drunk** 20:11 | 36:19 39:13 |
| 2:11 5:3 | 10:7,10 13:22 | **due** 17:19 | **evidently** 17:7 |
| **defendant's** | 37:20 40:8 | **duly** 6:4 45:6 | **exact** 9:21 18:6 |
| 23:8,11 | **directly** 39:9 | **e** | **exactly** 12:15 |
| **defense** 28:14 | **disciple** 42:25 | **e** 5:3 23:8,11,17 | **examination** |
| **department** | **discovered** | 28:2 47:3,3,3 | 4:5 6:7 33:5 |
| 1:20 2:23 6:12 | 10:17,20 31:17 | | 37:12 40:11 |

43:6
**examine** 38:14
**example** 19:19
  20:9
**exhibit** 4:19
  13:21 23:8,11
  23:17 26:13,19
  28:2 33:8,16
  40:16 41:3
  42:5,6
**exhibits** 4:3,20
  5:1 33:7,11
**exited** 11:10,13
  11:13 25:2
  32:3,4
**experience**
  30:22 32:17,23
**expires** 44:20
**explained**
  28:13
**extensive** 39:17
**eye** 41:7
**eyes** 38:13

### f

**faces** 11:11
**fact** 21:1 37:7
  41:16
**factual** 32:25
**fails** 46:19
**fair** 14:9 27:9
  27:15 36:10
  40:5 43:5
**fairly** 39:17
**far** 22:20 40:23

**fashion** 43:13
**fast** 40:21
  41:23 42:11
**fax** 2:8,17 3:2
**feet** 30:11
**felony** 12:3
**females** 11:9
  32:6
**figure** 17:23
  18:2
**financially**
  45:19
**find** 12:16
  24:12
**finding** 11:1
**finger** 14:11
**fire** 35:12 37:1
**firearm** 28:4,6
  28:11,14,20,24
  35:12 37:1,1,7
  39:1 40:1
  41:13
**firearms** 10:24
  12:1 15:16
  28:16,25
**fired** 10:1
  11:14 25:7,15
  25:22,24 26:3
  30:20 31:1
  32:7 36:5 38:1
  39:6 41:13,25
  42:14
**firing** 36:2
  37:21 38:23,25
  39:1,4,11,22

40:3,7
**first** 6:4,23
  10:3 14:19
  27:1,6 29:14
  30:9 34:13
  37:17 38:3,12
  41:5 45:6,9
**five** 6:16 40:21
  40:22
**flagged** 23:24
  24:6
**flesh** 18:4
**floor** 1:21 2:24
  11:8 30:8,9
  35:21
**follow** 17:12
  33:4 43:8
**following** 23:15
**footage** 26:6,10
  27:6 32:2
  34:13 35:20
**foregoing** 44:1
**form** 20:18
  22:14 42:21
**forth** 45:9
**forward** 42:11
**forwarded**
  40:21 41:24
**found** 12:2,2
  14:1 15:17,20
  18:7 25:14
  36:9,15,15,21
**four** 40:15
**fourth** 7:7

**frame** 18:8
  40:18 43:13,13
**front** 11:11
**full** 9:6
**further** 12:4
  25:10 41:23
  42:12 45:17
**furthest** 42:8

### g

**gang** 18:14,17
  18:20,25 19:15
  19:17,19,23
  20:6,8,15
  42:25
**gangs** 19:6,7,10
**gangster** 42:25
**gd** 42:25
**general** 20:14
  20:16
**generally** 9:19
  10:2
**gentleman**
  40:23 42:4,7
**gentleman's**
  10:16
**give** 18:8 20:9
  29:12 43:4
**given** 27:22
  45:8,12
**gives** 39:17
**giving** 10:19
**go** 11:21 12:8,9
  23:20 40:18
  41:6,23

**goers**  29:10,19
**going**  11:6 12:7
   13:20 14:2
   15:9 17:2,24
   23:10,20 26:12
   26:18 28:2
   34:13 35:1,17
   35:20
**good**  36:3
**ground**  15:14
   39:7
**group**  32:6
   40:22,24 41:16
   42:2
**guess**  20:23
   21:1 42:8,12
**guest**  35:21
**gun**  30:16,20
   31:1 33:25
   35:7 39:11,23
   39:25
**gunfire**  10:12
**guns**  15:24
   25:12,14
**guy**  39:25

**h**

**h**  47:3
**half**  8:7
**hall**  1:20
**hand**  23:10
   26:18 45:20
**handed**  33:10
**handguns**
   10:21

**happened**  9:23
   11:6
**head**  21:17
**headlights**
   20:10
**heard**  10:12,23
   14:23 15:7
   16:2
**help**  17:6
**helped**  22:9
**helping**  22:8
**hid**  32:9
**history**  18:11
**holding**  40:1
**hoody**  35:11
   41:12,19
**hoping**  36:1
**hospital**  11:4
   17:2,9,11,15,18
   18:13 21:12
**hotel**  1:8 10:5
   11:17 30:8
   34:12 35:15,21
   44:25 46:4
   47:1
**houghton**  2:21
   43:19 46:1
**hour**  21:15,16
**huh**  37:16
**hunch**  32:21

**i**

**idea**  29:3 31:25
**identification**
   23:9 33:9

**identified**
   42:17
**identify**  20:3
   38:15
**identity**  25:23
   26:2,3 31:15
**immediately**
   10:19 19:17
   20:4,7
**impacted**  38:2
   39:9
**incident**  8:17
   8:19 12:5
   23:15 26:7
**included**  8:20
**inclusive**  44:2
**index**  4:1,3 5:1
**indicate**  34:10
   36:15
**indicated**  19:14
**indicates**  36:20
**indicating**  14:1
   26:15
**individual**
   11:16,16 13:25
   22:25 24:5,8,9
   24:10,13 25:24
   27:10 31:16,21
   34:1 35:11
   38:11 39:1,4
   39:11,15,21
   40:7 41:12,19
   41:25 42:19
**individually**
   7:23,24

**individuals**
   10:14,18,19
   15:13 17:24
   33:13,18 35:5
   35:8 40:14
**information**
   5:3 24:18,24
   27:18 29:21,24
   30:12
**informed**  18:17
   18:20 29:25
**initially**  17:4
**injured**  11:16
**injuries**  11:2
   29:22
**injury**  2:4
**inn**  10:6 14:14
   15:3,10,11,25
   16:3,22 24:2
   24:10 25:16,19
   33:19 34:5
   36:9 41:7,18
**inside**  11:8
   25:8,11
**instance**  27:21
   36:14
**interested**
   45:19
**interesting**
   32:1
**interview**  11:15
   11:21 17:6,16
   18:13 22:22
   23:6 31:22
   32:4,21

| | | | |
|---|---|---|---|
| **interviewed** 18:7 | **jaylen's** 11:23 29:6 31:22 37:10 | 37:9 38:9 42:13,24 | **locate** 28:19 |
| **interviews** 32:18 | **jeffrey** 2:3 | **knowledge** 18:14 29:5 44:3 | **located** 16:15 25:12 |
| **investigation** 11:1 16:5,8 30:25 31:3 42:16 | **job** 1:24 44:24 | | **location** 16:9 |
| | **jumpsuit** 20:22 | **knowledgeable** 19:7 | **long** 6:14 17:1 17:3,15,17 21:11,19 35:12 41:12,20 42:19 |
| | **june** 8:17 9:17 | **knows** 26:1,3 | |
| **investigations** 7:22 | **jwilson** 2:9 | **ks** 1:25 | **look** 40:13,16 |
| **investigative** 22:20 | **k** | **l** | **looking** 27:14 41:3 |
| **involved** 16:7 23:4 42:16 | **kansas** 1:2,3,3 1:22 2:6,20,25 45:2,5,21 | **lab** 11:22 22:4 36:19 | **looks** 14:7 38:21 40:24 |
| **involvement** 16:11 31:25 | **kathy** 1:25 45:4 45:24 | **large** 11:7 22:2 25:4 | **lot** 7:15 13:5 16:18,22 17:22 22:3,4,17 25:9 31:20 32:18,20 32:21 39:18,22 40:7 41:8,17 41:18,21 |
| **j** | **kbanahan** 2:18 | **law** 2:23 | |
| **jackson** 11:19 11:24 23:5 | **keep** 41:7 | **lawyers** 2:4 | |
| | **keeping** 22:7 | **laying** 15:13 | |
| **james** 2:4 | **kerry** 2:12 | **learn** 30:12 | **lots** 22:3 27:18 27:18 32:7 |
| **january** 6:16 | **kimble** 9:5 | **learned** 12:19 | |
| **jaylen** 10:15 11:3 12:2 13:24 14:12,20 17:25 18:2,13 19:21 23:4 24:13,18 25:1 25:2,11,13,20 25:21,24 26:4 26:13,20 27:11 28:3,10,15,23 29:4 31:16,20 33:20,25 36:25 37:6,8 40:19 40:20 41:1 | **kind** 9:12 12:9 20:23 22:13 27:17 30:1 40:23 43:13 | **leave** 11:9 | **loud** 10:12 14:23,25 |
| | **kinds** 32:18 | **leg** 34:4 | **louis** 2:15 |
| | **knew** 17:7 28:3 34:1 | **legal** 45:25 46:23 | **m** |
| | **know** 13:7 16:3 16:23,24,25 18:16 20:20 24:5 25:21,22 25:23 26:1 27:9 30:13,14 30:16,19,25 31:3,8,11,15,19 33:22 34:7 | **level** 9:16 | **machine** 45:9 |
| | | **likely** 41:19 | **made** 15:7 19:22 20:5 30:20 31:8 45:15 |
| | | **line** 47:4,7,10 47:13,16,19 | |
| | | **listed** 18:18 | |
| | | **little** 7:25 12:10 35:1,2 40:4 41:5,23 42:11 42:12 | **maella** 1:5 23:1 29:22 30:14,16 30:21 31:4 46:4 47:1 |
| | | **llc** 1:8 2:13 44:25 46:4 47:1 | |

**main** 1:21 2:24 11:21
**make** 14:6 37:2 42:13
**making** 28:16 28:21
**malcolm** 10:8 10:13 12:13 15:5
**male** 25:14 34:2,4,7 35:6 38:21 39:24
**males** 32:6
**marion** 14:12 14:19 26:4 27:11 29:6 31:21 33:22
**mark** 23:10 33:7
**marked** 5:2 13:21 23:9 26:12,19 33:9 33:11
**masenthin** 1:12 4:5 6:3,10,11 44:7 46:5 47:2 47:24
**mean** 18:9 20:11
**medical** 11:3 25:12 32:19
**member** 18:21 19:23 20:6,7 20:14

**members** 18:25 19:14,17,19
**memory** 21:14 36:11
**mentioned** 23:6
**middle** 11:12
**miranda** 12:4,5 32:3
**mishael** 11:18
**missouri** 2:15
**mo** 1:25
**morning** 9:22
**motel** 8:20 12:17
**move** 22:8
**moving** 17:22
**multiple** 9:25 16:17,19

**n**

**name** 6:9 10:16 11:18 13:25 18:18 23:1
**named** 45:6
**names** 9:13
**narrative** 9:14
**narrow** 40:4
**nearly** 21:15
**needed** 22:6,6
**neighboring** 10:5
**never** 15:14,15 28:11,15
**newland** 7:15 8:3

**night** 20:11
**noise** 10:23
**north** 1:21 2:5 2:14,24 7:5,8 8:20 9:24 13:1 15:2,2
**northbound** 40:8
**northwest** 14:13,15 15:11
**norwood** 10:16 13:25 14:12,19 17:24,25 19:13 26:4 28:4,6,13 29:7 31:21 33:23,25 34:2 34:3,10 42:18
**nos** 33:8
**notary** 44:17
**note** 46:10
**number** 5:2

**o**

**oath** 6:4
**object** 20:18 42:21
**objection** 21:4 21:9
**observe** 16:12 16:21 35:11
**observed** 16:19
**occurred** 9:16 35:9
**officer** 6:10,11 6:20,21 7:15 8:3 10:8,9,13

11:25 12:13 15:4 19:4 23:14 29:1 33:2,10 37:14 42:13 43:8
**officers** 7:24 10:2,3 15:4 17:21 22:4,15 22:17 42:15
**official** 7:16 45:20
**okay** 23:23
**once** 7:24 21:19 21:25 22:22
**opinion** 21:10 38:1
**originally** 11:17
**outside** 16:18 19:3 30:5 34:24 35:15
**overtime** 21:21

**p**

**page** 47:4,7,10 47:13,16,19
**pages** 44:2
**parenthesis** 24:1
**parking** 16:18 16:22 22:3 25:9 31:20 39:18,22 40:7 41:7,17,18,21
**part** 22:20 30:7 32:11

| | | | |
|---|---|---|---|
| **particular** 27:20 | **personal** 9:16 9:20 31:25 | **police** 1:20 6:12 6:19,20 7:1,18 9:6 22:10 26:2 31:5 | **processed** 11:24,25 |
| **parties** 11:9 27:19 45:14,18 | **personally** 15:15 26:5 31:24 | | **processing** 16:11 |
| **partner** 7:13,14 7:16,21 | **perspective** 37:10 | **pop** 10:12 14:23,25 15:8 16:2 | **properties** 25:18 |
| **partners** 7:18 7:23 | **phone** 26:9 35:22 38:19 | **portrayed** 20:24 | **property** 14:14 14:20,24 15:23 15:25 24:23 25:16 36:6,10 36:16,21 42:18 |
| **parts** 17:23 | **photo** 20:1 26:23 | **position** 19:6 29:6,8 30:19 | **propounded** 45:8 |
| **party** 11:7 19:24 25:5,20 25:21 29:7,10 29:18 | **photographed** 26:23 | **possibly** 11:7 | **protected** 22:7 |
| **patrol** 6:20,21 7:22,24 10:9 | **photographs** 26:14,20 27:2 27:14 | **potentially** 23:3 | **proximity** 12:2 |
| **pause** 35:4 36:1 | **photos** 26:25 | **preliminary** 11:5 | **public** 20:14,16 44:17 |
| **paused** 35:10 | **physically** 10:8 | **preparation** 23:18 | **pull** 38:18,18 |
| **peace** 19:25 | **pick** 27:13 | **prepare** 8:23 | **purposes** 23:9 33:9 |
| **people** 8:1 9:25 10:6 11:8 17:19,20,20 22:7,10 25:4 29:11 32:21 36:2 40:23 41:17 42:2,17 | **piece** 12:10,10 | **presumed** 25:4 | **pursuant** 8:13 |
| | **plaintiff** 1:6 2:2 5:5,6,7 | **pretty** 18:5 | **put** 31:22 |
| | **plaintiff's** 26:13,19 | **previous** 13:17 43:16 | **q** |
| **perceived** 20:20 32:24 | **play** 34:12 35:1 41:6 | **previously** 23:5 | **question** 13:10 15:14 36:11 42:12,22 |
| **percent** 34:6 | **played** 35:25 38:20 | **primary** 32:18 | **questions** 11:5 33:4 35:2 37:11 43:9,16 45:8 |
| **period** 21:16 45:15 | **please** 6:9 | **prints** 29:3 | |
| **permission** 22:15 | **plus** 25:7 32:8 | **prior** 12:3,13 27:21 | **quick** 18:5 |
| **person** 8:3 21:2 24:14 26:3 38:25 40:18 | **point** 12:16 18:12 | **probably** 8:6 21:13,15 | **quite** 36:3 |
| | **pointed** 10:5 | **problem** 43:2 | |
| | **pointing** 14:16 23:25 39:25 | **proceedings** 43:20 | |
| | | **process** 22:5,9 | |

**r**

**r**  1:25 45:4,24
  47:3,3
**radio**  12:20
  29:25
**ran**  10:7,8 12:1
  13:21,24 18:17
**read**  12:3 27:20
  43:19 44:1,1
  46:9
**readily**  19:22
  26:23,24 40:3
**reading**  12:5
**really**  19:16
**reason**  35:3
  36:17,22 42:20
  42:23 46:11
  47:6,9,12,15,18
  47:21
**recall**  16:23
  17:17 18:6,22
  21:13 27:23,24
  28:16,21 37:19
**receipt**  46:18
**recognize**
  26:13,19,24
  33:13,16 34:16
  35:4,6,7 40:14
  42:6
**recognizing**
  18:25
**recollection**
  9:16,20 13:16
  23:22 28:5

**record**  6:9 14:6
  18:10 35:19
  44:2 45:12
**recordkeeping**
  9:12
**records**  18:19
**recover**  14:24
**recross**  40:11
**red**  19:19,21
  20:6 21:1 34:2
  35:6,11 39:1
  40:1 41:19
**redirect**  37:12
  43:6
**reduced**  45:10
**referenced**  8:12
  46:6
**regard**  8:9 13:2
  19:9
**relates**  8:17
**relation**  26:7
**relative**  45:17
**released**  18:5
**relying**  36:10
**remember**  9:21
  13:16,16
**report**  5:4 9:3,7
  9:8,9,10,11,13
  23:12,13,22
  25:10 28:3
  33:24 36:14,19
  36:25 37:4
**reported**  15:16
  37:8

**reporter**  14:3
  45:5
**reporter's**  4:17
**reports**  34:9
**represent**  27:4
**requested**
  45:14
**respond**  13:1,5
  32:20
**responded**  13:3
  13:7,11,17
**response**  8:20
  22:12 40:4
  45:8
**rest**  19:25
**retained**  4:20
**return**  46:13,17
**returned**  21:25
  22:23
**review**  45:13
  46:7
**reviewed**  9:3,6
  23:17 26:6,9
**ricochet**  39:8
**ride**  7:15,15,19
  7:24 8:2
**riding**  8:6,10
  15:5
**right**  13:23
  16:18 18:3
  33:17 34:13
  40:24
**road**  8:21
**rock**  8:21 9:24
  36:16

**rode**  11:2 25:11
**room**  11:8 30:4
  30:6
**rooms**  11:7
**rounded**  15:12
**rounds**  32:10
**rpr**  1:25 45:24
**running**  10:11
  15:1
**rusty**  21:14
**ryan**  1:12 4:5
  6:3,10 44:7
  46:5 47:2,24

**s**

**s**  2:21 47:3
**saw**  35:9 36:4
  38:1
**saying**  37:4,6
**says**  11:13 24:1
  25:10
**sbkbs**  46:4 47:1
**scene**  9:3 10:2
  10:4,9 12:13
  13:3,23 16:10
  16:13 17:1,6
  17:19 19:12
  20:3 21:17,19
  21:25 22:2,6,8
  22:19,21,23
  23:24 27:21
  28:20,24 29:12
  29:14,17 34:16
**se**  7:14
**seal**  45:20

**[search - specialty]**                                   Page 11

search  22:11
searching
   10:20
second  11:8
   29:18 35:21
   38:6,17
seconds  34:15
   35:5,10 40:15
   40:21,22 41:6
   41:24 42:1,9
secured  31:12
security  22:19
   26:6
sedgwick  45:3
   45:21
see  19:20 20:1
   29:9 32:1
   34:23 35:4
   36:2 37:18
   38:7,11 39:14
   39:21 40:3,7
   41:8,9,17,24
seen  17:7 27:2
   27:6 35:22
self  28:14
senior  7:25
sent  46:14
separate  37:14
sergeant  9:5
serious  22:13
set  45:9
seven  21:22
several  9:24
   10:1 29:11

sheer  18:1
sheet  46:11
shell  16:17 22:5
   36:20
shift  7:6,25
shirt  19:22
   20:1 21:7
   26:16,17,22
   35:12 38:22
   39:2,24 41:12
   41:20 42:19
shoes  34:3
shooter  24:25
   27:14,23 30:19
   37:20 38:10
shooters  37:17
   38:6
shooting  9:23
   12:24 13:4,8
   13:11 16:5
   23:4 27:17
   32:20 42:17
shootings  13:6
   13:17
short  17:3
   26:22
shorthand  45:4
   45:10
shot  10:1,7,18
   17:20 18:3
   24:2,9,14,19
   27:11 28:15
   30:10,14,17
   31:16 34:4
   36:3

shots  5:5,6,7
   10:1 11:14
   25:7,22,24
   26:4 32:6,7
   33:14 36:2,5
   38:1 40:8
   41:25 42:14
show  13:20
   26:12 35:20
   39:13
showed  14:11
shows  40:6
side  11:12 15:2
   15:3,17,20,20
   15:22,23 16:17
   16:20 24:1
   25:3,9,13 30:6
   30:7,24 32:5
   33:18 34:5
sidewalk  34:23
   35:14
sign  22:11,15
   43:19 46:12
signal  18:21
   20:7,13
signature  45:23
signed  46:20
similar  30:3
simplicity
   17:25
sit  9:15 24:17
   25:23 27:24
sleeping  30:2,4
sleeve  35:12

sleeved  26:22
   41:12,20 42:19
solutions  45:25
   46:23
somebody
   19:24 20:10
   41:20
soon  15:7 25:6
sorry  13:15
   32:4
sounded  19:5
source  14:25
south  11:11
   16:16,20 25:3
   25:9 30:6,7,24
   32:4 34:21,24
   35:15 37:22
   42:8
southeast  14:8
   34:19
southeastern
   13:22
southwest
   37:22
span  17:17
speak  12:6
   22:25 23:3
   29:9,18
speaking  25:18
special  18:24
specialize  19:8
specialized
   19:2,5
specialty  7:20

| | | | |
|---|---|---|---|
| **specifically** 24:20 | 29:2 | **sweatshirt** 21:2 | **thomas** 10:15 |
| **spider** 18:19 | **subpoena** 8:14 8:16 | **sworn** 6:4 44:12 45:7 | 14:20 17:8,16 19:14 21:12 |
| **spoke** 9:2 14:19 19:16 | **subscribed** 44:12 | **system** 18:19 | 23:4 24:13,18 26:4,14,20 |
| **srkbs** 1:8 44:25 | **suite** 2:14 | **t** | 31:16,21 33:20 |
| **st** 2:15 | **suites** 14:14 | **t** 19:22 21:7 | 36:25 42:18 |
| **stamped** 34:14 34:15 40:15 | 15:3 16:1,3 24:2,10 36:9 | 38:22 47:3,3 | **thought** 10:12 |
| **standing** 24:25 | **super** 8:20 9:24 | **take** 38:17 40:13 | **three** 21:15 34:14 41:6 |
| 35:14 39:22 40:23 41:8 | 12:17 13:8,11 13:12,18,20 | **taken** 1:19 35:21 45:9 | 42:17 |
| 42:8,15 | 14:8,17,21 | **talking** 12:4 42:7 | **throwing** 19:24 |
| **standpoint** 32:2 | 16:1,6,17 24:22 25:3,9 | **tank** 26:22 | **thrown** 10:21 10:23 15:18 |
| **state** 6:9 36:10 | 27:5 30:4 32:5 | **tattoos** 20:2 | 25:15 |
| 44:10 45:2,5 | 34:20,21 35:15 | **tell** 9:19 23:21 | **tied** 16:5 |
| **stated** 14:7 | 36:6,21 37:23 | 34:2 38:23,25 | **time** 8:10 9:3 |
| 25:20,22 28:15 | 38:2 39:5,9,12 | 40:1 41:8 | 9:11,21 10:3 |
| 32:12 | 39:18 40:6 | **tend** 19:18,19 | 17:17 18:6,8 |
| **statement** 28:7 | 41:17,21 | **terms** 7:18 | 18:19 22:13 |
| 28:8,17,21 | **supervisor** 9:2 | **testified** 13:13 | 27:1,6,19 |
| 36:24 37:4 | 9:4 | **testifies** 6:6 | 29:15,18 34:1 |
| **states** 1:1 | **supplemental** | **testify** 6:4 45:7 | 34:14,14 38:8 |
| **stating** 24:2 | 5:3 9:10,11,13 | **testimony** 44:2 | 38:14,14,15 |
| **stepped** 25:3,6 | 9:14 | 45:7,12,13 | 40:14 45:15 |
| **stills** 27:5 | **sure** 10:16 | 46:9,18 | 46:19 |
| **stop** 12:7 14:2 | 12:11 30:8 | **text** 27:17,22 | **timeframe** 46:8 |
| 15:9 34:13 | 33:3 37:2 | **texts** 27:20 | **toben** 2:5 |
| **strike** 31:2 | 38:23,25 40:17 | **thing** 20:23 | **today** 8:13 9:15 |
| **strikes** 16:19 | **surveillance** | **things** 17:7 | 23:18 24:17 |
| **struck** 25:7 | 27:7 | 22:8,9 | 25:23 27:24 |
| 31:4 32:8,9 | **suspects** 18:1 | **think** 13:13 | **together** 15:6 |
| **submitted** | **sustained** 29:22 | 19:22 30:9 | **told** 10:25 |
| 22:18 26:23 | | 33:2 40:25 | 18:22 24:8,22 25:1 37:10 |

**[top - wichita.gov]**

**top** 26:22
**towards** 39:11
  39:25
**town** 30:2
**traffic** 29:25
**trained** 38:13
**training** 18:24
  19:2,5,10
  32:16,23
**transcript** 4:1
  45:16 46:6,20
**transcription**
  45:11
**transported**
  11:20
**trauma** 17:14
**traveling** 30:3
**treat** 17:4
**treatment**
  17:13
**triple** 18:7,9,10
**true** 8:5 19:9
  44:3 45:11
**truth** 6:5,5,6
  37:9 45:7
**trying** 17:23
  18:2
**turning** 22:19
**two** 8:7,7 10:14
  10:21 15:13
  17:23 25:12,18
  33:18 37:14
**type** 12:23
  19:25 32:17

**typical** 12:25
**typically** 8:3,4

**u**

**uh** 37:16
**ultimately**
  30:20 41:25
**unarmed** 28:10
  32:10
**unaware** 29:6
**undersigned**
  44:12
**understand**
  8:13,16,19
  13:19
**understanding**
  12:12 39:10
**unidentified**
  42:18
**unit** 7:21
**united** 1:1
**units** 7:20
**unorthodox**
  42:11
**upper** 18:3
**use** 35:17
**used** 46:20
**using** 28:14

**v**

**v** 46:4 47:1
**vacate** 11:10
**vehicles** 22:3,8
  22:16
**verbal** 14:6
  22:12

**verify** 46:9
**veritext** 45:25
  46:14,23
**veritext.com**
  46:15
**versus** 7:19
**victim** 31:23
**victims** 18:1
  32:20
**video** 34:12
  35:22,25 36:4
  37:17,25 38:3
  38:6,12,19,24
  39:14,17 40:5
  40:13,15,22
  41:6,11,24
  42:1,9 43:9
**videos** 37:15
  43:12
**view** 39:18 40:3
**vs** 1:7 44:25

**w**

**waivers** 22:11
  22:16,17,19
**wall** 10:21
  15:22 25:13,15
  25:15,18
**want** 23:21
  26:21 35:17
  37:2 38:16
  41:7 43:4
**wanted** 34:12
**watch** 7:11
  13:1 38:8,16

**watched** 36:4
  37:14,25 40:6
  43:9
**watching** 39:20
  41:11
**way** 11:4 20:21
  20:24
**we've** 8:6
**weapons** 10:20
**wear** 19:18,19
  19:25
**wearing** 19:20
  19:21 20:6,21
  20:22 21:1,6
  26:21 38:21
  39:24
**went** 15:6 30:5
  43:12
**wesley** 11:3,17
  11:20,20,25
  25:12 32:19
**west** 14:15,17
  15:23 23:25
  33:18
**white** 19:21
  26:16,17 38:22
  39:24 40:24
**wichita** 1:20,22
  2:6,20,25 6:12
  6:23 7:2,18
  22:10 23:15
  26:2 31:5
  45:20
**wichita.gov**
  46:2

**wichita.gov.**
  3:3
**wilson**   2:3 4:7,9
  20:18 21:4,9
  33:3,6 35:17
  38:17 40:12
  42:24
**witness**   45:6,13
  45:20 46:8,10
  46:12,19
**witnesses**   22:22
**woodlawn**
  11:18,20,25
**words**   25:6
**work**   7:4,6,17
  30:3
**worked**   6:14,24
  7:8,11
**wound**   18:4
**write**   28:3
**writing**   45:10
**written**   22:14
  22:15,17
**wrong**   30:10
  43:4

---

**y**

---

**yeah**   13:5
  26:17 38:5,18
  39:6
**years**   6:16 8:7
  21:15
**yesterday**   19:4

Federal Rules of Civil Procedure

Rule 30


(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.