## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

MAELLA BLALOCK,

                  **Plaintiff**,

v.

                                   Case No. 21-2552-DDC

**SRKBS HOTEL, LLC, NINAD SHARMA, PARESH BHAKTA, SURENDRAKUMAR BHAKTA, GEETA V. REDDY, RSD, LLC, and SEVJAYMAN, LLC,**

                  **Defendants**.

_____

## <u>MEMORANDUM AND ORDER</u>

This is a classic case of wrong place, wrong time. Plaintiff slept in her motel bed on a mid-summer's night in 2020. And then, a stray bullet from a gang showdown in the motel's parking lot penetrated her motel room's exterior wall, injuring plaintiff's feet. Plaintiff contends she sustained that injury because of the defendant motel owner's negligence when executing proper security measures. This diversity case comes before the court on plaintiff Maella Blalock's Motion for Partial Summary Judgment (Doc. 132) and defendants SRKBS Hotel, LLC, Ninad Sharma, Paresh Bhakta, Surendrakumar Bhakta, Geeta V. Reddy, RSD, LLC, and Sevjayman, LLC's Motion for Summary Judgment (Doc. 136).

On June 20, 2020, plaintiff sustained foot injuries from third party gunfire while staying as a guest at the Super 8 Motel in Wichita, Kansas. At the time of plaintiff's injuries, defendant SRKBS Hotel, LLC owned and operated that Super 8 Motel. The other listed defendants were SRKBS Hotel, LLC's members. Plaintiff brings negligence claims against defendant SRKBS on four liability theories: premises, employer, occupier of land, and a general duty of reasonable

care.  Plaintiff contends that SRKBS breached its duties by failing to provide various security protections leading "to a natural, continuous, and foreseeable chain of events that ultimately resulted in Plaintiff being shot."  Doc. 123 at 13 (Pretrial Order ¶ 4.a.a.iii.).  Plaintiff also brings a claim for punitive damages and asks the court to pierce the corporate veil to satisfy any forthcoming judgment.

Both parties filed summary judgment motions.  Plaintiff moves for summary judgment on the issues of duty and breach only.  Doc. 132 at 36.  Plaintiff argues that the violent crime leading to her injuries was foreseeable under the totality of the circumstances test—the test adopted by the Kansas Supreme Court to evaluate a business proprietor's liability for criminal acts by third parties.  *Id.*  So, plaintiff asks the court to hold as a matter of law that defendant SRKBS had a duty to provide appropriate security measures to mitigate this foreseeable danger, and that SRKBS breached that duty.  *Id.* at 46, 48.

Defendants move for summary judgment on all plaintiff's claims or, in the alternative, for partial summary judgment.  Doc. 136 at 1.  Defendants contend that no duty inhered to SRKBS because the violent crime leading to plaintiff's injuries wasn't foreseeable under the totality of the circumstances test.  Doc. 137 at 21, 29.  And so, plaintiff can't make a submissible case of negligence against SRKBS.  *Id.* at 20.  Defendants also argue that plaintiff hasn't met her burden to demonstrate—with clear and convincing evidence—that defendants acted with the mental state required for a punitive damage award.  *Id.* at 32.  Finally, defendants contend that plaintiff cannot meet her burden of proof for her request to pierce the corporate veil.  *Id.*

The court denies plaintiff's Motion for Partial Summary Judgment (Doc. 132) and grants defendants' Motion for Summary Judgment (Doc. 136).  The court explains its reasoning for these decisions in the following sequence:  first, the court outlines the uncontroverted

background facts.  Next, it recites the legal standard for summary judgment before addressing

negligence and foreseeability in the context of both summary judgment motions.  Finding

defendants owed no duty on which plaintiff can support a negligence claim, the court doesn't

reach the punitive damages issue or analyze the veil piercing issue.

## I.   Uncontroverted Background Facts

The following facts are uncontroverted.  The parties controvert, wholly or partially,

numerous other factual assertions which aren't material to the disposition these cross motions.

### June 20, 2020, Shooting

On June 19 and 20, 2020, plaintiff was a guest in Room 116 at the Super 8 Motel, located

at 3741 North Rock Road in Wichita, Kansas.  Doc. 123 at 3 (Pretrial Order ¶¶ 2.a.xix., xxi.).

Plaintiff was asleep in her motel room when—around 2:35 a.m. on June 20, 2020—bullets came

through the exterior wall of her room and struck her feet, causing injuries.  *Id.* at 4 (Pretrial

Order ¶¶ 2.a.xxv., xxvi.).  Third parties fired the gunshots that injured plaintiff.  *Id.* (Pretrial

Order ¶ 2.a.xxvii.).  The gunfire came from the Motel parking lot.  Doc. 137-5 at 6–7 (Whisby

Dep. 21:18–22:1).  Law enforcement officers later identified the shooters as Jaylen Thomas,

Marion Norwood, and an unidentified male in a red, long-sleeved shirt with the word "Swoosh"

on it.  Doc. 137-6 at 10 (Abasolo Dep. 35:14–37:16).  The shooters fired shots following a verbal

altercation among them.  Doc. 137-7 at 12 (Kimble Dep. 43:5–10).

### The Pre-Shooting Party

Before the shooting, all three shooters were attending a party at the Super 8 Motel.  *Id.*

(Kimble Dep. 43:1–4).  The party took place in Room 319.  Doc. 135-6 at 6 (Townsend Dep.

13:11–13).  Gregg Townsend, the night auditor on duty, had rented the room to two women

around 11:30 p.m. on June 19, 2020.  Doc. 123 at 3 (Pretrial Order ¶ 2.a.xxii.).  When the young

women rented the room, they asked Mr. Townsend about its layout.  *Id.* (Pretrial Order

¶ 2.a.xxiv.A.).  Mr. Townsend later received a noise complaint from another guest, on the third floor, about the room.  *Id.* (Pretrial Order ¶ 2.a.xxiv.B.).  When Mr. Townsend received the noise complaint, he first checked if he could see anything on the surveillance camera monitor, but he didn't see anything.  Doc. 135-6 at 6 (Townsend Dep. 13:13–18).  Then, he attempted to call the room to address the noise issue, but no one answered.  Doc. 123 at 3 (Pretrial Order ¶ 2.a.xxiv.B.).  So, Mr. Townsend went to the third floor room and discovered a party in progress. *Id.* (Pretrial Order ¶ 2.a.xxiv.C.).  He saw about 30 people packed into the room.  Doc. 135-6 at 7 (Townsend Dep. 14:6–8).  He asked everyone to leave except the two women who had rented the room.  Doc. 123 at 3 (Pretrial Order ¶ 2.a.xxiv.C.).

The partygoers complied with Mr. Townsend's request, leaving the room and the hotel. *Id.* at 4 (Pretrial Order ¶ 2.a.xxiv.D.).  On his way back downstairs, Mr. Townsend stopped on the second floor to ensure no partygoers were congregating there.  Doc. 135-6 at 8 (Townsend Dep. 15:1–3).  When Mr. Townsend reached the first floor, he could see that some of the partygoers were loitering in the parking lot, and he realized he would have to ask them to leave the property.  *Id.* (Townsend Dep. 15:3–6).  Mr. Townsend then stepped out of the building to take the trash out, and the shooting started.  *Id.* (Townsend Dep. 15:7–13).

### Crime at the Super 8 Motel Before the June 20, 2020, Shooting

Before the events of June 20, 2020, no shooting had occurred on the Super 8 Motel's property.  Doc. 137-14 at 8 (Snyder Dep. 30:4-11).  Super 8 Motel employees had observed behavior consistent with prostitution at the Motel.  Doc. 135-1 at 6, 8 (T. Malone Dep. 20:15–21:2, 22:11–19).  And one of the crime reports submitted cites "sale of sexual relations" as an offense in December 2018.  Doc. 135-31 at 1 (Pl. Ex. 31).  Super 8 Motel employees had observed evidence suggesting drug use at the motel.  Doc. 135-4 at 10–11, 14 (J. Malone Dep. 37:25–38:12, 43:6–20).  And crime reports submitted cite unlawful possession and possession of

drug paraphernalia.  *See, e.g.*, Doc. 135-31 at 1 (Pl. Ex. 31); Doc. 135-34 at 1 (Pl. Ex. 34); Doc. 135-38 at 1 (Pl. Ex. 38).  Those crime reports also indicated numerous instances of larceny, from the Super 8 Motel building and from automobiles in its parking lot.  *See, e.g.*, Doc. 135-52 at 1 (Pl. Ex. 52); Doc. 135-53 at 1 (Pl. Ex. 53); Doc. 135-59 at 1 (Pl. Ex. 59).  And Kansas Standard Offense Reports indicated several instances of battery and aggravated battery at the property before the shooting at issue here.  *See, e.g.*, Doc. 137-19 at 2 (Def. Ex. 19); Doc. 137-23 at 4 (Def. Ex. 23).

### *Security Measures at the Super 8 Motel*

The Super 8 Motel had installed interior and exterior surveillance cameras.  Doc. 135-5 at 10 (Wissinger Dep. 30:1–5); *see, e.g.*, Doc. 135-11 (Pl. Ex. 11) (interior camera surveillance video).  Only a person at the Motel's front desk could view the surveillance video.  Doc. 135-6 at 6 (Townsend Dep. 13:16–18).  The night auditor worked alone and, so, was the only individual who could watch the surveillance video.  Doc. 135-18 at 18, 19 (Shura Dep. 102:8–16, 112:6–23).  The night auditor had numerous other duties—setting up breakfast, taking out the trash—that prevented his ability to watch the surveillance video continuously.  Doc. 135-2 at 31 (Stark Dep. 72:10–23).  The Super 8 Motel did not employ a security guard.  Doc. 135-18 at 14 (Shura Dep. 74:4–9).  SRKBS never considered hiring a security guard for the Super 8 Motel nor investigated what that would cost.  *Id.*; *id.* at 19 (Shura Dep. 112:2–5).

Staff at the Super 8 Motel utilized a do-not-rent list to keep track of individuals to whom they wouldn't rent rooms.  Doc. 137-11 at 8 (Stark Dep. 22:19–23:1).  But guests could rent rooms online to circumvent the do-not-rent list.  Doc. 135-28 at 3 (Pl. Ex. 28).  And one former front desk employee had identified occasions when the Motel had rented rooms to do-not-rent listed individuals.  Doc. 135-4 at 13 (J. Malone Dep. 42:1–16).

One exterior door at the hotel, the south door nearest where the shooting occurred, was broken and a person could yank it open at any time. Doc. 135-5 at 9 (Wissinger Dep. 29:3–16). The hotel entrances weren't equipped with alarms that would sound if a door was propped open too long. *Id.* at 10 (Wissinger Dep. 30:1–5).

With this background, the court moves on to the legal standard for summary judgment motions.

## II.    Legal Standard

Summary judgment is appropriate when the moving party demonstrates that "no genuine dispute" exists about "any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). When it applies this standard, the court views the evidence and draws inferences in the light most favorable to the non-moving party. *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010). "An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense." *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 247–48.

The moving party bears "'both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law.'" *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)). To meet this burden, the moving party "'need not negate the non-movant's claim, but need only point to an absence of

6

evidence to support the non-movant's claim.'" *Id.* (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).

If the moving party satisfies its initial burden, the non-moving party "'may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries the burden of proof.'" *Id.* (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); accord *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671 (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992)). When deciding whether the parties have shouldered their summary judgment burdens, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

The federal courts don't view summary judgment as a "disfavored procedural shortcut." *Celotex*, 477 U.S. at 327. To the contrary, it's an important procedure "designed 'to secure the just, speedy[,] and inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1).

While a court can treat cross motions for summary judgment separately, and "the denial of one does not require the grant of another[,]" *Buell Cabinet Co., Inc. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979), it also may address the legal arguments together, *Berges v. Standard Ins.*, 704 F. Supp. 2d 1149, 1155 (D. Kan. 2010). Here, the two motions, and their legal arguments, overlap substantially. Indeed, both parties—when briefing defendants' motion—invoke and incorporate briefing filed to support and oppose plaintiff's motion.[1] The court thus exercises its discretion and addresses the legal arguments made by the dueling motions together.

---

[1]     Both parties explicitly acknowledge the overlap between the cross summary judgment motions. For example, plaintiff's Response to defendant's motion invokes incorporation when addressing

III.      **Analysis**

Plaintiff brings a single claim against defendants for negligence.  Plaintiff's Motion for

Partial Summary Judgment asks the court to determine two of the four elements of her

negligence claim as a matter of law:  duty and breach.  Plaintiff also argues she's entitled to

recover from defendant SRKBS and SRKBS's members by piercing its corporate veil.  And

plaintiff seeks punitive damages.  Defendants' Motion for Summary Judgment addresses all

three legal theories—negligence, veil piercing, and punitive damages—but the court need only

address the negligence claim because of its decision on that claim.  Specifically, the court

concludes that plaintiff has failed to create a triable issue of SRKBS's duty, so defendants are

entitled to summary judgment as a matter of law.  The court explains its reasoning, below.

Plaintiff brings a negligence claim under Kansas law[2] against defendant SRKBS.  It

asserts that SRKBS breached its duty to plaintiff, leading to plaintiff's injuries.  Specifically,

plaintiff alleges that SRKBS breached its duty by failing to:  provide security, employ sufficient

persons to monitor individuals entering the motel, install a call forwarding system, wire side

doors to sound an alarm when propped open, fix broken southern entrance, mitigate crime on

---

foreseeability:  "Plaintiff has stated the governing legal standards in her own motion for partial summary
judgment . . . .  Plaintiff incorporates that discussion by reference."  Doc. 143 at 26.  Defendants' Reply
brief on defendants' motion likewise invokes defendants' Response to Plaintiff's motion on the issue of
foreseeability:  "Each of the foregoing . . . are more fully addressed in . . . Defendant's Response to
Plaintiff's Motion for Summary Judgment.  To that end, Defendant restates and reincorporates those
analyses to the extent applicable."  Doc. 147 at 8–9.  Because the parties incorporate briefing from one
motion to brief the other motion, the court follows suit and addresses the foreseeability arguments of the
two motions together.

[2]      Kansas law governs the claims asserted in this diversity action.  *See* Doc. 123 at 2 (Pretrial Order
¶¶ 1.a., 1.d.) (invoking court's diversity subject matter jurisdiction and agreeing that Kansas law governs
the case).  In a diversity case like this one, the court applies the substantive law of the forum state,
including its choice of law rules.  *Emp'rs Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1170 (10th
Cir. 2010) (citation omitted).  Kansas courts follow the rule of *lex loci delicti* for tort claims, applying the
substantive law of the place where the tort occurred.  *Anderson v. Com. Constr. Servs., Inc.*, 531 F.3d
1190, 1193–96 (10th Cir. 2008); *Ling v. Jan's Liquors*, 703 P.2d 731, 735 (Kan. 1985).  Here, the torts
giving rise to plaintiff's claims occurred in Kansas—*i.e.,* the place where plaintiff sustained her injury.

property, conduct a risk assessment, and train employees to spot and mitigate crime.  Doc. 123 at

12 (Pretrial Order ¶¶ 4.a.a.ii.1–5., 7–9.)  And plaintiff includes one other basis for breach of the

duty of care, but it's incomplete:  The Pretrial Order alleges that "[d]efendant breached its duties

by . . . [r]enting the room to the women in the first place while acknowledging that" and then

stops.  *Id.* (Pretrial Order ¶ 4.a.a.ii.6.).  A Pretrial Order isn't a Mad Libs exercise, and the court

is unwilling to fill in blanks for parties.  The court thus disregards this unfinished basis for

breach.  Having outlined plaintiff's claims, the court turns to the legal standard for a negligence

claim.

Under Kansas law, negligence "exists where there is a duty owed by one person to

another and a breach of that duty occurs."  *Gragg v. Wichita State Univ.*, 934 P.2d 121, 128

(Kan. 1997) (internal quotation marks and citation omitted).  If a negligence plaintiff satisfies

those first two elements, she also "must show:  (1) a causal connection between the duty

breached and the injury received; and (2) [plaintiff] was damaged by the negligence."  *Id.*

(internal quotation marks and citation omitted).  To state a claim for negligence, therefore, a

plaintiff first must establish the existence of a duty.  "Whether a duty exists is a question of law."

*Seibert v. Vic Regnier Builders, Inc.*, 856 P.2d 1332, 1338 (Kan. 1993).  The court thus addresses

this duty question next.  The court begins by summarizing a business owner's duty to provide

security against criminal acts of third parties.

### A.      Business Owner's Duty to Provide Security

When it comes to a business owner's duty to provide security for its patrons, Kansas

courts have clarified two general rules:  First, the "owner of a business is not the insurer of the

safety of its patrons or customers."  *Id.*  Second, the "owner ordinarily has no liability for injuries

inflicted upon patrons or customers by the criminal acts of third parties in the business' parking

lot, as the owner has no duty to provide security."  *Id.*  But these general rules are subject to an

exception: "Such a duty may arise, however, where circumstances exist from which the owner could reasonably foresee that its customers have a risk of peril above and beyond the ordinary and that appropriate security measures should be taken." *Id.* So, whether a business owner's duty arises turns on the foreseeability of an out-of-the-ordinary risk of peril. The court next explores how Kansas law analyzes such foreseeability.

In *Seibert*, the Kansas Supreme Court established that courts use the totality of the circumstances test to determine the requisite foreseeability for a business owner's duty to provide security—but not the prior similar incidents test. 856 P.2d at 1339. In *Seibert*, plaintiff and a friend were getting out of their car in a shopping center's underground parking garage when two assailants approached the women and one assailant shot plaintiff in the head. *Id.* at 1334. Plaintiff brought a negligence action against the owners of the parking garage, alleging that the owners owed her a duty, as a business invitee, to provide security. *Id.* The district court granted summary judgment for the premises owner because evidence of prior similar crimes in the parking garage was sparse. *Id.* at 1334–35. The district court concluded that the criminal act injuring plaintiff wasn't foreseeable due to the absence of earlier similar incidents. *Id.* But the Kansas Supreme Court reversed the summary judgment decision and remanded the case, holding the totality of the circumstances test—not the prior similar incidents test—the proper method to evaluate foreseeability. *Id.* at 1340. The Kansas Supreme Court explained the totality of the circumstances test this way:

> Under such a rule, patrons are not limited to past experience in establishing that a new business owes them a duty of protection from criminal conduct by third persons; foreseeability may be established by the place and character of the business. . . . The circumstances to be considered must, however, have a direct relationship to the harm incurred in regard to foreseeability. Prior incidents remain perhaps the most significant factor, but the precise area of the parking lot is not the only area which must be considered. If the parking lot is located in a known high crime area, that factor should be considered.

10

*Id.* at 1335–36, 1339.

The Kansas Supreme Court also clarified when, exactly, a duty arises under this newly adopted test.  "It is only where the frequency and severity of criminal conduct substantially exceed the norm or where the totality of the circumstances indicates the risk is foreseeably high that a duty should be placed upon the owner of the premises to provide security."  *Id.* at 1339.  Finally, the Kansas Supreme Court circumscribed the extent of such a duty—when it does arise—by clarifying that an owner "is not under a duty to provide such security as will prevent attacks on the patrons[.]"  *Id.* at 1340.  Instead, the "duty to provide security is determined under the reasonable person standard.  Thus, the duty to provide security and the level of such security must be reasonable—that includes the economic feasibility of the level of security."  *Id.* at 1339.

Here, third party criminal acts injured plaintiff.  Given Kansas's general rule, then, SRKBS isn't liable for the injuries inflicted by those third parties under a theory of premises liability.  Indeed, Kansas law doesn't require SRKBS to act as the insurer of plaintiff's security or prevent an attack on plaintiff altogether.  Instead, SRKBS's duty to provide security to plaintiff only arises "where circumstances exist from which [SRKBS] could reasonably foresee that [plaintiff has] a risk of peril above and beyond the ordinary and that appropriate security measures should be taken."  *Id.* at 1338.  And the foreseeability of any "risk of peril above and beyond the ordinary" turns on the totality of the circumstances.  These circumstances include—as the most significant factor—any prior similar incidents at the Super 8 Motel.  The circumstances also include whether the Super 8 Motel is located in a high crime area and whether the security SRKBS provided at the Super 8 Motel is reasonable, accounting for economic feasibility.  Both parties agree that *Seibert* sets forth the Kansas test for determining

whether a duty existed to provide security. *See* Doc. 132 at 37; Doc. 137 at 21. So, the court's next logical step is to engage in a totality-of-the-circumstances foreseeability analysis.

### 1.    Foreseeability and Summary Judgment

But the court must tread with caution into the territory of foreseeability, ever cognizant of the risk of stepping on the jury's toes. Although the determination of duty is a matter of law, foreseeability is typically the realm of the jury: "Whether risk of harm is reasonably foreseeable is a question to be determined by the trier of fact." *Nero v. Kan. State Univ.*, 861 P.2d 768, 779 (Kan. 1993) (internal quotation marks and citation omitted). Also, the court must heed Kansas law's warning that "summary judgment should be granted with caution in negligence cases." *Hammond v. San Lo Leyte VFW Post # 7515*, 466 P.3d 886, 890 (Kan. 2020) (citations omitted); *see also Esquivel v. Watters*, 183 P.3d 847, 850 (Kan. 2008) ("[S]ummary judgment is seldom proper in negligence cases" (internal quotation marks and citation omitted)).

Caution doesn't preclude entirely, however, the court's capacity to conduct a foreseeability analysis and grant a summary judgment motion in a negligence case. Instead, it limits that analysis to situations where reasonable jurors could reach but one, sole result: "Only when reasonable persons could arrive at but one conclusion may the court determine the question as a matter of law." *Nero*, 861 P.2d at 779 (internal quotation marks and citation omitted). Indeed, in *Gragg v. Wichita State University*—a premises liability suit—the Kansas Supreme Court affirmed a decision granting summary judgment due to a lack of foreseeability under the totality of the circumstances test. 934 P.2d at 135. In *Gragg*, plaintiffs alleged that Wichita State University—when hosting a community fireworks event—breached its duty to provide greater security and that this breach resulted in the shooting death of an attendee after the event. *Id.* The Kansas Supreme Court held "as a matter of law, the [plaintiffs] have failed to show a special duty existed on the part of WSU to protect [the victim] from the unanticipated and

unexpected attack by" the shooter.  *Id.*  The Kansas Supreme Court "also decide[d], as a matter

of law, that it was not foreseeable under the totality of the circumstances that [the shooter] would

shoot [the victim]."  *Id.*

Other Kansas cases concur.  Summary judgment, at times, is warranted.[3]  The Kansas

Court of Appeals recently affirmed a matter-of-law determination of the unforeseeability issue in

a premises liability suit similar to the case at hand.  *See Est. of Bell ex rel. Bell v. 617 W. LLC*,

521 P.3d 1145, No. 124,418, 2022 WL 17881331, at *1 (Kan. Ct. App. Dec. 23, 2022) ("After

carefully reviewing the record and the parties' arguments, we agree that Bell's killing was not

foreseeable and that this determination could be made as a matter of law.").  In *Bell*, the plaintiff

claimed that the killing of her son in an apartment complex's parking lot "was caused by the

complex's negligence—specifically, its failure to take additional steps to ensure the safety of

people at the apartments."  *Id.*  The district court granted summary judgment for the apartment

complex owner and the appellate court affirmed, finding "sound" the district court's

determination "that the complex owed [the son] no duty to prevent his death because it was

unforeseeable[.]"  *Id.* at *4.  And the Court of Appeals noted that instances where a court can

determine foreseeability as a matter of law are "rare."  *Id.* at *1.

---

[3]      The Kansas Court of Appeals reached a similar conclusion when it affirmed a decision granting
summary judgment to a hotel owner in *Gardin v. Emporia Hotels, Inc.*, 61 P.3d 732, 738 (Kan. Ct. App.
2003).  The appellate court held that the crime perpetrated on hotel property "was not foreseeable under
the totality of the circumstances in accordance with *Seibert*."  *Id.  Gardin* clarified that though
"[f]oreseeability is generally a question of fact for the jury. . . . when there is no evidence to indicate that
the cause of plaintiff's injuries was foreseeable, summary judgment may be appropriate."  *Id.*  And the
Kansas Court of Appeals again affirmed a decision granting summary judgment to a business owner
under a foreseeability analysis in *Weroha v. Craft*, 951 P.2d 1308 (Kan. Ct. App. 1998).  *Weroha* justified
its decision this way:  "The district court did not err in finding that based upon the totality of the
circumstances . . . [the business owner] did not have a general duty to provide additional security to its
patrons."  *Id.* at 1314.

In light of this Kansas case law, the court trudges carefully forward into foreseeability territory to evaluate whether, under the totality of this case's circumstances, the criminal acts at issue were either so foreseeable—as plaintiff's motion contends—or so unforeseeable—as defendants' motion contends—that any reasonable juror would conclude as much.

### 2.     Foreseeability Analysis[4]

To engage in this foreseeability analysis, the court finds it instructive to review the circumstances in various decisions decided under Kansas law that have found third party criminal acts foreseeable or unforeseeable. So, the court begins by reviewing, in detail, four cases where Kansas courts affirmed decisions granting summary judgment to business owners on unforeseeability grounds. After its review of the cases, the court evaluates the present case's circumstances in light of these other Kansas decisions. Finally, the court reviews a case where, under Kansas law, the Tenth Circuit affirmed a jury finding of foreseeability and the duty that subsequently inhered to the premises owner. The court then distinguishes the case at hand from the Tenth Circuit decision. And, ultimately, the court concludes that defendant SRKBS owed plaintiff no duty under a premises liability theory because the risk of peril was unforeseeable as a matter of law.

### a.     Cases Where Kansas Courts Held the Risk of Peril Unforeseeable

The court begins its review of Kansas case law with a Kansas Supreme Court decision and then takes up three Kansas Court of Appeals decisions, starting with its most recent decision.

---

[4]     In conducting this analysis, the court relies solely on Kansas law. Plaintiff's Response (Doc. 143) to defendants' motion cites cases from other jurisdictions "that bear a marked resemblance to this matter" to argue that "summary judgment must be denied to Defendants." Doc. 143 at 30. But there is ample Kansas case law to guide the court's duty to apply Kansas law when it is clearly established. The question that this case presents doesn't call the court to apply the law of other states. "Instead, our Court's assignment in a diversity case like this one is to identify the rule adopted by the Kansas Supreme Court and apply it." *State Farm Fire & Cas. Co. v. Bell*, 30 F. Supp. 3d 1085, 1119 (D. Kan. 2014) (citing *Macon v. United Parcel Serv., Inc.*, 743 F.3d 708, 713 (10th Cir. 2014)).

After each case, the court evaluates any overlap with the circumstances of the present case and adopts the Kansas courts' treatment of those overlapping circumstances.  In the end, the court concludes that all those circumstances on which the plaintiff bases her foreseeability argument here present themselves in the reviewed cases—though in different configurations.  And so, the court concludes that a Kansas court would determine that the third party criminal acts leading to plaintiff's injuries here were unforeseeable as a matter of law.  The court begins with *Gragg v. Wichita State*.

### i.    *Gragg v. Wichita State University*

In *Gragg*, Barbara Gragg was shot and killed by Anthony Scott—a member of the Insane Crips gang—at a July 4th community fireworks display held on Wichita State University's campus in 1993.  934 P.2d at 125, 127.  After the display was over, Gragg left the stadium with a friend and was walking through a dark grassy field on campus—formerly used for football practice—when Scott killed her.  *Id.* at 127.  Gragg's heirs alleged, among other things, that WSU failed to provide adequate security for the event and failed to install adequate lighting on its campus.  *Id.* at 125.  No other shootings or violent assaults had occurred during the previous 17 years' fireworks events, *id.* at 135, though two years earlier a man was shot and killed at the Black Arts Festival, held on a different part of WSU's campus, *id.* at 127.  The police captain who planned the security for the event, *id.* at 126, knew that gang activity had occurred within half a mile of campus, *id.* at 127.  WSU utilized over 100 officers from various forces for the event.  *Id.* at 135.  And, the Kansas Supreme Court noted that "no one participating in the production of [the fireworks event] or law enforcement personnel had any prior knowledge that Scott intended to shoot anyone on the WSU campus."  *Id.*  Having enumerated these facts, the

Kansas Supreme Court affirmed summary judgment for WSU, concluding, "[n]o undisputed facts exist that would justify a finding that it was foreseeable that Scott would shoot Gragg." *Id.*

Of note in *Gragg*'s analysis—for present purposes—is the Kansas Supreme Court's finding of unforeseeability based on the lack of previous shootings/violent assaults at the same event and the lack of prior knowledge about Scott and his intentions. The court also noted known gang activity close to campus, but still regarded the shooting as unforeseeable. Likely, the hefty police presence at the event also influenced the court's holding.

As in *Gragg,* the present case presents with a lack of previous shootings or violent assaults at the Super 8 Motel. Plaintiff's exhibits include incident reports—from the Super 8 Motel location at issue—filed with the Wichita Police Department beginning three years before the June 20, 2020, shooting. Those incident reports include the following incidents, none of which indicate shootings or violent assaults:

| Description of Offense | Report's Date | Location in the Record |
|---|---|---|
| Intimidation | 8/11/2017 | Doc. 135-26 at 1 (Pl. Ex. 26) |
| Trespass | 1/11/2018 | Doc. 135-27 at 1 (Pl. Ex. 27) |
| Burglary | 6/29/2018 | Doc. 135-28 at 1 (Pl. Ex. 28) |
| | 7/21/2018 | Doc. 135-29 at 1 (Pl. Ex. 29) |
| | 8/4/2019 | Doc. 135-35 at 1 (Pl. Ex. 35) |
| Embezzlement—Auto | 8/20/2018 | Doc. 135-30 at 1 (Pl. Ex. 30) |
| Sale Sexual Relations | 12/6/2018 | Doc. 135-31 at 1 (Pl. Ex. 31) |
| Unlawful Possession Meth | 12/6/2018 | Doc. 135-31 at 1 (Pl. Ex. 31) |
| | 3/2/2019 | Doc. 135-34 at 1 (Pl. Ex. 34) |
| | 3/6/2020 | Doc. 135-55 at 1 (Pl. Ex. 55) |
| Possession Paraphernalia | 10/19/2019 | Doc. 135-38 at 1 (Pl. Ex. 38) |
| | 11/24/2019 | Doc. 135-39 at 1 (Pl. Ex. 39) |
| Larceny | 12/24/2018 | Doc. 135-32 at 1 (Pl. Ex. 32) |
| from auto | 12/30/2018 | Doc. 135-33 at 1 (Pl. Ex. 33) |
| | 9/21/2019 | Doc. 135-37 at 1 (Pl. Ex. 37) |
| | 1/17/2019 | Doc. 135-40 at 1 (Pl. Ex. 40) |
| from auto | 2/8/2019 | Doc. 135-42 at 1 (Pl. Ex. 42) |
| | 3/7/2019 | Doc. 135-43 at 1 (Pl. Ex. 43) |
| | 3/8/2019 | Doc. 135-44 at 1 (Pl. Ex. 44) |
| from auto | 6/22/2019 | Doc. 135-45 at 1 (Pl. Ex. 45) |
| from auto | 7/8/2019 | Doc. 135-46 at 1 (Pl. Ex. 46) |
| from auto | 7/21/2019 | Doc. 135-47 at 1 (Pl. Ex. 47) |
| from auto | 7/27/2019 | Doc. 135-48 at 1 (Pl. Ex. 48) |

| | | |
|---|---|---|
| from auto | 8/1/2019 | Doc. 135-49 at 1 (Pl. Ex. 49) |
| | 8/15/2019 | Doc. 135-50 at 1 (Pl. Ex. 50) |
| | 9/24/2019 | Doc. 135-51 at 1 (Pl. Ex. 51) |
| from auto | 10/17/2019 | Doc. 135-52 at 1 (Pl. Ex. 52) |
| | 12/21/2019 | Doc. 135-53 at 1 (Pl. Ex. 53) |
| | 3/5/2020 | Doc. 135-59 at 1 (Pl. Ex. 59) |
| | 3/16/2020 | Doc. 135-60 at 1 (Pl. Ex. 60) |
| | 5/10/2020 | Doc. 135-56 at 1 (Pl. Ex. 56) |
| | 6/13/2020 | Doc. 135-62 at 1 (Pl. Ex. 62) |
| Forcible Rape | 9/5/2019 | Doc. 135-36 at 1 (Pl. Ex. 36) |
| Suspicious Character | 1/29/2019 | Doc. 135-41 at 1 (Pl. Ex. 41) |
| Sudden Death-drug related | 1/20/2020 | Doc. 135-54 at 1, 3 (Pl. Ex. 54) |
| Misc. Report—woman woke with knee abrasion, hickey, no memory | 5/21/2020 | Doc. 135-57 at 1, 3 (Pl. Ex. 57) |
| Motor Vehicle Theft | 2/1/2020 | Doc. 135-58 at 1 (Pl. Ex. 58) |
| | 4/2/2020 | Doc. 135-61 at 1 (Pl. Ex. 61) |

Detective Ryan Snyder, the community police officer for the area since 2019, further confirmed no "other shooting events at this particular motel" had occurred during this timeframe.  Doc. 137-14 at 8 (Snyder Dep. 30:4-11).  Defendants' exhibits also include Kansas Standard Offense Reports.  Defendants focus on offense reports that involve battery and aggravated battery— sometimes accompanied by other crimes like burglary and often including a designation or description of domestic violence.  *See, e.g.*, Doc. 137-19 at 2 (Def. Ex. 19); Doc. 137-23 at 4 (Def. Ex. 23).  While the parties fervently debate the details and import of these reports—with plaintiff challenging defendants' characterization of the reports and interpretation of the involved individuals' relationships, Doc. 143 at 7–9—what matters most is what's not there.  In none of the various police and crime reports submitted by either party does the court find any report of a shooting or violent assault at the Super 8 Motel.

And the same is true about SRKBS's prior knowledge of the shooters here.  None of the evidence presented by either party suggests that SRKBS or its employees knew anything about the shooters before the incident on June 20, 2020.  And so, the court sees important overlap between the factual circumstances *Gragg* referenced to justify affirming summary judgment

based on unforeseeability and the case at hand.  But at the same time, the court acknowledges an important difference: *Gragg*'s undisputed facts included a police presence of more than 100 officers, 934 P.2d at 135, but the Super 8 Motel didn't have a security guard.  And SRKBS never considered hiring one, Doc. 135-18 at 14 (Shura Dep. 74:4–9).  And so, the court withholds a conclusion for now and turns to the next case in the lineup—again evaluating circumstances where a Kansas court affirmed summary judgment, on unforeseeability grounds, to a business owner in a premises liability case.

### ii.       *Estate of Bell ex rel. Bell v. 617 West LLC*

In *Bell*, members of a rival gang shot and killed 18-year-old Debrylan Bell in the parking lot of the Village Park at Woodgate apartment complex in Wichita.  2022 WL 17881331, at *1. Bell wasn't a Woodgate tenant but he had stayed at his friend's apartment at the complex occasionally in the weeks leading to the shooting.  *Id.*  The night of the shooting, the shooters drove around Wichita—driving past Bell's home and near his girlfriend's home—apparently looking for Bell.  *Id.*  The GPS tracking system on the ankle monitor of one of the shooter's documented their route that night.  *Id.*  That tracking system also revealed that the shooters were at Woodgate for less than three minutes.  *Id.* at *2.  On the night of the shooting, Woodgate's security measures weren't in place.  *Id.*  The complex had security cameras around the apartments' exterior, and a sign warning of the surveillance, but the camera system wasn't working that night.  *Id.*  And there was no security guard on duty that night, though Woodgate typically shared an unarmed security guard with another complex.  *Id.* at *3.

Affirming summary judgment for Woodgate, the Kansas Court of Appeals held "Bell's killing was not foreseeable to the apartment complex."  *Id.* at *5.  The court premised its decision, *first*, on "whether the landowner knew about the attack beforehand."  *Id.* at *4.  The court explained that neither Bell nor the shooters lived at the complex and that there "had been

18

no prior incidents at the complex involving any of them." *Id.* at *5.  *Second*, the court

discounted previous incidents of reported crime at the apartment complex—even though the

incidents "increased after the defendants bought the complex and include[d] violent crimes, such

as gun crimes and rape." *Id.*  The court reasoned that the incident reports "d[id] not demonstrate

that the particular crime committed here was reasonably foreseeable" because those "previous

incidents 'had no direct relationship to the harm incurred[.]'" *Id.* (quoting *Seibert*, 856 P.2d at

1339).  Instead, the shooting's "location was irrelevant" because no evidence showed "that the

shooters planned the shooting at the apartment complex in order to benefit from inoperative

cameras or lack of a guard; instead, they tracked Bell down after searching for him around

Wichita," *id.* at *6, making this a "targeted killing" and "not a crime of opportunity[,]" *id.* at *5.

Here, as in *Bell*, no evidence suggests that SRKBS knew about the attack beforehand or

had encountered the shooters in any prior incident at the Super 8 Motel.  And no evidence

indicates that the crimes previously reported at the Super 8 Motel had any "'direct relationship to

the harm incurred[.]'" *Id.* (quoting *Seibert*, 856 P.2d at 1339).  Indeed, the parties here spill

bottles of ink arguing about the suspicion, speculation, and observation of various Super 8 Motel

employees.  The employees suspected crimes of prostitution, drug use, drug sales, and the

presence of gang members on the property.  *See, e.g.*, Doc. 135-1 at 6–7 (T. Malone Dep. 20:15–

21:2); Doc. 135-4 at 10–11 (J. Malone Dep. 37:25–38:12); Doc. 135-5 at 5 (Wissinger Dep.

16:6–13).  Deposition testimony by the Motel's general manager, its assistant manager, a former

employee, a housekeeper, and the Motel's maintenance man—and that testimony's subsequent

interpretation by the parties—feature prominently in these arguments.  *See, e.g.*, Doc. 132 at 2, 6;

Doc. 142 at 2, 4.  But Kansas case law—starting with *Seibert*'s outlining the totality of the

circumstances test—prohibits the court from considering any circumstances that don't have a

"direct relationship to the harm incurred[.]"  *Seibert*, 856 P.2d at 1339 ("We believe that totality of the circumstances is the better reasoned basis for determining foreseeability.  The circumstances to be considered *must*, however, have a direct relationship to the harm incurred in regard to foreseeability." (emphasis added)).  Indeed, in *Bell*, the Kansas Court of Appeals disregarded even "violent crimes, such as gun crimes and rape" as not directly related to the shooting.  2022 WL 17881331, at *5.

Plaintiff here doesn't contend the shooters were on the property to use or sell drugs or to avail themselves of sexual services for hire.  Nor does plaintiff aver that the shooters had done so at the Super 8 Motel in the past.  The shooters came to attend a party in Room 319,[5] which later devolved into violence after the night auditor shooed the partygoers outside.  The suspected crimes of prostitution and drug use/sales thus didn't bear a "direct relationship to the harm incurred[.]"  *Seibert*, 856 P.2d at 1339.

Plaintiff argues that the presence of crimes like prostitution and drug use create an environment conducive to a shooting crime,[6] and therefore deposition testimony about these

---

[5]    *See* Doc. 135-7 at 2 (Pl. Ex. 7) (indicating in a police report that Marion Norwood stated he was at the Super 8 Motel "for a party that a female was having[.]"); *id.* at 5 (Pl. Ex. 7) (indicating in a police report that the young woman throwing the party said Jaylen Thomas was present); *see also* Ex. 11-4 (Cam 8 footage 1:48:53–1:49:26) (showing Jaylen Thomas and Marion Norwood—two of the shooters—entering the elevator from front desk area); Ex. 11-5 (Cam 15,16 Footage 1:49:47–1:50:04) (showing—seconds after entry—Jaylen Thomas and Marion Norwood entering Room 319); Ex. 11-12 (Cam. 15, 10 Footage 2:27:28–2:28:59) (showing Jaylen Thomas and Marion Norwood exiting Room 319 just minutes before the shooting in the parking lot); Ex. 11-7 (Cam. 15 Footage 2:04:55–2:06:20) (showing the later-identified shooter in the red hoodie entering Room 319); Ex. 11-13 (Cam. 15, 14 Footage 2:29:28–2:30:30) (showing the male in the red hoodie leaving Room 319 just minutes before the shooting in the parking lot).  The parties stipulated to the admissibility of the police report and the Super 8 Motel surveillance footage from June 20, 2020.  Doc. 123 at 5 (Pretrial Order ¶¶ 2.b.ii., iv.).

[6]    The parties refer to this theory throughout the briefing and depositions as the "broken window theory" of crime.  *See* Doc. 137-5 at 11 (Whisby Dep. 38:2–40:17); *see also* Doc. 142 at 31 ("Plaintiff has continued to attempt to advance the 'Broken Windows Theory' of crime, arguing that when any type of crime exists in increasing numbers on a property, the existence of such crime lends itself to welcoming other criminals, and thus, the creation of more crime."); Doc. 143 at 28 ("The sale of illegal drugs on a property naturally creates an elevated risk of violence. . . .  Moreover, property crimes, despite not

other criminal infractions is relevant to the court's foreseeability analysis. A similar rationale appears to drive plaintiff's decision to include motel reviews about the presence of drug use and suspicious characters. And this conducive environment theory explains plaintiff's focus on the Super 8 Motel's willingness to accept cash payments for rooms—which "attracted a lower clientele"—and to lower their rates—which "attracted risky guests."[7] Doc. 132 at 39–40. But *Bell* doesn't credit this conducive environment theory, as demonstrated by *Bell*'s willingness to discount "a long list of incidents reported to police from the apartment complex in the years before Bell's death." 2022 WL 17881331, at *5. And neither did *Gragg*, where known gang activity in the event's proximity didn't persuade the court to find the shooting foreseeable. 934 P.2d at 127. So, this court doesn't see how—following, as it must, the Kansas courts' lead—it can credit various observations and suspicions of the Super 8 Motel's employees as events directly related to the shooting that injured plaintiff. And so, the court doesn't.

Plaintiff disputes the application of *Bell* to this case's facts. Plaintiff notes that the shooters in *Bell* were on the property for three minutes. Doc. 143 at 29 (citing *Bell*, 2022 WL 17881331 at *2). And, she argues, this matters because there "was no evidence the apartment complex [sued in *Bell*] knew about gang members being on the property prior to the shooting." *Id.* But the same goes here. Plaintiff has failed to adduce any evidence the Super 8 Motel night auditor knew of the gang members' presence. To the contrary, all the summary judgment evidence suggests the night auditor didn't know of their presence until he received a noise

---

involving violence per se, lead to violent crimes if left unchecked. . . . The evidence above indicates that the Super 8 Motel had policies and practices that encourage criminals to congregate on the property[.]")..

[7]     According to the Super 8 Motel's night auditor, accepting cash payments—instead of a credit card for incidentals—"was unwise and . . . did probably attract a lower clientele." Doc. 135-6 at 13–14 (Townsend Dep. 25:11–26:11). He explained that other employees shared this view: "most of the people that worked there did not think [cash deposits] was a good idea because they thought if you didn't have a credit card you maybe were kind of undesirable." *Id.* at 13 (Townsend Dep. 25:20–24).

complaint phone call.  Doc. 135-6 at 6–7 (Townsend Dep. 13:8–14:19).  Indeed, in his deposition

testimony, the night auditor explained that he checked the monitor after receiving the phone call,

suggesting he was unaware of the partygoers' presence before the call (because the video

monitor was only viewable in the office, and he had been working in the breakfast room).  *Id.* at

6 (Townsend Dep. 13:8–18).  And, when the night auditor learned of the partygoers' presence,

he called and then walked to Room 319 where he required the partygoers to leave the Motel.  *Id.*

at 6–7 (Townsend Dep. 13:18–14:21).  And *Bell* emphasized the landowner's lack of knowledge

of an "attacker" beforehand and the absence of "prior incidents" involving the shooters.  2022

WL 17881331 at *4–5.  Even once defendant SRKBS knew of the partygoers' presence—

through its night auditor—it still lacked any knowledge that any of the partygoers were attackers.

The night auditor explained the peaceful interaction he had when he told the partygoers to leave:

"So the people were pretty respectful, I was surprised, they didn't complain or anything, I am

surprised, looking back at what happened, . . . So they all left.  They either went down the stairs

which were right by there or they took the elevator down."  Doc. 135-6 at 7 (Townsend Dep.

14:8–21).  Such a peaceable interaction isn't a "prior incident" involving an "attacker."  And so,

this interaction minutes before the shooting wouldn't change a reasonable factfinder's calculus of

foreseeability.  Just as the *Bell* court concluded the apartment complex didn't know the attackers

beforehand, here, no evidence in the summary judgment record would permit a reasonable

finding that defendant SRKBS knew the partygoers would become attackers.

Plaintiff also argues that the shooter in *Bell* "had sought out the decedent and he just

happened to be at the apartment complex . . . Bell was going to be killed whether he was in a

Ritz-Carlton parking lot or the worst criminal-infested place imaginable."  Doc. 143 at 29.  But,

again, this is a difference without a distinction.  To be sure, the present case contains no facts

suggesting the shooters spent the evening seeking out their respective targets. But that doesn't negate the conclusion that the location was just as "irrelevant" in this case as it was in *Bell*. 2022 WL 17881331 at *6. This shooting, too, could have happened anywhere. In explaining that the location was irrelevant, *Bell* expounds that there was "no evidence to show that the shooters planned the shooting at the apartment complex in order to benefit from inoperative cameras or lack of a guard[.]" *Id.* Similarly, here, plaintiff hasn't adduced any evidence that the shooters planned the shooting at the Super 8 Motel to benefit from a paucity of security. Plaintiff calls the crime here a "crime of opportunity" but hasn't adduced any evidence that the alleged gang members knew that the Super 8 Motel presented an opportunity of any kind and they seized that opportunity.

The court acknowledges some distinctions in factual circumstances between *Bell* and this case, but the court nevertheless finds this Kansas Court of Appeals determination of foreseeability under the *Seibert* test instructive. And, the court doesn't rely solely on *Bell* in reaching its conclusions. It also relies on the next case in the lineup, *Gardin v. Emporia Hotels, Inc.*, 61 P.3d 732, 738 (Kan. Ct. App. 2003).

### iii.     *Gardin v. Emporia Hotels, Inc.*

In *Gardin*, a man in a hotel parking lot—he wasn't a hotel guest—was stabbed repeatedly by a hotel guest. 61 P.3d 732, 735 (Kan. Ct. App. 2003). The hotel guest was a member of a sales group that previously had rented rooms at the hotel. *Id.* at 734–35. The stabbing victim, hoping to take refuge from the attack inside the hotel, ran to the glass doors that opened into the lobby. He repeatedly asked an observing hotel employee to let him into the lobby. *Id.* at 735. The employee refused to unlock the lobby doors but told him the police were on the way. *Id.* The stabbing victim brought an action against the hotel alleging that the hotel owed him a duty.

*Id.*  When the hotel moved for summary judgment, in part, on foreseeability grounds, the court applied the totality of the circumstances analysis.

The Kansas Court of Appeals concluded that there was "no evidence the motel knew that members of the . . . sales group had engaged in prior criminal activity." *Id.* at 739.  Nor did the court find it "foreseeable that [the attacker] would follow [the victim] into the lighted entrance and stab him repeatedly in front of" a hotel employee.  *Id.*  Finally, the court determined, the employee "had no warning that [the attacker] was violent[.]"  *Id.*  The court also noted the following:  the record of prior crime at the hotel was sparse; the hotel's location wasn't in a "high-crime neighborhood" (despite its location "near an interstate highway"); and it did "not appear that the lighting in the parking lot would have prevented the attack[.]"  *Id.* at 738.  On these facts, the Kansas Court of Appeals affirmed the district court's decision granting summary judgment, concluding that, "under the totality of the circumstances, [the hotel] had no duty to protect [plaintiff] from this unforeseeable attack."  *Id.* at 739.

Of particular note—for the court's analysis in this case—is *Gardin*'s distinction between previous knowledge of an interaction with the attacker versus a warning that the attacker was violent.  61 P.3d at 738.  As discussed under the *Bell* analysis, above, no reasonable factfinder could conclude that the night auditor's interaction with the shooters here, as members of the party that he had dispersed, provided any warning that they or any of the partygoers were violent. *See* Doc. 135-6 at 7 (Townsend Dep. 14:8–21).

The court also views *Gardin* as an opportunity to evaluate the "high-crime neighborhood" prong of the foreseeability analysis.  *Seibert*, when establishing the totality of the circumstances test for foreseeability, suggested that when a "parking lot is located in a known crime area, that factor should be considered."  856 P.2d at 1339.  And *Seibert* clarified that "the

precise area of the parking lot is not the only area which must be considered" but that "an all-night, poorly lit parking lot *in a dangerous high crime area of an inner city*" is a factor affecting the foreseeability of criminal activity.  *Id.* (emphasis added).  So, *Seibert* suggests, the high-crime analysis should encompass an "area" of an inner city—not the entire city.  But *Seibert* didn't provide any more guidance about how to apply this "high-crime neighborhood" prong of the analysis.  That's one reason *Gardin*'s guidance is helpful.  *Gardin* disregarded the close proximity of an interstate highway when concluding the hotel was not located in a high-crime neighborhood.  61 P.3d at 738 ("Although the motel is located near an interstate highway, there is no evidence that this is a high-crime neighborhood.").  This reference suggests courts should identify the relevant neighborhood for the "high-crime" analysis with some degree of definitude.  Recall too that *Gragg* disregarded known gang activity within half a mile of a gang shooting.  934 P.2d at 127. [8]

Plaintiff here asserts that she's entitled to partial summary judgment on the issue of defendant's duty to take security action.  She relies, in part, on her argument the Super 8 Motel is "located in a high crime area" and notes that "Wichita is a known high crime city."  Doc. 132 at 40.  Plaintiff supports her assertion with maps and charts from an expert report portraying state-

---

[8]      The court recognizes that the Tenth Circuit affirmed a jury finding of foreseeability in *Storts v. Hardee's Food Systems, Inc.* that rested, in part, on the relevant high-crime analysis area including the "entire Kansas Turnpike."  210 F.3d 390, Nos. 98-3285, 98-3320, 2000 WL 358381, at *6 (10th Cir. 2000).  Defendant asked the Circuit to certify the expansiveness of this area to the Kansas Supreme Court, as follows:  "The second question posed is whether the totality of the circumstances can include prior criminal attacks that occurred in an area as widespread as the entire Kansas Turnpike."  *Id.*  The Circuit denied the certification request on two grounds:  (1) defendant first posed the question after the moving party had received an adverse decision from the district court, and (2) the totality of the circumstances test is "broad enough to encompass such evidence."  *Id.*  This court understands the Circuit's embrace of such a widespread area as one tightly tethered to the circumstances of that particular case.  The isolated nature of fast food restaurants nestled within the Kansas Turnpike, and the shared clientele between Turnpike stops despite significant geographic separation, warranted a far more expansive area for consideration than is typical.  Here, though, the court considers a more typical case and determines that the court's high-crime analysis should not include the entire city of Wichita.  Indeed, *Gardin* focused on a particular neighborhood.  61 P.3d at 738.

wide and city-wide crime data.  *Id.* at 25–26; Doc. 135-20 at 2–4 (Pl. Ex. 20).[9]  Defendants

dispute plaintiff's use of this data because "[c]ity data is not site specific enough for [the] crime

analysis."  Doc. 142 at 12.  The court agrees—given *Gardin*'s focus on the hotel's particular

neighborhood—so the court's analysis disregards the state and city-wide data.

But plaintiff's crime density maps—focusing on the location of the Super 8 Motel—are

more compelling (and more in line with *Gardin*).  Doc. 132 at 13–14; Doc. 135-20 at 10–11 (Pl.

Ex. 20).  The brown-block crime density map, below, locates the Super 8 Motel at a mid-level

range for crime density with higher crime density existing north and a much higher crime density

existing east (to the right) of the Motel.  Doc. 132 at 25; Doc. 135-20 at 2 (Pl. Ex. 20).



The rainbow-colored crime density map (below) appears to center the hotspot of the 2020

Wichita crime scene squarely over the Super 8 Motel.  Doc. 135-20 at 11 (Pl. Ex. 20).  Plaintiff

argues that the "crime density maps speak for themselves."  Doc. 132 at 40.

---

[9]      The parties stipulated to the admissibility of "[e]xhibits and photos from the parties' expert
reports."  Doc. 123 at 5 (Pretrial Order ¶ 2.b.xii.).



Plaintiff also offers testimony of Detective Ryan Snyder, a community police officer

assigned to the Wichita Police Department's territory that includes the Super 8 Motel.  Doc. 135-

17 at 4 (Snyder Dep. 7:20–24).  When plaintiff asked Detective Snyder to compare the crime at

the Super 8 to other hotels in that part of town, he qualified his answer this way:  "Obviously,

quantitatively, I can't tell you because I don't have the numbers in front of me."  *Id.* at 5 (Snyder

Dep. 11:14–22).  Detective Snyder then proceeded to testify that he didn't experience as many

problems with the neighboring Comfort Inn and that the level of crime at the Super 8 Motel was

"probably higher."  *Id.* at 5–6 (Snyder Dep. 11:24–12:15).

These location-specific crime density maps and the testimony of Detective Snyder could

convince a reasonable juror that this is a "high crime area."  *Seibert*, 856 P.2d at 1339.  This

conclusion has consequences for the summary judgment motions here—and the consequence

changes based on which motion the court is deciding.  If the court, when evaluating plaintiff's

Partial Motion for Summary Judgment, views defendants as the non-moving party, the court

must draw inferences in the light most favorable to defendants. *Nahno-Lopez v. Houser*, 625

F.3d at 1283.  In this posture, the court notes the discrepancy between the crime density maps the

plaintiff offers.  The brown-block map indicates a mid-level crime range for the Super 8 Motel,

while the rainbow map glows red with crime. And the court recognizes that Detective Snyder's phrases "quantitatively, I can't tell you" and "probably" might give a juror pause. So, in this procedural context, a reasonable factfinder could conclude the Super 8 Motel doesn't qualify as a high crime area. The high crime area evidence plaintiff adduces thus doesn't suffice to establish that defendants had a duty as a matter of law. So, the court couldn't grant plaintiff's summary judgment motion on this issue.

On the other hand, when evaluating defendants' motion, the court treats plaintiff as the non-moving party. *Id.* And in that context, the court must draw inferences in the light most favorable to plaintiff. *Id.* From this vantage point, the maps indicate high levels of crime—even if the maps suggest different density levels—and Detective Snyder's testimony confirms that high-crime indicator. A reasonable juror thus could infer that the Super 8 Motel sits in a high crime area, suggesting a triable issue of foreseeability and requiring the court to deny summary judgment to defendants. So, the high crime factor appears—but only at first blush—to support a jury submissible case. But the more granular analysis required by Kansas law produces a different conclusion.

The crime density maps don't differentiate among the types of crime. And neither did Detective Snyder. This imprecision matters. The Kansas Supreme Court requires this court to consider only those circumstances that "have a direct relationship to the harm incurred[.]" *Seibert*, 856 P.2d at 1339. The crimes that pigment these density maps don't portray a direct relationship to shootings, or, for that matter, any type of violent assault. This Order already has noted the precision demanded by Kansas's foreseeability test. Recall the table above where the court summarized the type of crime occurring at the Super 8 Motel: primarily larceny, coupled with some drug use crimes and burglary (*see* § III.A.2.a.i. above). Simply put, these maps don't

answer the right question—at least not according to the Kansas Supreme Court's reasoning in *Seibert*.

*Seibert* acknowledged that parking lots breed crime, and precisely the kind of crime painting the maps here:  "It is a sad commentary on our times that there is probably no shopping center parking lot that is likely to be crime free.  Thefts of vehicles and from vehicles do occur, as well as purse snatches, etc."  *Id.*  *Seibert*'s next sentence then distinguished between these types of crimes and those which give rise to a business owner's duty to protect:  "It is only where the frequency *and severity* of criminal conduct substantially exceed the norm or where the totality of the circumstances indicates the risk is foreseeably high that a duty should be placed upon the owner of the premises to provide security."  *Id.* (emphasis added).  To be sure, the maps here, and Detective Snyder's testimony, suggest crime *frequency*.  But frequency under *Seibert* isn't enough.  A high crime area must include more frequent *and more severe* levels of criminal conduct such that those levels substantially exceed the norm.  The evidence plaintiff has adduced—the crime density maps and Detective Snyder's testimony—indicates frequent crime, but not severe crime.  No reasonable factfinder could examine maps showing a high level of crime—but without evidence of shootings or other violent crime—and find that defendants here should have foreseen the gang shooting that injured plaintiff.  And so, the high crime area prong doesn't present a genuine issue warranting a trial on foreseeability, after all.

The court concludes its review of Kansas premises liability case law affirming summary judgment on unforeseeability grounds with *Weroha v. Craft*, 951 P.2d 1308 (Kan. Ct. App. 1998).

iv.        *Weroha v. Craft*

In *Weroha*, unknown assailants attacked plaintiff in the restroom of a Planet Pinball arcade, and plaintiff sustained a broken jaw and other injuries to his face and head.  *Id.* at 1309.  And the attacker knocked him unconscious.  *Id.*  At the time of the attack, the sole employee on duty didn't have eyes on the arcade because he was in the storeroom talking on the phone, *id.*, and was absent from the public area for "an extended period of time," *id.* at 1313.  No security guard patrolled, though occasionally Planet Pinball had utilized off-duty police officers.  *Id.* at 1309.  The arcade hadn't installed either mirrors (allowing one to see the arcade's blind spots) or surveillance cameras (real or fake).  *Id.*  Plaintiff filed suit, alleging "that Planet Pinball negligently or recklessly breached its duty of care owed to him by failing to provide reasonable security measures[.]"  *Id.*  The Kansas Court of Appeals affirmed the district court's decision granting summary judgment to Planet Pinball, concluding the attack on plaintiff was unforeseeable as a matter of law.  Analyzing the totality of the circumstances, the court took into account the employee's extended absence; the absence of "inexpensive, unobtrusive security measures" to enhance patron safety; the absence of a policy to eject loitering individuals; the low rate of criminal activity in the area; and the absence of prior incidents, among other things.  *Id.* at 1313.

Of particular relevance here is *Weroha*'s treatment of the employee's absence.  The defendant's sole employee on duty had removed himself from a position where he could discern the arcade's goings-on.  *Id.*  So, he wasn't aware of plaintiff's attackers until he heard the attack through the storeroom wall, at which point he asked the attackers to leave.  *Id.* at 1314.  Given the lack of a security guard or other staff, only the sole employee could have identified preemptively the security threat the assailants posed to plaintiff.  But the Kansas Court of

Appeals concluded neither the absence of dual staffing nor the absence of a security guard could support a factfinder's finding of foreseeability.

In the present case, the Super 8 Motel's night auditor, Gregg Townsend, was likewise the only employee on duty at the time of the incident.  Doc. 135-2 at 25 (Stark Dep. 55:2–7).  And Mr. Townsend's duties—taking out the trash and setting up breakfast—often kept him away from the front desk where he could monitor security cameras and foot traffic through the front door.  *Id.* at 31 (Stark Dep. 72:10–23).  Plaintiff suggests this sole employee approach shows defendants breached their duty because having only the night auditor working prevented any preemptive identifying of the security threat:  "Dozens of the partygoers, including all three shooters, entered the hotel from the front door.  That too is uncontroverted.  But, as SRKBS knew, Mr. Townsend was too preoccupied with his duties to be able to monitor the front door."  Doc. 146 at 23.  And the Super 8 Motel didn't have a security guard because SRKBS had never considered hiring one.  Doc. 135-18 at 14 (Shura Dep. 74:4–9).  While dual staffing and security guards may support a premise owner's defense of a premises liability claim, the court here follows the Kansas Court of Appeals in holding the absence of such security measures doesn't preclude summary judgment for the business owner.  And the absence of such security measures doesn't entitle plaintiff to judgment as a matter of law on the issues of duty and breach.

Also notable from *Weroha*, the Kansas Court of Appeals chose not to take Planet Pinball to task for failing to install even unobtrusive and inexpensive security measures, like mirrors and cameras.  This failure brings to the fore the final piece of the foreseeability puzzle:  the use of reasonable and economically feasible security measures.  *See Seibert*, 856 P.2d at 1339.  *See also Storts v. Hardee's Food Sys., Inc.*, 210 F.3d 390, Nos. 98-3285, 98-3320, 2000 WL 358381, at *7 (10th Cir. 2000) ("There was also considerable testimony concerning the appropriateness of

security measures . . . and the feasibility of enhanced measures, both of which are factors

relevant to a foreseeability analysis.").  Plaintiff has adduced the following evidence about the

Super 8 Motel's security measures.

On one hand, the Super 8 Motel had interior and exterior cameras.  Doc. 135-2 at 31

(Stark Dep. 72:10–17).  It also employed a do-not-rent list to prevent troublesome individuals

from renting a room again.  Doc. 137-11 at 8 (Stark Dep. 22:19–23:1).  On the other hand, the

monitor for those cameras was at the front desk and the sole employee wasn't always at the front

desk, able to see them.  Doc. 135-2 at 31–32 (Stark Dep. 72:10–73:6).  And guests could rent

rooms online to circumvent the do-not-rent list.  Doc. 135-28 at 3 (Pl. Ex. 28).  Indeed, one front

desk employee identified rooms rented to do-not-rent listed individuals.  Doc. 135-4 at 13 (J.

Malone Dep. 42:1–16).  Finally, SRKBS knew about an unsecure entrance to the Motel—the

south door—and didn't take the necessary measures to secure it.  The court concludes from these

measures that the Super 8 Motel could have done better, and in an economically feasible manner.

But the same is true of Planet Pinball in *Weroha*.  The Kansas Court of Appeals still affirmed

summary judgment in favor of Planet Pinball despite a complete absence of any cameras or

mirrors.  Indeed, the security measures the Super 8 Motel employed here were significantly more

substantial than those in *Weroha* and, as the court will discuss below, involved the security

cameras and natural surveillance that the Tenth Circuit found crucially absent in *Storts*.  *See*

2000 WL 358381, at *7.

In sum, the various circumstances plaintiff relies on to advance a finding of foreseeability

surface in the above Kansas cases.  And in all of those cases, the Kansas courts affirmed

summary judgment for the defendants because the attacks were unforeseeable and, thus, no duty

inhered to the defendant business owners.  The court acknowledges that the particular mix of

circumstances here isn't identical to the particular mix in any of the Kansas cases the court has discussed. But this extended survey of how Kansas courts have applied the totality of the circumstances test to determine foreseeability manifests significant overlap with the summary judgment facts here. And that overlap convinces the court that granting summary judgment to defendants on plaintiff's premises liability theory of negligence is appropriate under Kansas law. In short, applying Kansas law wouldn't permit a reasonable factfinder to conclude that defendant SRKBS breached its duty to plaintiff. But, not wanting to leave any stone unturned, the court confirms this conclusion with a brief foray into a case reaching the opposite conclusion, below.

### b.    Foreseeable:  *Storts v. Hardee's Food Systems*[10]

In *Storts*, plaintiff exited the Kansas Turnpike at the Belle Plaine service area to stop at the Hardee's restaurant there. 2000 WL 358381, at *1. Plaintiff parked her van at the rear of the restaurant, near the trash dumpsters and an employee entrance which had no windows. *Id.* at *7. To access a customer entrance from her parking place, plaintiff had to walk along a windowless wall to a recessed door. *Id.* After, among other things, purchasing a soda from Hardee's, plaintiff returned to her van. *Id.* at *1. Parked in the adjacent stall was a car with a male driver behind the wheel and two men standing next to the trunk of the car. *Id.* When plaintiff

---

[10]    Plaintiff cited other Kansas cases that fall into the foreseeable category, including: *Hammond v. San Lo Leyte VFW Post #7515*, 466 P.3d 886 (Kan. 2020), and *Kimple v. Foster*, 469 P.2d 281 (Kan. 1970). *See* Doc. 132 at 36–37. The court reviewed these two cases and found that they—along with *Gould v. Taco Bell*, 722 P.2d 511 (Kan. 1986)—constitute a particular line of cases of less relevance here. In all three cases, conflict arose between patrons, boiling up while the business owner (or the owner's agent) looked on without acting. Indeed, *Seibert*—the controlling case for our purposes—distinguished this line of cases from the kind of case presented in *Seibert*. 856 P.2d at 1338 ("In the case before us, the attack upon plaintiff did not occur inside the business premises under the noses, so to speak, of the proprietors. The attack occurred in a parking lot. . . . Neither failure to intervene nor to summon police is the basis of liability asserted herein, as was true in the *Gould* and *Kimple* cases. Rather, the liability sought to be imposed herein is predicated upon the frequency and severity of prior attacks against different patrons by presumably different attackers at different times and in different areas of the parking lot, plus the totality of the circumstances[.]"). Now, in the present case, the court follows suit and differentiates this line of cases from the *Seibert* line. So, the court doesn't address those other cases beyond this footnote.

attempted to enter her van, one man snatched her purse and then the men threw her in the trunk of their car.  *Id.*  Plaintiff's abductors drove her to a field, raped and sodomized her, put the barrel of a pistol in her mouth, and stole her jewelry.  *Id.*  Plaintiff filed suit, alleging that Hardee's negligently failed to provide proper security to protect her.  *Id.*  The case was tried to a jury, who found Hardee's 70% at fault and the court entered judgment against Hardee's for $140,000.  *Id.* at *2.  Hardee's appealed arguing, among other things, that "it owed no duty as a matter of law to provide increased security."  *Id.*

The Tenth Circuit concluded that plaintiff had adduced sufficient evidence at trial to support a jury finding of foreseeability, giving rise to Hardee's duty to plaintiff.  The Circuit explained its decision this way:

> [T]he record before us contains evidence that the Kansas Turnpike, and other Hardee's along the Turnpike, had been the sites of multiple violent crimes in the preceding three years.  Furthermore, . . . the evidence demonstrates that fast food restaurants experience a high rate of crime, the Belle Plaine[] Hardee's and its parking lot were especially vulnerable, and the foreseeable risk of crime at that location was greater than usual.  Finally . . . the jury heard opinion testimony that reasonable, widely-used security measures were not employed and the security in place was below industry standards.

*Id.* at *8.  To explain the increased risk of criminal activity at the Belle Plaine Hardee's, the Circuit cited the following factors:  "It was located on the Kansas Turnpike, a crime corridor with a high crime rate; it experienced an exceptionally high volume of customers; and the parking lot was isolated, lacking natural surveillance otherwise afforded by the presence of other businesses and activities."  *Id.* at *7.  And the Circuit expounded on the security measures Hardee's hadn't employed, explaining that the "parking area surprisingly had no natural surveillance and fell far below industry standards . . . Hardee's should have installed security cameras, windows facing the parking area, and/or a window or peephole in the rear employee entrance[.]"  *Id.*

Several aggravating factors—ones not presented in this case—make the finding of foreseeability in *Storts* distinguishable.  *First*, the Circuit cites multiple violent crimes exacerbated by Hardee's location on "a crime corridor" and its exceptionally high volume of customers.  *Id.* at *8.  Here, the previous crimes at the Super 8 Motel were non-violent in nature (*see* § III.A.2.a.i. above), and neither the "crime corridor" nor the exceptionally high volume exacerbations apply.  *Second*, the Circuit emphasizes the isolated nature of the parking lot and the lack of other businesses and activities nearby, precluding natural surveillance.  *Storts*, 2000 WL 358381, at *7.  Here, other businesses sit in close proximity to the Motel.  *See* Doc. 135-9 at 1 (Pl. Ex. 9) (showing an aerial diagram of the Super 8 Motel with neighboring businesses and residences).  And the Super 8 Motel parking lot is adjacent to and intersects with the neighboring Comfort Inn & Suites parking lot.  Doc. 137-7 at 5 (Kimble Dep. 14:20–15:9).  *Third*, in *Storts* the Hardee's had no security cameras or windows.  *Storts*, 2000 WL 358381, at *7.  But the Super 8 Motel at issue here had exterior cameras.  Doc. 135-2 at 24–25 (Stark Dep. 54:22–55:1).  And so, given both the alignment with the foreseeability analysis in Kansas cases granting summary judgment to business owners and the distinguishing circumstances from *Storts*, as enumerated above, the court is confident that a Kansas court would grant summary judgment to defendants on plaintiff's premises liability theory here.

Before leaving this discussion about plaintiff's first duty theory, the court pauses to recall that imposing a duty on business owners for third party criminal acts is the exception, not the general rule.  The Kansas Supreme Court made this clear in *Seibert*.  856 P.2d at 1338.  The duty arises only when the "risk of peril" registers as "*above and beyond* the ordinary," "where the frequency and severity of criminal conduct *substantially exceed* the norm[,]" and where "the risk is foreseeably *high*[.]"  *Id.* at 1338–39 (emphases added).  The Kansas Supreme Court was

cautious, limiting the circumstances when such a duty arises. *Id.* And—in those exceptional cases when a duty arises—the Kansas Supreme Court also limited the level of security the duty compels to a reasonableness standard. *Id.* at 1339.

Over-zealously applying such a duty exacts a burden on business owners—and particularly business owners who serve clients in the lower socioeconomic stratum—that could affect a business's ability to exist. A court-imposed mandate that requires every budget hotel in Wichita to hire full-time security guards or dual staff all shifts compromises the ability of an individual with limited economic means to secure lodging. And if that mandate's net expands even further, it also could compromise the provision of other services and products to such an individual. The court is sympathetic to plaintiff's plight. She sustained injury while minding her own business in a bed inside a motel room. But under Kansas law, a duty to provide a higher level of security should inhere only when the totality of the circumstances warrants it. It is the exception, not the rule. The court heeds the Kansas Supreme Court's cautious language and circumscribes its interpretation of a business owner's duty accordingly.

### B.    Other Theories of Duty

While the parties' briefs focus almost exclusively on the duty a business owner owes to a patron, the Pretrial Order lists three other theories under which plaintiff claims SRKBS owes her a duty: a duty to prevent harm caused by its employees acting within the course and scope of their employment; a duty of reasonable care to an entrant as an occupier of land; and a general duty of reasonable care under the circumstances. Doc. 123 at 12 (Pretrial Order ¶¶ 4.a.a.i.2–4). Plaintiff asserts that defendants' Motion for Summary Judgment doesn't address her other theories of duty. And so, plaintiff contends, defendants' motion turns into a request for partial summary judgment. Doc. 143 at 26. Defendants reply that all plaintiff's negligence theories require foreseeability of harm to establish a legal duty on the part of SRKBS. Doc. 147 at 7. In

36

support, defendants cite *Manley v. Hallbauer*, which reads: "To find a legal duty to support a negligence claim, (1) the plaintiff must be a foreseeable plaintiff and (2) the probability of harm must be foreseeable."[11] 423 P.3d 480, 483 (Kan. 2018) (citation and internal quotation marks omitted). So, defendants contend, their briefing, which demonstrates an absence of foreseeable harm to plaintiff, applies to all plaintiff's theories of negligence. Doc. 147 at 8. So, defendants assert, all plaintiff's theories fail. *Id.* The court agrees with defendants. The court explains its conclusion, taking the theories of duty in reverse order, below.

But before the court engages in that analysis, it suspects that these remaining three theories of duty are essentially the same argument that the court rejected above, just repackaged. For example, plaintiff contends that defendants owed a duty to plaintiff "to prevent harm caused by its employees acting within the course and scope of their employment." Doc. 123 at 12 (Pretrial Order ¶ 4.a.a.i.2.). But the only harms plaintiff claims as a breach involve SRKBS's failure to provide security: the general manager failed "to employ sufficient persons to be able to monitor the traffic in and out of the hotel[;]" and the general manager failed to train "employees on spotting and mitigating crime on the property."[12] *Id.* (Pretrial Order ¶¶ 4.a.a.ii.2., 4.a.a.ii.9.). The alleged harms caused by employees, therefore, revolve around providing adequate

---

[11] In *Manley*, the Kansas Supreme Court addressed the Restatement (Third) of Torts proposition that courts should consider omitting foreseeability of risk from the duty analysis. 423 P.3d at 486. The Kansas Supreme Court left "for another day the decision whether to adopt other aspects of the Restatement (Third), in particular whether we should abandon foreseeability as a consideration when analyzing a person's duty to another." *Id.* When making that save-it-for-later determination, the Kansas Supreme Court noted that abandoning a foreseeability analysis "would deviate from [Kansas] caselaw" and then emphasized the court's primary policy consideration is its adherence to precedent. *Id.* One recent Kansas Supreme Court case cites the Restatement (Third) of Torts, but in the context of breach and without offering any definitive endorsement of its divergent approach to foreseeability. *Reardon for Est. of Parsons v. King*, 452 P.3d 849, 856 (2019). This discussion convinces this court that, at least until "another day" comes, foreseeability in a duty analysis is appropriate under Kansas law.

[12] As noted previously, plaintiff included one other alleged breach that involved an employee's actions in the Pretrial Order. "Defendant breached its duties by . . . renting the room to the women in the first place while acknowledging that . . . ." Doc 123 at 12 (Pretrial Order ¶ 4.a.a.ii.6.). But plaintiff left this alleged breach incomplete. And so, the court doesn't consider it here.

security—nothing more.  *Weroha* made a similar repackaging observation when it separately addressed a business owner's duty to provide security and an employee's duty to intervene: "[Plaintiff] is actually just arguing again that Planet Pinball had a duty to take additional security measures to prevent or make less likely the commission of the crime."  *Weroha*, 951 P.2d at 1315.  The same is true here.  The court could dispense with these final three theories on this basis alone.  But, out of an abundance of caution, the court addresses each additional theory of duty below, starting with the "general duty of reasonable care under the circumstances."  Doc. 123 at 12 (Pretrial Order ¶ 4.a.a.i.4.).

"Kansas law does not impose a generalized duty on everyone to prevent all possible harms to others."  *Corbett v. City of Kensington*, 530 P.3d 750, 758 (Kan. Ct. App. 2023).  Rather, Kansas law only "imposes a duty of care to safeguard against reasonably foreseeable harms based on the circumstances of a particular case and the parties' relationships."  *Id.*  And "in the absence of a 'special relationship' there is no duty on a person to control the conduct of a third person to prevent harm to others.  A special relationship may exist between parent and child, master and servant, the possessor of land and licensees."  *Gragg*, 934 P.2d at 128 (citation and internal quotation marks omitted)

Plaintiff alleges defendants had a general duty of reasonable care.  But, apart from a special relationship, no such general duty arises when the harm involves the conduct of a third person.  And the court has addressed any special relationship that might suffice to recognize such a duty separately (*i.e.*, the court addressed the business-owner/patron relationship—above—and the land possessor/licensee relationship—below).  So, the general duty theory fails easily here.

Next up on the list:  plaintiff's theory of duty which relies on an entrant and an occupier of land.  Doc. 123 at 12 (Pretrial Order ¶ 4.a.a.i.3.).  This land possessor duty fails—as

defendants predicted—on foreseeability grounds.  While the requisite special relationship inheres

a duty on an occupier of land, the relevant Restatement provision limits that duty with

foreseeability.  Restatement (Second) of Torts § 314A identifies the special relationship that

leads to a duty to aid or protect for an occupier or possessor of land:

> (1) A common carrier is under a duty to its passengers to take reasonable action
>
>> (a) to protect them against unreasonable risk of physical harm, and
>>
>> (b) to give them first aid after it knows or has reason to know that they are ill or injured, and to care for them until they can be cared for by others.
>
> . . . .
>
> (3) A possessor of land who holds it open to the public is under a similar duty to members of the public who enter in response to his invitation.

Restatement (Second) of Torts § 314A (Am. L. Inst. 1965); *see also Gragg*, 934 P.2d at 129

(citing Restatement (Second) of Torts § 314A as the relevant provision under Kansas law to

establish an occupier of land-entrant based theory of duty).  But the Restatement—in its

comments—circumscribes that duty:  "The defendant is not liable where he neither knows nor

should know of the unreasonable risk, or of the illness or injury.  He is not required to take

precautions against a sudden attack from a third person which he has no reason to anticipate[.]"

Restatement (Second) of Torts § 314A cmt. e (Am. L. Inst. 1965).  And so, even if plaintiff here

were to recharacterize her relationship with SRKBS to avoid the limitations on a business

owner's duties, she runs into the same foreseeability problem.  And the court already has

determined that no reasonable factfinder could conclude SRKBS knew or should have known of

the unreasonable risk to plaintiff as a result of the third party criminal acts here.  So, SRKBS

didn't have a duty to take precautions against a sudden attack from the partygoers that SRKBS

didn't anticipate.  And defendants properly argue that their foreseeability arguments—which

warrant summary judgment under a premises liability theory—likewise apply here.

Plaintiff's only remaining theory of duty is the duty employer defendants owe to third persons "to prevent harm caused by its employees acting within the course and scope of their employment."  Doc. 123 at 12 (Pretrial Order ¶ 4.a.a.i.2.).  "A review of [Kansas] caselaw makes it clear that an employer owes a duty of reasonable care under the circumstances to prevent harm to third parties caused by its employees when those employees are acting within the scope of their employment."  *Reardon for Est. of Parsons v. King*, 452 P.3d 849, 855 (Kan. 2019).  But the harm to plaintiff alleged here wasn't caused by defendant SRKBS's employees, but by the criminal acts of third parties—so this theory is on shaky ground at best.

And, even if the court credits plaintiff's theory—and assumes an SRKBS employee's actions somehow caused plaintiff's harm—foreseeability still governs employer liability.  The Kansas Supreme Court has explained that foreseeability applies in the employer liability context: "liability results . . . because the employer *had reason to believe that an undue risk of harm to others would exist* as a result of the employment of the alleged tortfeasor.  The employer is subject to liability only for such harm as is within that risk."  *Kan. State Bank & Tr. Co. v. Specialized Transp. Servs., Inc.*, 819 P.2d 587, 598 (Kan. 1991) (emphasis added).  And the Kansas Supreme Court affirmed the "trial court's analysis of the foreseeability issue" in *Kansas State Bank & Trust* by explaining that "if [the employee's] battery of [plaintiff] was foreseeable, the employer . . . may be liable."  *Id.*  Here, the court already has determined that the harm to plaintiff by third party criminal acts was unforeseeable to SRKBS as a matter of law.  This analysis encompasses any actions SRKBS's employees took or failed to take.  And so, as defendants suggest, the foreseeability analysis applied above forestalls a duty to SRKBS on this negligence theory as well.  The court thus grants summary judgment to defendants, finding no duty inhered to SRKBS.

The court wraps up its work in this action with some housekeeping work, below.

### C.      Punitive Damages and Piercing the Corporate Veil

#### 1.  Punitive Damages

Plaintiff also brings a claim for punitive damages premised on the general manager's alleged unresponsiveness to "the crime and dangerous patrons on the property."  Doc. 123 at 13 (Pretrial Order ¶ 4.a.b.i.).  But, as plaintiff acknowledges, punitive damages require willful and wanton conduct—that is, conduct beyond mere negligence.  *Id.  See D.M. ex rel. Morgan v. Wesley Med. Ctr., LLC*, 487 F. Supp. 3d 1071, 1078 (D. Kan. 2020) ("Under Kansas law, plaintiff may recover punitive damages to punish the wrongdoer for a malicious, vindictive or willful and wanton invasion of plaintiff's rights . . . .  To recover punitive damages, plaintiff must show by clear and convincing evidence that defendant's conduct was willful, malicious or wanton. . . .  For their acts to be wanton, defendants must realize the imminence of danger and recklessly disregard and be indifferent to the consequences of their act. . . .  Recklessness is more than mere negligence and requires conduct which shows disregard of or indifference to consequences, under circumstances involving danger to life or safety of others." (internal quotation marks and citations omitted)).  The court has determined under its foreseeability analysis that defendants didn't foresee or anticipate the danger to plaintiff from these third party criminal acts.  This conclusion precludes a finding of wanton acts—such as punitive damages require—because "defendants must realize the imminence of danger."  *Id.*  And so, having ruled on unforeseeability grounds, the court needn't reach the issue of punitive damages.

#### 2.  Piercing the Corporate Veil

In a similar vein, the court needn't reach plaintiff's request to pierce the corporate veil. Having found no duty under which plaintiff can submit a claim for negligence to a jury, no

judgment is forthcoming.  And with no judgment possible, the court needn't decide anything about piercing the corporate veil.

## IV.        Conclusion

The court denies plaintiff's Motion for Partial Summary Judgment (Doc. 132).  Plaintiff moved the court to hold as a matter of law that SRKBS owed plaintiff a duty—and that SRKBS breached that duty—under a premises liability theory.  But for a business owner to owe a duty to a patron to provide security and protection against third party criminal acts, the totality of the circumstances must indicate the harm to the plaintiff was foreseeable.  And here, no reasonable factfinder could conclude the harm here was foreseeable.

The court grants defendants' Motion for Summary Judgment (Doc. 136).  The court determines under a foreseeability analysis that the circumstances of this case align with other Kansas cases affirming summary judgment to defendants on unforeseeability grounds.  And the court thus concludes that no reasonable juror could find plaintiff's harm foreseeable under a totality of the circumstances test.  The court also holds that plaintiff's other theories of duty fail under the foreseeability analysis as well.  Finding no duty to plaintiff, the court grants defendants summary judgment.

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiff Maella Blalock's Motion for Partial Summary Judgment (Doc. 132) is denied.

**IT IS FURTHER ORDERED THAT** defendants SRKBS Hotel, LLC, Ninad Sharma, Paresh Bhakta, Surendrakumar Bhakta, Geeta V. Reddy, RSD, LLC, and Sevjayman, LLC's Motion for Summary Judgment (Doc. 136) is granted.

**IT IS SO ORDERED.**

Dated this 28th day of March, 2024, at Kansas City, Kansas.

s/ Daniel D. Crabtree
Daniel D. Crabtree
United States District Judge